**CHORA YOUNG & MANASSERIAN LLP**
Paul P. Young (SBN 257571)
Joseph Chora (SBN 284700)
Nikko S. Stevens (SBN 305843)
650 Sierra Madre Villa Avenue, Suite 304
Pasadena, California 91107
Tel.: (626) 744-1838
Fax: (626) 744-3167
Email: paul@cym.law
        joseph@cym.law
        nikko@cym.law

Attorneys for Creditor and Plaintiff
Gabrielino-Tongva Tribe

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA—NORTHERN DIVISION

| | |
|---|---|
| In re:<br><br>JONATHAN ALAN STEIN,<br><br>                    Debtor.<br>_____<br><br>Gabrielino-Tongva Tribe,<br><br>                    Plaintiff,<br><br>   vs.<br><br>Jonathan Alan Stein, Esq.,<br><br>                    Defendant. | Case No.: 9:23-bk-10174-RC<br><br>Chapter 7<br><br>Adversary Case No.: 9:23-ap-_____-RC<br><br>**COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**<br><br>**Hearing Date and Time:**<br><br>Date:    [To be Set]<br>Time:    [To be Set]<br>Crtrm.:  1575<br>Judge:  Hon. Ronald A. Clifford III |

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

**TO THE HONORABLE RONALD A. CLIFFORD, III, TO DEBTOR, AND TO ALL INTERESTED PARTIES:**

Plaintiff-Creditor, Gabrielino-Tongva Tribe ("Plaintiff"), complains ("Complaint") of Defendant-Debtor, Jonathan Alan Stein, Esq. ("Defendant") alleging respectfully as follows:

## I.    JURISDICTION

1.    On March 10, 2023, Defendant filed a voluntary petition ("Petition") for relief under Chapter 7 of Title 11 of the United States Code ("Bankruptcy Code") in the United States Bankruptcy Court for the Central District of California, Northern Division.  Pursuant to Local Bankruptcy Rule 7008-1, this is a core proceeding under 28 U.S.C. § 157(b)(2).  Plaintiff consents to jurisdiction of this Court, including entry of final orders and judgment by the Court, under Rule 7008 of the Federal Rules of Bankruptcy Procedure.

2.    The meeting of creditors under Section 341(a) of the Bankruptcy Code ("341 Meeting") was set for April 24, 2023.

3.    On April 29, 2023, the 341 Meeting was continued to May 15, 2023.

4.    On May 21, 2023, the 341 Meeting was continued to July 17, 2023.

5.    As of the date of this Complaint, Defendant has not been granted a discharge with respect to Petition.

6.    This Complaint is timely because the deadline to object to discharge or to challenge dischargeability is on June 23, 2023.  (See, e.g., Doc 4.)[1]

7.    This Complaint initiates an adversary proceeding in which Plaintiff seeks a determination as to the dischargeability of the debt owed by Defendant to Plaintiff under Bankruptcy Code §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6), and a denial of Defendant's discharge under Bankruptcy Code §§ 727(a)(3) and (4).  This Complaint will determine, among other things, the dischargeability of a debt under

---

[1] References to docket numbers and claim numbers are to the Bankruptcy Case unless specified otherwise, as is certain, below.

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGEABILITY of a debt under 11 U.S.C. § 727**

1    Rules 4004, 4007, and 7001 of the Federal Rules of Bankruptcy Procedure.

2        8.    The adversary proceeding initiated by the Complaint arises under title

3    11, United States Code, and in *In re Stein*, 9:23-bk-10174-RC, a Chapter 7 case

4    commenced in the United States Bankruptcy Court for the Central District of

5    California ("Bankruptcy Case").  The Court has jurisdiction under 11 U.S.C. §§ 523

6    and 727, and 28 U.S.C. §§ 157 and 1334.

7        9.    Venue is proper under 28 U.S.C. § 1409 because the Bankruptcy Case

8    is pending before this Court.

9        10.    Plaintiff has standing to bring this action because Plaintiff is a creditor

10   in the Bankruptcy Case under 11 U.S.C. § 101(10).

11                    **II.    PARTIES**

12       11.    Plaintiff is an unincorporated association duly organized and existing

13   pursuant to the laws of the State of California and doing business in Riverside

14   County, California.  Plaintiff is a creditor of Defendant.  (See, e.g., Claim 1; Doc

15   21.)  Plaintiff is a former client of Defendant owning a money judgment against

16   Defendant entered August 27, 2019 ("Judgment") in Superior Court of California

17   County of Los Angeles Case No. BC361307 ("Nonbankruptcy Action").

18       12.    Defendant is an individual over the age of eighteen whose principal

19   residence is in Santa Barbara County, California.  Defendant is an attorney licensed

20   by the State of California to practice law in the State of California.  Defendant's

21   state bar license identification number is: 123894.

22                    **III.    FACTS**

23       13.    On August 7, 1986, Defendant is admitted to the State Bar of

24   California.

25       14.    "In 2001, [Defendant] and Plaintiff entered into a Development

26   Agreement by which [Defendant] would work to achieve formal federal recognition

27   and development of a casino ('SMDC Agreement')."  (Doc 21-1, at 43.)

28   "[Defendant] held himself out as the Tribal Development Officer, CEO of the

3

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM
DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

GTGA, and on occasion he held himself out as [Plaintiff's] lawyer.  All of [Plaintiff's] books and records were kept at Stein's Law Offices, which is also where SMDC was located."[2]  "Defendants engaged in a pattern and practice of unauthorized and bad faith conduct designed to undermine and usurp the authority of the Tribal Council and GTGA and to obtain control of [Plaintiff's] property."  "Despite his resignation, [Defendant] refused to return all of [Plaintiff's] documents, including Tribal birth and bloodline records, and kept the records at his Law Offices.  After his resignation, [Defendant] continued to act as though he had authority over tribal affairs.  Specifically, he continued to access and make changes to [Plaintiff's] financial accounts on his own volition and without tribal authority."  (*Id*., at 43–44.)

15.    "When [Plaintiff's] Tribal Council met with [Defendant], the Tribal Councilmembers openly disliked and distrusted him."  (*Id*., at 49.)  "The SMDC Agreement gave [Defendant] a significant ownership interest in any future Tribal casino gaming by [Plaintiff].  It also guaranteed him $25,000 a month as compensation (deferred until funds were available) and a 10% of the 'net win,' from certain casino earnings.  [Defendant] presented the SMDC Agreement to [Plaintiff], with no other lawyer (other than [Defendant]) present, sometime in February and March of 2001."  (*Id*., at 50.)

16.    "The Tribal Councilmembers were told that they would be removed from the Tribal Council if they failed to sign the SMDC Agreement.  So, [Plaintiff] executed the SMDC Agreement in March of 2001, without the benefit of counsel (other than [Defendant]) or understanding of it.  They described this as being 'under duress' and believed that [Defendant's] presence was intended to encourage the signing of the Agreement."  (*Id*., at 51.)

///

---

[2] GTGA is the Gabrielino Tribal Gaming Authority.  SDMC is St. Monica Development Company, LLC, an adjudicated alter ego of Defendant Stein in the Nonbankruptcy Action.

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

17.    "[Defendant] purposely lied to [Plaintiff] that Otto was their lawyer in order to induce [Plaintiff] to sign the SMDC Agreement, without the benefit of counsel, and in order to take advantage of [Plaintiff]." (*Id.*) "During trial, [Defendant's] only explanation was that a lawyer named Ed Hamburger served as counsel for [Plaintiff], but none of the Tribal Councilmembers recall him and Dunlap specifically recalled that Hamburger was not involved with [Plaintiff]. Other than [Defendant's] testimony during trial, there is no record of Mr. Hamburger ever agreeing to be legal counsel for [Plaintiff]." (*Id.*, at 51–52.)

18.    "When it became clear that Tribal Councilmembers would lose against the Morales Family faction in <u>Dunlap, et al. v. Morales, et al.</u>, [Defendant] withdrew as counsel for Dunlap.  Eventually the individual Tribal Councilmembers lost all of their claims.  As a result, the Plaintiffs (Dunlap, Alcala, Carmelo and Perez) owed the Morales Family faction the costs and fees of the litigation.  The costs were expensive and led Dunlap to eventually file for personal bankruptcy." (*Id.*, at 53–54.)

19.    "When there were settlement negotiations of the judgment in <u>Dunlap, et al. v. Morales, et al</u>., [Defendant] insisted on personally negotiating any possible settlement of the judgment—even long after he substituted out as counsel of record." (*Id.*, at 54.)

20.    "[Defendant] told Polanco that the Tribal Council would do anything he asked and never failed to follow his advice on any issue." (*Id.*, at 55.) "An argument arose between [Defendant] and Dunlap when Dunlap requested that [Plaintiff] use [Investor] funds to hire an Indian Law expert who could help the Tribe achieve federal recognition." (*Id.*, at 59.) "So, while [Defendant] did not think [Investor] funds could fund federal recognition, he thought they could fund [Defendant] and SMDC." (*Id.*, at 63.) "Tribal Councilmembers denied that they instructed [Defendant] not inform the membership about the $21 million." (*Id.*)

///

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

21.    Between October to November 2006, Defendant drafted "letters to the Tribal membership during the dispute.  The letters contained several material lies . . .. So, [Defendant] deliberately lied to the Tribal membership in order to gain political support for himself and undermine the Tribal Council in their dispute with him." (*Id.*, at 64 (cleaned up).)

22.    "[Defendant] claimed that he told [Investor] about the opinion in August but there was no evidence that he did so.  [Defendant] simply ignored that opinion and published his law review article that was based on the false premise that [Plaintiff] was state recognized and that the State of California could allow it to engage in gaming without federal recognition.  [Defendant's] inability to represent [Plaintiff's] interest forthrightly and to do what was in the best interest of the [Plaintiff] was exemplified by his stubbornness in pursuing a strategy that one of the foremost experts on California law told him was untenable and wrong." (*Id.*, at 65–66.)

23.    "In addition to writing a letter to the Tribal membership with material misrepresentations, [Defendant] also took significant steps to cut off all communications between [Plaintiff's] leadership, its Tribal Council and its Tribal membership.  He did so by cutting off access to cell phones, emails and website to the Tribal Councilmembers.  On the stand, [Defendant] admitted that he did so. Essentially, he interfered with the Tribal Councilmembers ability to communicate with the entire membership and, in effect, to explain their side of the story, as he continued a one-sided dialogue with the Tribal membership." (*Id.*, at 66.)

24.    "[Defendant Employee] claimed that returning the records to the Tribal Council would be 'stealing' because she mistakenly believed that they belonged to [Defendant] and not [Plaintiff] or Tribal Council.  [Defendant Employee], who kept the individual membership records of all of the members (which showed their familiar relationships and percentage of Native American heritage relationship to [Plaintiff]), agreed that the original membership files) came from Dunlap." (*Id.*, at

6

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

67 (cleaned up).)  "[Plaintiff's] membership records were highly confidential documents, individually belonging to the members, but collectively belonging to [Plaintiff]."  (*Id.*)

25.    On November 2, 2006, the Nonbankruptcy Action commences.

26.    "After resigning, and after [Nonbankruptcy Action] had already been initiated, [Defendant] began efforts to mount a recall election of the Tribal Council. However, that recall was never held.  Having failed to orchestrate a coup, [Defendant] pretended that the Tribal council had abandoned the Tribe and recruited a group of members so that they could start their own competing tribal group, using all of the tribal records he had withheld from [Plaintiff]."  (*Id.*, at 68.)

27.    "On December 17, 2006, after [Defendant's] relationship with [Plaintiff] had been terminated and after [Nonbankruptcy Action] was already being vigorously litigated, [Defendant] registered an unincorporated association using [Plaintiff's] exact name—the 'Gabrielino-Tongva Tribe' . . . [Defendant] admitted that he was responsible for causing the new tribe to file a statement of unincorporated association usurping [Plaintiff's] name.  [Defendant] chose to register the Candelaria Faction with the same name that had been used by [Plaintiff] while all sides were still deeply involved in this instant litigation.  He also admitted that he brought that idea to the Candelaria Faction but wanted to file such a document in part so that [Plaintiff's] mail could continue to be directed to his Law Offices' address and to [Stein Employee].  That imposter entity which was first registered in December of 2006 by [Defendant] and Candelaria continued to exist until the instant trial in this [Nonbankruptcy Action] started.  The imposter entity was created by [Defendant] and existed for the sole reason of attempting to deceive the Tribal members and the public about the true identify of [Plaintiff], and to take all of [Plaintiff's] legal rights and obligations."  (Id., at 68–69 (cleaned up).)

28.    On June 23, 2011, Defendant's signature appears on a document entitled "Premarital Agreement Between Linda Hong Sun and Jonathan A. Stein."

29.    On May 24, 2013, Defendant's signature appears on the articles of organization of Santa Barbara Milpas Property Company, LLC ("Milpas Company") filed with the office of the Secretary of State of California.

30.    On July 18, 2013, a grant deed is recorded on behalf of Milpas Company, "Attn: Linda Hong Sun Stein."

31.    On June 20, 2016, the first part of the trifurcated Nonbankruptcy Action trial begins and the jury is sworn.

32.    "[O]n July 5, 2016, a jury found that Plaintiff Tribe, and not the Candelaria Faction, was the real party in interest in this case and had standing to assert its fourteen claims against Stein and SMDC.  (And that Stein/SMDC could assert its claims against it.)" (Doc 21-1, at 70.)  "At [Stein's] request, the second part of the trial proceeded as a bench trial.  During the next two years, the case was suspended for various reasons, mainly the health issues of [Defendant]."  (*Id.,* at 44–45.)

33.    For the year ending December 31, 2016, Defendant and Linda Hong Sun Stein ("Spouse") report losses of Milpas Company in the ratio of 0.499951 and 0.500049.

34.    On February 2, 2017, Defendant's signature appears on a document entitled "Uniform Residential Loan Application" ("First Murrell Mortgage Application") for property located at 2520 Murrell Road, Santa Barbara, California 93109 (APN: 041-291-025) ("Murrell").  Defendant declares on First Murrell Mortgage Application that Defendant is not a party to a lawsuit.

35.    On February 27, 2017, Defendant's signature appears on a document entitled "Uniform Residential Loan Application" ("Second Murrell Mortgage Application") for Murrell.  The Second Murrell Mortgage Application provides:

    (a)    Title will be held in the name of Defendant and Spouse;

    (b)    Defendant is a "Partner" in Milpas Company (since May 24, 2013); and

    (c)    Defendant's declaration that Defendant is not a party to a lawsuit.

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

36.    On March 2, 2017, a grant deed is recorded on behalf of Defendant and Spouse for Murrell.

37.    On July 22, 2018, Spouse is listed on Milpas Company's statement of information filed with the office of the Secretary of State of California.

38.    On September 27, 2018, Bankruptcy Case creditor Glenn Golden files a complaint in the United States District Court, Southern District of Iowa (Case No. 4:18-cv-00331-RGE-HCA) ("Iowa Action") against Defendant alleging a single cause of action for professional negligence.  (See, e.g., Doc 37, at 15; Doc 1–Iowa Action.)

**$20 Million Compensatory Damage Award**

39.    "In the end, the Court [in Nonbankruptcy Action] was unpersuaded that the document represented work which Stein had done for [Plaintiff] (only) and for which he was entitled to compensation pursuant to the SMDC Agreement or otherwise." (Doc 21-1, at 72.)

40.    "Second, [Defendant] owed [Plaintiff] fiduciary duties as (a) an attorney, and (b) also as an officer of [Plaintiff] who had a 'trust relationship' with [Plaintiff]; (c) among those duties were the duties of loyalty, confidentiality, candor and complete disclosure, which includes warning the client (or beneficiary) against himself just, as he would warn against a third party—all of which he breached with respect to [Plaintiff]." (*Id.,* at 74–75.)

41.    "In sum, these conflicts were based on [Defendant] acting as the legal representative of SMDC during the entire course and scope of his relationship with [Plaintiff], including 1) when he entered into the SMDC Agreement, where he represented both [Plaintiff] and SMDC (both sides of the Agreement) and 2) every time he drafted a resolution, when he represented the interests of both [Plaintiff] and SMDC when either reviewing or drafting each of those resolutions.  He also had a conflict every time he advocated for gaming in California without federal recognition.  [Defendant] failed to tell [Plaintiff] that this advice was motivated by

9

1  his financial interest in the SMDC agreement which would be extinguished if

2  [Plaintiff] achieved federal recognition because it would not survive scrutiny by the

3  NIGC under the sole proprietorship rule." (*Id.,* at 76–77.)

4      42.    In the Nonbankruptcy Action, "[t]he [Superior] Court [found] that the

5  clear and convincing evidence proved that Stein's conduct—individually and

6  through his alter ego, SMDC, and through his d.b.a., Law Offices, was fraudulent,

7  despicable, oppressive and malicious." (*Id.,* at 77.)

8      43.    "[Defendant] committed many incidences of fraud. [Defendant's] fraud

9  against [Plaintiff] began with the inception of his relationship with them." (*Id*.)

10      44.    "[Defendant] told the Tribal Council that Otto would serve as their

11  general counsel for purposes of reviewing and advising on the SMDC Agreement

12  entering into that relationship with SMDC and [Defendant].  Yet Otto told

13  [Defendant], via email, telephone and letter that he would not serve in such a role.

14  The fraud continued when [Defendant] gave [Plaintiff] advice concerning whether

15  they were a state recognized tribe, and whether that status could give them a right to

16  engage in gaming in California without federal recognition.  It continued after their

17  relationship ended, when this litigation had already started.  [Defendant] took the

18  identity of [Plaintiff] using membership records without permission, and registered

19  a different, group with the Secretary of State with the exact same name as

20  [Plaintiff], as an unincorporated association, and then tried to settle the

21  [Nonbankruptcy Action].  **Evidence of fraud is extensive and at the center of this**

22  **case.**" (*Id.,* at 77–78 (emphasis added).)

23      45.    "**[Defendant] engaged in oppressive and malicious conduct.**

24  [Defendant] set up [Plaintiff's] offices in his Law offices and gave his law office

25  manager, [Stein Employee], the job of Tribal Administrator, in order to control

26  [Plaintiff] and its legal and financial affairs.  And when the Tribal councilmembers

27  confronted Stein in those offices, Stein threatened them, threw objects at them, and

28  cast them out of their own offices.  In the Court's view, among the worst things

10

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM
DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

Stein did was his failure to return [Plaintiff's] original birth and family records to [Plaintiff] after Stein was fired/resigned. Stein kept [Plaintiff's] membership and family records thus preventing [Plaintiff] from pursuing federal recognition (a 25-30 year process). To this day, almost 15-20 years later, Stein has not returned the records." (*Id.,* at 78 (emphasis added).)

46.    "[Defendant] is a recidivist in targeting Native Americans for exploitation. Repeated actions are worse than and can be punished more severely than isolated incidents. [Plaintiff] was not the first Native American group which was targeted by [Defendant's] misconduct. [Defendant] preyed upon Native American groups, including the Morales Family faction, whom he tried to convince to join him in his endeavors, and when he could not persuade them, he later sued them to gain access to their records. And after he had a falling out with [Plaintiff], he recruited a different group, the Candelaria Faction, to use as a vehicle for his casino development plans. [Defendant] used his status as a lawyer, a position of trust, as a weapon against a less sophisticated client. The Tribal Councilmembers were relatively poor and unsophisticated, and they trusted [Defendant's] advice and his position as a high-status lawyer. Further, [Defendant] used litigation as a weapon, including against the Morales Family faction, and against [Plaintiff]. [Defendant] oppressed [Plaintiff] by using attachment proceedings, including false statements in the applications, during the litigation in order to deprive [Plaintiff] of its assets and by prolonging this litigation to deprive [Plaintiff] from freedom to move on as a political entity pursuing their ultimate goal, federal recognition." (*Id.,* at 79–80 (cleaned up).)

47.    On November 8, 2018, court orders issue in the Nonbankruptcy Action and are served by mail on Defendant ("Nov. 8, 2018 Order"), providing as follows:

(a)    "Pursuant to CCP §632 and CRC Rule 3.1590(a), the court issues a Tentative Decision as follows:

1.    On the Fourth Amended Complaint at case number BC361307:

11

     a. On all causes of action, in favor of Plaintiff [] and against
Defendants Jonathan Stein, Law Offices of Jonathan Stein,
and St. Monica Development Company, LLC (SMDC),
jointly and severally.

     b. On all causes of action, the court declares as follows:

         1) Defendants Jonathan Stein and the Law Offices of
Jonathan Stein violated California Rules of
Professional Conduct Rules 3-300 [] and 3-310 [] and
3-100 [];

         2) At the election of Plaintiff, the SMDC Development
Agreement is rescinded and void.

     c. On all causes of action, the Court enjoins and restrains
Defendants from:

         1) Retaining possession, custody or control of any files,
documents or other property of [Plaintiff], including
but not limited to (a) [Plaintiff's] membership records,
whether in hard copy or electronic form, (b)
[Plaintiff's] financial records, whether in hard copy or
electronic form, (c) [Plaintiff's] internet domain
name, www.tongvatribe.org, and (d) [Plaintiff's]
website;

         2) Using any of [Plaintiff's] confidential information,
including but not limited to its membership records or
financial information;

         3) Contacting or soliciting any member of [Plaintiff] for
any purpose relating to any tribal membership or
casino gaming project;

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM
DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

4) Disclosing or disseminating any of [Plaintiff's] confidential information, including but not limited to its membership information or financial information;

5) Destroying, discarding, altering or otherwise making unavailable to [Plaintiff] or its agents any documentary, computer or other evidence relevant to this litigation in Defendants' and/or their agents' possession, custody or control;

6) Holding themselves out to be the offices of or affiliated in any manner with [Plaintiff], including but not limited to (a) receiving telephone calls for [Plaintiff], (b) answering their telephones as [Plaintiff] or as any affiliate of [Plaintiff], or as any other person, entity, or organization using the words "Gabrielino-Tongva Tribe," "Gabrielino-Tongva," "Gabrielino Tribe," "Gabrielino," "Tongva Tribe," "Tongva," or other phrase likely to create the impression that Defendants have any relationship whatsoever to [Plaintiff], (c) using [Plaintiff's] stationery, or any other stationery that uses the words "Gabrielino-Tongva Tribe," "Gabrielino-Tongva," "Gabrielino Tribe," "Gabrielino," "Tongva Tribe," "Tongva," and (d) using [Plaintiff's] logo; and

7) Using [Plaintiff's] membership records, or any document derived therefrom, to contact any member or members of [Plaintiff].

8) Executing upon any order/writ for any of Plaintiff's property.

13

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

d.  On all causes of action, the Court commands/orders
    Defendants to:

    1)  Deliver to [Plaintiff] all of [Plaintiff's] information in
        documentary or electronic form, or any other form,
        including but not limited to any and all originals and
        copies of [Plaintiff's] membership records and
        financial records;

    2)  Deliver to [Plaintiff] all of [Plaintiff's] computers,
        disks and electronic equipment in the form and
        condition in which they were taken from [Plaintiff];

    3)  Deliver all of the above within 30 days of service of
        this Judgment.

e.  On the first through sixth, ninth; eleventh, twelfth and
    fifteenth causes of action, in favor of Plaintiff [] and against
    Defendants Jonathan Stein, Law Offices of Jonathan Stein,
    and St. Monica Development Company, LLC, jointly and
    severally, in the amount of $20,411,067.23 [$21,000,000
    minus $800,000 (Libra), minus $161,067.23 (Tribe payments)
    minus $50,000 ([Defendant Agent] payment)].

f.  On the tenth cause of action, in favor of Plaintiff [] and
    against Defendants Jonathan Stein, Law Offices of Jonathan
    Stein, and St. Monica Development Company, LLC, jointly
    and severally, the court declares:

    1)  Pursuant to the jury's verdict in the first phase of trial,
        Plaintiff is the real party in interest with standing to
        pursue the litigation;

    2)  Pursuant to the jury's verdict in the first phase of trial,
        Bernard Acuna, Linda Candelaria, Martha Gonzales-

14

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM
DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

Lemos, Laurie Salse, and Suzanne Rodriguez are not the Plaintiff [], the real party in interest.

g.  On the fourteenth cause of action, in favor of Plaintiff [] and against Defendants Jonathan Stein, Law Offices of Jonathan Stein, and St. Monica Development Company, LLC, jointly and severally, the court finds that:

1) Defendants Jonathan Stein, Law Offices of Jonathan Stein, and St. Monica Development Company, LLC, are alter egos of each other;

2) Defendants Jonathan Stein, Law Offices of Jonathan Stein, and St. Monica Development Company, LLC, jointly and severally, are responsible for the obligations of each other.

h.  Plaintiff shall recover attorney fees and costs as provided by law.

i.  Defendants Jonathan Stein, Law Offices of Jonathan Stein, and St. Monica Development Company, LLC, acted with malice, oppression, and fraud.

2.  On the First Amended Complaint at case no. SC091644, on all causes of action, in favor of Defendants Virginia Carmelo, Martin Alcala, Edgar Perez, Shirley Machado, Adam Loya, Samuel Dunlap, Elizabeth Aronson, and Richard G. Polanco and against Plaintiff St. Monica Development Company, LLC.  Plaintiff shall take nothing.

4.  On the First Amended Cross-complaint at case no. SC091644, on all causes of action, in favor of Cross-defendants Jonathan Stein, Law Offices of Jonathan Stein, and St. Monica Development Company, LLC, Bernard Acuna, Linda Candelaria, Martha

15

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

Gonzales-Lemos, Laurie Salse, and Suzanne Rodriguez and against Cross-complainant Sam Dunlap.  Cross-complainant shall take nothing.

5. On the Complaint at case no. SC092615, on the second through fourth causes of action only, in favor of Defendants Virginia Carmelo, Martin Alcala, Edgar Perez, Shirley Machado, Adam Loya, Samuel Dunlap, Elizabeth Aronson, and Richard G. Polanco and against Plaintiff [Stein Agent].  Plaintiff [Stein Agent] shall take nothing.

(b) The [Nonbankruptcy Action] Court also orders:

1. A second phase for punitive damages trial on December 10, 2018, 9:30 a.m., Dept. 28.

2. Defendants Jonathan Stein, Law Offices of Jonathan Stein, and St. Monica Development Company, LLC, shall disclose their financial records to Plaintiff no later than November 15, 2018.

3. All counsel and the parties themselves are ordered to appear.

4. Defendant Jonathan Stein's personal accountant(s) and the Law Offices of Jonathan Stein and St. Monica Development Company, LLC' s business accountant (s) are ordered to appear. [Fns. omitted.]"

48.    "On December 3, 2018, the Court [in the Nonbankruptcy Action] issue[s] a First Amended Tentative Decision and Orders finding for [Plaintiff] on all fourteen causes of action against Stein and SMDC, including a finding of malice, oppression and fraud; finding for [Plaintiff] as to Stein and SMDC's claims; and finding for [Plaintiff] as to [Defendant Agent's] claims."  (Doc 21-1, at 45.)

///

///

///

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

49.     On December 5, 2018, the following occurs:

(a)    "[T]he Court [in the Nonbankruptcy Action] issue[s] additional orders, including an order that Plaintiff's counsel draft a proposed statement of decision." (*Id*.)

(b)    Defendant communicates with David Allan Klass, CPA (Cal. Bar No. 24926) and Steven Tangherlini discussing "Alex [Brucker] is the best ERISA Attorney for his needs."

50.     On December 21, 2018, articles of incorporation of Law Offices of Jonathan Stein, P.C. ("Law Offices") are filed with the office of the Secretary of State of California.

51.     On December 27, 2018, Defendant's signature appears on a document entitled "Law Offices of Jonathan Stein Amendment to the Law Offices of Jonathan Stein, P.C. Defined Benefit Pension Plan."

52.     On January 10, 2019, Defendant's signature appears as co-borrower on a "Uniform Residential Loan Application" ("Kirk Mortgage Application") for property at 5222 Kirk Drive, Santa Barbara, California 93111 (APN: 065-072-009) ("Kirk").  The Kirk Mortgage Application provides:

(a)    Spouse is borrower;

(b)    Title held in name of Defendant and Spouse;

(c)    Spouse is self-employed at 500 North Milpas, Santa Barbara, California 93103 ("Milpas Property");

(d)    Defendant is self-employed at "Jonathan Stein Law" (for 33 years); and

(e)    Defendant's declaration that Defendant is not a party to a lawsuit.

53.     On February 6, 2019, Defendant has email from E. Mark Fishman, MSPA, FCA, MAA (Owner and Enrolled Actuary) of Actuaries Unlimited, Inc. ("TPA").

///

///

17

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

54.    On February 22, 2019, a grant deed is recorded on behalf of Defendant and Spouse for Kirk.  "The date is significant because [Defendant] provided responses to punitive damages questions, under penalty of perjury on February 16, 2019, after he had formed an intent to purchase another property, but he did not feel obliged to disclose this in discovery which was designed to uncover evidence of his net worth."  (Doc 21-1, at 84.)

55.    On March 12, 2019, Law Offices files a statement of information with the office of the Secretary of State of California.

56.    On April 5, 2019, the third part of the Nonbankruptcy Action trial is held—punitive damages.  "Before the hearing, the Court [in Nonbankruptcy Action] ordered Defendants Stein, Law Offices, and SMDC to disclose their financial records to Plaintiff but those parties failed to do so."  (*Id.,* at 45–46.) "Moreover, as for Stein/SMDC's remaining claims of account stated and quantum meruit, they are similarly extinguished because Stein failed to proffer persuasive evidence that he did the work that he claimed to have done.  He submitted two documents which were incomplete and heavily redacted.  (Exhs. 1550-1562.)  As produced during trial, those documents had no indicia of reliability and failed to persuade the Court."  (*Id.,* at 46.)

57.    "During the punitive damages phase of the trial, [Defendant] failed to provide evidence of his assets and failed to be candid about his assets under oath. [Defendant] provided scant evidence of his net worth.  This conduct is consistent with his conduct throughout the course of this litigation and this trial.  Indeed, [Defendant] refused to take the stand or appear on April 5, 2019, to answer questions regarding his financial condition so [Plaintiff] had no meaningful opportunity to cross-examine him on this topic.  Rather, during the punitive damage discovery phase, his attorney provided a chart that aimed to show his net worth, but that chart was without any backup or foundation and was unreliable."  (*Id.,* at 80.)

///

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM
DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

58.   "As the finder of fact, the Court [in the Nonbankruptcy Action] reasonably deduced and considered all the facts available regarding [Defendant's] veracity and credibility and his prior statements regarding his net worth and decided that [Defendant] was untruthful about ability to pay a judgment or punitive damages.  In his discovery responses during the punitive damages phase, [Defendant] failed to describe the income he gets from his father-in-law, Chinese assets in America, or any of the very high net value items he was engaged in which he described to the Court on the record on July 22, 2016.  Because [Defendant] is not forthcoming about the value of those holdings, the Court reasonably placed a value of at least twice as much of the litigation in California, equaling $3 million a year.  The Stein Family has substantial real estate holdings and properties.  On April 5, 2019, [Plaintiff] filed a Request for Judicial Notice attaching documents that tend to show that Stein has significant property holdings, in his own name, in California.  The Court took judicial notice.  Those documents show that [Defendant] provided less than candid responses and perhaps perjured himself when he provided those responses to the punitive damages discovery served on him by [Plaintiff].  For example, in response to Interrogatory Question 11 which requested information regarding any loan which he or his wife, singly or jointly received to pay for the real property located in Ashland Avenue in Santa Monica, California, [Defendant] provided a verified response, under penalty of perjury that 'he has never had an ownership interest in 2215 Ashland Avenue in Santa Monica, CA.'  But that property is currently owned by [Spouse].  And, according to the inter-spousal transfer deed, which [Defendant] attached to those same discovery responses where he denies ownership, [Defendant] did indeed own that property and transferred it to his wife on May 7, 2012—that is, during the pendency of this litigation which started in November of 2006.  The Ashland Avenue address is the same address that [Defendant] listed in verified responses to Form Interrogatories in this action in 2015.  He obviously owned it and lived in it during the pendency of

ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM
DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727

this action.  Whether he currently owns it or merely transferred it to his wife for zero consideration as recorded on the inter-spousal transfer deed reflected well on his financial condition."  (*Id.,* at 82–83.)

59.    "[Defendant] has repeatedly stated that all of these properties are largely in his wife's name or belong to his wife's family and not to him.  He has lived at these properties, does not report that he paid any rent to live in these properties, and whether or not they are in his name or not, all of these real estate holdings are part of what he can rely on for his lifestyle and make a living.  Lastly on this topic, [Defendant] has been less than candid about his assets during the punitive damages phase of this trial and he continues to accumulate assets.  He is undeterred from his lawless behavior, evasiveness, and untruthfulness to opposing parties and to the Court."  (*Id.,* at 84–85.)  "The Court believes a $7 million punitive award is appropriate—that is a third of the compensatory damages awarded here.  [Defendant] is neither sorry nor contrite and has no misgivings about anything that occurred here.  He refuses to change his conduct.  Clearly, he is undeterred."  (*Id.,* at 85.)

60.    On April 11, 2019, Defendant communicates with TPA.

**Judgment**

61.    On August 27, 2019, Judgment enters and a statement of decision ("SOD," and hereafter with Judgment, "Judgment") issues in Nonbankruptcy Action.  A true and correct copy of the Judgment, which tracks the Nov. 8, 2018 Order, is attached hereto as **Exhibit A** and is expressly incorporated by reference herein.  The Judgment provides Defendant to "pay Plaintiff [] **punitive damages in the amount of $7 million**."  (Doc 21-1, at 37 (emphasis added).)  A true and correct copy of the SOD, which is 138 pages in length, is attached hereto as **Exhibit B** and is expressly incorporated by reference herein.

///

///

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM
DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

62.   The Judgment[3] further provides:

(a)  **Conflicts.**  "[Defendant] was obliged to advise [Plaintiff] that he had an adverse interest pursuant to Rule 3-3L0 (B) (1) of the Rules of Professional Conduct and was required to provide a written disclosure to [Plaintiff]. He did not.  Thus, [Defendant] violated his fiduciary duty."  (Doc 21-1, at 92.)

(b)  "[Plaintiff Expert] opined that [Defendant] also violated Rule 3-300 of the Rules of Professional Conduct by failing to advise [Plaintiff] that by acquiring a financial interest adverse to the Tribe, [Defendant] must give the Tribe a meaningful opportunity to consult with another lawyer (or to provide the Tribe the same advice as he would provide as against a third person).  [Defendant] did not.  Thus, [Defendant] violated his fiduciary duty."  (*Id*.)

(c)  "[Plaintiff's Expert] also opined that [Defendant] violated Rules 3-310(A) and 3-310 (B)(1) of the Rules of Professional Conduct, which require a lawyer to advise any client that he has a legal, financial, business or personal relationship with another party in the same matter. In this case, [Plaintiff's Expert] noted that [Defendant] admitted that he had relationship with both SMDC and [Plaintiff] and (according to Stein's own testimony) provided concurrent advice to both as to the SMDC Agreement or any of its amendments.  Pursuant to Rule 3-310(A), [Defendant] was required to provide written disclosures to both but did not.  [Plaintiff's Expert] opined that [Defendant] also violated Rule 3-310(B)(3) which prohibits a lawyer who has a legal, business, financial, personal or professional relationship with another person or entity that the attorney knows or reasonably should know

---

[3] Inclusive of SOD.

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM
DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

would be affected substantially by resolution of the matter." (*Id.,* at 92–93.)

(d) "[Plaintiff's Expert] opined that [Defendant] also violated Rule 3-310(B)(4) which requires a written disclosure when an attorney has a legal, business, financial, professional interest in the subject of a matter or representation. [Defendant] made no such disclosures." (*Id.*, at 93.)

(e) "[Plaintiff's Expert] opined that [Defendant] also violated Rules 3-310(C)(1) and (2) which prohibits concurrent representation (SMDC and [Plaintiff]) when they had adverse or potentially adverse interests and requires that [Defendant] provide not just written disclosures, but written consents from the clients. [Defendant] neither made disclosures nor obtained consents." (*Id.*)

(f) "Most of these conflicts were based on [Defendant's] own testimony that he was acting as the legal representative of SMDC during the entire course and scope of his relationship with [Plaintiff], including when he entered into the SMDC Agreement, where he represented both [Plaintiff] and SMDC, and every time he drafted a resolution, when he represented the interests of both [Plaintiff] and SMDC when either reviewing or drafting each of those resolutions." (*Id.*)

(g) "[Defendant] also had a conflict every time he advocated for engaging in gaming in California without federal recognition as he failed to tell [Plaintiff] that his advice was motivated by his interest in the SMDC Agreement that would be extinguished if [Plaintiff] achieved federal recognition." (*Id.,* at 94.)

(h) **Fiduciary duty.** "[Defendant] acted on his own interest and against [Plaintiff's] interest for the reason that it would be (in the long run) more financially advantageous to him, despite [Plaintiff's] repeatedly stated wishes for federal recognition. Moreover, all of [Defendant's]

22

behavior was against the interests of [Plaintiff] and was not dependent on [Defendant's] conduct as a lawyer, but as a fiduciary with divided loyalties.  For example: [Defendant] sent letters to [Plaintiff's] membership, without Council's consent or knowledge; [Defendant] froze [Plaintiff's] bank account; and [Defendant] demanded that [Investor] pay him instead of [Plaintiff], even though the [Investor] Agreement was for the benefit of [Plaintiff]."  (*Id.,* at 95.)

(i)    **Malpractice**.  "[Defendant] breached his ethical duties, willfully concealed information from [Plaintiff], and attempted to mislead [Plaintiff] (about [Defendant's] relationship with [Plaintiff] as a lawyer, and about Otto being a lawyer for [Plaintiff])."  (*Id.,* at 96.)

(j)    **Business torts**.  "[Defendant] is liable for the tort of conversion of [Plaintiff's] property."  (*Id.*)  "[Defendant] admitted that he retained possession of [Plaintiff's] membership and financial records and other business records after his relationship with [Plaintiff] had unambiguously terminated."  (*Id.*, at 97.)  "[Defendant] used that information, computers, and documents for his own purposes, including sending letters to financial institutions and to the membership to disparage the Tribal Council and gain support for himself."  (*Id.*)

(k)    "[Defendant] is liable for the tort of misappropriation of trade secrets in the form of confidential membership records."  (*Id.*, at 98.)  "Accordingly, these were [Plaintiff's] trade secrets, and not [Defendant's] or SMDC's work product.  Yet, [Defendant] maintained possession of these records and refused to turn them over to [Plaintiff] when it asked for them."  (*Id.*, at 99.)

///

///

23

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM
DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

(l)   "[Defendant] and SMDC are liable for the tort of breach of
confidences of [Plaintiff]." (*Id.*)  "After [Defendant's] relationship
with [Plaintiff] ended, [Defendant] admitted that he used [Plaintiff's]
membership records for the benefit of Stein and SMDC, and contrary
to the rights of [Plaintiff] and GTGA.  So he breached the confidences
of [Plaintiff]." (*Id.,* at 100.)

(m)   "[Defendant] is liable for the tort of intentionally interfering with
economic and prospective relationships of [Plaintiff]." (*Id.*)  "Here,
[Defendant]/SMDC interfered with [Plaintiff's] contract with
[Investor]." (*Id.*, at 101.)  "[Defendant] disrupted the relationship with
[Investor] intentionally, when the dispute between [Defendant] and
[Plaintiff] first came to a head.  [Defendant] did not get to spend
[Investor] money as he wanted, so [Defendant] threatened to send the
money back to [Investor], rather than continue working with
[Plaintiff].  He followed through on that threat by interfering with
[Investor] deal.  [Defendant's] attorney, Sulzer, testified that once a
dispute with [Plaintiff] started, [Defendant]/SMDC wanted [Investor]
to pay [Defendant] any monies owed by [Plaintiff] (the monthly fee).
[Defendant]/SMDC insisted that [Defendant] and SMDC be first in
line for payment.  By insisting to not go away until those monies were
paid, even though he had no right to payment from [Investor] funds (a
fact he was well aware of), [Defendant] interrupted the [Investor]
Agreement.  Because [Investor] did not deviate from the original
intention of its agreement with [Plaintiff] (which had nothing to do
with payment to [Defendant]) and did not want to pay [Defendant],
[Defendant's] threat came to fruition." (*Id.*)

///

///

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM
DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

(n)  "[Defendant] wanted [Plaintiff] and [Investor] to promise to use those subsequent tranches to <u>pay him, or else he would disrupt the relationship.</u>"  (*Id.,* at 102 (emphasis in original).)

(o)  "[Defendant]/SMDC breached the Agreement by pursuing only one of the two material promises made in the SMDC Agreement, that is, the casino.  Indeed, [Defendant]/SMDC abandoned the second promise, pursuit of federal recognition.  [Defendant] did so without telling [Plaintiff] that federal recognition was against [Defendant]/SMDC's interest because federal recognition would cause the NIGC to invalidate [Defendant]/SMDC's 10% gaming receipts incentive in the SMDC Agreement . . . By never intending to perform on the SMDC Agreement as to federal recognition, [Defendant] breached it."  (*Id.,* at 104.)

(p)  "Additionally, [Defendant]/SMDC breached the SMDC Agreement by the following conduct:

a.  usurping the authority of the Tribal Council . . .

b.  terminating the Tribe's outside counsel . . .

c.  terminating or attempting to terminate Aronson . . .

d.  refusing to explore federal recognition . . .

e.  trying to force tribal council members to resign and attempting to gain sole signatory authority of Tribe investment monies . . .

f.  attempting to claim reimbursement of unreasonable expenses . . ."  (*Id.,* at 104–105.)

(q)  "[Defendant] violated Penal Code §502(c) and committed computer fraud."  (*Id.,* at 106.)

(r)  "[Defendant]/SMDC is liable for the tort of unfair competition in violation of Business and Professions Code §17200 . . . Here, the claim against [Defendant]/SMDC is based on a number of other claims stated

25

1

2

3

against [Defendant], including unlawfully retaining [Plaintiff's] books and records, misappropriation of trade secrets, and fraud." (*Id.,* at 107–108.)

4

5

6

7

8

9

10

(s) **Fraud.** "[Defendant] fraudulently claimed that the Candelaria Faction was the real Tribe.  Since October 2006, [Defendant] began making representations to the members of [Plaintiff] which he knew were false, that is, that the faction of [Plaintiff] represented by Linda Candelaria was the real tribe.  Even after the jury found that Plaintiff Tribe was the real party in interest, [Defendant] continued to represent that:

11

a.  Plaintiff's Tribal Council members abandoned [Plaintiff].

12

13

14

b.  The entity that he registered with the Secretary of State in December 2006 and shared a similar name with Plaintiff was the duly elected tribal entity, and that Plaintiff was a false entity.

15

16

c.  The Candelaria Faction which was first registered (by [Defendant]) in December 2006 continued to exist until the trial started.

17

18

19

d.  The Candelaria Faction was created by [Defendant] and existed for the sole reason of attempting to succeed to all of the legal rights and obligations of Plaintiff.

20

21

22

e.  [Defendant] and SMDC negotiated and entered into a settlement agreement in this litigation (later voided) with the Candelaria Faction." (*Id.,* at 113–114.)

23

24

25

26

27

28

(t)  "[Defendant] knew that all of these representations were false.  He made these representations in order to defraud and confuse Gabrielinos who were members of Plaintiff and Gabrielinos who were not in order to dissuade them from joining Plaintiff.  [Defendant] had no reasonable basis for believing that these representations were true.  He made them knowingly in order to deceive and defraud Plaintiff's tribal members,

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM
DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

1    other Gabrielinos who were potential members, the public at large,

2    former investors, potential investors and the Court.  [Defendant] made

3    these false representations in order to usurp all of Plaintiff Tribe's legal

4    rights and obligations.  [Defendant] damaged [Plaintiff] by deceiving

5    [Plaintiff's] members about the split between Stein and [Plaintiff]

6    thereby causing [Investor], who had committed to supporting

7    [Plaintiff], from withdrawing its financial and other support.  The loss is

8    more than $18,000,000 which had been pledged by [Investor] but was

9    lost because of [Defendant] fraudulent conduct.  [Plaintiff] also suffered

10    through loss of reputation as it was forced to deny charges from

11    [Defendant] that the Tribal Council members had stolen money from

12    [Plaintiff]."  (*Id.*, at 114–115 (cleaned up).)

13    (u)    "[Defendant] also committed fraud by attaching to [Investor]

14    Agreement dated May 20, 2006, as Exhibit B, a document which

15    purports to be California Senate Bill 175, as allegedly introduced and

16    amended by Senator Vincent.  Exhibit B to [Investor] Agreement led

17    [Plaintiff] (via Council Chair Carmelo) to believe that it could game in

18    California because actual legislation had been introduced on its behalf.

19    However, [Defendant] failed to disclose to [Plaintiff] that two days

20    after [Investor] Agreement was executed, on May 22, 2006, the

21    California Legislative Counsel of California issued an opinion to

22    Senator Vincent finding that 'the Legislature has no power to authorize

23    a non-federally recognized Indian tribe to operate slot machines,

24    lottery games, and banking and percentage card games in California,

25    even if the state gives the tribe the designation of a state-recognized

26    tribe[.]'  The opinion concluded with footnote 7, which explained that

27    'the state of California may recognize a tribe that is not federally

28    recognized, but it has not done so.'  Accordingly, [Defendant's]

27

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM
DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

1    repeated representation that [Plaintiff] was 'state recognized' was not

2    true.  [Defendant] knew about this opinion and yet failed to rectify this

3    representation he made to [Investor] and to [Plaintiff]."  (*Id.,* at 115–

4    116 (cleaned up).)

5    (v)  "On July 15, 2006, [Defendant] wrote to the Tribal Council to

6    complain about 'a lot of alleged misconduct on the part of the Tribe,'

7    and in a short statement, item number 6, he stated that 'we recently

8    suffered a huge defeat in Sacramento . . . we previously assured [the

9    investors] that SB 175 was authored by Senator Vincent and would be

10   introduced publicly, a major step toward the casino.  In the August 9

11   report, we are likely going to state that Sen. Vincent refused to author

12   SB 175 and it will not be publicly introduced.'  Accordingly, Stein

13   knew that his prior representation that SB 175 was authored was a lie.

14   In fact, he admitted the above in Exhibit 54.  In that email, he admitted

15   that despite the fact that he represented to [Investor] that the legislation

16   was authored and introduced by a lawmaker, he had lied.  On the stand

17   at trial, [Defendant] admitted that he drafted the document attached as

18   an exhibit.  Moreover, the statements he made in that email were

19   untrue.  It was [Defendant] who had made that representation on behalf

20   of [Plaintiff].  [Plaintiff] did not know whether SB 175 had been

21   introduced by Senator Vincent until [Defendant] in that email told

22   them that he had lied to [Investor] (purportedly) on their behalf."  (*Id.,*

23   at 116–117 (cleaned up).)

24   (w)  "[Defendant] also committed fraud by all of the following conduct:

25   a.  accusing the Tribal Council of stealing funds, and freezing their

26   banking accounts when he had no good faith basis for doing so and

27   after he had ceased to have any actual authority over any aspect of

28   [Plaintiff].

28

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM
DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

      b.   causing Ms. Candelaria to file the Statement of Unincorporated Association with the Secretary of State on December 18, 2006, claiming she was the representative of [Plaintiff], when he had no good faith bases of believing that she had a right to do so.

      c.   telling the Tribal Council who executed the SMDC Agreement in March of 2001 that Otto had agreed to review the Agreement and to act as their lawyer, and had approved of the SMDC Agreement as a transaction on their behalf when he knew that was a lie.

      d.   failing to advise [Plaintiff] (fraud by omission) that the SMDC Agreement would be rejected by the NIGC if it ever achieved federal recognition.  ([Defendant], by his own description, was an expert on tribal gaming, yet he failed to advise [Plaintiff] on this basic fact because it was against [Defendant's] own interest.)"  (*Id.,* at 117 (cleaned up).)

63.    On October 24, 2019, a statement of information of Milpas Company is filed with the office of the Secretary of State of California.  Defendant and Spouse deny filing this.

64.    On November 8, 2019, Defendant appeals the Judgment.

65.    On March 30, 2020, *Golden v. Clear Advantage Mktg*., No. 4:16-cv-00529-JAJ-CFB, 2020 U.S. Dist. LEXIS 88130 (S.D. Iowa Mar. 30, 2020) issues.

66.    On October 29, 2020, an order issues in Nonbankruptcy Action providing that Defendant's lawyers "jointly and severally, must pay Plaintiff $16,000 in sanctions."

67.    On November 24, 2020, the Law Offices file a statement of information of no change with the office of the Secretary of State of California.

68.    On January 29, 2021, Defendant has email from TPA.

69.    On October 14, 2021, *Gabrielino-Tongva Tribe v. Stein*, 2021 U.S. Dist. LEXIS 199237 (C.D. Cal. Oct. 14, 2021) issues.

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM
DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

1

### First Bankruptcy

2     70.    On November 8, 2021, Defendant commences United States

3   Bankruptcy Court for the Central District of California Case Number 9:21-bk-

4   11117-DS ("First Bankruptcy") (Doc 1–First Bankruptcy).

5     71.    On November 22, 2021, Defendant makes certain representations

6   regarding expenses in First Bankruptcy (Doc 17–First Bankruptcy).

7     72.    On December 9, 2021, Defendant testifies in First Bankruptcy under

8   Section 341(a) of the Bankruptcy Code.

9     73.    On January 18, 2022, Hon. Deborah J. Saltzman states at the hearing

10  on a motion to dismiss for abuse (Doc 88–First Bankruptcy) in First Bankruptcy as

11  follows:

12  (a)  "As I said at the beginning of this hearing, this is the sort of motion at

13       this stage of the case that I think it is a very difficult one to make and

14       to prevail on.  At the same time, this is a motion that I think was

15       getting less attention, because the record that has been laid out, even

16       taking into the account the opposition, is pretty striking.

17  (b)  When I looked at the case law -- you know, first, I think that everyone

18       agrees that the question of whether this is a case that's filed in bad faith

19       is really the crux of the inquiry for the Court.

20  (c)  And the case law sets forth a number of factors that a court can

21       consider when assessing whether a case has not been filed in good

22       faith, and these are the factors the Court considered in connection with

23       the motion to dismiss.

24  (d)  Does the Debtor have only one asset? What is the extent of the secured

25       creditor's lien encumbering that asset? Whether there are any other

26       employees? Whether there is any cash flow and available income to

27       fund a plan or to make adequate protection payments?

28

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM
DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

1    (e)   The number of unsecured creditors and the extent of their claims.

2          Issues of wrongdoing by the Debtor or its principals.  The -- what I

3          refer to as 'me debtor syndrome,' where a one-asset entity is formed on

4          the eve of a foreclosure to essentially protect property from being

5          levied upon.  And, finally, does bankruptcy offer the only possibility of

6          forestalling the loss of property?

7    (f)   These are factors that are set forth in a variety of cases.  I think this

8          particular list is from the BAP case, the (indiscernible), Inc. case.

9    (g)   At this stage of the case, the factors are kind of all over the place, but

10         the Court has a few observations, in particular, about ones that are

11         fairly striking.  There's more than one asset involved here.  I don't

12         think that we could refer to this as a single-asset case.  There's, you

13         know, a couple of pieces of real property.  There are speculative claims

14         at this point.  It's difficult to value this early in the case.

15   (h)   While this may be more important in a single-asset case, the extent of

16         the ORAP lien here is, is important to note, and I think important when

17         it's happening, whether this is a case that's been filed in good faith.

18         The third factor on (indiscernible), it's not really particularly

19         applicable here.

20   (i)   Factor four, cash flow, sources of income to fund a plan.  This, again, I

21         think where we are early in the case, where the Court doesn't have

22         much in the way of admissible evidence on income, and the ability to

23         fund a plan.  I had essentially asked for proof from counsel for the

24         Debtor, and a couple of comments from the Debtor, but I don't have a

25         lot of information here about the Debtor's new employment here.

26   (j)   On unsecured claims, I see 17 scheduled unsecured claims.  It appears

27         to be mostly attorneys who have rendered services in prior actions.

28         There are also some unsecured claims of the moving party here and the

31

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM
DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

1     joining party here that are scheduled.  The unsecured claims, I think

2     they're under two-percent of the total claims here.

3   (k) Again, it's early in the case, and I'm not sure where that factor really

4     falls.  I think at this stage it probably falls in -- on the side of the

5     Movant herein, in terms of whether this is a good-faith case.

6   (l) **But where I have to stop and take notice is the sixth factor, and**

7     **that is, allegations of wrongdoing by the Debtor.  I don't think I**

8     **have ever seen a motion to dismiss, certainly not one this early in a**

9     **case, with such a record of allegations of wrongdoing, followed**

10    **with court orders of numerous other courts bolstering those**

11    **allegations.**

12  (m) It is true that, you know, certainly when someone files a motion, they

13    can pick out the ugliest quotes, right, from a court order, but I don't see

14    anything in those court orders that would suggest that these quotes are

15    taken so out of context or so chopped up, that they wouldn't support

16    the allegations of wrongdoing by this Debtor.

17  (n) **Judge Scarsi's opinion in connection with the removal, I don't see**

18    **language like this in court orders typically, and it's definitely**

19    **something that the Court has to take notice of right now.**

20  (o) **Calling this Debtor a recidivist in targeting Native American tribes**

21    **litigation, referencing post-judgment misconduct, including**

22    **multiple attempts to take jurisdiction from the state court by filing**

23    **cases in other courts.  A sanctions order to this magnitude from**

24    **the district court in connection with removal of an action is far**

25    **from the norm, and it's something that really does cause a court to**

26    **sit up and take notice.**

27  ///

28  ///

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM
DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

(p) I see nothing in the opposition that would really suggest that this -- these allegations are not correct. It is true, as Mr. Manasserian pointed out earlier, that it is a classic bad-faith situation, where we see a Chapter 11 case being filed as an effort to get around a bonding requirement.

(q) **And looking at the record of the state court activity, coupled with the removal and Judge Scarsi's findings, I don't see how a bankruptcy court could come to any other conclusions looking at the activity here."**

74. On January 31, 2022, (i) Hon. Deborah J. Saltzman dismisses First Bankruptcy (Doc 93–First Bankruptcy), and (ii) Hon. Mark C. Scarsi dismisses litigation filed against Plaintiff by Defendant, Spouse, Law Offices of Jonathan Stein, P.C., Defined Benefit Plan, and Arka Inc. Profit-Sharing Plan, filed in the United States District Court for the Central District of California, Case Number 2:21-cv-05653-MCS-DFM ("ERISA Action") (Doc 32–ERISA Action).

75. On February 6, 2022, Defendant communicates with TPA.

76. On March 7, 2022, an order regarding summary adjudication issues in the Iowa Action (Doc 461–Iowa Action).

77. On May 19, 2022, an order issues in the Nonbankruptcy Action, providing as follows:

(a) "First, the work product doctrine presumes an actual attorney-client relationship. Under the 'dominant purpose' test, the emails show that [Defendant's] dominant purpose was not to represent a client, but instead to conceal his assets from [Plaintiff's] impending collection efforts. Trial in this action ended in November 2018 and the Court entered judgment against [Defendant] in August 2019. [Defendant] has not shown that his activity during the post-judgment phase comports with the policy underlying the work product doctrine, which

33

1    is to protect attorneys' thoughts and impressions while preparing for

2    trial.

3    (b)    **Second, [Defendant's] claim that he was engaging 'consulting**

4    **experts' is not credible.  The trial in this action has concluded.**

5    **The emails were sent on December 5, 2018, soon after the Court**

6    **found [Defendant] liable on all of [Plaintiff's] causes of action and**

7    **issued a compensatory damages award of over $20 million against**

8    **[Defendant].  The Court also issued the following order regarding**

9    **the punitive damages phase of the trial: 'Defendant Jonathan**

10    **Stein's personal accountant(s) and the Law Offices of Jonathan**

11    **Stein and St. Monica Development Company, LLC's business**

12    **accountant(s) are ordered to appear.'  However, 'Neither**

13    **Defendants nor their accountants appeared at the punitive**

14    **damages hearings (even though the Court cautioned that**

15    **voluntary non-appearance would likely have a detrimental effect**

16    **on the punitive damages phase).'  If [Defendant] had in fact**

17    **retained Klass as an accountant, then Klass was required to**

18    **personally appear for punitive damages phase of the trial.**

19    (c)    **Third, the express language of the emails shows that [Defendant]**

20    **was not seeking expert consulting services, but instead services**

21    **designed to conceal his personal assets and evade the Court's**

22    **judgment.  [Defendant's] acts after the emails confirm this.  Two**

23    **weeks after the emails, [Defendant] (1) converted his law practice**

24    **into a professional corporation; (2) assigned 99% of [Defendant's]**

25    **rights to a lawsuit against a third party in Iowa, worth over $1.5**

26    **million, to his wife, as her 'sole and separate property,' for no**

27    **consideration; and (3) purchased residential property in Santa**

28

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM
DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

**Barbara by placing 99% of ownership in the name of his wife, as her 'sole and separate property,' also for no consideration."**

78.    On June 6, 2022, Plaintiff is mailed Defendant's claim of exemption in the Nonbankruptcy Action.

79.    On June 8, 2022, an order issues in Nonbankruptcy Action providing as follows: "**The Court issues and will hold a bench warrant for the arrest of David A. Klass, and sets bail at $20,000.00, for Mr. Klass' failure to appear for his Court-ordered examination on June 7, 2022.**"

80.    On June 14, 2022, Defendant testifies under California Code of Civil Procedure ("CCP") § 708.110 in the Nonbankruptcy Action.

81.    On August 8, 2022, Defendant testifies under CCP § 708.110 in the Nonbankruptcy Action.

82.    On November 18, 2022, Superior Court of California County of Santa Barbara Case No. 21CV00198 ("SB UVTA") issues an order denying Defendant's motion to expunge lis pendens.

83.    On December 16, 2022, Defendant makes certain representations in open court in SB UVTA.  For example, "there has been no payment of expenses by the 1 percent interest to the cotenant."

84.    On January 31, 2023, Spouse testifies under CCP §§ 708.120, 708.130 in the Nonbankruptcy Action.

85.    On February 28, 2023, Spouse testifies under CCP §§ 708.120, 708.130 in the Nonbankruptcy Action.

86.    On March 1, 2023, an order in the Nonbankruptcy Action issues on Plaintiff's Motion for Terminating Sanctions and Motion to Transfer from Santa Barbara County to Los Angeles County, as follows:  "Third Party Claimants Arka Inc. Profit-Sharing Plan; [Spouse]; Arka, Inc.; and Law Offices of Jonathan Stein, P.C., Defined Benefit Plan, jointly and severally, must pay sanctions to [Plaintiff] and its counsel, Chora Young & Manasserian LLP, jointly and severally, in the

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

1  amount of $21,840."

2      87.    On March 24, 2023, Defendant makes certain representations on

3  Defendant's Forms (Doc 13).

4      88.    On March 31, 2023, judgment enters in United States District Court for

5  the Central District of California Case Number 2:22-cv-00919-FMO.  (See, e.g.,

6  Doc 124–First Bankruptcy.)

7      89.    On May 30, 2023, an order issues in the Nonbankruptcy Action

8  **granting Plaintiff's motion for order <u>deeming Defendant a vexatious litigant</u>**

9  **<u>and for prefiling order</u>**.

10     90.    On June 1, 2023, an order issues in the Nonbankruptcy Action,

11  providing as follows:

12     (a)    "After consideration of all of the evidence and arguments at the

13              indirect contempt trial, the Court withdraws the OSC re: Contempt.

14     (b)    However, the matter is referred to the State Bar of California as the

15              court will be filing a Discipline Referral."

16              **IV.    CAUSES OF ACTION**

17              **<u>FIRST CAUSE OF ACTION</u>**

18      **NON-DISCHARGEABILITY OF PLAINTIFF'S CLAIM**

19      **<u>SECTION 523(a)(2)(A) OF BANKRUPTCY CODE</u>**

20     91.    Plaintiff adopts, alleges, and incorporates expressly by reference

21  paragraphs 1 through 90, inclusive, of this Complaint above as though fully

22  articulated individually here in this first cause of action under Bankruptcy Code §

23  523(a)(2)(A).

24     92.    In the Nonbankruptcy Action, the Judgment found and concluded,

25  among other things, that Defendant committed a fraud upon Plaintiff, and the

26  intended and actual effect of that fraud was to deprive Plaintiff of property.

27  ///

28  ///

36

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM
DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

93.     As a direct, proximate, and foreseeable result of Defendant's fraud and deprivation of Plaintiff's property, and the malice with which such actions were committed, Plaintiff has been damaged and was awarded damages in the principal amount of $27,411,067.23. This amount is exclusive of interest, attorney fees, and costs for which Defendant is liable, and which Plaintiff is entitled to recover from Defendant in the Nonbankruptcy Action (and which additional sums Plaintiff further requests of this Court be added to the $27,411,067.23 adjudged to be a debt of Defendant that is non-dischargeable). Plaintiff's claim against Defendant arising from the Nonbankruptcy Action is $37,065,922.66 as of the Petition date. (See, e.g., Claim 1.)

94.     As the Judgment confirms, the fraud committed against Plaintiff by Defendant has already been conclusively determined. Accordingly, under 11 U.S.C. § 523(a)(2)(A), Plaintiff respectfully requests that the Court determine the entirety of the existing award and any ultimate future awards, judgment, fees and costs, and prejudgment interest thereon (and such other and further sums arising from the awards, Judgment, and orders of the court) in the Nonbankruptcy Action to be adjudged and determined by this Court to be non-dischargeable debts of Defendant.

95.     The debt owed to Plaintiff, as evidenced by the Judgment, is non-dischargeable as it is a debt for money and property obtained by false representations and actual fraud within the meaning of 11 U.S.C. § 523(a)(2)(A).

## SECOND CAUSE OF ACTION

### NON-DISCHARGEABILITY OF PLAINTIFF'S CLAIM
### SECTION 523(a)(4) OF BANKRUPTCY CODE

96.     Plaintiff adopts, alleges, and incorporates expressly by reference paragraphs 1 through 95, inclusive, of this Complaint above as though fully articulated individually here in this second cause of action under Bankruptcy Code § 523(a)(4). This is not the "honest but unfortunate" debtor.

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM
DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

97.    In the Nonbankruptcy Action, the Judgment found Defendant to owe and have intentionally breached Defendant's fiduciary duties to Plaintiff while engaged in fraud, and the intended and actual effect of the breaches and fraud were to cause substantial harm to Plaintiff, including, without limitation, to deprive Plaintiff of property.

98.    As a direct, proximate, and foreseeable result of Defendant's intentional breaches of fiduciary duties owed to Plaintiff and including, without limitation, such acts which constituted fraud committed against Plaintiff, deprivation of Plaintiff's property, and the malice with which such actions were committed, Plaintiff has been damaged and was awarded damages in the principal amount of $27,411,067.23.  This amount is exclusive of interest, attorney fees, and costs for which Defendant is liable, and which Plaintiff is entitled to recover from Defendant in the Nonbankruptcy Action (and which additional sums Plaintiff further requests of this Court be added to the $27,411,067.23 adjudged to be a debt of Defendant that is non-dischargeable).  Plaintiff's claim against Defendant arising from the Nonbankruptcy Action is $37,065,922.66 as of the Petition date.  (See, e.g., Claim 1.)

99.    As the Judgment confirms, the intentional breaches of fiduciary duty (including the fraud committed against Plaintiff and the deprivation of Plaintiff's property) committed by Defendant have already been conclusively determined. Accordingly, under 11 U.S.C. § 523(a)(4), Plaintiff respectfully requests that the Court determine the entirety of the existing and any ultimate awards, judgment, fees and costs, and prejudgment interest thereon (and such other and further sums arising from the awards, Judgment, and orders of the court) in the Nonbankruptcy Action to be adjudged and determined by this Court to be non-dischargeable debts of Defendant.

///

///

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM
DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

100.    As evidenced by the Judgment, the debt owed to Plaintiff is non-dischargeable because Defendant was acting in a fiduciary capacity, and the debt is for fraud and embezzlement, as defined in Bankruptcy Code § 523(a)(4). Defendant was acting in a fiduciary capacity.  Defendant was in an attorney-client relationship with Plaintiff.  Defendant was entrusted with property of Plaintiff. Defendant misappropriated property of Plaintiff.  Defendant had actual intent to deprive Plaintiff of Plaintiff's property rights.

**THIRD CAUSE OF ACTION**

**NON-DISCHARGEABILITY OF PLAINTIFF'S CLAIM**

**SECTION 523(a)(6) OF BANKRUPTCY CODE**

101.    Plaintiff adopts, alleges, and incorporates expressly by reference paragraphs 1 through 100, inclusive, of this Complaint above as though fully articulated individually here in this third cause of action under Bankruptcy Code § 523(a)(6).  This is not the "honest but unfortunate" debtor.

102.    In the Nonbankruptcy Action, the Judgment found Defendant to have acted willfully and maliciously in committing a fraud upon and intentionally breaching fiduciary duties to Plaintiff, the intended and actual effect of such actions/breaches were to injure Plaintiff's property, embezzle, and misappropriate it.

103.    As a direct, proximate, and foreseeable result of Defendant's intentional breaches of fiduciary duties owed to Plaintiff, the acts which constituted fraud against Plaintiff, deprivation of Plaintiff's interests in property, and a willful and malicious injury to Plaintiff's property, Plaintiff has been damaged and was awarded damages in the principal amount of $27,411,067.23.  This amount is exclusive of interest, attorney fees, and costs for which Defendant is liable, and which Plaintiff is entitled to recover from Defendant in the Nonbankruptcy Action (and which additional sums Plaintiff further requests of this Court be added to the $27,411,067.23 adjudged to be a debt of Defendant that is non-dischargeable). Plaintiff's claim against Defendant arising from the Nonbankruptcy Action is

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM
DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

1   $37,065,922.66 as of the Petition date.  (See, e.g., Claim 1.)

2       104.   The debt owed to Plaintiff, as evidenced by the Judgment, is non-

3   dischargeable as it is a debt for willful and malicious injury to Plaintiff and

4   Plaintiff's property within the meaning of Bankruptcy Code § 523(a)(6).  Defendant

5   intended Defendant's actions, and their result.  For example, Defendant "never

6   intend[ed] to perform on the SMDC Agreement as to federal recognition."  (Doc

7   21-1, at 104.)  His actions were willful, deliberate, and intentional.  He had a

8   subjective motive and knew the harm was substantially certain to occur because of

9   his conduct.  Defendant's actions were malicious.  He committed wrongful acts

10  intentionally, which caused injury to Plaintiff.  There is and was no excuse for his

11  conduct.  Punitive damages were awarded against Defendant.  For further example:

12      a.  "[Defendant] engaged in oppressive and malicious conduct.

13          [Defendant] set up [Plaintiff's] offices in his Law Offices and gave

14          [Stein Employee] the job of Tribal Administrator, in order to control

15          [Plaintiff] and its legal and financial affairs.  And when the Tribal

16          Councilmembers confronted [Defendant] in those offices, [Defendant]

17          threatened them, threw objects at them, and cast them out of their own

18          offices.  In the Court's view, among the worst things [Defendant] did

19          was his failure to return [Plaintiff's] original birth and family records

20          to [Plaintiff] after [Defendant] was fired/resigned.  [Defendant] kept

21          [Plaintiff's] membership and family records thus preventing [Plaintiff]

22          from pursuing federal recognition (a 25-30 year process).  To this day,

23          almost 15-20 years later, [Defendant] has not returned the records."

24          (Doc 21-1, at 78.)

25      b.  "[Defendant] breached his ethical duties, willfully concealed

26          information from [Plaintiff], and attempted to mislead [Plaintiff]."

27          (Id., at 96.)

28      ///

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM
DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

105.   As the Judgment confirms, the malicious and willful acts of Defendant—as demonstrated by Defendant's intentional breaches of fiduciary duty (including, without limitation, the fraud committed against Plaintiff and embezzling Plaintiff's property)—have already been conclusively determined.  Accordingly, under 11 U.S.C. § 523(a)(6), Plaintiff respectfully requests that the entirety of the existing award and any ultimate awards, judgment, fees and costs, and prejudgment interest thereon (and such other and further sums arising from the awards, Judgment, and orders of the court) in the Nonbankruptcy Action be adjudged and determined by this Court to be non-dischargeable debts of Defendant.

## FOURTH CAUSE OF ACTION

## OBJECTION TO DEBTOR'S DISCHARGE

## SECTION 727(a)(3) OF BANKRUPTCY CODE

106.   Plaintiff adopts, alleges, and incorporates expressly by reference paragraphs 1 through 105, inclusive, of this Complaint above as though fully articulated individually here in this fourth cause of action under Bankruptcy Code § 727(a)(3).

107.   Defendant has not maintained adequate books and records from which Debtor's financial condition can be ascertained.  There is no justification for Defendant's failure and refusal to keep adequate books and records.

108.   Defendant has concealed, destroyed, falsified, and/or failed to keep or preserve information from which Defendant's financial condition and/or business transactions might be ascertained.

109.   Defendant has not been cooperative with creditors.  Defendant has intentionally withheld records, books, documents, and/or other papers relating to Defendant's property and/or financial affairs.

110.   Considering the foregoing, Defendant's discharge must be denied under 11 U.S.C. § 727(a)(3).

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

# FIFTH CAUSE OF ACTION

## OBJECTION TO DEBTOR'S DISCHARGE
## SECTION 727(a)(4) OF BANKRUPTCY CODE

111.   Plaintiff adopts, alleges, and incorporates expressly by reference paragraphs 1 through 110, inclusive, of this Complaint above as though fully articulated individually here in this fifth cause of action under Bankruptcy Code § 727(a)(4).

112.   Defendant has a pattern of misleading conduct.

113.   Defendant has a reckless indifference to the truth.

114.   Defendant has made false oaths in his bankruptcy filings.

115.   Defendant has made false oaths concerning Defendant's property.

116.   Defendant has knowingly and fraudulently made false oaths and/or accounts in the Bankruptcy Case.

117.   Defendant has failed to provide records which are necessary for the Chapter 7 trustee and creditors to properly understand Defendant's financial condition and/or recent business transactions.

118.   Considering the foregoing, Defendant's discharge must be denied under 11 U.S.C. § 727(a)(4).

## V.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment on the Complaint as follows:

1.      For a determination of the amount owing by Defendant to Plaintiff as evidenced by the Judgment, plus additional awards, fees and costs, and prejudgment interest thereon, and such other and further sums arising from the awards, Judgment, and orders of the Court in the Nonbankruptcy Action (collectively, the "Debt").

2.      On the First Cause of Action, for judgment against Defendant, determining that the Debt owed to Plaintiff is not dischargeable in this Bankruptcy Case, under 11 U.S.C. § 523(a)(2)(A);

3.      On the Second Cause of Action, for judgment against Defendant, determining that the Debt owed to Plaintiff is not dischargeable in this Bankruptcy Case, under 11 U.S.C. § 523(a)(4);

4.      On the Third Cause of Action, for judgment against Defendant, determining that the Debt owed to Plaintiff is not dischargeable in this Bankruptcy Case, under 11 U.S.C. § 523(a)(6);

5.      On the Fourth Cause of Action, for judgment against Defendant, denying Defendant a discharge in this Bankruptcy Case, under 11 U.S.C. § 727(a)(3);

6.      On the Fifth Cause of Action, for judgment against Defendant, denying Debtor a discharge in this Bankruptcy Case, under 11 U.S.C. § 727(a)(4);

7.      For an award of attorney fees as allowable by law in an amount the Court determines to be reasonable;

        a.  E.g., Judgment [Doc 21-1, at 36];

        b.  E.g., CCP § 685.040;

8.      For costs of suit; and

9.      For such other and further relief as the Court deems just and proper.

Dated: June 23, 2023                    **CHORA YOUNG & MANASSERIAN LLP**


By:   */s/ Nikko S. Stevens, Esq.*
              Paul P. Young, Esq., CFE
              Joseph Chora, Esq.
              Nikko S. Stevens, Esq.
              Attorneys for Creditor and
              Plaintiff Gabrielino-Tongva Tribe

**ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM DISCHARGE UNDER 11 U.S.C. § 523, AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727**

# EXHIBIT A

Judgment in Nonbankruptcy Action, LASC Case No. BC361307
Entered Aug. 27, 2019

**FILED**
Superior Court of California
County of Los Angeles

AUG 27 2019

Sherri R. Carter, Executive Officer/Clerk
By _____ Deputy
Neli M. Raya

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| GABRIELINO-TONGVA TRIBE, | ) Case No.: BC361307 |
| Plaintiff, | ) |
| vs. | ) JUDGMENT |
| ST. MONICA DEVELOPMENT, et al., | ) |
| Defendants. | ) |

It is hereby ORDERED, ADJUDGED and DECREED:

1.    On the Fourth Amended Complaint[1] at case number BC361307:

_____

[1] On August 20, 2007, a Cross-complaint was filed by Cross-complainants
Jonathan Stein, Law Offices of Jonathan Stein, St. Monica Development
Company, LLC (SMDC) against Cross-defendants Gabrielino/Tongva Nation,
Virginia Carmelo, Martin Alcala, Edgar Perez, Shirley Machado Adam Loya,
Samuel Dunlap, Elizabeth Aronson and Richard G. Polanco, alleging the
following causes of action:  Breach of Contract (SMDC Agreement); breach of
contract (FPPC contract); intentional interference with contractual
relations; negligent interference with contractual relations; fraudulent
conveyance; account stated; quantum meruit; declaratory relief (SMDC
Agreement); total indemnity; equitable indemnity and apportionment;
contribution; declaratory relief (indemnification).  However, there are no

-1-

a.   On all causes of action, in favor of Plaintiff Gabrielino-Tongva Tribe (the "Tribe") and against Defendants Jonathan Stein, Law Offices of Jonathan Stein, and St. Monica Development Company, LLC ("SMDC"), jointly and severally.

b.   On all causes of action, the Court declares as follows:

1)  Defendants Jonathan Stein and the Law Offices of Jonathan Stein violated California Rules of Professional Conduct, Rules 3-300 (avoiding interests adverse to client), 3-310 (avoiding the representation of adverse interests) and 3-100 (confidential information of client);

2)   At the election of Plaintiff, the SMDC Development Agreement is rescinded and void.

c.   On all causes of action, the Court enjoins and restrains Defendants from:

1)   Retaining possession, custody or control of any files, documents or other property of the Tribe, including but not limited to (a) the Tribe's membership records, whether in hard copy or electronic form, (b) the Tribe's financial records, whether in hard copy or electronic form, (c) the Tribe's internet domain name, www.tongvatribe.org, and (d) the Tribe's website;

proofs of service of summons and complaint of such Cross-complaint upon any Cross-defendant.

-2-

2)   Using any of the Tribe's confidential information, including but not limited to its membership records or financial information;

3)   Contacting or soliciting any member of the Tribe for any purpose relating to any tribal membership or casino gaming project;

4)   Disclosing or disseminating any of the Tribe's confidential information, including but not limited to its membership information or financial information;

5)   Destroying, discarding, altering or otherwise making unavailable to the Tribe or its agents any documentary, computer or other evidence relevant to this litigation in Defendants' and/or their agents' possession, custody or control;

6)   Holding themselves out to be the offices of or affiliated in any manner with the Tribe, including but not limited to (a) receiving telephone calls for the Tribe, (b) answering their telephones as the Tribe or as any affiliate of the Tribe, or as any other person, entity, or organization using the words "Gabrielino-Tongva Tribe," "Gabrielino-Tongva," "Gabrielino Tribe," "Gabrielino," "Tongva Tribe," "Tongva," or other phrase likely to create the impression that Defendants have any relationship whatsoever to the Tribe, (c) using the Tribe's stationery, or any other stationery that uses the words "Gabrielino-Tongva Tribe," "Gabrielino-Tongva," "Gabrielino

-3-

1  Tribe," "Gabrielino," "Tongva Tribe," "Tongva," and (d) using

2  the Tribe's logo;

3         7)    Using the Tribe's membership records, or any

4  document derived therefrom, to contact any member or members of

5  the Tribe; and

6         8)    Executing upon any order/writ for any of

7  Plaintiff's property.

8       d.   On all causes of action, the Court commands/orders

9  Defendants to:

10         1)    Deliver to the Tribe all of the Tribe's

11  information in documentary or electronic form, or any other

12  form, including but not limited to any all originals and copies

13  of the Tribe's membership records and financial records;

14

15         2)    Deliver to the Tribe all of the Tribe's

16  computers, disks and electronic equipment in the form and

17  condition in which they were taken from the Tribe;

18         3)    Deliver all of the above within 30 days of

19  service of this Judgment.

20       e.   On the first through sixth, ninth, eleventh, twelfth

21  and fifteenth causes of action, in favor of Plaintiff

22  Gabrielino-Tongva Tribe and against Defendants Jonathan Stein,

23  Law Offices of Jonathan Stein, and St. Monica Development

24  Company, LLC, jointly and severally, in the amount of

25

-4-

**48**

$20,411,067.23 [$21,000,000 minus $800,000 (Libra), minus $161,067.23 (Tribe payments) minus $50,000 (Crane payment)].

    f.   On the tenth cause of action, in favor of Plaintiff Gabrielino-Tongva Tribe and against Defendants Jonathan Stein, Law Offices of Jonathan Stein, and St. Monica Development Company, LLC, jointly and severally, the Court declares:

    1)   Pursuant to the jury's verdict in the first phase of trial, Plaintiff is the real party in interest with standing to pursue the litigation;

    2)   Pursuant to the jury's verdict in the first phase of trial, Bernard Acuna, Linda Candelaria, Martha Gonzales-Lemos, Laurie Salse, and Suzanne Rodriguez are not the Plaintiff Gabrielino-Tongva Tribe, the real party-in-interest.

    g.   On the fourteenth cause of action, in favor of Plaintiff Gabrielino-Tongva Tribe and against Defendants Jonathan Stein, Law Offices of Jonathan Stein, and St. Monica Development Company, LLC, jointly and severally, the Court finds that:

    1)   Defendants Jonathan Stein, Law Offices of Jonathan Stein, and St. Monica Development Company, LLC, are alter egos of each other;

    2)   Defendants Jonathan Stein, Law Offices of Jonathan Stein, and St. Monica Development Company, LLC, jointly

-5-

and severally, are responsible for the obligations of each other.

    h.   Plaintiff Gabrielino-Tongva Tribe shall recover attorney fees and costs as provided by law.

    i.   Defendants Jonathan Stein, Law Offices of Jonathan Stein, and St. Monica Development Company, LLC, acted with malice, oppression, and fraud.

2.   On the Cross-complaint filed on September 26, 2017 at case number BC361307,[2] on all causes of action, in favor of Cross-defendants Virginia Carmelo, Martin Alcala, Edgar Perez, Shirley Machado, Adam Loya, Samuel Dunlap, Elizabeth Aronson, and Richard G. Polanco and against Cross-complainants Jonathan Stein, Law Offices of Jonathan Stein, and St. Monica Development Company, LLC.  Cross-complainants shall take nothing.

3.   On the First Amended Complaint at case number SC091633,[3] on all causes of action, in favor of Defendants Virginia Carmelo, Martin Alcala, Edgar Perez, Shirley Machado, Adam Loya, Samuel Dunlap, Elizabeth Aronson, and Richard G. Polanco and against Plaintiff St. Monica Development Company, LLC.  Plaintiff shall take nothing.

---

[2] Defendant Gabrielino-Tongva Tribe was dismissed on April 30, 2008.
[3] Defendant Sheppard Mullin Richter and Hampton, LLP was dismissed on December 1, 2011.

4.    On the First Amended Cross-complaint at case number SC091644, on all causes of action, in favor of Cross-defendants Jonathan Stein, Law Offices of Jonathan Stein, and St. Monica Development Company, LLC, Bernard Acuna, Linda Candelaria, Martha Gonzales-Lemos, Laurie Salse, and Suzanne Rodriquez and against Cross-complainant Sam Dunlap.  Cross-complainant shall take nothing.

5.    On the Complaint at case number SC092615,[4] on the second through fourth causes of action only, in favor of Defendants Virginia Carmelo, Martin Alcala, Edgar Perez, Shirley Machado, Adam Loya, Samuel Dunlap, Elizabeth Aronson, and Richard G. Polanco and against Plaintiff The Crane Group, Inc.  Plaintiff shall take nothing.

6.    Defendants Jonathan Stein, Law Offices of Jonathan Stein, and St. Monica Development Company, LLC, jointly and severally, shall pay Plaintiff Gabrielino-Tongva Tribe punitive damages in the amount of $7 million.

DATED:    August 27, 2019

---

[4] Defendants Gabrielino-Tongva Tribe and Gabrielino Tribal Gaming Authority were dismissed on October 19, 2011.

-7-



I certify that this is a true and correct copy of the
original on file in this office consisting of_____pages

SHERRI R. CARTER, Executive Officer / Clerk of the
Superior Court of California, County of Los Angeles

Date:___JUL 1 4 2020_____ Deputy

MANUEL GIRES

# EXHIBIT B

Statement of Decision in Nonbankruptcy Action, LASC Case No. BC361307
Entered Aug. 27, 2019

1

2

3

**FILED**
Superior Court of California
County of Los Angeles

4

5

AUG 27 2019

6

Sherri R. Carter, Executive Officer/Clerk
By _____, Deputy
Neli M. Raya

7

8                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                         FOR THE COUNTY OF LOS ANGELES

10

GABRIELINO-TONGVA TRIBE,        ) Case No.: BC361307
                                )
11          Plaintiff,          )
                                )
12      vs.                     ) STATEMENT OF DECISION; APPENDIX
                                ) OF EVIDENCE
13                              )
ST. MONICA DEVELOPMENT, et al., )
                                )
14          Defendants.         )
                                )
15 _____ )

16

17          Pursuant to Code of Civil Procedure §632, the Court issues

18  the following Statement of Decision in support of its Judgment

19  (filed concurrently herewith) after court trial:

20                                  I.

21                             INTRODUCTION

22  Case Number BC361307

23  1.   In the Original Complaint at case number BC361307 filed on

24  November 2, 2006, Plaintiff Gabrielino-Tongva Tribe ("Tribe")

-1-

1  commenced action against Defendants Jonathan Stein; Law Offices

2  of Jonathan Stein ("Law Offices"); St. Monica Development

3  Company, LLC ("SMDC"); and Does 1 through 100.

4  2.    The Fourth Amended Complaint alleges causes of action for:

5  (1) conversion (all Defendants); (2) breach of fiduciary duty

6  (all Defendants); (3) misappropriation of trade secrets (all

7  Defendants); (4) breach of confidence (all Defendants);

8  (5) intentional interference with economic relationships (all

9  Defendants); (6) negligent interference with economic

10 relationships (all Defendants); (7) breach of contract

11 (Defendant SMDC and Does); (8) breach of the implied covenant of

12 good faith and fair dealing (Defendant SMDC and Does); (9) legal

13 malpractice (Defendants Stein, Law Offices and Does);

14 (10) declaratory relief (all Defendants); (11) violation of

15 Penal Code §502(c) (all Defendants); (12) unfair competition

16 (all Defendants); (13) rescission per California Rules of

17 Professional Conduct, Rule 3-300 (Defendants Stein and Law

18 Offices); (14) alter ego liability (all Defendants); and

19 (15) fraud (all Defendants).

20 3.    On the Cross-complaint filed on September 26, 2017 at case

21 number BC361307,[1] Cross-complainants Jonathan Stein, Law Offices

22 of Jonathan Stein, and St. Monica Development Company, LLC sued

23

24 _____

[1] Cross-defendant Gabrielino-Tongva Tribe was dismissed on April 30, 2008.

-2-

1  Cross-defendants Virginia Carmelo, Martin Alcala, Edgar Perez,

2  Shirley Machado, Adam Loya, Samuel Dunlap, Elizabeth Aronson,

3  and Richard G. Polanco.[2]

4  Case Number SC091644

5  4.   On the First Amended Complaint at case no. SC091644,[3]

6  Plaintiff St. Monica Development Company, LLC sued Defendants

7  Virginia Carmelo, Martin Alcala, Edgar Perez, Shirley Machado,

8  Adam Loya, Samuel Dunlap, Elizabeth Aronson, and Richard G.

9  Polanco.

10  5.   On the First Amended Cross-complaint at case no. SC091644,

11  Cross-complainant Sam Dunlap sued Cross-defendants Jonathan

12  Stein, Law Offices of Jonathan Stein, and St. Monica Development

13  Company, LLC, Bernard Acuna, Linda Candelaria, Martha Gonzales-

14  Lemos, Laurie Salse, and Suzanne Rodriguez.

15  Case Number SC092615

16  6.   On the Complaint at case no. SC092615,[4] Plaintiff The Crane

17  Group, Inc. ("Crane") sued Defendants Virginia Carmelo, Martin

18  Alcala, Edgar Perez, Shirley Machado, Adam Loya, Samuel Dunlap,

19  Elizabeth Aronson, and Richard G. Polanco.

20

21

22

---

[2] All Cross-defendants were Tribal Council members except Aronson and Polanco. Aronson was the Tribe's lawyer and Polanco was the Tribe's lobbyist.

23  [3] Defendant Gabrielino-Tongva Tribe was dismissed on April 30, 2008. Defendant Sheppard Mullin Richter and Hampton, LLP was dismissed on December 1, 2011.

24  [4] Defendants Gabrielino-Tongva Tribe and Gabrielino Tribal Gaming Authority were dismissed on October 19, 2011.

-3-

II.

BACKGROUND

7.    Plaintiff Tribe is a Native American Tribe recognized in California and governed by a Tribal Council.  At all times relevant, the Tribe has sought recognition as a federal tribe and to develop a casino gaming project.

8.    Stein created SMDC and is the sole member.  Stein controls Law Offices and is its sole attorney.

9.    In 2001, SMDC and the Tribe entered into a Development Agreement by which SMDC would work to achieve formal federal recognition and development of a casino ("SMDC Agreement"). Stein served as an officer of the Tribe and of the Gabrielino Tribal Gaming Authority ("GTGA").  He held himself out as the Tribal Development Officer, CEO of the GTGA, and on occasion he held himself out as the Tribe's lawyer.  All of the Tribe's books and records were kept at Stein's Law Offices, which is also where SMDC was located.

10.  The SMDC Agreement contained provisions that the Tribe would not have an attorney-client relationship with Stein or Law Offices.  Despite those provisions, Stein performed legal work for the Tribe and was its de facto general counsel during the entirety of their relationship.

11.  As part of the services performed under the SMDC Agreement, Stein hired Crane to lobby for the Tribe in Washington, D.C.

-4-

12.   Defendants engaged in a pattern and practice of unauthorized and bad faith conduct designed to undermine and usurp the authority of the Tribal Council and GTGA and to obtain control of the Tribe's property.

13.   Due to his misconduct, Stein eventually was forced to resign.  Despite his resignation, Stein refused to return all of the Tribe's documents, including Tribal birth and bloodline records, and kept the records at his Law Offices.  After his resignation, Stein continued to act as though he had authority over tribal affairs.  Specifically, he continued to access and make changes to the Tribe's financial accounts on his own volition and without tribal authority.

14.   The first part of the trifurcated trial began in June of 2016.  Defendant claimed that Plaintiff Tribe was not "the real Tribe" and that another group of individuals, led by alleged tribal council members Bernard Acuna, Linda Candelaria, Martha Gonzales-Lemos, Laurie Salse, and Suzanne Rodriguez was "the real tribe."  On July 5, 2016, the jury rejected Defendants' claim and found that the Plaintiff Tribe was the real party in interest and therefore the Tribe had standing to legally assert its fourteen claims against Stein and SMDC.  And, of course, Stein and SMDC could assert claims against the Tribe.

15.   At Defendants' request, the second part of the trial proceeded as a bench trial.  During the next two years, the case

1  was suspended for various reasons, mainly the health issues of

2  Stein.  On December 3, 2018, the Court issued a First Amended

3  Tentative Decision and Orders finding for the Tribe on all

4  fourteen causes of action against Stein and SMDC, including a

5  finding of malice, oppression and fraud; finding for the Tribe

6  as to Stein and SMDC's claims; and finding for the Tribe as to

7  Crane's claims.

8  16.  On December 5, 2018, the Court issued additional orders,

9  including an order that Plaintiff's counsel draft a proposed

10  statement of decision.  Since the litigation spanned nearly

11  twelve years, and the trial involved a number of different

12  factual and legal issues, Plaintiff also prepared an appendix of

13  evidence, which the Court has adopted and attached hereto.  The

14  Appendix of Evidence ("Appendix") contains citations to evidence

15  presented as exhibits or testimony during the trial.  Although

16  the pagination of the Appendix is misnumbered (two page ones),

17  the paragraphs therein are sequentially numbered.  The Appendix

18  is voluminous, but not exhaustive.  Each of the paragraphs

19  summarizing evidence is referenced as a numbered "separate fact"

20  and is cited in this Statement of Decision as a "SF ¶_".

21  17.  The third part of the trial was the punitive damages phase

22  held on April 5, 2019.  Before the hearing, the Court ordered

23  Defendants Stein, Law Offices, and SMDC to disclose their

24  financial records to Plaintiff but those parties failed to do

-6-

1    so.   Only a few documents were disclosed and they were

2    incomplete.   The Court also ordered a) all counsel and the

3    parties themselves to appear at future hearings; and b)

4    Defendant Stein's personal accountant(s) and the Law Offices and

5    SMDC's business accountant(s) to appear at future punitive

6    damages hearings.   Neither Defendants nor their accountants

7    appeared at the punitive damages hearings (even though the Court

8    cautioned that voluntary non-appearances would likely have a

9    detrimental effect on the punitive damages phase).

10   18.   Stein and SMDC filed but never served what would have been

11   the operative Cross-complaint in this action (Cross-complaint

12   dated August 20, 2007), so SMDC's claims fail for that reason.

13   Additionally, as described more fully below, the Court found

14   that the SMDC Agreement was voidable by the Tribe and subject to

15   rescission.   Accordingly, Stein/SMDC's breach of contract cause

16   of action is extinguished as a matter of law.   Moreover, as for

17   Stein/SMDC's remaining claims of account stated and quantum

18   meruit, they are similarly extinguished because Stein failed to

19   proffer persuasive evidence that he did the work that he claimed

20   to have done.   He submitted two documents which were incomplete

21   and heavily redacted.   (Exhs. 1560-1562.)   As produced during

22   trial, those documents had no indicia of reliability and failed

23   to persuade the Court.   Without more than that, Stein failed to

24

-7-

1   carry his burden that he was entitled to quantum meruit or an

2   account stated.

3   19.   Crane's claims similarly fail because Crane failed to

4   submit competent, persuasive evidence that it had done any work

5   for the Tribe and because Crane's contract explicitly stated

6   that no money would be due (would only be triggered) if the

7   Tribe received more than $2 million dollars in investment funds,

8   which it did not.  In fact, the Tribe only received one tranche

9   from investors below $2 million.

10                 III.

11           FINDINGS OF FACT

12   Stein's Relationship As the Tribe's Lawyer

13   20.   Stein's relationship with the Tribe began around 2000.  Sam

14   Dunlap ("Dunlap"), a current and now long-standing member of the

15   Tribe and sometimes member of Tribal Council, met Stein in early

16   2000.  (SF ¶1.)  Stein approached Dunlap with an idea of setting

17   up a casino gaming operation in Los Angeles by helping the

18   Gabrielino people gain federal recognition.  (SF ¶4.)  Dunlap is

19   a registered Gabrielino-Tongva Native American who was friendly

20   with many of the Gabrielino families in Southern California.

21   21.   Stein represented himself as a sophisticated transactional

22   lawyer, experienced in tribal gaming and financing.  (SF ¶2.)

23   Thus, Dunlap believed that Stein's proposed development work

24   with the Tongva was within the scope of legal work and

-8-

1 | representation.  (SF ¶10.)  And, nothing Stein ever did or said

2 | contradicted that belief.

3 | 22.  For example, on at least one occasion, Stein sent Dunlap a

4 | legal invoice from the Law Offices for services rendered in

5 | connection with a meeting and legal research, which he conducted

6 | pursuant to that meeting.  (SF ¶¶5, 6.)  Soon after that, Stein

7 | sent Dunlap a letter, on a different law firm letterhead (Arter

8 | Hadden, LLP), explaining that the prior legal invoice was "sent

9 | in error" and no payment was expected, <u>at that time</u>.  The Stein

10 | letter retracting demand for payment clarified that:

11 |    Payment on Stein Structure Financings is often made in
    whole or part from the proceeds of the financing.
12 |    Until that happens, I keep internal records of my
    time, to be fair and accurate in setting the legal
13 |    costs for each separate financing transaction.  If the
    transaction fails to go through, this time is often
14 |    written off.  (SF ¶7 (emphasis added).)

15 | 23.  During this time, Dunlap and Stein had no contractual

16 | agreement whatsoever.  (SF ¶8.)  But, they were clearly forming

17 | and stating an intention of what the relationship (between the

18 | Tribe and Stein) would be.  While he was on the witness stand,

19 | Stein acknowledged that when he first encountered the Tongva, he

20 | had an intention of entering into an attorney-client

21 | relationship with them.  And he wanted to be their lawyer and

22 | help them achieve federal recognition.  (SF ¶3.)  He claimed

23 | that he later changed his mind about this, but as discussed

24 |

-9-

1  herein, there is no evidence he ever explained this to the

2  Tribe.

3  24.   From November of 2000 to March of 2001, Dunlap and Stein

4  worked together to court a faction of Gabrielinos (Coastal

5  faction of the Gabrielino-Tongva Tribe), who were led by

6  patriarch Jim Velasquez. (SF ¶¶13, 14.)   That entity is the

7  predecessor to the instant Plaintiff Tribe.   (SF ¶¶15-18, 22.)

8  When the group's Tribal Council met with Stein, the Tribal

9  Councilmembers openly disliked and distrusted him.   But the

10 patriarch Velasquez coerced them and strong-armed them to accept

11 Stein and his ideas.   (SF ¶14.)   By February of 2001, Stein had

12 drafted the SMDC Agreement, (with the assistance of an attorney

13 from Seyfarth Shaw LLP) to formalize the relationship between

14 Stein and the Tribe.   (SF ¶¶17, 18.)

15 <u>Stein Personally Drafted Much of the SMDC Agreement with Another</u>

16 <u>Lawyer.</u>

17 25.   During trial, Stein's long-time lawyer, Ken Sulzer

18 ("Sulzer"), formerly of Seyfarth Shaw, testified that Stein and

19 a law partner named Thomas Watt worked on the draft of the SMDC

20 Agreement.   (SF ¶18.)   According to Sulzer, "Mr. Stein and

21 Mr. Watts [sic] worked through it a lot, I worked through it

22 some."   (Id.)   As for the Tribal resolutions adopting the

23 agreement, Sulzer said that it was his "best recollection that

24 Mr. Stein and Mr. Watts [sic] worked on them together. . . ."

-10-

1   (Id.)   On cross-examination, Sulzer had no explanation about

2   Exhibit 6, which is the letter that Stein addressed to Sulzer,

3   Sam Dunlap and other lawyers transmitting a draft SMDC Agreement

4   with the Tribe nearly a year before the SMDC Agreement was

5   actually finalized in 2001.   That letter stated that "Ken and

6   Lee are seeing this [Agreement] for the first time" — implying

7   that only Stein had seen and drafted the original agreement.

8   (SF ¶32.)   Mr. Watt is not copied in that correspondence.   (Id.)

9   26.   Pursuant to the SMDC Agreement, Stein through SMDC, would

10  serve as the Tribe's developer, assist it in achieving federal

11  recognition and develop a casino in Los Angeles County.

12  (SF ¶20.)   The SMDC Agreement gave Stein a significant ownership

13  interest in any future Tribal casino gaming by the Tribe.   It

14  also guaranteed him $25,000 a month as compensation (deferred

15  until funds were available) and a 10% of the "net win" from

16  certain casino earnings.   (SF ¶21.)

17  Execution of the Original SMDC Agreement in 2001

18  27.   Stein presented the SMDC Agreement to the Tribe, with no

19  other lawyer (other than Stein) present, sometime in February

20  and March of 2001.   (SF ¶29.)   The Tribal Councilmembers did not

21  understand the SMDC Agreement as presented to them.   They were

22  not given the necessary time to read the document and/or to take

23  a copy of it home to review.   (SF ¶30.)   Therefore, they did not

24  have a meaningful opportunity to have a lawyer (or anybody else)

-11-

1   help them review the document.  The Tribal Councilmembers were

2   told that they would be removed from the Tribal Council if they

3   failed to sign the SMDC Agreement. (SF ¶31.)  So, the Tribe

4   executed the SMDC Agreement in March of 2001, without the

5   benefit of counsel (other than Stein) or understanding of it.

6   They described this as being "under duress" and believed that

7   Stein's presence was intended to encourage the signing of the

8   Agreement. (Id.)

9   28.  Stein attempted but was unsuccessful in getting an attorney

10  to represent the Tribe in connection with the SMDC transaction.

11  At least one attorney, Stephen Otto, Esq. ("Otto"), declined any

12  involvement in writing and orally multiple times.  (SF ¶¶27,

13  28.)  Otto disclaimed his role because Stein had prepared a

14  tribal resolution appointing him Tribal General Counsel despite

15  the fact that Otto had earlier explicitly declined to accept

16  that position, via telephone, email and letter.  (SF ¶28.)  Otto

17  sent a second letter to the entire Tribal Council because Stein

18  had failed to share Otto's earlier letter and multiple other

19  communications declining involvement with the Tribe.  Stein

20  purposely lied to the Tribe that Otto was their lawyer in order

21  to induce the Tribe to sign the DMDC Agreement, without the

22  benefit of counsel, and in order to take advantage of the Tribe.

23  29.  During trial, Stein's only explanation was that a lawyer

24  named Ed Hamburger served as counsel for the Tribe, but none of

1    the Tribal Councilmembers recall him and Dunlap specifically

2    recalled that Hamburger was not involved with the Tribe.

3    (SF ¶32.)  Other than Stein's testimony during trial, there is

4    no record of Mr. Hamburger ever agreeing to be legal counsel for

5    the Tribe.  (Id.)

6    Stein Acts As the Tribe's General Counsel and Provides Legal

7    Services.

8    30.  The SMDC Agreement provided that Stein was not the Tribe's

9    attorney and that no attorney-client relationship was created

10   between them.  However, Stein and his Law Offices provided an

11   array of legal services to the Tribe.  (SF ¶35.)  For example,

12   as noted above, (and as indicated by Otto's letter to the tribal

13   council) Stein drafted and prepared the resolution appointing

14   Otto general counsel of the Tribe, without Otto's consent.

15   Stein also drafted the resolutions of the Tribe's alleged

16   adoption of the SMDC Agreement.  (SF ¶28.)  Stein prepared those

17   resolutions before the Tribe adopted the SMDC Agreement, so,

18   from the outset, and even before the SMDC Agreement was

19   executed, Stein performed legal services for the Tribe.  Also,

20   Sulzer confirmed that Stein prepared the Tribe's resolutions

21   adopting the SMDC Agreement. (SF ¶¶17, 18.)  Tribal

22   Councilmembers believed Stein drafted many of the Tribe's

23   resolutions.  (SF ¶78.)  As explained later, Stein admitted to

24   drafting certain resolutions during the trial.

-13-

31.  Also, among other things, Stein hired, fired and directly and vigorously supervised all of the Tribe's various lawyers. (SF ¶110.)  About a month or two after the SMDC Agreement was executed, he hired Rae Lamothe ("Lamothe") as the Tribe's General Counsel.  (SF ¶39.)  Lamothe served part-time and did only the legal work delegated to her by Stein.  (SF ¶40.)

32.  Around August of 2002, Stein advised the individual members of the Tribal Council that they should sue the Morales Family faction of the Gabrielino-Tongva in order to gain access to the membership information of the Morales organization.  (SF ¶¶37, 38.)  The Morales Family faction was a significant group of competing Gabrielinos.  Dunlap, et al. v. Morales, et al., LASC case number BC280605, was conceived, initiated and litigated by Stein.  (Id.)  Stein is listed as the attorney of record for Dunlap in that case.  (SF ¶45.)  Lamothe is listed as the attorney of record for Martin Alcala ("Alcala"), Virginia Carmelo ("Carmelo") and Edgar Perez ("Perez").  (SF ¶45.)  Stein advised that the Tribe, as an entity, should not be a party to the litigation.  (SF ¶41.)  Together, Stein and Lamothe prosecuted the action against the Morales Family faction.  (Id.)

33.  When it became clear that Tribal Councilmembers would lose against the Morales Family faction in Dunlap, et al. v. Morales, et al., Stein withdrew as counsel for Dunlap.  (SF ¶42.)  Eventually, the individual Tribal Councilmembers lost all of

-14-

1  their claims.  As a result, the Plaintiffs (Dunlap, Alcala,

2  Carmelo and Perez) owed the Morales Family faction the costs and

3  fees of the litigation.  (SF ¶43.)  The costs were expensive and

4  led Dunlap to eventually file for personal bankruptcy.  (Id.)

5  34.  When there were settlement negotiations of the judgment in

6  Dunlap, et al. v. Morales, et al., Stein insisted on personally

7  negotiating any possible settlement of the judgment — even long

8  after he substituted out as counsel of record.  (SF ¶44.)

9  35.  Even after Dunlap filed for bankruptcy, on November 30,

10 2005, Stein sent an e-mail to Lamothe explaining that while they

11 should allow Dunlap's bankruptcy counsel to "be attorney of

12 record" for the bankruptcy, Stein would supervise Lamothe in

13 representing the Tribe's interest in Dunlap's bankruptcy.

14 (SF ¶44.)  Thus, again, Stein was acting as the Tribe's general

15 counsel, allegedly worried about the Tribe's interest, even if

16 they arose in an individual member's bankruptcy proceeding.

17 The Tribal Council Moves Forward in Other Ways with Stein's

18 Legal Advice and Guidance.

19 36.  Despite the Tribal Council's legal problems with the

20 Morales Family faction, they were seemingly moving forward on

21 other fronts.  Stein hired Richard Polanco ("Polanco"), a former

22 state legislator, as the Tribe's political advisor and lobbyist.

23 (SF ¶48.)  When Stein approached Polanco, Stein represented

24 himself as the Tribe's lawyer and developer and as someone with

-15-

1  capacity to hire and fire all professionals and consultants for

2  the Tribe, including lawyers.  Stein told Polanco that the

3  Tribal Council would do anything he asked and never failed to

4  follow his advice on any issue.  (SF ¶46.)  Polanco believed

5  that Stein drafted the contract between the Tribe and Polanco.

6  (SF ¶47.)

7  37.  In October 2005, the Tribe held official elections for its

8  Tribal Council.  The following individuals were formally elected

9  to the Tribal Council: Dunlap, Carmelo, Perez, Shirley Machado,

10  Alcala and Adam Loya.  (SF ¶53.)  They had acted as members of

11  the Tribal Council before elections and in fact had signed many

12  resolutions on behalf of the Tribe.  Many of those resolutions,

13  which were drafted by Stein or Lamothe at Stein's request,

14  purported to amend and/or reaffirm the original SMDC Agreement.

15  38.  Carmelo, who served as the Tribal Council Chair since 2002,

16  testified that despite voting on a number of resolutions that

17  were supposed to amend or modify the SMDC Agreement, she had

18  never once reviewed the original SMDC Agreement until the

19  instant litigation.  (SF ¶54.)  Before that, she had only

20  reviewed amendments and modifications, but not the original SMDC

21  Agreement.  (Id.)

22

23

24

-16-

<u>Stein Developed a New Legal Theory to Circumvent the National</u>

<u>Indian Gaming Commission's Rules.</u>

39.   In March or April of 2004, Stein claimed the Tribe was state recognized.  Stein provided the Tribal Council with a long legal memorandum arguing that a state recognized Tribe did not need federal recognition to conduct legal gaming operations in California.  Stein stated that the Tribe only needed state approval of the gaming.  (SF ¶¶49-51.)

40.   The legal memorandum was 120 pages and widely circulated by Stein.  (<u>Id.</u>)  In fact, he presented a version of the memorandum to State Attorney General Bill Lockyer and his senior staff.  (SF ¶51.)  In March of 2005, Stein sent it to State Senator Marta Escutia, and described it as "argu[ing] successfully I think that our state-recognized tribe may conduct gaming on a state Indian reservation without federal recognition."  (SF ¶49.)

41.   During the trial, Stein claimed to have developed "cutting-edge" legal arguments for the Tribe by writing two law review articles regarding state recognition.  (SF ¶52.)  Although the Tribe did not know it at the time, Stein's "cutting edge" legal theories allowed the SMDC Agreement to avoid review by the National Indian Gaming Commission ("NIGC") which invalidates agreements that provide significant ownership interest by non-Native Americans like Stein in tribal gaming by federally

-17-

1   recognized tribes.  (SF ¶¶190-201.)  Stein skirted this scrutiny

2   by avoiding federal recognition altogether.  Significantly,

3   although Stein argued that the Tribe was state recognized, there

4   was no evidence that the Tribe was ever state recognized or that

5   the State of California had state recognized tribes.

6   <u>The Tribe and Libra Executed a Funding Agreement.</u>

7   42.  In May of 2006, due in part to Stein's efforts, Libra

8   Securities, LLC ("Libra"), a Los Angeles investment fund,

9   decided to invest in the Tribe.  In preparation for the funding,

10  and at Libra's request, Stein drafted a constitution for the

11  Tribe with the help of Dunlap. (SF ¶56.)

12  43.  Also, in preparation for the execution of the Libra funding

13  Agreement ("Libra Agreement"), Stein hired Marilyn Barrett, Esq.

14  ("Barrett"), an experienced tax and corporate lawyer to assist

15  the Tribe with the financing transaction.  Stein approached

16  Barrett about the engagement.  (SF ¶58.)  As he did with other

17  lawyers, Stein closely supervised and directed Barrett's work.

18  For example, in one email, dated March 22, 2006, Stein explained

19  to Barrett that he was contemplating hiring a new lawyer "to

20  help with Indian issues", but he was not convinced one was

21  needed because "you are here for all corporate issues and I can

22  handle Indian issues well enough to respond to investor counsel.

23  In essence, the question is just the same as corporate law:

24  duly organized, validly existing and fully authorized." (SF

-18-

¶59.)   The next day Stein emailed Barrett directing her to draft a "waiver" and specified five key provisions and suggested language to be included in those provisions.  (SF ¶60.)  As was Stein's practice, he did as much legal work as he was capable of handling and only hired outside counsel or delegated to in-house counsel when it was outside of his capacity or interest.

44.   Stein fired Barrett a few days before the Libra Agreement was scheduled to close.  He fired her without the knowledge or consent of the Tribe.  (SF ¶61.)  Thus, Stein handled the closing of the Libra Agreement for the Tribe personally, without the benefit of any experienced corporate finance counsel, other than himself.  (SF ¶66.)  In fact, just before the Libra Agreement was scheduled to close, on May 20, 2006, at the request of Libra, Stein drafted another amendment to the SMDC Agreement, which limited the personal liability of the Tribal Councilmembers to SMDC, except for misappropriation.  (SF ¶57.)

45.   The Libra Agreement was worth up to $21 million.  (SF ¶86.)  In late May of 2006, the Tribe received $1,805,889, which was the first tranche of the investment funds promised by Libra, less certain expenses which were contemplated by the Libra Agreement.  (SF ¶87.)

-19-

1   Stein Did Not Tell the Tribe About Key Parts of the Libra

2   Agreement.

3   46.   Pursuant to the Libra Agreement, only the Tribal Council

4   had the power and authority to spend Libra Funds.  (SF ¶89.)

5   Nonetheless, when he was on the witness stand, Stein denied that

6   term of the Libra Agreement and stated that the funds were not

7   intended for the Tribe, but for a separate, related, entity

8   called the GTGA.  (SF ¶232.)  He stated that the Libra investors

9   were not interested in funding federal recognition on behalf of

10  the Tribe.  (SF ¶¶233, 272.)  This was the first time that the

11  Tribe had been told that the Libra funds would not be used for

12  federal recognition.  (SF ¶273.)  An argument arose between

13  Stein and Dunlap when Dunlap requested that the Tribe use Libra

14  funds to hire an Indian Law expert who could help the Tribe

15  achieve federal recognition.  (SF ¶234.)

16  47.   There were several significant pieces of the Libra

17  Agreement, which Stein admitted were drafted by him, including

18  the Senate Bill that was attached as Exhibit B to that Agreement

19  which purported to be the Senate Bill 175 ("SB 175").  Although

20  it was not marked as a draft, Stein admitted that he drafted

21  SB 175 and that it was a draft document that was never

22  introduced.  (SF ¶271.)  At the time that Carmelo executed the

23  Libra Agreement on behalf of the Tribe, Carmelo, the Tribal

24  Council Chair, did not know that Exhibit B was merely a crude

-20-

1  draft by Stein, instead of an actual bill drafted by a member of

2  the State Senate (or his staff).  (Id.)

3  The Dispute Between SMDC/Stein and the Tribe Escalated After the

4  Funding.

5  48.  Lamothe stopped working with the Tribe in the spring of

6  2006, and Liz Aronson ("Aronson") became Assistant General

7  Counsel around that time.  (SF ¶55.)  After the Libra Agreement

8  was executed and throughout the summer of 2006, disputes arose

9  between Stein, the Tribal Council and Aronson.  The disputes

10  involved allegations from Aronson that Stein was improperly

11  billing (and double billing) his legal costs from his law

12  practice to the Tribe's Libra funds (SF ¶63) and that Stein was

13  unreasonably delaying finalization of the Morales Family faction

14  settlement in Dunlap, et al. v. Morales, et al.  (SF ¶64.)

15  There were also allegations from Stein that Dunlap was

16  requesting reimbursements to which he was not entitled (SF ¶65)

17  and allegations by Dunlap that Stein believed that as their

18  lawyer, he was the ultimate power and authority in the Tribe

19  (and not the Tribal Council).  (SF ¶67.)

20  49.  During this time, Dunlap sent a number of emails to the

21  Tribal Council, sometimes copying Stein.  In these emails, he

22  complained about mistreatment by Stein, whom he described as

23  their lawyer. (SF ¶¶67, 68.)  In response to these emails, no

24  one contradicted Dunlap or corrected his statement (or

-21-

1  understanding) that Stein was the Tribe's lawyer — not even

2  Stein who was copied on those emails.  During testimony, many

3  Tribal witnesses stated that they did not contradict Dunlap

4  because in fact, they believed that Stein was their lawyer.

5  (SF ¶¶10, 36, 37, 46, 129.)

6  50.  During this time, Stein asked Aronson to resign and he

7  drafted a termination letter and resolution terminating her, on

8  behalf of the Tribe.  (SF ¶77.)  On September 9, 2006, the

9  dispute came to a head:  at a meeting at Stein's law offices,

10  Stein demanded that the Tribal Council fire Aronson.  (SF ¶71.)

11  When the Tribal Council refused, Stein stated that he would

12  quit.  At that point, Dunlap requested that Stein put that in

13  writing.  (Id.)  In response, Stein hand-delivered a letter of

14  resignation to the Tribal Council, resigning his positions in

15  the Tribal Administration.  (Id.)  The Tribal Council then

16  attempted to move out of Stein's Law Offices, which had housed

17  its operations and tried to carry out whatever documents they

18  could, but many documents were left behind, including individual

19  tribal member records and financial records.  (SF ¶74.)

20  51.  Nevertheless, Stein appeared to change his mind about his

21  resignation; he told the Tribal Council that he had frozen its

22  funds and would return them to the Libra investors and proposed

23  that Aronson be fired.  (SF ¶76.)

24

-22-

52.  On September 19, 2006, Stein held a meeting with the Tribal

Council and Jim McShane, a lawyer from Sheppard Mullin whom he

wanted to hire to replace Aronson.  Stein also drafted a

"Fiduciary Duties" Report that he asked McShane to discuss with

the Tribal Council.  (SF ¶79.)  The Fiduciary Duties report came

as a surprise to McShane.  (Id.; Exh. 67 Fiduciary Duties

Report).  In the Fiduciary Duties report, Stein advised the

Tribe that certain conduct would constitute breaches of their

fiduciary duty by the Tribal Councilmembers to the Tribe.  (Id.)

Stein also explained that certain debts owed to Dunlap would

constitute property of his bankruptcy estate.  (SF ¶79.)

53.  On September 29, 2006, the Tribal Council wrote to Stein,

directing him to "immediately suspend all of [his] activities

and those of [SMDC] on behalf of the Tribe and the Tribal Gaming

Authority."  (SF ¶83.)  The next day, September 30, 2016, Stein

sent yet another email, Exhibit 678 (re: Changing Horses

Midstream Email).  He explained that he was writing to

communicate to the Tribe that "$2 million is immediately due

SMDC from the Tribe and, hopefully Libra could finance that."

(SF ¶274.)

54.  Sulzer testified similarly.  He explained that SMDC and

Stein were aware that Libra was considering another $18 million

in total to the Tribe, with a second tranche (of $2 million)

imminent, so Stein wanted to ensure that SMDC would be first to

-23-

1  be paid out from those forthcoming Libra funds. (SF ¶166.) So,

2  while Stein did not think the Libra funds could fund federal

3  recognition, he thought they could fund Stein and SMDC.

4  55.  On October 3, 2006, at a Tribal Council meeting at Libra's

5  office, the Tribe's new outside counsel, Jim McShane, told Stein

6  (and later confirmed in a letter) that the Tribe had accepted

7  Stein's September 9 letter of resignation and that to the degree

8  Stein claimed he had not resigned, the Tribe was terminating

9  him.  (SF ¶84.)  Thus, by October 3, 2006, the Tribe had

10  unambiguously terminated any relationship with SMDC or Stein.

11  (Id.)

12  56.  While the dispute between Stein and the Tribe was becoming

13  more acrimonious, Stein used the Tribe's confidential membership

14  list and converted it for his personal use (without the consent

15  of the Tribal Council) to plead his case directly to the

16  membership.  (SF ¶152.)  He wrote several letters to the

17  membership.  In one letter, Stein explained that he personally

18  raised $21 million but was asked not to inform the Tribal

19  membership.  (SF ¶152; Exh. 520 (Member Letter #1).)  Tribal

20  Councilmembers denied that they instructed Stein not inform the

21  membership about the $21 million.  He wrote another letter

22  unilaterally calling for a membership meeting about, among other

23  issues, his termination.  (SF ¶152; Exh. 522 (Member Letter

24  #3).)  He wrote another letter during this time informing that a

-24-

1  "Financial Oversight Committee" had been formed and sent a

2  letter anticipating a November 18 meeting and a recall election.

3  (Exh. 523 (Member Letter #4).)

4  <u>As the Disputes Escalated, Stein Made Material</u>

5  <u>Misrepresentations to the Tribe.</u>

6  57.  Stein testified that he drafted the October-November 2006

7  letters to the Tribal membership during the dispute.

8  (Exh. 523.)   The letters contained several material lies.   One

9  letter stated:   "The investor group refuses to forward new

10  investor funds to the Tribe since termination of Mr. Stein and

11  refusal of Tribal Council to cooperate with Tribe accountants."

12  (SF ¶100.)   The Tribe presented evidence that Libra never

13  thought of Stein as necessary for the deal with the Tribe and

14  were ready to move forward without Stein.   (SF ¶85.)   In fact,

15  Tribal Chairperson Carmelo testified that during the

16  negotiations for the Libra Agreement, it had been agreed that

17  Stein/SMDC would not be paid from the Agreement because it would

18  consume too much of the funds.   (SF ¶167.)   So, Stein

19  deliberately lied to the Tribal membership in order to gain

20  political support for himself and undermine the Tribal Council

21  in their dispute with him.

22

23

24

<u>Stein Failed to Tell the Tribe That the California Legislative
Counsel's Office Had Opined That the Tribe Was Not a State
Recognized Tribe for Purposes of Gaming.</u>

58.  Stein's novel legal theory that the Tribe could conduct tribal gaming in California without federal recognition depended on Stein's repeated assertion that the Tribe was a state recognized tribe and the State of California could allow a state recognized Tribe to conduct gaming.  The statement that the Tribe was state recognized originated with Stein who placed that statement on the cover of the SMDC Agreement.  (SF ¶19.)  At some point during the summer of 2006, Stein learned that on May 22, 2006, the Legislative Counsel, which advises the California state legislature on all legal matters, had issued an opinion that the Tribe was not a state recognized tribe and that even if it was, a state recognized tribe could not engage in gaming without federal recognition.  Stein claimed that he told Libra about the opinion in August but there was no evidence that he did so.

59.  Stein simply ignored that opinion and published his law review article that was based on the false premise that the Tribe was state recognized and that the State of California could allow it to engage in gaming without federal recognition.  (SF ¶289.)  Stein's inability to represent the Tribe's interest forthrightly and to do what was in the best interest of the

1   Tribe was exemplified by his stubbornness in pursuing a strategy

2   that one of the foremost experts on California law told him was

3   untenable and wrong.

4   <u>Stein Acts in Bad Faith to Cut Off the Tribal Council's</u>

5   <u>Communications with the Tribal Membership and Retained All of</u>

6   <u>Its Records.</u>

7   60.   Stein retained possession of the following:  confidential

8   individual tribal membership records, tribal letterhead,

9   website, cell phones, computers, confidential membership lists,

10  contact information for those members, and all the former

11  government filings which Stein had ever caused to be filed on

12  the Tribe's behalf.  (SF ¶158.)  In addition to writing a letter

13  to the Tribal membership with material misrepresentations, Stein

14  also took significant steps to cut off all communications

15  between the Tribe's leadership, its Tribal Council and its

16  Tribal membership.  He did so by cutting off access to cell

17  phones, emails and website to the Tribal Councilmembers.  On the

18  stand, Stein admitted that he did so.  (SF ¶256.)  Essentially,

19  he interfered with the Tribal Councilmembers ability to

20  communicate with the entire membership and, in effect, to

21  explain their side of the story, as he continued a one-sided

22  dialogue with the Tribal membership.

23  61.   Barbara Garcia ("Garcia"), Stein's administrative assistant

24  and paralegal employed by his Law Offices, admitted that she

-27-

1  retained possession of the Tribe's records at Stein's Law

2  Offices, after the split.  She stated that she did not return

3  the records even when the individual Tribal Councilmembers asked

4  her to return those records to them.  (SF ¶163.)  She claimed

5  that returning the records to the Tribal Council would be

6  "stealing" because she mistakenly believed that they belonged to

7  Stein and not the Tribe or Tribal Council.  (Id.)  Garcia, who

8  kept the individual membership records of all of the members

9  (which showed their familiar relationships and percentage of

10 Native American heritage and relationship to the Tribe), agreed

11 that the original information regarding the members (individual

12 membership files) came from Dunlap.  (SF ¶161.)

13 62.  Stein admitted that these membership records, (and the

14 membership as a whole) was developed as a consequence of the

15 efforts of individual Tribal Councilmembers, and not as a

16 consequence of his own efforts. (SF ¶160.)  Others recall that

17 the four main councilmembers were specifically chosen to serve

18 on the Tribal Council because they were considered influential

19 representatives of their family groups and they were responsible

20 for recruiting their extended family to submit their individual

21 family records to the Tribe.  (SF ¶161.)

22 63.  The Tribe's membership records were highly confidential

23 documents, individually belonging to the members, but

24 collectively belonging to the Tribe.  The information consisted

-28-

1    of the membership list, contact information and membership

2    records.

3    64.   In Exhibit 520 (another letter to the membership), Stein

4    stated that these membership records and the membership as a

5    whole were developed as a consequence of the efforts of

6    individual Tribal Councilmembers, and not as a consequence of

7    his own efforts.   In that letter, he stated:  "With the

8    excellent work of the Tribal Council, we built up tribal

9    membership to over 1900 Gabrielinos."

10    65.   On November 2, 2006, both the Tribe and SMDC filed suits

11    against each other.

12    Stein Failed to Conduct a Recall of the Tribal Council So He

13    Registered a Competing Tribal Faction That Usurped the Tribe's

14    Name.

15    66.   After resigning, and after this litigation had already been

16    initiated, Stein began efforts to mount a recall election of the

17    Tribal Council.   However, that recall was never held.   Having

18    failed to orchestrate a coup, Stein pretended that the Tribal

19    Council had abandoned the Tribe and recruited a group of members

20    so that they could to start their own competing tribal group,

21    using all of the tribal records he had withheld from the Tribe.

22    (SF ¶268.)

23    67.   On December 17, 2006, after Stein's relationship with the

24    Tribe had been terminated and after this case was already being

-29-

1   vigorously litigated, Stein registered an unincorporated

2   association using the Tribe's exact name — the "Gabrielino-

3   Tongva Tribe." (SF ¶153.)  Linda Candelaria, a former member of

4   the Tribe was listed as the Secretary of this new group (the

5   "Candelaria Faction").  Stein's legal assistant, Garcia, was

6   listed as the agent for service of process, and his Law Offices

7   were listed as the entity's business address.  (SF ¶154.)

8   68.  Stein admitted that he was responsible for causing the new

9   tribe to file a statement of unincorporated association usurping

10  the Tribe's name.  (SF ¶¶155, 156.)  Stein chose to register the

11  Candelaria Faction with the same name that had been used by the

12  Tribe, while all sides were still deeply involved in this

13  instant litigation.  He also admitted that he brought that idea

14  to the Candelaria Faction but wanted to file such a document in

15  part so that the Tribe's mail could continue to be directed to

16  his Law Offices' address and to his legal assistant, Garcia.

17  (SF ¶157.)

18  69.  That imposter entity which was first registered in December

19  of 2006 by Stein and Candelaria continued to exist until the

20  instant trial in this action started.  The imposter entity was

21  created by Stein and existed for the sole reason of attempting

22  to deceive the Tribal members and the public about the true

23  identity of the Tribe, and to take all of the Tribe's legal

24  rights and obligations.  (SF ¶263.)

-30-

1   70.   After incorporating the Candelaria Faction with the same

2   name used by the Tribe, around March of 2008, Stein and SMDC

3   moved to enforce settlement of the instant litigation with the

4   Candelaria Faction.  (SF ¶265.)  Stein claimed that SMDC had

5   entered into a settlement agreement for the instant action with

6   "the Tribe," that is, the Candelaria Faction.  (Id.)  And, Stein

7   claimed that Candelaria had a right to control this litigation.

8   The Tribe Prevailed Against the Candelaria Faction As the True

9   Tribe and Real Party in Interest.

10  71.   During the first part of this trifurcated trial, on July 5,

11  2016, a jury found that Plaintiff Tribe, and not the Candelaria

12  Faction, was the real party in interest in this case and had

13  standing to assert its fourteen claims against Stein and SMDC.

14  (And that Stein/SMDC could assert its claims against it.)

15  72.   After the first phase of the jury trial where the jury

16  found against him, Stein requested a bench trial for the balance

17  of the case.

18  Alter Ego Issues

19  73.   The Tribe proved that Stein and SMDC were each other's

20  alter ego.  Stein, the Law Offices, and SMDC (and for a time,

21  the Tribe) shared the same address of 501 Santa Monica Blvd., at

22  a suite that Stein rented for his Law Offices — Suite 500.

23  Likewise, they also shared the services of Garcia as either a

24  legal assistant (for SMDC and Stein) or volunteer "Tribal

-31-

**84**

1  Administrator" (for the Tribe), even though she was employed by

2  only one entity — the Law Offices.  (SF ¶¶246, 247.)

3  74.  As the sole owner of SMDC, Stein paid the Tribe's attorneys

4  for a time, before the Libra Agreement reimbursed him for those

5  funds.  (SF ¶249.)  Garcia admitted that she was appointed and

6  paid by Stein during the time that she served as Tribal

7  Administrator for the Tribe.  She stated that she reported to

8  Stein for all of these various entities.  (SF ¶247.)  She also

9  agreed that there was no tribal resolution appointing her as

10  Tribal Administrator, but she contended the Tribe was aware that

11  she did administrative work for them, through Stein, and they

12  never complained.  (SF ¶248.)

13  75.  In order to prove his quantum meruit claims against the

14  Tribe, Stein introduced a "quantum meruit worksheet" which was

15  heavily redacted and merely totaled the hours that Stein claimed

16  he worked on behalf of the Tribe.  (SF ¶290.)  Stein called on

17  Steve Johnson, who acted as a controller for the imposter

18  Candelaria Faction to testify about that document.  During

19  trial, Mr. Johnson was asked whether when he "looked at all of

20  the — all of those backup documents, were you able to determine

21  if Mr. Stein was doing legal work for the tribe?"  He answered,

22  yes.  He elaborated:  "I think he [referring to Stein] was using

23  his general legal knowledge but I think most of it was

24  development work for trying to get a gaming license."

-32-

1   Mr. Johnson also said that Stein was a "smart guy so he used his

2   well oiled brain to try to do — better the tribe in many

3   different directions and if some of that involved legal

4   expertise . . .". (SF ¶101.)

5   76.  Significantly, the legal work, development work that Stein

6   performed for the Tribe and perhaps other clients, was

7   summarized in the "quantum meruit" documents that Stein sought

8   to introduce.  The client identification and description of

9   services were heavily redacted.  In the end, the Court was

10  unpersuaded that the document represented work which Stein had

11  done for the Tribe (only) and for which he was entitled to

12  compensation pursuant to the SMDC Agreement or otherwise.

13  <u>Tribal Gaming Expert</u>

14  77.  The Tribe's first expert, Phil Hoag, opined that if the

15  Tribe ever became a federal recognized tribe, the SMDC Agreement

16  would run afoul of the NIGC's "sole proprietary rule."  The sole

17  proprietary rule means that "if somebody other than [a federally

18  recognized] tribe has an ownership interest in the [tribe's]

19  game — the profits — then the tribe doesn't have the sole

20  proprietorship interest.  In other words it's the Indian gaming

21  regulatory act not the Indian gaming and Indian — and their

22  partners gaming — so you can't have a joint venture, a

23  partnership."

24

-33-

78.   He opined that the SMDC Agreement would not be subject to the regulations of 2001, when it was written, but it would fall under the regulations of an evolving NIGC at the time the SMDC Agreement would be reviewed by the NIGC. (SF ¶192.)  He explained that if somebody other than the federally recognized tribe has an ownership interest in the gaming profits, then the tribe doesn't have the sole proprietorship interest.  (SF ¶193.) The NIGC would view the 10% of net win of the gross gaming revenues to a third party (when there is no direct relationship between the quantity of the services or the goods provided in exchange for that 10%), such as Stein or SMDC in this instance, as the third party having an ownership interest, thus depriving the tribe of the sole proprietary interest.  Mr. Hoag opined this arrangement would be unlawful.  (SF ¶194.)

79.   He further opined that the SMDC agreement could not avoid invalidity by invoking Section 4.J. of the SMDC agreement (which states that the restrictions of the NIGC or IGRA do not apply to the SMDC Agreement).  Such a provision would have raised an immediate red flag with the NIGC.  (SF ¶200.)  Thus, even if the Tribe achieved federal recognition and the SMDC Agreement was still in place, the SMDC Agreement would be invalidated and unenforceable under the sole proprietary interest rule. (SF ¶201.)

-34-

<u>Ethics Expert Opined That Stein Breached Numerous Fiduciary</u>
<u>Duties.</u>

80.   Arthur Margolis ("Margolis"), an ethics expert, was called as the Tribe's witness.  He provided opinions on ethics topics on the first day of his testimony (July 6, 2016).

81.   First, Margolis opined that there was an attorney-client relationship between the Tribe and Stein despite the fact that there was no written agreement so stating and despite the fact that the SMDC Agreement stated that it did not create an attorney-client relationship.  He opined the attorney-client relationship was based on the conduct of the parties and expectation of the parties outside of the SMDC Agreement.  Stein provided legal services to the Tribe (as detailed above).  And that led the Tribe to believe he was its lawyer.  He also opined that Stein had acquired significant confidential information belonging to the Tribe and that information was obtained both in his capacity as a lawyer, and his capacity as a senior officer and confidential employee (officer) of the Tribe.

82.   Second, Stein owed the Tribe fiduciary duties as (a) an attorney, and (b) also as an officer of the Tribe who had a "trust relationship" with the Tribe; (c) among those duties were the duties of loyalty, confidentiality, candor and complete disclosure, which includes warning the client (or beneficiary)

-35-

**88**

1  against himself just as he would warn against a third party —

2  all of which he breached with respect to the Tribe.

3  83.  Third, whether Stein was acting as a lawyer or as another

4  fiduciary, he was held to the same fiduciary duties/standard of

5  care as a lawyer because he was subject to the standards of

6  ethics and professionalism of a lawyer regardless of what

7  capacity he was acting (lawyer/or non-lawyer fiduciary).

8  84.  Fourth, Stein had several conflicts that violated the rules

9  of professional conduct, including:

10     a.    violation of Rule 3-300 of the Rules of Professional

11 Conduct (advising clients regarding potential conflict because

12 lawyer is acquiring a financial interest that may be adverse to

13 the client and giving client disclosure about opportunity to

14 consult with another lawyer and meaningful opportunity to

15 actually do so).  This rule applied to Stein's/SMDC's 10%

16 interest in the Tribe's future gaming as detailed in the SMDC

17 Agreement.

18     b.    violation of Rules 3-310(A) and 3-310(B)(1) which

19 require a lawyer to advise any client that s/he has a legal,

20 financial, business or personal relationship with a party in the

21 same matter.  In this case, Stein admitted that he had a

22 relationship with both SMDC and the Tribe and provided advice to

23 both.  Pursuant to Rule 3-310(A), he was required to provide

24 written disclosures to both.  Stein also violated Rule 3-

1  310(B)(3), which requires a written disclosure when an attorney

2  has a legal, business, financial, personal or professional

3  relationship with another person or entity that the attorney

4  knows or reasonably should know would be affected substantially

5  by resolution of the matter.

6      c.   violation of Rule 3-310(B)(4), which requires a

7  written disclosure when an attorney has a legal, business,

8  financial, professional interest in the subject of a matter or

9  representation.

10      d.   violation of Rule 3-310(C)(1) and (2), which prohibit

11  concurrent representation (SMDC and the Tribe) when they had

12  adverse or potentially adverse interests, without written

13  disclosures and written consents from each client.

14  85.  In sum, these conflicts were based on Stein acting as the

15  legal representative of SMDC during the entire course and scope

16  of his relationship with the Tribe, including 1) when he entered

17  into the SMDC Agreement, where he represented both the Tribe and

18  SMDC (both sides of the Agreement) and 2) every time he drafted

19  a resolution, when he represented the interests of both the

20  Tribe and SMDC when either reviewing or drafting each of those

21  resolutions.  He also had a conflict every time he advocated for

22  gaming in California without federal recognition.  Stein failed

23  to tell the Tribe that this advice was motivated by his

24  financial interest in the SMDC agreement which would be

-37-

1  extinguished if the Tribe achieved federal recognition because

2  it would not survive scrutiny by the NIGC under the sole

3  proprietorship rule.

4  86.  Fifth, Stein was required to comply with rules of

5  professional responsibility, if he was acting as a fiduciary,

6  even if he was not serving as an attorney.

7  87.  Stein's legal ethics expert William Mills' opinion was

8  unpersuasive for the factual reasons discussed above.

9  88.  The Court finds that the clear and convincing evidence

10  proved that Stein's conduct — individually and through his

11  alter ego, SMDC, and through his d.b.a., Law Offices, was

12  fraudulent, despicable, oppressive and malicious.  The Court

13  determined three things: 1) the reprehensibility of Stein's

14  conduct; 2) the amount of the award which would suffice to deter

15  future similar conduct by Stein given his financial condition;

16  3) the reasonableness of the amount given the harm Stein caused.

17  Neal v. Farmers Ins. Exchange, 21 Cal.3d 910, 928 & fn.13

18  (1978).

19  89.  Stein committed many incidences of fraud.  Stein's fraud

20  against the Tribe began with the inception of his relationship

21  with them.  He told the Tribal Council that Otto would serve as

22  their general counsel for purposes of reviewing and advising on

23  the SMDC Agreement entering into that relationship with SMDC and

24  Stein.  Yet Otto told Stein, via email, telephone and letter

-38-

1  that he would not serve in such a role.  The fraud continued

2  when Stein gave the Tribe advice concerning whether they were a

3  state recognized tribe, and whether that status could give them

4  a right to engage in gaming in California without federal

5  recognition.  It continued after their relationship ended, when

6  this litigation had already started.  Stein took the identity of

7  the Tribe using membership records without permission, and

8  registered a different group with the Secretary of State with

9  the exact same name as the Tribe, as an unincorporated

10  association, and then tried to settle the instant lawsuit.

11  Evidence of fraud is extensive and at the center of this case.

12  90.  Stein engaged in oppressive and malicious conduct.  Stein

13  set up the Tribe's offices in his Law Offices and gave his law

14  office manager, Garcia, the job of Tribal Administrator, in

15  order to control the Tribe and its legal and financial affairs.

16  And when the Tribal Councilmembers confronted Stein in those

17  offices, Stein threatened them, threw objects at them, and cast

18  them out of their own offices.  In the Court's view, among the

19  worst things Stein did was his failure to return the Tribe's

20  original birth and family records to the Tribe after Stein was

21  fired/resigned.  Stein kept the Tribe's membership and family

22  records thus preventing the Tribe from pursuing federal

23  recognition (a 25-30 year process).  To this day, almost 15-20

24  years later, Stein has not returned the records.

-39-

91. Stein is a recidivist in targeting Native Americans for exploitation. Repeated actions are worse than and can be punished more severely than isolated incidents. Johnson v. Ford Motor Co., 35 Cal.4th 1191, 1206 (2005). The Tribe was not the first Native American group which was targeted by Stein's misconduct. Stein preyed upon Native American groups, including the Morales Family faction, whom he tried to convince to join him in his endeavors, and when he could not persuade them, he later sued them to gain access to their records. And after he had a falling out with the Tribe, he recruited a different group, the Candelaria Faction, to use as a vehicle for his casino development plans.

92. Stein used his status as a lawyer, a position of trust, as a weapon against a less sophisticated client. The Tribal Councilmembers were relatively poor and unsophisticated, and they trusted Stein's advice and his position as a high-status lawyer. Further, Stein used litigation as a weapon, including against the Morales Family faction, and against the Tribe. The finder of fact is "free to conclude on this evidence that the protracted degradation of an honest and hard-working businessman, and the conscious indifference to his suffering was despicable." George F. Hillenbrand, Inc. v. Insurance Co. of North America, 104 Cal.App.4th 784, 818 (2002).

-40-

93.  Stein oppressed the Tribe by using attachment proceedings, including false statements in the applications, during the litigation in order to deprive the Tribe of its assets and by prolonging this litigation to deprive the Tribe from freedom to move on as a political entity pursuing their ultimate goal, federal recognition.

94.  During the punitive damages phase of the trial, Stein failed to provide evidence of his assets and failed to be candid about his assets under oath.  Stein provided scant evidence of his net worth.  This conduct is consistent with his conduct throughout the course of this litigation and this trial.

95.  Indeed, Stein refused to take the stand or appear on April 5, 2019 to answer questions regarding his financial condition so the Tribe had no meaningful opportunity to cross-examine him on this topic.  Rather, during the punitive damage discovery phase, his attorney provided a chart that aimed to show his net worth, but that chart was without any backup or foundation and was unreliable.  "Net worth is too easily subject to manipulation to be the sole standard for measuring a defendant's ability to pay." Zaxis Wireless Communications, Inc. v. Motor Sound Corp., 89 Cal.App.4th 577, 582 (2001).  So, the finder of fact may disbelieve self-serving claims by the defendant that exaggerate his or her liabilities and minimize his or her net worth. Moore v. American United Life Ins. Co., 150 Cal.App.3d 610, 641

-41-

1   (1984).  Most importantly, "by failing to bring any records

2   which would reflect his financial condition, despite being

3   ordered to do so . . . defendant has waived any right to

4   complain of the lack of such evidence."  Mike Davidov Co. v.

5   Issod, 78 Cal.App.4th 601, 608-609 (2000).  Accordingly, the

6   Court relied on the information already on the record, and

7   concluded that Stein has ample ability to pay a multi-million

8   dollar judgment.

9   96.  Stein bragged about substantial assets during trial.  While

10  still on the record on July 22, 2016, Stein represented to the

11  Court that:

12      I'm in charge of the American Branch of my father-in-
        law — I don't know if you've ever heard of a family
13      office from China, but we have a seven figure
        transaction and unfortunately, they look to money not
14      circumstances would be the best way to put it.  And
        then of course we have the seven figure matter in Van
15      Nuys that this court has most graciously allowed me to
        handle, we settled out the second largest casino in
16      Iowa out of the New Orleans IP actions.  It's been a
        very difficult doing all that and of course preparing
17      for each witness each day.  So I apologize to the
        court when my abilities have run short of what the
18      demands were and I apologize to the court that I'm not
        a little bit stronger given a week with you know 10
19      hours sleep over the course of five days.

20  (Stein's comments on the record to the Court on July 22, 2016,

21  p. 37, ln. 25-p. 38, ln. 20.)

22  97.  The Tribe earlier identified a Cross-complaint against

23  Stein, from a former client who claims to have paid him $750,000

24  at the end of 2014 and in early 2015 (case number SC125747).  It

-42-

1  is a Cross-complaint because Stein sued his former client for an

2  extra $400,000 that Stein claimed was still due to him.  A

3  Notice of Settlement was filed in the case in June 2017, and

4  then a dismissal of all of the claims and cross-claims in July

5  of 2017, and a disbursement of funds was made in that case.

6  98.  As the finder of fact, the Court reasonably deduced and

7  considered all the facts available regarding Stein's veracity

8  and credibility and his prior statements regarding his net worth

9  and decided that Stein was untruthful about ability to pay a

10  judgment or punitive damages.

11  99.  In his discovery responses during the punitive damages

12  phase, Stein failed to describe the income he gets from his

13  father-in-law, Chinese assets in America, or any of the very

14  high net value items he was engaged in which he described to the

15  Court on the record on July 22, 2016.  Because Stein is not

16  forthcoming about the value of those holdings, the Court

17  reasonably placed a value of at least twice as much of the

18  litigation in California, equaling $3 million a year.

19  100. The Stein Family has substantial real estate holdings and

20  properties.  On April 5, 2019, the Tribe filed a Request for

21  Judicial Notice attaching documents that tend to show that Stein

22  has significant property holdings, in his own name, in

23  California.  The Court took judicial notice.  Those documents

24  show that Stein provided less than candid responses and perhaps

-43-

1    perjured himself when he provided those responses to the

2    punitive damages discovery served on him by the Tribe.  For

3    example, in response to Interrogatory Question 11 which

4    requested information regarding any loan which he or his wife,

5    singly or jointly received to pay for the real property located

6    in Ashland Avenue in Santa Monica, California, Stein provided a

7    verified response, under penalty of perjury that "he has never

8    had an ownership interest in 2215 Ashland Avenue in Santa

9    Monica, CA."  But that property is currently owned by Linda Hong

10   Sun Stein, his wife.  And, according to the inter-spousal

11   transfer deed, which Stein attached to those same discovery

12   responses where he denies ownership, Stein did indeed own that

13   property and transferred it to his wife on May 7, 2012 — that

14   is, during the pendency of this litigation which started in

15   November of 2006.  The Ashland Avenue address is the same

16   address that Stein listed in verified responses to Form

17   Interrogatories in this action in 2015.  He obviously owned it

18   and lived in it during the pendency of this action.  Whether he

19   currently owns it or merely transferred it to his wife for zero

20   consideration as recorded on the inter-spousal transfer deed

21   reflected well on his financial condition.

22   101. Linda Hong Sun Stein and Stein are also listed as joint

23   owners of a property at 2520 Murrell Road in Santa Barbara,

24   California, an address that Stein listed as his address of

-44-

1   record in this litigation before he was represented by John

2   Rubiner, Esq.  More interestingly, as recently as last month,

3   while Stein was supposed to be providing responses to this

4   discovery, Linda Hong Sun Stein and Stein acquired a third

5   property in California, a second in Santa Barbara.  That

6   property is listed at 5222 Kirk Drive in Santa Barbara.  The

7   grant deed on the property was signed on January 7, 2019 and was

8   apparently recorded in the County of Santa Barbara on

9   February 22, 2019.  The date is significant because Stein

10  provided responses to punitive damages questions, under penalty

11  of perjury on February 16, 2019, after he had formed an intent

12  to purchase another property, but he did not feel obliged to

13  disclose this in discovery which was designed to uncover

14  evidence of his net worth.  The Murrell Road Property is

15  assessed at $1 million by the County of Santa Barbara.  The Kirk

16  Drive Property was sold for $830,000 and the Steins took out a

17  loan for that property from Wells Fargo for $580,000 which was

18  recorded by Wells Fargo, and that document is public record.

19  The Steins have had access and still have access to a

20  substantial amount of cash.

21  102. Stein has repeatedly stated that all of these properties

22  are largely in his wife's name or belong to his wife's family

23  and not to him.  He has lived at these properties, does not

24  report that he paid any rent to live in these properties, and

1  whether or not they are in his name or not, all of these real

2  estate holdings are part of what he can rely on for his

3  lifestyle and to make a living.

4  103. Lastly on this topic, Stein has been less than candid about

5  his assets during the punitive damages phase of this trial and

6  he continues to accumulate assets.  He is undeterred from his

7  lawless behavior, evasiveness, and untruthfulness to opposing

8  parties and to the Court.

9  A Large Award Can Equal the Harm Already Caused and Deter Stein.

10  104. "'[F]ew awards' significantly exceeding a single-digit

11  ratio will satisfy due process to establish a type of

12  presumption:  ratios between the punitive damages award the

13  plaintiff's actual or potential compensatory damages

14  significantly greater than 9 or 10 to 1 are suspect and, absent

15  special justification (by, for example, extreme reprehensibility

16  or unusually small, hard-to-detect or hard-to-measure

17  compensatory damages), cannot survive appellate scrutiny under

18  the due process clause."  Simon v. San Paolo U.S. Holding Co.,

19  35 Cal.4th 1159, 1182 (2005).  The Court believes a $7 million

20  punitive award is appropriate — that is a third of the

21  compensatory damages awarded here.  Stein is neither sorry nor

22  contrite and has no misgivings about anything that occurred

23  here.  He refuses to change his conduct.  Clearly, he is

24  undeterred.

-46-

1

IV.

2

CONCLUSIONS OF LAW

3    Stein Formed an Attorney-Client Relationship with the Tribe and

4    Owed It a Fiduciary Duty.

5    105. Whether Stein established an attorney-client relationship

6    is generally a question of law, and not facts.  Meehan v. Hopps,

7    144 Cal.App.2d 284, 287 (1956) (existence of an attorney-client

8    relationship is a question of law).  The facts and the law

9    strongly support that Stein was the Tribe's lawyer.  Stein

10   defended himself by stating that the SMDC Agreement's express

11   language disclaimed any attorney-client relationship with the

12   Tribe.  There is no dispute that the SMDC Agreement contained

13   that language.  However, that language is not dispositive when

14   all the conduct between the parties that occurred outside the

15   scope of the SMDC Agreement and during the scope of the parties'

16   professional relationship contradicts it.

17   106. Margolis, the Tribe's expert witness, explained that an

18   attorney-client relationship could be formed without an express

19   agreement.  Lister v. State Bar, 51 Cal.3d 1117, 1126 (1990);

20   Davis v. State Bar, 33 Cal.3d 231, 237 (1983).  Neither a fee

21   payment nor a formal agreement is required to show that an

22   attorney-client relationship existed.  Ibid.  Rather, an

23   attorney-client relationship may be "implied" between the

24   parties.  Westinghouse Elec. Corp. v. Kerr-McGee Corp., 580 F.2d

-47-

1   1311, 1319 (7th Cir. 1978) (professional relationship "hinges

2   upon the client's belief that he is consulting a lawyer in that

3   capacity and his manifested intention to seek professional legal

4   advice" (internal quotations omitted).)

5   107. To determine the existence of an implied attorney-client

6   relationship, California courts look to "the intent and conduct

7   of the parties." <u>Hecht v. Super. Ct. (Ferguson)</u>, 192 Cal.App.3d

8   560, 565 (1987). These two factors are the most "critical [in]

9   the formation of the attorney-client relationship." <u>Ibid.</u>  We

10  deal with the second factor (conduct) first because it is

11  straightforward.

12  <u>Stein's Conduct and the Tribe's Conduct Were Consistent with the</u>

13  <u>Expectation That Stein Was the Tribe's Lawyer.</u>

14  108. To establish an implied attorney-client relationship, it is

15  enough to show that legal advice and assistance was sought and

16  received.  "When a party seeking legal advice consults an

17  attorney at law and secures that advice, the relation of

18  attorney and client is established prima facie." <u>Beery v. State</u>

19  <u>Bar</u>, 43 Cal.3d 802, 811-812 (1987) (<u>Beery</u>) (internal quotations

20  omitted).  Also, the practice of law includes giving "legal

21  advice and legal instrument and contract preparation, whether or

22  not these subjects were rendered in the course of litigation."

23  <u>Birbrower, Montalbano, Condon & Frank, P.C. v. Super. Ct. (ESQ</u>

24  <u>Business Services, Inc.)</u>, 17 Cal.4th 119, 128 (1998).

-48-

**101**

Similarly, providing legal advice includes "the drawing of

agreements, the organization of corporations and preparing

papers connected therewith[.]"  People ex rel. Lawyers Institute

of San Diego v. Merchants' Protective Corp., 189 Cal. 531, 535

(1922).

109. Here, all the credible evidence is that Stein provided

legal advice and acted as the Tribe's lawyer.  A short non-

exhaustive list includes that:

    a.   Stein was the principal drafter of the SMDC Agreement

— with the assistance of one or two other lawyers, Mr. Watt and

Mr. Sulzer of Seyfarth Shaw.

    b.   After the SMDC Agreement was purportedly in effect,

Stein became a trusted legal advisor who left a trail of written

legal opinions and work-product.

    c.   Stein freely admitted to drafting the "cutting edge"

legal advice which he provided regarding engaging in gaming in

California without federal recognition.

    d.   Stein drafted or closely supervised the drafting of

all tribal resolutions.

    e.   Stein provided advice on the initiation of the Morales

Family litigation (and whether the Tribe, as an entity, should

be a party to the litigation), and the negotiation of payments

for the Tribe's adverse judgment from that litigation.

-49-

f.    Stein advised the Tribe on the competence of other lawyers, including the Tribe's lawyers such as Aronson.

g.    Stein hired and fired the Tribe's lawyers without the express or implicit consent of the Tribe (including Lamothe, Barrett and Aronson, without the knowledge or consent of the Tribe).

h.    Stein conducted all final negotiations on important contracts, including the SMDC Agreement and the Libra Agreement, and any modifications to them.  (SF ¶¶100-132.)

110. Of significance was that he provided very detailed legal opinion(s) advising the Tribe that it was legally possible for the Tribe to build a casino in California even though they were (according to Stein) only a state recognized Tribe and had not yet achieved federal recognition.  Indeed, Stein was the sole author of that shorter (four-page) legal opinion containing this legal advice to the Attorney General (Bill Lockyer) and the Tribe.  (SF ¶51.)

111. There was no evidence that the Tribe or any of its members ever rejected Stein's legal services or that they did not think of him as their lawyer.  They had formed an opinion that he was their most trusted advisor and lawyer.  Even outside observers such as Mr. Johnson (who was called as Stein's witness) formed the opinion that Stein was performing legal work for the Tribe. (SF ¶101.)  This opinion was reinforced when he hired and fired

1  the Tribe's lawyers (Lamothe, Barrett and Aronson) and offered

2  opinions as to their legal competence.

3  112. Until this action was filed, Stein never clearly disclaimed

4  his role as a lawyer for the Tribe.

5  113. Disclaiming an attorney-client relationship, or fiduciary

6  duties will not prevent the existence of such a relationship if

7  the lawyer attempting to disclaim a relationship is in fact

8  performing legal services or offering legal advice.

9  Benninghoff v. Super. Ct. (State Bar of California), 136

10  Cal.App.4th 61, 73 & fn.10 (2006); Cal. State Bar Form. Opn.

11  2004-165, at p. 5.

12  114. Moreover, it is unclear whether the Tribal Council ever

13  understood the SMDC Agreement in detail, or in some, cases, at

14  all.  Some of them understood it in broad brushstrokes but none

15  of them were lawyers.  They did not pay any attention to the

16  language in SMDC Agreement disclaiming Stein's role as their

17  lawyer.  Indeed, they had no time to review it at all.  Carmelo

18  did not even recall seeing the original SMDC Agreement until

19  this litigation started.  She had been presented with amendments

20  to sign, but not the entire document.

21  115. It is worth restating the Tribe was not represented by an

22  attorney (other than Stein) when it entered into the SMDC

23  Agreement.  Only during the amendments did the lawyers Stein

24  hired represent the Tribe, but the original SMDC Agreement did

-51-

1   not accompany the amendments.  Those lawyers who represented the

2   Tribe, especially Lamothe, had conflicts of their own.  For

3   example, Lamothe was not an independent lawyer as Stein, who

4   used his own legal judgment to override Lamothe's legal

5   judgment, was vigorously supervising her.

6   116. "The attorney's duty to communicate with a client includes

7   the duty to communicate to persons who reasonably believe they

8   are clients to the attorney's knowledge at least to the extent

9   of advising them that they are not clients."  Butler v. State

10  Bar, 42 Cal.3d 323, 329 (1986); see also Cal. State Bar Form.

11  Opn. 2001-155.  Stein offered no evidence that he ever clarified

12  to the Tribe, either orally or in writing, that he was not their

13  lawyer.

14  Stein Had Numerous Conflicts of Interest.

15  117. A lawyer's duties to a client begin when the relationship

16  starts.  Styles v. Mumbert, 164 Cal.App.4th 1163, 1167 (2008).

17  Stein began to provide legal services to the Tribe when he was

18  seeking to start a relationship with the Tribe, before the SMDC

19  Agreement was signed, when he prepared the SMDC Agreement, and

20  when he prepared associated resolutions for the Tribal Council's

21  execution.

22  118. According to expert Margolis, when Stein advised the Tribe

23  that it did not need to achieve federal recognition to engage in

24  gaming, Stein had a conflict.  That advice was motivated by the

1   fact that if the Tribe achieved federal recognition, Stein's 10%

2   interest in the Tribe's future gaming operations revenue under

3   the SMDC Agreement would be scrutinized by the NIGC and

4   rejected.  He was obliged to advise the Tribe that he had an

5   adverse interest pursuant to Rule 3-310(B)(1) of the Rules of

6   Professional Conduct and was required to provide a written

7   disclosure to the Tribe.  He did not.  Thus, Stein violated his

8   fiduciary duty.

9   119. Expert Margolis opined that Stein also violated Rule 3-300

10  of the Rules of Professional Conduct by failing to advise the

11  Tribe that by acquiring a financial interest adverse to the

12  Tribe, Stein must give the Tribe a meaningful opportunity to

13  consult with another lawyer (or to provide the Tribe the same

14  advice as he would provide as against a third person).  Stein

15  did not.  Thus, Stein violated his fiduciary duty.

16  120. Expert Margolis also opined that Stein violated Rules 3-

17  310(A) and 3-310(B)(1) of the Rules of Professional Conduct,

18  which require a lawyer to advise any client that he has a legal,

19  financial, business or personal relationship with another party

20  in the same matter.  In this case, Margolis noted that Stein

21  admitted that he had a relationship with both SMDC and the Tribe

22  and (according to Stein's own testimony) provided concurrent

23  advice to both as to the SMDC Agreement or any of its

24  amendments.  Pursuant to Rule 3-310(A), Stein was required to

-53-

1  provide written disclosures to both but did not.  Margolis

2  opined that Stein also violated Rule 3-310(B)(3) which prohibits

3  a lawyer who has a legal, business, financial, personal or

4  professional relationship with another person or entity that the

5  attorney knows or reasonably should know would be affected

6  substantially by resolution of the matter.

7  121. Margolis opined that Stein also violated Rule 3-310(B)(4)

8  which requires a written disclosure when an attorney has a

9  legal, business, financial, professional interest in the subject

10 of a matter or representation.  Stein made no such disclosures.

11 122. Margolis opined that Stein also violated Rules 3-310(C)(1)

12 and (2) which prohibits concurrent representation (SMDC and the

13 Tribe) when they had adverse or potentially adverse interests

14 and requires that Stein provide not just written disclosures,

15 but written consents from the clients.  Stein neither made

16 disclosures nor obtained consents.

17 123. Most of these conflicts were based on Stein's own testimony

18 that he was acting as the legal representative of SMDC during

19 the entire course and scope of his relationship with the Tribe,

20 including when he entered into the SMDC Agreement, where he

21 represented both the Tribe and SMDC, and every time he drafted a

22 resolution, when he represented the interests of both the Tribe

23 and SMDC when either reviewing or drafting each of those

24 resolutions.

-54-

1  124. Stein also had a conflict every time he advocated for

2  engaging in gaming in California without federal recognition as

3  he failed to tell the Tribe that his advice was motivated by his

4  interest in the SMDC Agreement that would be extinguished if the

5  Tribe achieved federal recognition.

6  Stein Breached His Fiduciary Duty As an Officer of the Tribe

7  Even If He Was Not the Tribe's Lawyer.

8  125. Stein breached his fiduciary duties of loyalty to the Tribe

9  by the conflicts of interest detailed above.  But, even if Stein

10 was not considered a lawyer of the Tribe, he still breached

11 fiduciary duties by his acts as an officer of the Tribe.  Stein

12 was an executive officer of the Tribe.  (He served as its

13 developer.)  The elements of a cause of action for breach of

14 fiduciary duty are the existence of a fiduciary relationship, its

15 breach, and damage proximately caused by that breach.  Knox v.

16 Dean, 205 Cal.App.4th 417, 432-433 (2012).

17 126. One of the essential fiduciary duties is the duty of

18 loyalty.  Indeed, "[e]very agent owes his principal the duty of

19 undivided loyalty.  During the course of his agency, he may not

20 undertake or participate in activities adverse to the interests

21 of his principal.  In the absence of an agreement to the

22 contrary, an agent is free to engage in competition with his

23 principal after termination of his employment but he may plan

24 and develop his competitive enterprise during the course of his

-55-

1 agency only where the particular activity engaged in is not

2 against the best interests of his principal." Sequoia Vacuum

3 Systems v. Stransky, 229 Cal.App.2d 281, 287 (1964). According

4 to Margolis, Stein also owed the duty of candor, of

5 confidentiality — all of which he breached.

6 127. Even if Stein were not the Tribe's lawyer, and his role was

7 solely of that of a developer, he breached duties to the Tribe

8 by pursuing a no-federal recognition strategy because it would

9 affect his rights to recover 10% of the Tribe's future gaming

10 revenue. Stein was an executive officer of the Tribe. He acted

11 on his own interest and against the Tribe's interest for the

12 reason that it would be (in the long run) more financially

13 advantageous to him, despite the Tribe's repeatedly stated

14 wishes for federal recognition.

15 128. Moreover, all of Stein's behavior was against the interests

16 of the Tribe and was not dependent on Stein's conduct as a

17 lawyer, but as a fiduciary with divided loyalties. For example:

18 Stein sent letters to the Tribe's membership, without the Tribal

19 Council's consent or knowledge; Stein froze the Tribe's bank

20 account; and Stein demanded that the Libra investors pay him

21 instead of the Tribe, even though the Libra Agreement was for

22 the benefit of the Tribe.

23 //

24 //

-56-

<u>Stein Committed Malpractice.</u>

129. It is malpractice for an attorney to breach the ethical duties of good faith and fidelity (loyalty).  <u>T&R Foods, Inc. v. Rose</u>, 47 Cal.App.4th Supp. 1, 8 (1996) (failure to segregate client funds constitutes breach of fiduciary duty).

130. Stein breached his ethical duties, willfully concealed information from the Tribe, and attempted to mislead the Tribe (about Stein's relationship with the Tribe as a lawyer, and about Otto being a lawyer for the Tribe).

131. Stein provided the Tribe with advice that benefitted Stein, even if it was legally incorrect.  For all those reasons and gross violations of ethics described herein, Stein is liable for malpractice for violations of his fiduciary duties to the Tribe.

<u>Stein Is Liable for a Number of Business Torts with Regard to the Tribe.</u>

132. Stein is liable for the tort of conversion of the Tribe's property.  To prevail on a claim of conversion, a plaintiff must show that "the essential elements of [] conversion . . . are [1] the plaintiff's ownership or right to possession of the property at the time of the conversion; [2] the defendant's conversion by a wrongful act or disposition of property rights; and [3] damages."  <u>Shopoff & Cavallo LLP v. Hyon</u>, 167 Cal.App.4th 1489, 1507 (2008) (internal quotations omitted).  Importantly, "[c]onversion is a strict liability tort. . . .  Therefore,

-57-

1  questions of the defendant's good faith, lack of knowledge, and

2  motive are ordinarily immaterial." Burlesci v. Petersen, 68

3  Cal.App.4th 1062, 1066 (1998).

4  133. Stein admitted that he retained possession of the Tribe's

5  membership and financial records and other business records

6  after his relationship with the Tribe had unambiguously

7  terminated.  Thus, he admitted all the essential facts of

8  conversion (and also breach of fiduciary duty).

9  134. During the confrontation between the Tribal Council and

10  Stein on September 9, 2006 in Stein's Law Offices (where he also

11  set up the Tribe's offices), the Tribal Councilmembers took

12  whatever documents they could, but many of the Tribe's documents

13  and its computers were left behind.  Stein used that

14  information, computers, and documents for his own purposes,

15  including sending letters to financial institutions and to the

16  membership to disparage the Tribal Council and gain support for

17  himself.  To this date, he has not returned those records or

18  computers.

19  135. The Tribe's damages are established because after twelve

20  years, the Tribe has not been able to use this property,

21  diminishing the value of some of these items (such as the

22  computers) and depriving the Tribe of the opportunity to conduct

23  business with others (their membership records) or pursue

24  federal recognition.

-58-

**111**

1  136. Stein is liable for the tort of misappropriation of trade

2  secrets in the form of confidential membership records.  To

3  establish a prima facie claim of misappropriation of trade

4  secrets, the plaintiff must show:  1) plaintiff owned a trade

5  secret; 2) defendant acquired, revealed or used the plaintiff's

6  trade secret through improper means and; 3) plaintiff was

7  damaged by defendant's actions.  <u>Sargent Fletcher, Inc. v. Able</u>

8  <u>Corp.</u>, 110 Cal.App.4th 1658, 1665 (2003).  In California, a

9  trade secret is information that a) derives independent economic

10  value (actual or merely potential) from not being generally well

11  known to the public or others; and b) is the subject of

12  reasonable efforts to maintain its secrecy.  Civ. Code

13  §3426.1(d).  Significantly, this definition applies if the trade

14  secret was "[a]cquired under circumstances giving rise to a duty

15  to maintain its secrecy or limit its use."  Civ. Code

16  §3426.1(B)(b)(ii).

17  137. The Tribe's membership records were highly confidential

18  documents that proved each member's familiar and Native American

19  ancestry and which individually belonged to the members.  In the

20  aggregate, the membership records belonged to the Tribe and the

21  extended family groups it represented.  These documents

22  comprised the Tribe's membership list, contact information and

23  membership records.  With respect to Exhibit 520, Stein admitted

24  that the membership records and the membership as a whole were

-59-

**112**

1  developed as a result of the efforts of individual Tribal

2  Councilmembers, and not as a consequence of his own efforts.

3  Exhibit 520 was Stein's letter to the membership that stated:

4  "With the excellent work of the Tribal Council, we built up

5  tribal membership to over 1900 Gabrielinos."

6  138. Similarly, Carmelo recalled that the Tribal Council records

7  were the result of efforts by the four main tribal

8  councilmembers (Alcala, Sam Dunlap, Shirley Machado, and Perez)

9  who were specifically chosen to serve on the Tribal Council

10 because they were representatives of key family groups of

11 surviving Gabrielinos.  Each of these Tribal Council people, as

12 representatives of their family groups recruited their families

13 to join the Tribe.

14 139. Accordingly, these were the Tribe's trade secrets, and not

15 Stein's or SMDC's work product.  Yet, Stein maintained

16 possession of these records and refused to turn them over to

17 Tribe when it asked for them.

18 140. Stein and SMDC are liable for the tort of breach of

19 confidences of the Tribe.  Under California law, a breach of

20 confidence claim arises when (1) an idea, whether or not

21 protectable (as a trade secret, for example), is offered to

22 another in confidence, (2) is voluntarily received in confidence

23 with the understanding that it is not to be disclosed, and

24 (3) is not to be used by the receiving party beyond the limits

-60-

1   of the confidence, without express permission provided.

2   Faris v. Enberg, 97 Cal.App.3d 309, 323 (1979).

3   141. As noted above, the membership records were maintained

4   confidentially.  Stein, SMDC, Stein's Law Offices, Garcia, the

5   Tribe's leadership and GTGA had access, but access was

6   restricted and not generally available to the public, or to

7   members of the Tribe who did not serve in a leadership capacity.

8   After Stein's relationship with the Tribe ended, Stein admitted

9   that he used the Tribe's membership records for the benefit of

10  Stein and SMDC, and contrary to the rights of the Tribe and

11  GTGA.  So he breached the confidences of the Tribe.

12  142. Stein is liable or the tort of intentionally interfering

13  with economic and prospective relationships of the Tribe.

14  Because the two claims (intentional interference with

15  contractual relationship and prospective relationship) are

16  related, they are best considered together.

17  143. To prove a claim for intentional interference with a

18  contractual relationship, the Tribe must show: (1) the existence

19  of a valid contract between plaintiff and a third party; (2) the

20  defendant knew of the contract; (3) defendant intentionally

21  acted to induce a breach or disrupt the contractual

22  relationship; and (4) there was an actual breach or disruption

23  of the relationship that resulted in damage.  Pacific Gas &

24  Electric Co. v. Bear Stearns & Co., 50 Cal.3d 1118, 1126 (1990);

-61-

1  accord <u>Quelimane Co. v. Stewart Title Guaranty Co.</u>, 19 Cal.4th

2  26, 55 (1998).

3  144. Here, Stein/SMDC interfered with the Tribe's contract with

4  the Libra investors.  The Libra Agreement between the Tribe and

5  the Libra investors existed during the time in question.  Stein

6  negotiated the Libra Agreement between the Tribe and the Libra

7  Group.  Thus, he knew of that relationship.

8  145. Stein disrupted the relationship with Libra intentionally,

9  when the dispute between Stein and the Tribe first came to a

10  head.  Stein did not get to spend the Libra money as he wanted,

11  so Stein threatened to send the money back to Libra, rather than

12  continue working with the Tribe.  He followed through on that

13  threat by interfering with the Libra deal.

14  146. Stein's attorney, Sulzer, testified that once a dispute

15  with the Tribe started, Stein/SMDC wanted Libra to pay Stein any

16  monies owed by the Tribe (the monthly fee).  Stein/SMDC insisted

17  that Stein and SMDC be first in line for payment.  By insisting

18  to not go away until those monies were paid, even though he had

19  no right to payment from the Libra funds (a fact he was well

20  aware of), Stein interrupted the Libra Agreement.  Because Libra

21  did not deviate from the original intention of its agreement

22  with the Tribe (which had nothing to do with payment to Stein)

23  and did not want to pay Stein, Stein's threat came to fruition.

24

-62-

147. Stein's demand to Libra also revealed that Stein and Sulzer had a high degree of confidence that the $18 million that Libra had promised to the Tribe would be forthcoming imminently.

148. Stein interfered with a prospective economic advantage of the Tribe for the same reason, so the Tribe prevails on its claim for interference with prospective economic advantage. To succeed, plaintiff must show: "(1) an economic relationship between the plaintiff and a third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) an intentional act by the defendant, designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the defendant's wrongful act, including an intentional act by the defendant that is designed to disrupt the relationship between the plaintiff and a third party." Edwards v. Arthur Andersen LLP, 44 Cal.4th 937, 944 (2008).

149. Here, the future economic prospect was the $18 million that Libra had promised as subsequent tranches to the Tribe. Stein wanted the Tribe and Libra to promise to use those subsequent tranches to pay him, or else he would disrupt the relationship. He did disrupt the relationship. The damages or economic harms were the remainder of the $21 million of Libra funds that Libra promised to the Tribe but that were cut-off because of Stein.

-63-

**116**

150. The SMDC Agreement is voidable and subject to rescission, but alternatively, Stein breached the SMDC Agreement. The Tribe pled the breach of contract cause of action in the alternative. During the trial, the Tribe showed that Stein and SMDC breached the SMDC Agreement, but since the Court has found that the contract (SMDC Agreement) is voidable, and subject to rescission by election of the Tribe, this claim is not considered in detail here.

151. Nonetheless, Stein and SMDC breached the SMDC Agreement. To prove breach of contract, the Tribe must show and has shown: (1) the existence of a contract, (2) plaintiff's performance or excuse for non-performance, (3) defendant's breach, and (4) damages to plaintiff therefrom. _Acoustics, Inc. v. Trepte Constr. Co._, 14 Cal.App.3d 887, 913 (1971). "When a party's failure to perform a contractual obligation constitutes a material breach of the contract, the other party may be discharged from its duty to perform under the contract." _Brown v. Grimes_, 192 Cal.App.4th 265, 277 (2011).

152. SMDC repeatedly alleged that the contract is valid. The Tribe alleged it is voidable (the Court agrees it is subject to rescission) but even so, the Tribe alleges, that SMDC and Stein breached the agreement. The Tribe has duly performed all conditions and obligations on its part to be performed under the

1   SMDC Agreement, except to the extent that performance was

2   excused by SMDC.

3   153. Stein/SMDC breached the Agreement by pursuing only one of

4   the two material promises made in the SMDC Agreement, that is,

5   the casino.  Indeed, Stein/SMDC abandoned the second promise,

6   pursuit of federal recognition.  Stein did so without telling

7   the Tribe that federal recognition was against Stein/SMDC's

8   interest because federal recognition would cause the NIGC to

9   invalidate Stein/SMDC's 10% gaming receipts incentive in the

10  SMDC Agreement.

11  154. And, while Stein/SMDC sought to modify or amend the SMDC

12  Agreement many times, Stein/SMDC never sought to modify the SMDC

13  Agreement in a way that would make it comply with the NGIC's

14  sole proprietary interest rule.  By never intending to perform

15  on the SMDC Agreement as to federal recognition, Stein breached

16  it.

17  155. Additionally, Stein/SMDC breached the SMDC Agreement by the

18  following conduct:

19      a.   usurping the authority of the Tribal Council described

20  in the SMDC Agreement which guarantees that "all ultimate

21  decisions" in connection with the Economic Development Tasks

22  "reside solely with the Tribe and their Council" by terminating

23  Tribal professionals, forcing Tribal Council members to resign,

24

-65-

1 and trying to get carte blanche power to spend Tribe investment

2 monies, in violation of p. 2, para. C.

3     b.   terminating the Tribe's outside counsel, Barrett,

4 without Tribal Council approval before the closing of the Libra

5 Agreement in violation of p. 3, para. 1(b)(ix).

6     c.   terminating or attempting to terminate Aronson (Tribe

7 General Counsel and outside counsel) in violation of p. 5,

8 para. 2(c)(ii).

9     d.   refusing to explore federal recognition in violation

10 of p. 5, para. 3(a).

11     e.   trying to force tribal council members to resign and

12 attempting to gain sole signatory authority of Tribe investment

13 monies in violation of p. 6, para. 2(f).

14     f.   attempting to claim reimbursement of unreasonable

15 expenses, including, but not limited to, expenses incurred by

16 the Law Offices and/or double billing for expenses in violation

17 of p. 7, para. 4(b).

18 156. Stein/SMDC breached the implied covenant of good faith and

19 fair dealing as well.  Since the Court has found that the SMDC

20 Agreement is voidable, and subject to rescission by election of

21 the Tribe, this claim is not considered in detail here.

22 157. Nonetheless, "[t]he covenant of good faith and fair

23 dealing, implied by law in every contract, exists merely to

24 prevent one contracting party from unfairly frustrating the

-66-

1 | other party's right to receive the <u>benefits of the agreement</u>

2 | <u>actually made</u>."  <u>Guz v. Bechtel Nat., Inc.</u>, 24 Cal.4th 317, 349

3 | (2000) (emphasis in original).  The covenant "cannot impose

4 | substantive duties or limits on the contracting parties beyond

5 | those incorporated in the specific terms of their agreement."

6 | <u>Id.</u> at 349-350.

7 | 158. By failing to pursue federal recognition and by failing to

8 | tell the Tribe and Tribal Council that the 10% incentive would

9 | be unenforceable if the Tribe achieved federal recognition,

10 | Stein breached the covenant for good faith and fair dealing

11 | implied in the SMDC Agreement.

12 | 159. Also, by attempting to usurp the power of the Tribal

13 | Council to supervise and hire and fire all professionals,

14 | including attorneys, Stein/SMDC breached the implied covenant of

15 | good faith and fair dealing.

16 | 160. Stein violated Penal Code §502(c) and committed computer

17 | fraud.  Penal Code §502(c) forbids actions by anybody who

18 | "[k]nowingly accesses and without permission alters, damages,

19 | deletes, destroys, or otherwise uses any data, computer,

20 | computer system, or computer network in order to either (A)

21 | devise or execute any scheme or artifice to defraud, deceive, or

22 | extort, or (B) wrongfully control or obtain money, property, or

23 | data" and who "[k]nowingly and without permission uses the

24 | Internet domain name or profile of another individual,

-67-

1  corporation, or entity in connection with the sending of one or

2  more electronic mail messages or posts and thereby damages or

3  causes damage to a computer, computer data, computer system, or

4  computer network." Pen. Code §502(c)(1) & (9). Subdivision

5  (e)(1) of the same Penal Code section provides that a person

6  affected by this section may "bring a civil action against the

7  violator for compensatory damages and injunctive relief or other

8  equitable relief."

9  161. Stein acknowledged that after his relationship with the

10  Tribe ended, he kept the Tribe's computer which contained all of

11  the Tribe's relevant data, without the Tribe's permission.

12  Stein also retained custody of the Tribe's email and web

13  address. (SF ¶188.)

14  162. Moreover, he used the website for the benefit of the

15  Candelaria Faction, even though he knew that they had no legal

16  right to it.

17  163. Stein/SMDC is liable for the tort of unfair competition in

18  violation of Business and Professions Code §17200. "[U]nfair

19  competition shall mean and include any unlawful, unfair or

20  fraudulent business act or practice and unfair, deceptive,

21  untrue or misleading advertising and any act prohibited by

22  Chapter 1[.]" Bus. & Prof. Code §17200. Accordingly, a

23  violation of another law or unfair practice may premise a

24  violation of this statute.

-68-

1    164. Here, the claim against Stein/SMDC is based on a number of

2    other claims stated against Stein, including unlawfully

3    retaining the Tribe's books and records, misappropriation of

4    trade secrets, and fraud.

5    165. Accordingly, the Tribe is entitled to restitution of the

6    amounts paid to Stein/SMDC under the SMDC Agreement.

7    The SMDC Agreement is Subject to Rescission.

8    166. The SMDC Agreement is subject to rescission because Stein

9    violated an important California Rule of Ethics.  California law

10   does not prohibit attorneys from entering into business

11   transactions with clients.  However, because of the strict

12   fiduciary duties imposed on attorneys, those transactions are

13   strictly scrutinized for fairness and for full and specific

14   disclosure.  Beery, supra, 43 Cal.3d at 812; Mayhew v.

15   Benninghoff, 53 Cal.App.4th 1365, 1369 (1997) (Mayhew).

16   167. Consistent with these principles, Rule 3-300 of the Rules

17   of Professional Conduct provides that:

18       A member shall not enter into a business transaction
         with a client; or knowingly acquire an ownership,
19       possessory, security, or other pecuniary interest
         adverse to a client, unless each of the following
20       requirements has been satisfied:

21       (A) The transaction or acquisition and its terms are
         fair and reasonable to the client and are fully
22       disclosed and transmitted in writing to the client in
         a manner which should reasonably have been understood
23       by the client;

24

-69-

(B) The client is advised in writing that the client may seek the advice of an independent lawyer of the client's choice and is given a reasonable opportunity to seek that advice; and

(C) The client thereafter consents in writing to the terms of the transaction or the terms of the acquisition.

Rules Prof. Conduct, rule 3-300.  Failure to comply with Rule 3-300 will not automatically invalidate an attorney-client transaction, but it does render the transaction "voidable" at the client's option.  BGJ Associates v. Wilson, 113 Cal.App.4th 1217, 1226 (2003) (BGJ).  Stein failed to comply with each subsection of Rule 3-300.  Stein acquired an ownership interest in the Tribe because he was guaranteed 10% of future casino gaming revenue per the SMDC Agreement, and he drafted Tribal resolutions and the SMDC Agreement at the outset of his relationship with the Tribe.

168. The Tribal members who reviewed the SMDC Agreement in February 2001 or March 2001 did not understand the SMDC Agreement, and it was not explained to them in a manner in which they could understand it (in violation of Section (A) of Rule 3-300).  In fact, they were not even given copies of the Agreement to take home to review.  So they had no meaningful opportunity to get an independent lawyer to help them review the document, or anybody else for that matter, to help explain it to them, other than Stein.

169. Stein misled the original signatories of the SMDC Agreement about the fact that they had a lawyer representing them (Otto). As Otto stated in his letters, he was not the Tribe's lawyer and had not reviewed the SMDC Agreement, and he should not be considered as having reviewed it.  So, the Tribe had no lawyer other than Stein at the time that it entered into the original SMDC Agreement.  And, the Tribal Council members were not allowed to take the Agreement home, so they could not search for their own lawyer to help them review the document and understand it.  The Tribe had no reasonable opportunity to get legal assistance to review the SMDC Agreement, in violation of Section (B) of Rule 3-300.

170. Stein did not overcome the presumption that the SMDC Agreement was without adequate consideration and was therefore a result of undue influence.  Mayhew, supra, 53 Cal.App.4th at 1369.  The burden is on the attorney to show that the dealings were fair and reasonable.  BGJ, supra, 113 Cal.App.4th at 1228. Stein did not overcome the presumption or meet the burden of fairness.  If Stein had complied with the Rule, it was likely that independent counsel competent in the myriad complex matters covered by the SMDC Agreement would have provided different advice to the Tribe.  Independent counsel would have pointed out that the twin goals of federal recognition and a casino were incompatible under the SMDC Agreement because of the sole

1  proprietary interest rule.  The sole proprietary rule is meant

2  to protect Native American tribes from the type of unfairness

3  embodied in the SMDC Agreement.  And the fact that Stein sought

4  to evade the rule by not pursuing federal recognition — an

5  important goal of the Tribe — compounded the unfairness.  Thus,

6  the Court has voided the SMDC Agreement at the Tribe's election.

7  Stein, SMDC, and the Law Offices Are Alter Egos.

8  171. In California, the alter ego doctrine allows a party to

9  pierce the corporate veil and pursue the shareholders of the

10  corporation based on the manner in which they have dealt with

11  the corporation.  Associated Vendors, Inc. v. Oakland Meat Co.,

12  210 Cal.App.2d 825, 836-837 (1962).  Alter ego liability usually

13  involves the commingling of corporate funds, failure to observe

14  corporate formalities including maintaining minutes and failure

15  to contribute sufficient capital.  Id. at 838-839.  Where

16  injustice would result but for the finding of alter ego

17  liability, courts tend to find for piercing the veil, especially

18  in the context of a tort.  Mesler v. Bragg Management Co., 39

19  Cal.3d 290, 300 (1985).  "The essence of the alter ego doctrine

20  is that justice be done." Id. at 301.

21  172. The Court found that Stein and SMDC and Stein's d.b.a., the

22  Law Offices of Jonathan Stein, are alter egos.  Stein is the

23  sole shareholder and manager of SMDC.  Law Offices of Jonathan

24  Stein is even more closely identified with Stein, as it is

-72-

1   merely his "doing business as" (d.b.a.) entity.  He created SMDC

2   for the sole purpose of entering into the SMDC Agreement with

3   the Tribe and to perform the functions promised by SMDC.  Law

4   Offices of Jonathan Stein was Stein's solo law practice.  But

5   all three of them operated out of the same office, used the same

6   staff, and accessed the same funds.  SMDC is inadequately

7   capitalized and has no assets whatsoever.  Stein disregarded

8   corporate formalities on behalf of SMDC.  It still exists only

9   for purposes of this litigation but probably will not exist for

10  purposes of collection of any judgment resulting therefrom.

11  173. Garcia testified that she was an employee of Law Offices of

12  Jonathan Stein, and yet, at Stein's direction, she performed

13  work for the Tribe as the Tribe Administrator.  The Tribe, the

14  Law Offices of Jonathan Stein and SMDC all shared employees, an

15  office, and resources.  Stein testified that he paid expenses

16  for the Tribe either out of SMDC's funds or his own pocket (as

17  an individual).

18  174. Former Senator Polanco, a consultant, testified that the

19  Law Offices of Jonathan Stein paid him and that the Law Office

20  was then reimbursed by the Libra funds.

21  175. Stein, SMDC, and the Law Offices of Jonathan Stein were one

22  and the same, and they all must be treated that way for purposes

23  of liability.

24  //

-73-

1    Stein Committed Fraud Against the Tribe.

2    176. To prove its fraud claim, the Tribe must show:  (1) a false

3    representation or concealment of a material fact susceptible of

4    knowledge, (2) made with knowledge of its falsity or without

5    sufficient knowledge on the subject to warrant a representation,

6    (3) with the intent to induce the person to whom it is made to

7    act upon it; and this person must (4) act in reliance upon the

8    representation (5) to his or her damage.  Reed v. King, 145

9    Cal.App.3d 261, 264 (1983).

10   177. Stein fraudulently claimed that the Candelaria Faction was

11   the real Tribe.  Since October 2006, Stein began making

12   representations to the members of the Tribe which he knew were

13   false, that is, that the faction of the Tribe represented by

14   Linda Candelaria was the real tribe.  Even after the jury found

15   that Plaintiff Tribe was the real party in interest,  Stein

16   continued to represent that:

17        a.   Plaintiff's Tribal Council members abandoned the

18   Tribe.

19        b.   The entity that he registered with the Secretary of

20   State in December 2006 and shared a similar name with Plaintiff

21   was the duly elected tribal entity, and that Plaintiff was a

22   false entity.

23

24

-74-

1   c. The Candelaria Faction which was first registered (by

2 Stein) in December 2006 continued to exist until the trial

3 started.

4   d. The Candelaria Faction was created by Stein and

5 existed for the sole reason of attempting to succeed to all of

6 the legal rights and obligations of Plaintiff.

7   e. Stein and SMDC negotiated and entered into a

8 settlement agreement in this litigation (later voided) with the

9 Candelaria Faction.

10 178. Stein knew that all of these representations were false.

11 He made these representations in order to defraud and confuse

12 Gabrielinos who were members of Plaintiff and Gabrielinos who

13 were not in order to dissuade them from joining Plaintiff.

14 179. Stein had no reasonable basis for believing that these

15 representations were true.  He made them knowingly in order to

16 deceive and defraud Plaintiff's tribal members, other

17 Gabrielinos who were potential members, the public at large,

18 former investors, potential investors and the Court.  Stein made

19 these false representations in order to usurp all of Plaintiff

20 Tribe's legal rights and obligations.

21 180. Stein damaged the Tribe by deceiving the Tribe's members

22 about the split between Stein and the Tribe thereby causing the

23 Libra investors, who had committed to supporting the Tribe, from

24 withdrawing its financial and other support.  The loss is more

1    than $18,000,000 which had been pledged by the Libra investors

2    but was lost because of Stein's fraudulent conduct.

3    181. The Tribe also suffered through loss of reputation as it

4    was forced to deny charges from Stein that the Tribal Council

5    members had stolen money from the Tribe.

6    182. Stein also committed fraud by attaching to the Libra

7    Agreement dated May 20, 2006, as Exhibit B, a document which

8    purports to be California Senate Bill 175, as allegedly

9    introduced and amended by Senator Vincent.  Exhibit B to the

10   Libra Agreement led the Tribe (via Council Chair Carmelo) to

11   believe that it could game in California because actual

12   legislation had been introduced on its behalf.

13   183. However, Stein failed to disclose to the Tribe that two

14   days after the Libra Agreement was executed, on May 22, 2006,

15   the California Legislative Counsel of California issued an

16   opinion to Senator Vincent finding that "the Legislature has no

17   power to authorize a non-federally recognized Indian tribe to

18   operate slot machines, lottery games, and banking and percentage

19   card games in California, even if the state gives the tribe the

20   designation of a state-recognized tribe[.]"  (Exh. 53, at

21   p. 10.)  The opinion concluded with footnote 7, which explained

22   that "the state of California may recognize a tribe that is not

23   federally recognized, but it has not done so."  Accordingly,

24   Stein's repeated representation that the Tribe was "state

1    recognized" was not true.  Stein knew about this opinion and yet

2    failed to rectify this representation he made to Libra and to

3    the Tribe.

4    184. On July 15, 2006, Stein wrote to the Tribal Council to

5    complain about "a lot of alleged misconduct on the part of the

6    Tribe," and in a short statement, item number 6, he stated that

7    "we recently suffered a huge defeat in Sacramento . . . we

8    previously assured [the investors] that SB 175 was authored by

9    Senator Vincent and would be introduced publicly, a major step

10   toward the casino.  In the August 9 report, we are likely going

11   to state that Sen. Vincent refused to author SB 175 and it will

12   not be publicly introduced."  (SF ¶301.)  Accordingly, Stein

13   knew that his prior representation that SB 175 was authored was

14   a lie.

15   185. In fact, he admitted the above in Exhibit 54.  In that

16   email, he admitted that despite the fact that he represented to

17   the Libra investors that the legislation was authored and

18   introduced by a lawmaker, he had lied.  On the stand at trial,

19   Stein admitted that he drafted the document attached as an

20   exhibit.  (Exh. 54.)  Moreover, the statements he made in that

21   email were untrue.  It was Stein who had made that

22   representation on behalf of the Tribe.  The Tribe did not know

23   whether SB 175 had been introduced by Senator Vincent until

24

Stein in that email told them that he had lied to the Libra
investors (purportedly) on their behalf.

186. Stein also committed fraud by all of the following conduct:

a. accusing the Tribal Council of stealing funds, and freezing their banking accounts when he had no good faith basis for doing so and after he had ceased to have any actual authority over any aspect of the Tribe. (Exhs. 107, 251.)

b. causing Ms. Candelaria to file the Statement of Unincorporated Association with the Secretary of State on December 18, 2006, claiming she was the representative of the Tribe, when he had no good faith bases of believing that she had a right to do so. (Exh. 107.)

c. telling the Tribal Council who executed the SMDC Agreement in March of 2001 that Otto had agreed to review the Agreement and to act as their lawyer, and had approved of the SMDC Agreement as a transaction on their behalf when he knew that was a lie. (Exhs. 16, 240.)

d. failing to advise the Tribe (fraud by omission) that the SMDC Agreement would be rejected by the NIGC if it ever achieved federal recognition. (Stein, by his own description, was an expert on tribal gaming, yet he failed to advise the Tribe on this basic fact because it was against Stein's own interest.)

//

//

<u>Stein and SMDC's Cross-claims Fail.</u>

187. Stein and SMDC filed, but never served, what would have been the Cross-complaint in this action (Cross-complaint dated August 20, 2007).  There is no proof of service despite the Court order giving leave to Stein to file proof of service years after it was filed.  (SF ¶¶276-288.)

188. The Court found that the SMDC Agreement was voidable by the Tribe and subject to rescission.  So even if Stein/SMDC's cross-claims were not inoperative for failure to serve, Stein/SMDC's cause of action for breach of contract would be extinguished as voidable and subject to rescission at the Tribe's election.

189. If Stein/SMDC's Cross-complaint had been served and the breach of contract claim extinguished, Stein and SMDC would have only two remaining claims:  one for account stated and another for quantum meruit.  Those claims are similarly extinguished because Stein failed to proffer any persuasive evidence that he did the work that he claimed to have done.  He submitted two documents which were incomplete and heavily redacted. (Exhs. 1560-1562.)  Those documents had no indicia of reliability and failed to persuade the Court.  Without more than that, Stein failed to carry his burden that he had done the work he claimed to have done.  Stein refused to produce unredacted copies of those documents.  If Stein had produced unredacted records, the Court infers that they likely contained evidence

1  that Stein was either billing work for other (legal) clients and

2  wrongfully charging it to the Tribe, or that Stein was doing

3  extensive legal work for the Tribe as the Tribe's lawyer —

4  which is what the Tribe contended all along.  The facts remain

5  that Stein never produced unredacted copies of those documents,

6  and what he produced contained no indicia of reliability that

7  they were what he contended that they were.  Stein's claims for

8  account stated and quantum meruit fail.

9  <u>Crane's Claims Also Fail.</u>

10  190. Crane failed to submit competent, persuasive evidence that

11  it had done any work whatsoever for the Tribe.

12  191. Crane's contract stated that no money would be due until

13  the Tribe received more than $2 million in investment funds,

14  which it did not.  The Tribe only received one tranche from the

15  Libra investors that was less than $2 million ($1.8 million).

16  192. Crane was the federal lobbyist hired by Stein for the

17  Tribe.  Oddly, Stein represented Crane during this litigation.

18  Crane's case was consolidated with the main action.  Crane's

19  principal, Daniel Crane, testified that he had done some federal

20  work for the Tribe, but other than his testimony which was

21  elicited by Stein, he was unable to point to any tangible work

22  product that he produced for the Tribe.  He also failed to show

23  any other evidence that he had actually done any work for the

24

1   Tribe.  Thus, the Court concluded that he failed to carry his

2   burden and show that he had done the work he claimed he did.

3   193. Additionally, Crane's contract stated that it would only be

4   paid if the Tribe ever acquired more than $2 million in investor

5   money.  The Tribe never did acquire more than $2 million in

6   investor money because Stein interfered with the Libra contract.

7   194. The Tribe only received the first tranche that had always

8   been contemplated to be $1.8 million, less than the $2 million

9   that would trigger any obligation to pay Crane.

10                                V.

11                           CONCLUSION

12  195. Given all of the findings of facts and law detailed above,

13  the Court renders the following Judgment:

14  1.    On the Fourth Amended Complaint[5] at case number BC361307:

15        a.    On all causes of action, in favor of Plaintiff

16  Gabrielino-Tongva Tribe (the "Tribe") and against Defendants

17

18

19  ───────────────────────
    [5] On August 20, 2007, a Cross-complaint was filed by Cross-complainants
    Jonathan Stein, Law Offices of Jonathan Stein, St. Monica Development
20  Company, LLC (SMDC) against Cross-defendants Gabrielino/Tongva Nation,
    Virginia Carmelo, Martin Alcala, Edgar Perez, Shirley Machado Adam Loya,
21  Samuel Dunlap, Elizabeth Aronson and Richard G. Polanco, alleging the
    following causes of action:  Breach of Contract (SMDC Agreement); breach of
    contract (FPPC contract); intentional interference with contractual
22  relations; negligent interference with contractual relations; fraudulent
    conveyance; account stated; quantum meruit; declaratory relief (SMDC
23  Agreement); total indemnity; equitable indemnity and apportionment;
    contribution; declaratory relief (indemnification).  However, there are no
    proofs of service of summons and complaint of such Cross-complaint upon any
24  Cross-defendant.

                                -81-

                                134

1  Jonathan Stein, Law Offices of Jonathan Stein, and St. Monica

2  Development Company, LLC ("SMDC"), jointly and severally.

3      b.   On all causes of action, the Court declares as

4  follows:

5          1)   Defendants Jonathan Stein and the Law Offices of

6  Jonathan Stein violated California Rules of Professional

7  Conduct, Rules 3-300 (avoiding interests adverse to client), 3-

8  310 (avoiding the representation of adverse interests) and 3-100

9  (confidential information of client);

10         2)   At the election of Plaintiff, the SMDC

11  Development Agreement is rescinded and void.

12     c.   On all causes of action, the Court enjoins and

13  restrains Defendants from:

14         1)   Retaining possession, custody or control of any

15  files, documents or other property of the Tribe, including but

16  not limited to (a) the Tribe's membership records, whether in

17  hard copy or electronic form, (b) the Tribe's financial records,

18  whether in hard copy or electronic form, (c) the Tribe's

19  internet domain name, www.tongvatribe.org, and (d) the Tribe's

20  website;

21         2)   Using any of the Tribe's confidential

22  information, including but not limited to its membership records

23  or financial information;

24

-82-

3)   Contacting or soliciting any member of the Tribe for any purpose relating to any tribal membership or casino gaming project;

4)   Disclosing or disseminating any of the Tribe's confidential information, including but not limited to its membership information or financial information;

5)   Destroying, discarding, altering or otherwise making unavailable to the Tribe or its agents any documentary, computer or other evidence relevant to this litigation in Defendants' and/or their agents' possession, custody or control;

6)   Holding themselves out to be the offices of or affiliated in any manner with the Tribe, including but not limited to (a) receiving telephone calls for the Tribe, (b) answering their telephones as the Tribe or as any affiliate of the Tribe, or as any other person, entity, or organization using the words "Gabrielino-Tongva Tribe," "Gabrielino-Tongva," "Gabrielino Tribe," "Gabrielino," "Tongva Tribe," "Tongva," or other phrase likely to create the impression that Defendants have any relationship whatsoever to the Tribe, (c) using the Tribe's stationery, or any other stationery that uses the words "Gabrielino-Tongva Tribe," "Gabrielino-Tongva," "Gabrielino Tribe," "Gabrielino," "Tongva Tribe," "Tongva," and (d) using the Tribe's logo;

-83-

7)   Using the Tribe's membership records, or any document derived therefrom, to contact any member or members of the Tribe; and

8)   Executing upon any order/writ for any of Plaintiff's property.

d.   On all causes of action, the Court commands/orders Defendants to:

1)   Deliver to the Tribe all of the Tribe's information in documentary or electronic form, or any other form, including but not limited to any all originals and copies of the Tribe's membership records and financial records;

2)   Deliver to the Tribe all of the Tribe's computers, disks and electronic equipment in the form and condition in which they were taken from the Tribe;

3)   Deliver all of the above within 30 days of service of this Judgment.

e.   On the first through sixth, ninth, eleventh, twelfth and fifteenth causes of action, in favor of Plaintiff Gabrielino-Tongva Tribe and against Defendants Jonathan Stein, Law Offices of Jonathan Stein, and St. Monica Development Company, LLC, jointly and severally, in the amount of $20,411,067.23 [$21,000,000 minus $800,000 (Libra), minus $161,067.23 (Tribe payments) minus $50,000 (Crane payment)].

-84-

1        f.   On the tenth cause of action, in favor of Plaintiff

2    Gabrielino-Tongva Tribe and against Defendants Jonathan Stein,

3    Law Offices of Jonathan Stein, and St. Monica Development

4    Company, LLC, jointly and severally, the Court declares:

5        1)   Pursuant to the jury's verdict in the first phase

6    of trial, Plaintiff is the real party in interest with standing

7    to pursue the litigation;

8        2)   Pursuant to the jury's verdict in the first phase

9    of trial, Bernard Acuna, Linda Candelaria, Martha Gonzales-

10   Lemos, Laurie Salse, and Suzanne Rodriguez are not the Plaintiff

11   Gabrielino-Tongva Tribe, the real party-in-interest.

12       g.   On the fourteenth cause of action, in favor of

13   Plaintiff Gabrielino-Tongva Tribe and against Defendants

14   Jonathan Stein, Law Offices of Jonathan Stein, and St. Monica

15   Development Company, LLC, jointly and severally, the Court finds

16   that:

17       1)   Defendants Jonathan Stein, Law Offices of

18   Jonathan Stein, and St. Monica Development Company, LLC, are

19   alter egos of each other;

20       2)   Defendants Jonathan Stein, Law Offices of

21   Jonathan Stein, and St. Monica Development Company, LLC, jointly

22   and severally, are responsible for the obligations of each

23   other.

24

1    h.    Plaintiff Gabrielino-Tongva Tribe shall recover

2  attorney fees and costs as provided by law.

3    i.    Defendants Jonathan Stein, Law Offices of Jonathan

4  Stein, and St. Monica Development Company, LLC, acted with

5  malice, oppression, and fraud.

6  2.    On the Cross-complaint filed on September 26, 2017 at case

7  number BC361307,[6] on all causes of action, in favor of Cross-

8  defendants Virginia Carmelo, Martin Alcala, Edgar Perez, Shirley

9  Machado, Adam Loya, Samuel Dunlap, Elizabeth Aronson, and

10  Richard G. Polanco and against Cross-complainants Jonathan

11  Stein, Law Offices of Jonathan Stein, and St. Monica Development

12  Company, LLC.   Cross-complainants shall take nothing.

13  3.    On the First Amended Complaint at case number SC091633,[7] on

14  all causes of action, in favor of Defendants Virginia Carmelo,

15  Martin Alcala, Edgar Perez, Shirley Machado, Adam Loya, Samuel

16  Dunlap, Elizabeth Aronson, and Richard G. Polanco and against

17  Plaintiff St. Monica Development Company, LLC.   Plaintiff shall

18  take nothing.

19  4.    On the First Amended Cross-complaint at case number

20  SC091644, on all causes of action, in favor of Cross-defendants

21  Jonathan Stein, Law Offices of Jonathan Stein, and St. Monica

22

23  [6] Defendant Gabrielino-Tongva Tribe was dismissed on April 30, 2008.

24  [7] Defendant Sheppard Mullin Richter and Hampton, LLP was dismissed on
December 1, 2011.

-86-

1  Development Company, LLC, Bernard Acuna, Linda Candelaria,

2  Martha Gonzales-Lemos, Laurie Salse, and Suzanne Rodriquez and

3  against Cross-complainant Sam Dunlap.  Cross-complainant shall

4  take nothing.

5  5.   On the Complaint at case number SC092615,[8] on the second

6  through fourth causes of action only, in favor of Defendants

7  Virginia Carmelo, Martin Alcala, Edgar Perez, Shirley Machado,

8  Adam Loya, Samuel Dunlap, Elizabeth Aronson, and Richard G.

9  Polanco and against Plaintiff The Crane Group, Inc.  Plaintiff

10 shall take nothing.

11 6.   Defendants Jonathan Stein, Law Offices of Jonathan Stein,

12 and St. Monica Development Company, LLC, jointly and severally,

13 shall pay Plaintiff Gabrielino-Tongva Tribe punitive damages in

14 the amount of $7 million.

15      CLERK TO GIVE NOTICE TO ALL PARTIES.

16      IT IS SO ORDERED.

17 DATED:     August 27, 2019

**YVETTE M. PALAZUELOS**

18

19                                YVETTE M. PALAZUELOS
                                  JUDGE OF THE SUPERIOR COURT

20

21

22

23

24 _____
   [8] Defendants Gabrielino-Tongva Tribe and Gabrielino Tribal Gaming Authority
   were dismissed on October 19, 2011.

-87-

**140**

I.    **ISSUE ONE– STEIN OWES THE PLAINTIFF (TRIBE) FIDUCIARY DUTIES AS A LAWYER/ATTORNEY**

| **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
| --- |
| 1.    Sam Dunlap ("Dunlap"), a former long-standing member of the Plaintiff's Tribal Council met Stein in early 2000.  (**Samuel Dunlap ("Dunlap")**, June 29, 2016, Page 38, Lines 21-25) (**Dunlap**, 7-7-2016, P. 51, L. 15-16) |
| 2.    At some point in early 2000, Dunlap received a notice from Arter & Hadden, LLP announcing that Stein was associated with them.  The announcement stated that "Mr. Stein shall continue his groundbreaking work with tribal sovereigns and their related entities, including joint agency-sovereign infrastructure financings, casino and resort financings, ...".  This announcement backed up Stein's representation of himself as an experienced litigator and sophisticated transactional lawyer with extensive experience in tribal gaming and financing. (**Dunlap**, 7-7-2016, P. 51, L. 6-28; P. 52, L. 5-15; P. 52, L. 25 – P. 54, L. 15) (**Exh. 10** (Arter & Hadden LLP Announcement Re Stein)) |
| 3.    When Stein first approached the tribe in 2000, he had the intention of entering into an attorney-client relationship.  He offered to help them achieve federal recognition, but changed his mind, deciding he wanted to be a real estate developer, be on the business end. (**Jonathan Stein ("Stein")**, June 27, 2016, Page 8, Line 18-26) |
| 4.    In 2000, Stein had an idea of developing tribal casino gaming in Los Angeles County by helping the Gabrielino-Tongva people achieve federal recognition.   Dunlap is a registered Gabrielino-Tongva Indian.  At that time, Dunlap was familiar with a lot of the Gabrielino family groups in Southern California and Stein enlisted Dunlap in helping him with this idea. (**Virginia Carmelo ("Carmelo")**, June 28, 2016, Page 2, Line 5 – Page 3, Line 1) (**Dunlap**, 6-29-2016, P. 39, L. 6 – P. 40, L. 5; P. 46, L. 2-18) (**Patricia Neminski ("Neminski")**, July 6, 2016, Page 34, Line 1-8; P. 54. L. 8-11; P. 79, L. 25 – P. 80, L. 3) (**Edgar Perez ("Perez")**, July 6, 2016, Page 102, Line 18-24) (**Victor Velasquez ("Velasquez")**, July 6, 2016, Page 141, Line 19 – P. 142, L. 13) (**Dunlap**, 7-7-2016, P. 51, L. 6-28) |
| 5.    Dunlap introduced Stein to other people with knowledge and expertise on Gabrielino Indians and to certain family groups. After one such meeting, Stein sent Dunlap an invoice for legal services.  The invoice was sent from the Law Offices of Jonathan Stein ("LOJS"). (**Dunlap**, 6-29-2016, P. 39, L. 13-22; P. 41, L. 10-23) (**Dunlap**, 7-7-2016, P. 54, L. 16 – P. 55, L. 6) (**Exh. 7** (Invoices for Services for Stein to Dunlap dated April 30, 2000)) |
| 6.    The invoice reflects legal work allegedly conducted on April 19, 2000, including a meeting with Dunlap and others, and then some legal research, including Westlaw research conducted by Stein. (**Dunlap**, 7-7-2016, P. 54, L. 16 – P. 55, L. 6) (**Exh. 7** (Invoices for Services for Stein to Dunlap dated April 30, 2000)) |
| 7.    On May 26, 2000, Stein sent Dunlap a letter explaining that "[y]our Tribe was sent an internal accounting by mistake, and of course no payment is due."  The same letter goes on to explain that "Payment on Stein Structure Financings is often made in whole or part from the proceeds of the financing.  Until that happens, I keep internal records of my time, to be fair and accurate in setting |

| Material Fact/Evidence With Specific Citations to Testimony or Exhibits |
|---|
| the legal costs for each separate financing transaction. If the transaction fails to go through, this time is often written off." Dunlap understood that Stein was not billing for any legal services provided – at that time but would try to do so later. (**Dunlap**, 7-7-2016, P. 55, L. 14 – P. 56, L. 15) (**Exh. 8** (May 26, 2000 letter retracting the prior invoice)) |
| 8.      Stein and Dunlap had no written agreement of any kind between them at that time that Stein sent a billing invoice and then retracted it. (**Dunlap**, 7-7-2016, P. 98, L. 7-11; P. 99, L. 3-9) |
| 9.      The May 26, 2000 retraction letter was not addressed to any tribe it was just addressed to Sam Dunlap. Also, the letterhead was that of a different law firm, Arter & Hadden, LLP. (**Dunlap**, 7-7-2016, P. 55, L. 14 – P. 56, L. 15) (**Exh. 8** (May 26, 2000 letter retracting the prior invoice)) |
| 10.      As a result of the Arter & Hadden, LLP announcement and the billing invoices from Stein and the explanation regarding the billing announcement from Stein, Dunlap formed a reasonable understanding that Stein's work as a "developer" for any Tribe was done in the context of his other legal work and as part of his practice of the law. (**Dunlap**, 7-7-2016, P. 51, L. 6-28; P. 52, L. 5-15; P. 52, L. 25 – P. 54, L. 4; P. 54, L. 16 – P. 55, L. 6; P. 55, L. 14 – P. 56, L. 15; P. 57, L. 4 – P. 58, L. 22; P. 59, L. 12 – P. 60, L. 3) (**Exh. 7** (Invoices for Services for Stein to Dunlap dated April 30, 2000)) (**Exh. 8** (May 26, 2000 letter retracting the prior invoice)) (**Exh. 10** (Arter & Hadden LLP Announcement Re Stein)) (**Exh. 11** (2000, June 6, Letter from Stein to S. Dunlap Re Misstatements by R. Milanovich)) |
| 11.      In 2000, Dunlap introduced Stein to the Morales group of Gabrielino Indians who were organized and primarily located in the San Gabriel Valley. They took a dislike and distrust to Stein and rejected their overtures. (**Dunlap**, 6-29-2016, P. 39, L. 13-22) |
| 12.      The Morales Family faction was a group of competing Gabrielinos. (**Linda Candelaria** ("**Candelaria**"), June 21, 2016, Page 23, Line 11-23; P. 25, L. 9-11) |
| 13.      In late 2000, Dunlap introduced Stein to Jim Velasquez the patriarch for another group of Indians who were known as Coastal group of the Gabrielino-Tongva Tribe or the Coastal Gabrielino/Diegueno Council. (**Dunlap**, 6-29-2016, P. 41, L. 20-28) |
| 14.      The tribal council for this group also took a dislike and distrust to Stein, but Velasquez persuaded them to be open to the idea of federal recognition and to the idea of a casino. (**Dunlap**, 6-29-2016, P. 41, L. 25-28) (**Neminski**, 7-6-2016, P. 37, L. 27 – P. 38, L. 1; P. 49, L. 1-6; P. 60, L. 7-17) (**Velasquez**, 7-6-2016, P. 149, L. 19 – P. 150, L. 17; P. 152, L. 19-25; P. 154, L. 2-4; P. 155, L. 6-20; P. 156, L. 20 – P. 157, L. 4; P.161, L. 17 – P.162, L. 1) (**Dianna Simental** ("**Simental**"), July 7, 2016, Page 18, Line 9-16; P. 31, L. 27 – P. 33, L. 9) (**Exh. 1542** (Resolution 10 - Originally attached to Exh. 569 - SMDC Agreement)) |
| 15.      The Coastal faction of the Gabrielino-Tongva Tribe eventually decided to move forward with Stein. (**Dunlap**, 6-29-2016, P. 41, L. 25 – P. 42, L. 3) |
| 16.      In March 2001, SMDC executed a contract ("SMDC Agreement") with the "Gabrielino-Tongva Tribal Nation." (**Dunlap**, 6-29-2016, P. 43, L. 7-9) (**Velasquez**, 7-6-2016, P. 143, L. 21 – P. |

1

Exh. C -- Appendix of Evidence In Support of Statement of Decision

| **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|
| 144, L. 2) **(Stein, 7-13-2016, P. 24, L. 18-21) (Exh. 569** (SMDC Agreement - at page 1)) |
| 17.    Stein drafted the SMDC Agreement that was eventually signed in March 2001 by the Tribe with the help of a senior lawyer named "Thomas Watt" from Seyfarth Shaw. Together, Stein and Mr. Watt also drafted the March 4, 2001 series of Tribal resolutions that approved the SMDC Agreement. **(Neminski,** 7-6-2016, P. 43, L. 9-16) **(Simental,** 7-7-2016, P. 18, L.13-14; P. 22, L. 27 – P. 23, L. 28; P. 24, L. 4-24) **(Dunlap,** 7-7-2016, P. 60, L. 23 – P. 61, L. 1; P. 71, L. 5-16) **(Ken Sulzer** ("**Sulzer**"), July 18, 2016, Page 5, Line 14-21; P. 5, L. 22-23; P. 11; L. 2-6; P. 11, L. 7-16; P. 11, L. 17-23; P 11, L. 24 – P. 12, L. 7) **(Exh. 6** (2000 April 21 Stein to Dunlap, et al regarding SMDC Development Agreement)) **(Exh. 16** (2001, March 8, Letter dated from Stephen Otto, Esq. to Tribal Council and Stein)) |
| 18.    During Trial, Stein's long-time lawyer, Ken Sulzer, formerly of Seyfarth Shaw testified that Stein and a law partner of Seyfarth Shaw named Thomas Watt worked on the draft of the SMDC Agreement; but he did so only minimally More specifically, according to Mr. Sulzer, "Mr. Stein and Mr. Watts worked through it a lot, I worked through it some." He also stated that he did not remember whether any of the resolutions were prepared by Seyfarth, but when pressed by the Court he stated that "It's my best recollection that Mr. Stein and Mr. Watts worked on them together, that's my best recollection." **(Sulzer,** July 18, 2016, Page 5, Line 14-21; P. 5, L. 22-23; P. 11; L. 2-6; P. 11, L. 7-16; P. 11, L. 17-23; P 11, L. 24 – P. 12, L. 7) |
| 19.    The SMDC Agreement stated in its very first paragraph of the actual agreement that it was between:<br><br>GABRIELINO-TONGVA NATION, a tribal sovereign for the Gabrielino aboriginal tribe of Los Angeles Basin, formerly known as the San Gabriel Band of Mission Indians and now recognized by Legislative Resolution Chapter 146 of the California Code (the "Tongva" or "Tribe"), acting by and through their legal and traditional governing body, their duly-elected Tribal Council ("Council"), and ST. MONICA DEVELOPMENT COMPANY…"<br><br>**(Ex. 569 (SMDC Agreement – at page 1))** |
| 20.    Indeed, pursuant to the 2001 SMDC Agreement, Stein, through SMDC proposed to serve as the Tribe's developer, assist it in achieving federal recognition and develop a casino in Los Angeles County. **(Dunlap,** 6-29-2016, P. 39, L. 23 – P. 40, L. 5) **(Neminski,** 7-6-2016, P. 34, L. 5-8; P. 54, L. 8-18) **(Velasquez,** 7-6-2016, P. 141, L. 23-27; P. 157, L. 9-15) **(Loya,** 7-6-2016, P. 165, L. 7-27) **(Lamothe,** 1-25-2017, P. 31, L. 10-15) **(Exh. 569** (SMDC Agreement at pp. 2-3)) |
| 21.    The SMDC Agreement gave Stein a significant ownership interest in any future Tribal gaming casino by the Tribe. It guaranteed him $25,000 a month for each month that the term was in effect compensation and a 10% of the "net win" for all Gaming Devices in operation at any entertainment facilities, as defined in the contract. **(Neminski,** 7-6-2016, P. 34, L. 5-8; P. 54, L. 8-18) **(Velasquez,** 7-6-2016, P. 141, L. 23-27) **(Stein,** 2-1-2017, P. 32, L. 4-7) **(Stein,** 3-15-2017, P. 27, L. 6) **(Stein,** 3-16-2017, P. 45, L. 26 – P. 46, L. 7). **Exh. 569** (SMDC Agreement at p. 7, Section 4, c, subsection 1) (monthly amount) and subsection 2) (10% incentive) |

2

| | **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|---|
| 22. | Jonathan Stein signed the SMDC Agreement on behalf of SMDC. (**Stein**, 6-27-2016, P. 8, L. 27 – P. 9, L. 1; P. 10, L. 20-23; P. 26, L. 7-9) (**Velasquez**, 7-6-2016, P. 143, L. 21 – P. 144, L. 2) (**Exh. 569** (SMDC Agreement p. 18)) |
| 23. | St. Monica Development Company ("SMDC") is a California limited liability that is owned 100% by Jonathan Stein. (**Barbara Garcia ("Garcia")**, June 23, 2016, Page 51, Line 24 – Page 52, Line 1) (**Stein**, 6-27-2016, P. 26, L. 23-28) (**Stein**, 2-15-2017, P. 6, L. 24 – P. 7, L. 7) (**Marilyn Barrett ("Barrett")**, March 7, 2017, Page 4, Lines 9-27) (**Stein**, 3-14-2017, P. 13, L. 10-19) (**Exh. 6** (2000 April 21 Stein to Dunlap, et al regarding SMDC Development Agreement and stating that Ken Sulzer is viewing it for the first time.)) (**Exh. 252** (Stein Declaration January 28, 2008)) (**Exh. 1508** (Unsigned Conflict of Waiver - Barrett/SMDC)) (**Exh. 1561** (Stein Declaration on Time Slips dated Sept. 8, 2008)) |
| 24. | The Tribe's tribal secretary Mary Aguilera signed the SMDC Agreement on behalf of the Gabrielino-Tongva Tribal Nation. At that time, Ms. Aguilera was part of a group of Gabrielinos that called themselves the Coastal Gabrielinos. (**Stein**, 6-27-2016, P. 8, L. 27 – P. 9, L. 1; P. 10, L. 20-23; P. 26, L. 7-9) (**Velasquez**, 7-6-2016, P. 143, L. 21 – P. 144, L. 2) (**Exh. 569** (SMDC Agreement p. 18)) |
| 25. | On March 4, 2001, the tribal council of the Coastal Gabricinos signed a resolution enacting, adopting and approving the SMDC Agreement. (**Dunlap**, 6-29-2016, P. 43, L. 27 – P. 44, L. 26) (**Neminski**, 7-6-2016, P. 43, L. 17-28; P. 63, L. 26 – P. 64, L. 5; P. 88, L. 6-10) (**Velasquez**, 7-6-2016, P. 144, L. 3-12; P. 144, L. 26 - P. 146, L. 18) (**Simental**, 7-7-2016, P. 20, L. 17 – P. 21, L. 3) (**Stein**, 7-13-2016, P. 6, L. 11-14) (**Exh. 1542** (Resolution 10 - Originally attached to Exh. 569 - SMDC Agreement)) |
| 26. | On March 4, 2001, the tribal council of the Coastal Gabrielinos consisted of Sam Dunlap, Chief Jim Ernie Velasquez, Richard C. Aguilera, Victor Velasquez, Mary Ellen Arreola, Mary I. Aguilera, David B. Velasquez, Connie Marie Torres, Robert Aguilar, Dianna Simental, Patricia M. Neminski, and Mary Aguilera. (**Dunlap**, 6-29-2016, P. 44, L. 11-26) (**Neminski**, 7-6-2016, P. 65, L. 7-18) (**Velasquez**, 7-6-2016, P. 144, L. 26 – P. 146, L. 18) (**Simental**, 7-7-2016, P. 27, L. 9-18) (**Exh. 1542** (Resolution 10 - Originally attached to Exh. 569 - SMDC Agreement)) |
| 27. | On March 1, 2001, Stephen Otto wrote a letter to Jim Ernest Velasquez, the Tribal council chief and chairman, expressing his regret that "I am unable to represent the Gabrieleno Tongva (the "Tribe") as Tribal Counsel and in connection with the St. Monica Development Company, LLC (Jonathan Stein) proposal agreement." He also encloses a copy of a $2,500 retainer check from an entity entitled "Professional Native American Cultural Resources Monitors." (**Simental**, 7-7-2016, P. 18, L. 23 – P. 19, L. 2; P. 22, L. 27 – P. 23, L. 13; P. 46, L. 27 – P. 48, L. 9.)(**Exh. 240 and 241** (2001, March 1, Letter from Stephen Otto, Esq to Tribal Council declining to be Counsel for the Tribe). (This exhibit was apparently marked twice.) |
| 28. | On or about March 8, 2001, Stephen B. Otto, Esq. wrote a second letter to the Gabrielino Tribal Council, Chief Velasquez and Stein to disclaim his role in the SMDC transaction because Stein had prepared a resolution appointing Otto as tribal general counsel despite the fact that Otto's had earlier explicitly declined to accept that position. He also states that he wouldn't forward any |

3

| **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
| --- |
| written comments, that he was not forwarded an engagement agreement. He forcefully states (in the second page of the letter) that: "I was not representing the Tribe in any capacity on March 4, 2001, nor had I under the circumstances provided the Tribe with comments or advice on the agreement or resolutions when the Tribe through its Tribal Council purportedly approved or agreed to the agreement with St. Monica Development Company LLC and the related resolutions." <br><br> The first page of the March 8, 2001 Otto letter states that Stein replied to his disclaiming any role as general counsel via email him on February 26, 2001 saying, "I am sorry to see your resignation, .." that was before the March 1, Otto Letter, and before the March 8, 2001 Otto letter. <br><br> **(Neminski,** 7-6-2016, P. 46, L. 1-11; P. 81, L. 21-24; P. 82, L. 20 – P. 84, L. 7; P. 85, L. 2-28.) **(Simental,** 7-7-2016, P. 18, L. 23 – P. 19, L. 2; P. 22, L. 27 – P. 23, L. 13.) **(Dunlap,** 7-7-2016, P. 66, L. 4-15; P. 67, L. 1-17.) **(Exh. 16** (2001, March 8, Letter dated from Stephen Otto, Esq. to Tribal Council and Stein declining appointment of General Counsel of Tribe)). |
| 29.    Mr. Stein was the only attorney present at the meeting when the Tribe signed the SMDC Agreement.  There was no attorney representing for the Tribe or the Tribe's interests, other than Stein who was advocating for the SMDC Agreement's execution. **(Neminski,** 7-6-2016, P. 43, L. 9-16; P. 45, L. 12-19; P. 46, L. 1-15; P. 60, L. 16-17; P. 97, L. 13 — P. 98, L. 17) **(Velasquez,** 7-6-2016, P. 150, L. 20-25) **(Simental,** 7-7-2016, P. 18, L. 18-22; P. 36, L. 26 — P. 37, L. 1) **(Dunlap,** 7-7-2016, P. 66, L. 2-6) **(Stein,** 7-13-2016, P. 26, L. 27 — P. 27, L. 6) **(Stein,** 1-19-2017, P. 20, L. 8-15; P. 21, L. 17 — P. 22, L. 2) |
| 30.    The Tribal Councilmembers did not understand the SMDC Agreement as was presented to them.  They were not given the necessary time to read the document.  Likewise, they were not allowed to take a copy home, therefore, they did not have a meaningful opportunity to have a lawyer (or anybody else) review the document.  Nonetheless, the Tribe executed the SMDC Agreement in March of 2001, without the benefit of any legal assistance or advice whatsoever other than Stein's. **(Neminski,** 7-6-2016, P. 44, L. 4-24; P. 46, L. 5-13; P. 60, L. 16-17; P. 70, L. 27 – P. 71, L. 1; P. 87, L. 11-18; P. 97, L. 24 - P. 98, L. 17) **(Velasquez,** 7-6-2016, P. 149, L. 14-23; P. 150, L. 5-9; P. 157, L. 18-25; P. 163, L. 4-12) **(Simental,** 7-7-2016, P. 13, L. 14-26; P. 14, L. 1-3; P. 14, L. 6-13; P. 18, L. 6-8; P. 18, L. 18-22; P. 20, L. 3-7; P. 22, L. 18-25; P. 37, L. 22-27; P. 38, L. 21-25; P. 41, L. 5-20; P. 48, 5-17) **(Dunlap,** 7-7-2016, P. 83, L. 6-14; P. 127, L. 2-21) **(Exh. 16** (2001, March 8, Letter dated from Stephen Otto, Esq. to Tribal Council and Stein **declining** appointment of General Counsel of Tribe)) **(Exh. 241** (2001, March 1, Letter from Stephen Otto, Esq. to Tribal Council declining to be Counsel for the Tribe)) |
| 31.    The Tribal Councilmembers were told they would be removed from the Tribal Council if they failed to sign the SMDC Agreement.  They described this as being "under duress" and believed that Mr. Stein's presence was to encourage the signing of the SMDC Agreement. **(Velasquez,** 7-6-2016, P. 150, L. 2-4; P. 152, L. 20-25; P. 155, L. 18-20; P. 159, L. 4-5; P. 161, L. 23-25; P. 161, L. 28 – P. 162, L. 1) **(Simental,** 7-7-2016, P. 14, L. 24 – P. 15, L. 3; P. 18, L. 13-16; P. 32, L. 1-22) **(Stein,** 7-13-2016, P. 25, L. 16-21; P. 26, L. 27 – P. 27, L. 4) |
| 32.    There is no record of Mr. Ed Hamburger ever agreeing to be general counsel.  **(Dunlap,** 7-7-2016, P. 64, L. 5 -- P. 65, L. 9) **(Exh. 1543** (Resolution 15 unsigned Hamburger/Resolution 15 signed |

| **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
| --- |
| Lamothe) |
| 33.    The SMDC Agreement was entered into before Virginia Carmelo started acting as a Tribal Councilmember, and before she was elected as a Tribal Councilmember in November of 2005. (**Stein**, 6-27-2016, P. 26, L. 12-22) (**Carmelo**, 6-28-2016, P. 2, L. 10-13) |
| 34.    The 2001 SMDC Agreement provides that no attorney-client relationship is created by the contract or ever existed between the Tongva and either Stein or the law firm or Arter & Hadden LLP. (**Velasquez**, 7-6-2016, P. 157, L. 9-17) (**Simental**, 7-7-2016, P. 41, L. 5-20) (**Dunlap**, 7-7-2016, P. 98, L. 9-11; P. 99, L. 3-9; P. 102, L. 25 – P. 103, L. 8) (**Exh. 569** (SMDC Agreement at pp. 5, section 2.e)) |
| 35.    Stein acted as the main attorney for the tribe, even though he made it clear in the SMDC Agreement that he was not entering into an attorney-client relationship. (**Perez**, 7-6-2016, P. 109, L. 10-14; P. 114, L. 15 – P. 115, L. 1) (**Adam Loya** ("Loya"), July 6, 2016, Page 178, Line 21- P. 179, L. 13) (**Dunlap**, 7-7-2016, P. 85, L. 7-19; P. 94, L. 21-28; P. 98, L. 19-26; P. 100, L. 4-8; P. 100, L. 14-16; P. 100, L. 24-25) (**Carmelo**, 7-7-2016, P. 136, L. 19 — P. 137, L. 13) (**Carmelo**, 7-11-2016, P. 2, L. 14-22; P. 31, L. 22 - P. 32, L. 6; P. 33, L. 11-19) (**Carmelo**, 7-12-2016, P. 17, L. 26 — P. 18, L. 24; P. 62, L. 19-25; P. 64, L. 17 - P. 65, L. 2) (**James McShane** ("McShane"), July 15, 2016, Page 3, Line 13 – P. 4, L. 13) (**Elizabeth Aronson** ("Aronson"), March 2, 2017, Page 39, Line 10-14) (**Exh. 32** (An unsigned letter by Stein apparently written for Attorney General Bill Lockyer providing a legal opinion regarding tribal gaming)) (**Exh. 55** (Email Dunlap to Tribal Council)) (**Exh. 56** (Email Dunlap to Polanco - August 4th, 2006)) |
| 36.    Dunlap believed that Stein was the Tribe's lawyer. (**Dunlap**, 7-7-2016, P. 83, L. 22 – P. 84, L. 4; P. 85, L. 7-19; P. 94, L. 21-28; P. 98, L. 19-26; P. 100, L. 4-25; P. 101, L. 5-8) (**Exh. 32** (An unsigned letter by Stein apparently written for Attorney General Bill Lockyer providing a legal opinion regarding tribal gaming)) (**Exh. 55** (Email Dunlap to Tribal Council)) (**Exh. 56** (Email Dunlap to Polanco - August 4th, 2006)) |
| 37.    Carmelo always believed that Stein was the Tribe's main advisor and lawyer.  He provided the Tribe with a lot of advice, including legal advice.  For example, he conceived, initiated and litigated the Morales litigation (case number BC280605). (**Carmelo**, 7-7-2016, P. 128, L. 25 – P. 129, L. 23; P. 129, L. 27 – P. 132, L. 17) (**Carmelo**, 7-11-2016, P. 2, L. 12-22) (**Carmelo**, 7-12-2016, P. 62, L. 19-25; P. 64, L. 17 - P. 65, L. 2) |
| 38.    Stein advised the plaintiffs in the Morales litigation and was the primary strategist in that litigation.  He advised the Tribe that three individual leaders of the Tribe (who were acting as Tribal Council) should bring a lawsuit against Morales group and sue in their own name, instead of in the name of the Tribe. (**Perez**, 7-6-2016, P. 106, L. 2-8; P. 107, L. 9-20; P. 107, L. 27 – P. 108, L. 3; P. 108, L. 24 – P. 109, L. 11; P. 110, L. 3-12; P. 120, L. 2-10) (**Dunlap**, 7-7-2016, P. 73, L. 16 – P. 74, L. 20; P. 75, L. 4-16; P. 76, L. 27 – P. 77, L. 18; P. 80, L. 4-10; P. 123, L. 11-16; P. 124, L. 7-24) (**Carmelo**, 7-7-2016, P. 128, L. 25 – P. 129, L. 23; P. 130, L. 21 – P. 131, L. 19) (**Carmelo**, 7-12-2016, P. 62, L. 19-25) (**Rae Lamothe** ("Lamothe"), July 22, 2016, Page 12, Line 9 — P. 13, L. 13; P. 22, L. 11-23) (**Lamothe**, 1-24-2017, P. 7, L. 10-17) (**Exh. 18** (2002, Aug. 29 Complaint in Morales Litigation (case number BC280605) (called as exhibit 19 later **separated from exhibit 19** |

| Material Fact/Evidence With Specific Citations to Testimony or Exhibits |
|---|
| 19))) **(Exh. 22** (Substitution of Attorney - Lamothe for Stein)) |
| 39.    A month after the SMDC Agreement was entered into, Stein hired Lamothe as the Tribe's "General Counsel." **(Dunlap,** 7-7-2016, P. 118, L. 7-18) **(Lamothe,** 1-24-2017, P. 31, L. 8-14) |
| 40.    Rae Lamothe, who was the Tribe's official "General Counsel" also worked on the Morales litigation, but she was only part-time and worked directly and exclusively under the supervision of Stein. **(Perez,** 7-6-2016, P. 119, L. 15 – P. 120, L. 1; P. 125, L. 27 – P. 126, L. 14; P. 135, L. 17 – P. 136, L. 17) **(Dunlap,** 7-7-2016, P. 76, L. 2-6; P. 76, L. 26-27; P. 123, L. 15-16) **(Carmelo,** 7-7-2016, P. 128, L. 24 – P. 129, L. 3; P. 131, L. 12-16) **(Carmelo,** 7-12-2016, P. 61, L. 3-16) **(Lamothe,** 7-22-2016, P. 14, L. 5-9) **(Lamothe,** 1-24-2017, P. 7, L. 23 – P. 8, L. 12) **(Exh. 18** (2002, Aug. 29 Complaint in Morales Litigation (case number BC280605) (called as exhibit 19 later **separated from exh. 19**))) **(Exh. 1543** (Resolution 15)) **(Exh. 1546** (Resolution 37)) |
| 41.    Stein served as Dunlap's attorney of record in the Morales litigation and gave the Tribe advice about how to bring the Morales litigation (on the names of the individual Plaintiffs, instead of the Tribe). Rae Lamothe represented Alcala, Carmelo and Perez. Stein advised that the Tribe (as an entity) should not be a party to the litigation. **(Dunlap,** 6-29-2016, P. 120, L. 8-9) **(Perez,** 7-6-2016, P. 120, L. 26 – P. 121, L. 9) **(Dunlap,** 7-7-2016, P. 73, L. 3 – P. 75, L. 10) **(Carmelo,** 7-7-2016, P. 128, L. 25 – P. 129, L. 23) **(Lamothe,** 7-22-2016, P. 10, L. 1-4; P. 12, L. 9 – P. 13, L. 13; P. 13, L. 19-23) **(Lamothe,** 1-24-2017, P. 6, L. 15; P. 6, L. 28 – P. 7, L. 1) **(Exh. 18** (2002, Aug. 29 Complaint in Morales Litigation (case number BC280605) (called as exhibit 19 later **separated from exh. 19**))) |
| 42.    Stein told Dunlap that the Morales litigation was going poorly and that he did not want to serve as counsel of record for Dunlap anymore.  Stein did not want a litigation loss on his record. Consequently, Dunlap, Stein and Lamothe all executed a substitution of attorney so that Rae Lamothe could substitute in as Dunlap attorney of record. **(Dunlap,** 7-7-2016, P. 87, L. 26 – P. 88, L. 6) **(Lamothe,** 7-22-2016, P.10, L.10 – P. 11, L. 4) **(Lamothe,** 1-24-2017, P. 9, L. 10-17) **(Exh. 22** (2003 Aug. 12 Morales Substitution of Attorney (case number BC280605))) |
| 43.    Eventually, the plaintiffs in the Morales litigation lost all of their claims against the Morales Group and became liable for the fees and costs owing to the Morales Group.  The costs were beyond what Dunlap could handle and was forced to file for personal bankruptcy.  **(Dunlap,** 6-29-2016, P. 119, L. 28 – P. 120, L. 13) **(Dunlap,** 7-7-2016, P. 77, L. 23 – P. 78, L. 11) **(Lamothe,** 7-22-2016, P. 16, L. 13-26) **(Lamothe,** 1-24-2017, P. 9, L. 18-22) |
| 44.    Stein insisted on handling the settlement negotiations with the Morales faction over the judgment due and owing to Morales faction (even after a judgment was entered against the plaintiffs) even though he was no longer counsel of record in that litigation. **(Dunlap,** 7-7-2016, P. 124, L. 7-24) **(Carmelo,** 7-7-2016, P. 134, L. 27 – P. 135, L. 9) **(Aronson,** 3-1-2017, P. 32, L. 11 – P. 33, L. 18; P. 34, L. 12-19) **(Aronson,** 3-2-2017, P. 42, L. 28 – P. 43, L. 8) **(Aronson,** 3-6-2017, P. 32, L. 22 – P. 33, L. 16) **(Exh. 254** (Aronson Response Letter to Geoffrey Long)) |
| 45.    On November 30, 2005, Stein sends an e-mail to Rae Lamothe explaining that they cannot let Dunlap's bankruptcy counsel do all the work on Dunlap's bankruptcy.  He tells Ms. Lamothe that he will supervise her in doing the work on the bankruptcy for on behalf of the tribe and will represent |

| **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|
| the *tribe's point of view*. |
| He writes that: "Sam needs to have his attorney to be the attorney of record for his adversary proceeding' However, *we have to represent the tribe's* point of view which can probably be done through a declaration from the tribal GC, backed up with an intensive list of exhibits. |
| "The key points are 1) we are the tribe and not the Inc., 2) the B K court should not decide any such controversy as to who is quote the tribe and 3) the exact nature of the judgment, which makes it dischargeable.  I would like to be sure that you do most of the work under my supervision.  Sam's attorney should work with us, but must follow our direction, …" |
| (**Lamothe**, 1-24-2017, P. 11, L. 15- P. 16, L. 10); (**Exh 36** email chain dated Nov. 30, 2005 between Stein and Ms. Lamothe.  (Emphasis added.) |
| 46.     When Stein introduced himself to Richard Polanco (around 2004), he described himself as the Tribe's developer and its lawyer.  He told him that he hired and fired all of the Tribe's consultants and lawyers that the Tribal Council trusted him without reservation.  He said that they had never failed to follow his advice on any issue.  Thus, it was unnecessary for Polanco to meet the Tribe for them to hire me. (**Richard Polanco ("Polanco")**, June 28, 2016, Page 74, Lines 23 – Page 75, Lines 6; P. 76, L. 13-16; P. 76, L. 24 – P. 77, L. 1) (**Polanco**, 7-12-2016, P. 97, L. 19-24; P. 99, L. 13-16; P. 102, L. 19-28) (**Exh. 25** (2004, March 1, Consulting Agreement between the Tribe and Tres Es, LLC)) |
| 47.     Polanco believed that Stein prepared the contract (agreement) which embodied the Political Consulting Agreement between the Tribe and Polanco's (and his wife's) company.  (**Polanco**, 7-12-2016, P. 99, L. 1 –  P. 100, L. 10) (**Exh. 25** (2004, March 1, Consulting Agreement between the Tribe and Tres Es, LLC)) |
| 48.     Polanco was engaged to consult on behalf of the Tribe from approximately May 2004 to June 2005, and again from February 1, 2006 through October 31, 2006.  He was hired by Stein. (**Polanco**, 6-28-2016, P. 74, L. 23 – P. 75, L. 6; P. 75, L. 17-21; P. 77, L. 10-14; P. 78, L. 9-27; P. 79, L. 18-26; P. 80, L. 7-11) (**Polanco**, 7-12-2016, P. 99, L. 6-12; P. 100, L. 18-25; P. 103, L. 8-10) (**Polanco**, 7-13-2016, P. 16, L. 6-26) (**Exh. 25** (2004, March 1, Consulting Agreement between the Tribe and Tres Es, LLC)) |
| 49.     Around March of 2005, Stein blind carbon copied (BCC) Polanco on a letter to State Senator Martha M. Escutia.  With that letter, Stein attaches a copy of a 120 page brief which he had written regarding the Tribe's ability to conduct gaming in California even before it achieves federal recognition.  Specifically, in that letter, Stein tells Escutia that the brief "argues, successfully, I think, that our state-recognized tribe may conduct gaming on a state Indian reservation without federal recognition." (**Candelaria**, 6-22-2016, P. 46, L. 11-21) (**Loya**, 7-6-2016, P. 165, L. 7-22) (**Polanco**, 7-13-2016, P. 35, L. 12-15) (**Stein**, 3-15-2017, P. 44, L. 22 – P. 45, L. 13) (**Exh. 30** (Excutia Letter)) |
| 50.     Polanco was aware that Stein had drafted a long brief arguing that a state recognized tribe, such as the Plaintiff (Tribe) could engage in gaming in a state reservation. (**Polanco**, 7-13-2016, P. 35, L. 12-15) |

| | **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|---|
| 1 | |
| 2 | 51.    Stein drafted a shorter letter (or 3-4 pages) which is apparently addressed to California's then Attorney General Bill Lockyer and makes a similar argument: that a California recognized tribe can engage in gaming operations as long as they get certain approval from the State, even without federal recognition.  (**Dunlap**, 7-7-2016, P. 83, L. 22 – P. 84, L. 2; P. 84, L. 20-26; P. 85, L. 7-19) (**Carmelo**, 7-7-2016, P. 135, L. 16-25; P. 136, L. 1-6) (**Carmelo**, 7-12-2016, P. 66, L. 22 – P. 67, L. 22) (**Stein**, 1-31-2017, P. 32, L. 21 – P. 33, L. 10) (**Stein**, 2-1-2017, P. 16, L. 22 – P. 17, L. 2) (**Exh.** **32** (An unsigned letter by Stein apparently written for Attorney General Bill Lockyer providing a legal opinion regarding tribal gaming)) |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | 52.    Stein had drafted two substantial briefs, law review articles arguing that a state recognized tribe, such as the Plaintiff (Tribe) could engage in gaming in a state reservation.  During trial, he stated that it was "cutting edge" legal advice regarding how a state-recognized Tribe could engage in gaming without federal recognition.  (**Stein**, 6-27-2016, P. 27, L. 22 – P. 29, L. 7) (Exhibit 738 – Law Review Article) |
| 8 | |
| 9 | |
| 10 | |
| 11 | 53.    The Gabrielino-Tongva Tribal Nation held elections in October 2005 wherein six Tribal members were elected to the Tribal Council – Virginia Carmelo, Sam Dunlap, Martin Alcala, Shirley Machado, Adam Loya and Edgar Perez.  This Tribal Council of the Gabrielino-Tongva Tribal Nation that was elected in October 2005 shall be referred to as the "Tribal Council."  (**Garcia**, 6-22-2016, P. 69, L. 7-9) (**Stein**, 6-27-2016, P. 26, L. 12-14) (**Dunlap**, 6-29-2016, P. 47, L. 14-19) (**Perez**, 7-6-2016, P. 100, L. 17-18) (**Loya**, 7-6-2016, P. 164, L. 27 – P. 165, L. 6) |
| 12 | |
| 13 | |
| 14 | |
| 15 | 54.    Thus, the SMDC Agreement was entered into before Carmelo and many of the key councilmembers in this dispute started acting as a Tribal Councilmembers, and before they were elected as a Tribal Councilmember in November of 2005. Virginia Carmelo testified that she didn't see the SMDC Agreement in whole, including the original agreement which was entered into in March of 2001, until this litigation broke out and she became a party to it. (**Stein**, 6-27-2016, P. 26, L. 12-14) (**Virginia Carmelo** ("Carmelo"), June 28, 2016, Page 2, Line 10 – Page 3, Line 8) ( **Carmelo**, 7-7-2016, P. 139, L. 9 – P. 140, L. 24. And 7-11-2016, P. 16, L. 12-17. and 7-12-2016, P. 3, L. 23 – P. 4, L. 4.) |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | 55.    Stein hired Elizabeth Aronson as an Associate General Counsel at around April of 2006. (**Aronson**, 3-1-2017, P. 15, L. 13 – P. 16, L. 8) |
| 21 | |
| 22 | 56.    Stein, with the help of Sam Dunlap, drafted the constitution to secure Libra investment funding.  (**Stein**, June 30, 2016, P. 36, L. 16-20; P. 37, L. 26 - P. 39, L. 2.) (**Exh. 44** (Candelaria Faction Constitution)) |
| 23 | |
| 24 | 57.    On May 20, 2006, Stein drafted, at the request of Libra, a legal document in the form of a letter agreement that purports to modify the SMDC Agreement and states that Tribe members and Tribal Council members had <u>no personal liability for any damages that SMDC may suffer as a result of any breach of the SMDC Agreement, or otherwise, except to the extent that such individuals misappropriated funds.</u> (**Carmelo**, 6-28-2016, P. 10, L.15 – P. 11, L. 9) |
| 25 | |
| 26 | |
| 27 | 58.    In preparation for the execution of the Libra Funding Agreement, Stein hired Marilyn Barrett, Esq., an experienced tax and corporate lawyer to assist with the financing transaction.  Stein |
| 28 | |

8

Exh. C -- Appendix of Evidence In Support of Statement of Decision

| | **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|---|
| 1 | |
| 2 | approached Barrett about the engagement. (**Barrett**, 7-8-2016, P. 5, L. 24-28; P. 6, L. 7-17) (**Barrett**, 3-7-2017, P. 41, L. 27 – P. 42, L. 4) |
| 3 | |
| 4 | 59.   As he did with other lawyers, Stein directed Barrett's work.  For example, in one email, dated March 22, 2006, Stein explained to Barrett that he was contemplating hiring a new lawyer "to help with Indian issues", but he was not convinced one was needed because "you are here for all corporate issues and I can handle Indian issues well enough to respond to investor counsel.  In essence, the question is just the same as corporate law: duly organized, validly existing and fully authorized."  (**Barrett**, 7-8-2016, P. 8, L. 18 – P. 9, L. 9) (**Exh. 38** (March 22, 2006 email from Stein to Marilyn Barrett, describing specific legal tasks to be performed by either Marilyn or Stein)) |
| 5 | |
| 6 | |
| 7 | |
| 8 | 60.   On March 23, 2006 Stein sends Barrett another email directing her to draft a waiver and specifies five key provisions and suggest language to be included in the provisions.  (**Barrett**, 7-8-2016, P. 15, L. 24 – P. 16, L. 16; P. 49, L. 21 – P. 50, L. 7) (**Exh. 40** (March 23, 2006 email from Stein to Barrett)) |
| 9 | |
| 10 | |
| 11 | 61.   A few days before a $22 million investment agreement with former defendant Libra Securities Holdings, LLC ("Libra") was to be executed, Stein unilaterally terminated the Tribe's outside counsel, Marilyn Barrett of McGuire Woods, without consulting the Tribal Council.  He handled the closing of the Libra deal, on behalf of the Tribe, without the assistance of any other experienced corporate counsel, other than himself. (**Carmelo**, 6-28-2016, P. 14, L. 1- 20) (**Loya**, 7-6-2016, P. 185, L. 27 – P. 186, L. 15) (**Barrett**, 7-8-2016, P. 19, L. 6-7; P. 19, L. 24 – P. 20, L. 19; P. 21, L. 7-11; P. 32, L. 8-10; P. 42, L. 26-28; P. 43, L. 21-28; P. 48, L. 24-25; P. 49, L. 2-6; P. 54, L. 4-8; P. 59, L. 10-16; P. 59, L. 17-22) (**Carmelo**, 7-11-2016, P. 11, L. 4-14) (**Carmelo**, 7-12-2016, P. 14, L. 11-20) (**Aronson**, 3-1-2017, P. 17, L. 11-25) (**Barrett**, 3-7-2017, P. 2, L. 26-27; P. 3, L. 16-19; P. 6, L. 1 – P. 8, L. 6; P. 38, L. 6-10; P. 63-64, L. 25-28 and 1-7) |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | 62.   Aronson believed that Stein terminated Ms. Barrett for unethical reasons.  (**Aronson**, 3-1-2017, P. 17, L. 11-25; P. 18, L. 14 – P. 19, L. 2) (**Aronson**, 3-2-2017, P. 36, L. 1 – P. 38, L. 1) (**Exh. 254** (Aronson Letter to Geoffrey Long)) |
| 18 | |
| 19 | |
| 20 | 63.   Aronson located multiple attempts by Stein to double bill for the same expenses in the ledger that Stein kept for his "tribal expenses".  Aronson questioned some of the expenses as being those of his law office, not the Tribe's.  Stein agreed to remove the questionable expenses.  Soon thereafter, Aronson came to the office and saw David Dekorte, a summer intern, making entries in QuickBooks and the Tribal Miscellaneous Account.  Realizing the entries were the same questionable expenses Stein had agreed to remove, Aronson questioned Dekorte.  He confirmed that Stein had told him to enter the transactions into QuickBooks. (**Aronson**, 3-1-2017, P. 58, L. 1 – P. 59, L. 28) |
| 21 | |
| 22 | |
| 23 | |
| 24 | 64.   Aronson sought the tribal council's permission to and was granted authority to take over the Morales settlement to cut and deliver a check for the settlement amount to Mr. Morales. Stein was still trying to add stipulations to the agreement on the day the check was to be delivered.  (**Aronson**, 3-1-2017, P. 32, L. 11 – P. 33, L. 18; P. 34, L. 12-19) (**Aronson**, 3-2-2017, P. 42, L. 28 – P. 43, L. 8) (**Aronson**, 3-6-2017, P. 32, L. 22 – P. 33, L. 16) (**Exh. 254** (Aronson Response Letter to Geoffrey Long)) |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

| **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|
| 65.    On July 15, 2006, Stein e-mailed the Tribal Council as well as Elizabeth Aronson about a dispute with Tribal Councilperson Sam Dunlap.  Accusing Dunlap of seeking reimbursement which he was not entitled to and making other accusations against Dunlap. (**Carmelo**, 7-11-2016, P. 22, L. 17-20; P. 23, L. 24 – P. 26, L. 7) (**Exh. 54** (July 15, 2006 email from Mr. Stein to Tribal Council and Ms. Aronson re Confidential re Dunlap proposal)) |
| 66.    Throughout the summer of 2006 up until Stein's September 9, 2006 resignation letter, Stein made anti-Muslim remarks in order to insult Mr. Dunlap and his religious beliefs, and began a vicious campaign to have Dunlap removed from the Tribal Council.  Stein alleged that Dunlap was a terrorist with ties to Hezbollah and, rather inconsistently, that Dunlap was a CIA agent who had plans to bomb Hezbollah.  In outrageous attempts to extort a resignation from Dunlap, Stein threatened to report Dunlap for bankruptcy fraud and to the office of Homeland Security.  (**Dunlap**, 6-29-2016, P. 93, L. 11-19; P. 119, L. 21-27) (**Carmelo**, 7-11-2016, P. 22, L. 17 – P. 23, L. 19; P. 25, L. 15 – P. 26, L. 3) (**Aronson**, 3-1-2017, P. 53, L. 20 – P. 56, L. 6) (**Exh. 54** (July 15, 2006 email from Mr. Stein to Tribal Council and Ms. Aronson re Confidential re Dunlap proposal)) |
| 67.    On August 4, 2006, Dunlap sent an e-mail to the Tribal Council and Mr. Polanco, Mr. Stein et al. re "Tongva Council Meeting – John Velie." He wrote, "[p]erhaps <u>attorneys</u> like Jonathan Stein are the true empowerment of our tribe. Perhaps, we <u>as his clients</u>, are to be dictated to and coerced as we have been in the past by him. Am I wrong to question Jonathan Stein's practice and treatment of his clients?"  (**Carmelo**, 7-11-2016, P. 31, L. 2 – P. 32, L. 6) (**Exh. 55** (Email Dunlap to Tribal Council)) |
| 68.    On August 4, 2006, Dunlap sent an e-mail to Polanco, et al. asking him if "any other elected tribal officials, like myself, that you may have interacted with have similar issues with their <u>attorneys</u>, i.e. Jonathan Stein? Or does the Gabrielino Tongva Just happen to be in a unique situation?"  (**Carmelo**, 7-11-2016, P. 33, L. 1-19) (**Exh. 56** (Email Dunlap to Polanco - August 4th, 2006)) (emphasis added.)) |
| 69.    On August 23, 2006, Jonathan Stein, Esq., President of SMDC and CEO of Gabrielino Tribal Gaming Authority, confirmed in a letter to the Tribe that he had resigned his position with the Tribe as Tribal Development Officer and that the only position he, acting through SMDC, held was Chief Executive Officer of the GTGA. (**Stein**, 2-2-2017, P. 4, L. 14-27; P. 6, L. 6-18; P. 7, L. 5-11) (**Stein**, 2-16-2017, P. 26, L. 3-17) (**Aronson**, 3-2-2017, P. 57, L. 25 – P. 59, L. 12; P. 63, L. 1-6; P. 66, L. 4-12; P. 83, L. 27 – P. 84, L. 5) (**Stein**, 3-16-2017, P. 57, L. 25 – P. 58, L. 1) (**Exh. 64** (Sept. 9, 2006, Stein's letter confirming his resignation)) (**Exh. 254** (Aronson Response Letter to Geoffrey Long)) |
| 70.    Prior to a Tribal Council meeting scheduled for September 9, 2006, Stein demanded that the Tribal Council fire Aronson. He accused her of professional misconduct and incompetence, and said that he could not work with her. Stein told the Tribal Council "it's either her or me," and said that if the Tribe did not terminate Ms. Aronson as its general counsel, he would "take my investors and walk." The Tribal Council refused to fire Aronson. (**Carmelo**, 6-28-2016, P. 13, L. 9-17) (**Loya**, 7-6-2016, P. 169, L. 1-8) (**Carmelo**, 7-11-2016, P. 10, L. 18 – P. 11, L. 1) (**Carmelo**, 7-12-2016, P. 79, L. 8 – P. 80, L. 13; P. 89, L. 7-22; P. 90, L. 3-15) (**Stein**, 7-13-2016, P. 54, L. 11-17) (**Stein**, 2-1-2017, P. 49, L. 21 – P. 50, L. 2) (**Stein**, 2-2-2017, P. 2, L. 5-27; P. 35, L. 10 – P. 36, L. 5) (**Stein**, 2-7-2017, P. 18, L. 25-28) (**Aronson**, 3-1-2017, P. 25, L. 6 – P. 26, L. 8) (**Aronson**, 3-2-2017, P. 32, L. |

| | **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|---|
| 1 | |
| 2 | 7-25) **(Aronson**, 3-6-2017, P. 57, L. 27 – P. 58, L. 9) **(Exh. 60** (An unsigned letter, drafted by Stein purporting Termination for Cause letter addressed to Ms. Elizabeth Aronson)) |
| 3 | |
| 4 | 71.    At the Tribal Council's request, Aronson attended the Tribal Council meeting on September 9, 2006.  Stein presented the Tribal Council with a letter to approve the termination of Ms. Aronson |
| 5 | as general counsel.  The Tribal Council refused to sign it. Stein then told the Tribal Council that he resigned, and that he refused to work any further with people 🞐🞐 the Tribal Council 🞐🞐 that he |
| 6 | despised.  Dunlap asked Stein to put his resignation in writing, and he did so.  **(Carmelo**, 6-28-2016, P. 16, L. 18 – P. 17, L. 21) **(Dunlap**, 6-29-2016, P. 117, L. 20 – P. 118, L. 6) **(Carmelo**, 7-12-2016, |
| 7 | P. 79, L. 8 – P. 80, L. 13; P. 89, L. 7-22) **(Stein**, 2-2-2017, P. 35, L. 10 – P. 36, L. 5) **(McShane**, 7-15-2016, P. 51, L. 5-15) **(Aronson**, 3-1-2017, P. 22, L. 21 – P. 24, L. 22; P. 28, L. 15 – P. 29, L. 13; |
| 8 | P. 30, L. 4 – P. 31, L. 1; P. 64, L. 28 – P. 65, L. 8) **(Aronson**, 3-2-2017, P. 32, L. 7-25) **(Aronson**, 3-6-2017, P. 58, L. 7-9) **(Exh. 60** (An unsigned letter, drafted by Stein purporting Termination For |
| 9 | Cause letter addressed to Ms. Elizabeth Aronson)) **(Exh. 71** (Sept. 12, 2006 letter prepared by Mr. Stein to Elizabeth Aronson re Termination For Cause)) |
| 10 | |
| 11 | 72.    At the conclusion of the September 9, 2006 meeting, after telling the Tribal Council that he despised them and delivering his resignation letter, Stein demanded that the Tribal Council |
| 12 | immediately leave his office.  **(Dunlap**, 6-29-2016, P. 118, L. 3-6) **(Loya**, 7-6-2016, P. 168, L. 14-20) **(Aronson**, 3-1-2017, P. 24, L. 18-22) **(Aronson**, 3-2-2017, P. 28, L. 13-20; P. 32, L. 7-25; P. 60, |
| 13 | L. 1-4) **(Aronson**, 3-6-2017, P. 37, L. 26-27; P. 58, L. 7-9) |
| 14 | |
| 15 | 73.    On September 9, 2006, Stein on behalf of SMDC resigned his position as CEO of the Gabrielino Tribal Gaming Authority, which was the only position with the Tribe he held at the time |
| 16 | because he resigned as Tribal Development officer on August 23, 2006.  **(Carmelo**, 6-28-2016, P. 17, L. 10-21; P. 19, L. 14 – P. 20, L. 1) **(Stein**, 6-28-2016, P. 46, L. 1-4; P. 46, L. 24-28; P. 63, L. 18- |
| 17 | 25) **(Dunlap**, 6-29-2016, P. 117, L. 20 – P. 118, L. 6) **(Stein**, 6-30-2016, P. 3, L. 19-26) **(Stein**, 2-2-2017, P. 2, L. 21-27; P. 4, L. 14-20; P. 5, L. 11-12; P. 6, L. 6-20; P. 6, L. 25 – P. 7, L. 19; P. 50, L. |
| 18 | 13-23) **(Stein** 2-6-2017, P. 62, L. 22-28) **(Stein**, 2-7-2017, P. 18, L. 12-14; P. 39, L. 23 – P. 40, L. 5; P. 50, L. 19-25) **(Stein**, 2-8-2017, P. 2, L. 24 – P. 3, L. 2) **(Stein**, 2-16-2017, P. 21, L. 16-19; P. 22, |
| 19 | L. 3-15; P. 26, L. 14-17) **(Stein**, 2-21-2017, P. 20, L. 1) **(Aronson**, 3-1-2017, P. 24, L. 16-22) **(Aronson**, 3-2-2017, P. 28, L. 13-20; P. 32, L. 15-16; P. 59, L. 6-12; P. 60, L. 1-4; P. 61, L. 28 – P. |
| 20 | 63, L. 6; P. 83, L. 27 – P. 84, L. 5) **(Aronson**, 3-6-2017, P. 37, L. 3-9) **(Stein**, 3-16-2017, P. 57, L. 25 – P. 58, L. 1) **(Exh. 71** (Sept. 12, 2006 letter prepared by Mr. Stein to Elizabeth Aronson re |
| 21 | Termination For Cause)) **(Exh. 64** (Sept. 9, 2006, Stein's letter confirming his resignation)) **(Exh. 571** (October 3, 2006 - SMDC Termination Letter)) |
| 22 | |
| 23 | 74.    After September 9, 2006, the Tribal Council of the Tribe no longer maintained its offices at 501 Santa Monica Blvd., Suite 500. The Tribal Council then attempted to move out of Stein's law |
| 24 | offices, which had housed its operations and tried to carry whatever documents they could, but many documents were left behind, including individual tribal member records and other financial records. |
| 25 | **(Carmelo**, 6-28-2016, P. 18, L. 7 – P. 19, L. 13) **(Dunlap**, 6-29-2016, P. 118, L. 21-28) **(Carmelo**, 7-19-2016, P. 141, L. 5 – P. 142, L. 11) |
| 26 | |
| 27 | 75.    Following the September 9, 2006 meeting, and in reliance on Stein's statements and letter of resignation, the Tribal Council prepared and executed resolutions removing Stein as signatory on the |
| 28 | |

Exh. C -- Appendix of Evidence In Support of Statement of Decision

| | **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|---|
| 1 | |
| 2 | Tribal and GTGA checking accounts, and appointing Aronson as account signatory. (**McShane**, 7-15-2016, P. 9, L. 12-15; P. 12, L. 4-7; P. 15, L. 15-19; P. 36, L. 19-23; P. 44, L. 7-12) (**Aronson**, 3-2-2017, P. 61, L. 15-27; P. 63, L. 16 – P. 64, L. 5) (**Aronson**, 3-6-2017, P. 28, L. 26 – P. 29, L. 6) (**Exh. 65** (Sept. 9, 2006 Resolution No. 106: Authorization to Establish and Maintain Financial Accounts of the Gaming Authority and Tribal Administration.—Removes Stein from signatory authority)) |
| 6 | 76.     On September 10, 2006, Stein told the Tribal Council via an e-mail that he had "frozen" the Tribe's money for two weeks, and would return it to the investors "if the current problems are not sorted out."  Stein said that he would once again propose to the Tribal Council that Ms. Aronson be terminated as the Tribe's General Counsel. (**Aronson**, 3-2-2017, P. 51, L. 21 – P. 52, L. 10; P. 55, L. 18 – P. 56, L. 4) (**Aronson**, 3-6-2017, P. 60, L. 17-20; P. 62, L. 19 – P. 63, L. 5) (**Exh. 68** (Sept. 10, 2006 Mr. Stein's email explaining that he had frozen the Tribe's accounts)) (**Exh. 701** (Aronson Cashier Check Receipts)) |
| 10 | 77.     In an unsigned draft letter from the Tribal Council to Aronson that Stein drafted and urged the Tribal Council to sign, but which they refused to sign, Stein set forth the bases he believed existed to terminate Aronson for cause. (**Carmelo**, 7-12-2016, P. 79, L. 8 – P. 80, L. 15; P. 89, L. 17-22) (**Stein**, 2-1-2017, P. 49, L. 21 – P. 50, L. 19) (**Aronson**, 3-6-2017, P. 36, L. 5-16) (**Exh. 60** (An unsigned letter, drafted by Stein purporting Termination for Cause letter addressed to Ms. Elizabeth Aronson)) |
| 15 | 78.     On September 14, 2006, Aronson submitted a letter of resignation to the Tribal Council. However, the Tribal Council did not accept her resignation. (**Aronson**, 3-1-2017, P. 47, L. 15 – P. 48, L. 3; P. 50, L. 3 – P. 51, L. 2; P. 51, L. 10 – P. 52, L. 9; P. 64, L. 9-27) (**Aronson**, 3-6-2017, P. 39, L. 25 – P. 40, L. 12; P. 47, L. 21 – P. 48, L. 6) (**Exh. 675** (September 14, 2006 Aronson Resignation Letter)) |
| 18 | 79.     On September 19, 2006, Stein held a meeting with the Tribal Council and Jim McShane a lawyer from Sheppard Mullin, whom he wanted to hire to replace Aronson. He also drafted a "fiduciary duties" report which he wanted McShane to discuss with the Tribe, a matter which came as a surprise to McShane.  In that report, Stein advises them that certain conduct, would constitute breaches of their fiduciary duty to the Tribe. Id. At a certain point, he also explained that certain debts owed to Sam Dunlap would constitute property of his bankruptcy estate. (**McShane** 7-15-2016, P. 5, L. 1-16; P. 6, L. 2 — P. 7, L. 2; P. 7, L. 12 — P. 10, L. 13; P. 10, L. 14 — P. 11, L. 28; P. 31, L. 26 — P. 32, L. 8; P. 32, L. 19-22; P. 41, L. 16 — P. 42, L. 18; P. 52, L. 26 — P. 53, L. 5) (**Exh. 67** (Sept. 9, 2006 Stein's "Fiduciary Duties Report" to Tribal Council)) (**Exh. 245** (2006, Sept. 19 email from Stein to McShane Re GTGA – Jim Here are bullet points to reformulate)) |
| 24 | 80.     At a meeting with Mr. Stein on September 19, 2006, Stein presented the Tribal Council with a proposed resolution purporting to "irrevocably" (a) appoint himself as sole signatory on the GTGA's institutional banking account, (b) appoint Barbara Garcia, a Law Offices employee, as sole signatory on a checking account for the Tribe, and (c) appoint himself as sole signatory on a checking account for the GTGA. The Tribal Council refused to approve Stein's proposed resolution. (**Perez**, 7-6-2016, P. 113, L. 9-18) (**Loya**, 7-6-2016, P. 177, L. 2-11; P. 178, L. 7-16) (**McShane**, 7-15-2016, P. 4, L. 14-28; P. 7, L. 9-21; P. 42, L. 26 – P. 43, L. 13; P. 50, L. 18 – P. 51, L. 25) (**Exh. 649** (Sept. 26, 2006 |

| **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|
| Stein email to Tribal Council)) |
| 81.      Stein often drafted Resolutions for the Tribe. (**Neminski**, 7-6-2016, P. 43, L. 9-16) (**Perez**, 7-6-2016, P. 103, L. 9-13) (**Simental**, 7-7-2016, P. 23, L. 14-28) (**Dunlap**, 7-7-2016, P. 71, L. 1-16) (**Carmelo**, 7-7-2016, P. 140, L. 10 – P. 141, L. 3; P. 141, L. 11-26; P. 142, L. 7 – P. 143, L. 12) (**McShane**, 7-15-2016, P. 42, L. 27 – P. 43, L.3; P. 43, L. 21-27; P. 44, L. 7-12) (**Lamothe**, 7-22-2016, P. 3, L. 10-14; P. 3, L. 25 – P. 4, L. 10) (**Aronson**, 3-1-2017, P. 41, L. 12 – P. 42, L. 12) |
| 82.      On September 27, 2006, Mr. Stein sent an e-mail to Ms. Aronson, Tribal Council, et al. re "Pending litigation." By then, Stein was essentially threatening to sue everybody on the Tribal Council and its advisors if resolution with Stein was not arrived at by Sunday night. (**Stein**, 6-27-2016, P. 58, L. 7 – P. 59, L. 9) (**Exh. 570** (Sept 27, 2006 Stein Email to Tribal Council re they plan to terminate SMDC without payment)) |
| 83.      On September 29, 2006, the Tribal Council wrote a letter to Stein, stating "The Tribal Council has not taken a position on whether you have resigned or whether your actions constitute grounds for termination of our arrangement." The Tribal Council further requested that Stein "immediately suspend all of your activities, and those of St. Monica Development Company, on behalf of the Tribe and the Tribal Gaming Authority." The Tribal Council copied Libra Investors and Richard Polanco, who at that time was still under contract as a consultant for the Tribe. (**Carmelo**, 6-28-2016, P. 25, L. 2-13) (**Polanco**, 6-28-2016, P. 89, 1-3) (**Carmelo**, 7-12-2016, P. 77, L. 18 – P. 78, L. 4) (**Stein**, 2-16-2017, P. 22, L. 21-27; P. 24, L. 27 – P. 25, L. 12) |
| 84.      On October 3, 2006, James F. McShane of Sheppard, Mullin, Richter & Hampton LLP wrote a letter to Jonathan Stein, stating that the Tribal Council of the Tribe had accepted Mr. Stein's resignation and that to the degree Mr. Stein took the position that he did not intend to resign, that the Tribal Council on behalf of the Tribe was terminating any relationship between SMDC and the Tribe, effective immediately. (**Stein**, 6-27-2016, P. 63, L. 13 – P. 64, L. 1) (**Polanco**, 6-28-2016, P. 89, L. 1-3) (**Stein**, 6-30-2016, P. 3, L. 19 – P. 4, L. 3) (**McShane**, 7-15-2016, P. 21, L. 20 – P. 22, L. 5; P. 53, L. 13 – P. 54, L. 3) (**Stein**, 2-16-2017, P. 22, L. 3-7) (**Exh. 571** (Oct 3, 2006 SMDC Termination Letter from Sheppard Mullin)) |
| 85.      After the October 3, 2006 meeting at Libra's offices, the Tribal Council asked Polanco to be Chief Executive Officer of the Tribe. Tribal councilperson Sam Dunlap had asked Polanco to attend the October 3, 2006 meeting at Libra's offices to provide the Tribe a legislative update. Polanco had been acting as a political consultant and lobbyist for the Tribe. (**Carmelo**, 6-28-2016, P. 20, L. 11-19) (**Polanco**, 6-28-2016, P. 81, L. 11-19; P. 81, L. 23 – P. 82, L. 25; P. 83, L.10-18; P. 84, L. 8-12) (**Polanco**, 7-12-2016, P. 98, L. 12-28) (**Exh. 25** (2004, March 1, Consulting Agreement between the Tribe and Tres Es, LLC (Polanco) (Ex. 40 to Greeley))) |
| 86.      On May 20, 2006, Libra Investors, LLC ("Libra") and the Tribe executed a Funding Agreement ("Libra Funding Agreement") for up to $21 million in investment funds. (**Stein**, 6-27-2016, P. 31, L. 8-12; P. 31, L. 22 – P. 32, L. 14) (**Stein**, 6-28-2016, P. 30, L. 7-10; P. 30, L. 19 – P. 31, L. 6) (**Carmelo**, 6-28-2016, P. 5, L. 1-4; P. 11, L. 13-16) (**Dunlap**, 6-29-2016, P. 47, L. 11 – P. 48, L. 12) (**Loya**, 7-6-2016, P. 165, L. 28 – P. 166, L. 6) (**Barrett**, 7-8-2016, P. 24, L. 2-10) (**Aronson**, 3-2-2017, P. 16, L. 26 – P. 17, L. 4; P. 17, L. 14-17) (**Exh. 644** (GT Tribe — Libra |

| **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|
| Investors Agreement)) |
| 87.    In late May 2006, the Tribe received $1,805,889 which represented the first tranche of that $2,150,000 in investment funds pursuant to the Libra Funding Agreement, less certain expenses. (**Stein**, 6-27-2016, P. 45, L. 11-14) (**Carmelo**, 6-28-2016, P. 4, L. 13-16) (**Stein**, 6-30-2016, P. 24, L. 11-13) (**Loya**, 7-6-2016, P. 165, L. 28 – P. 166, L. 6) (**Aronson**, 3-2-2017, P. 16, L. 26 – P. 17, L. 4; P. 17, L. 14-17) (**Exh. 644** (GT Tribe — Libra Investors Agreement)) |
| 88.    The Libra Funding Agreement required that SMDC confirm that no individuals were personally liable under the SMDC Agreement (except for embezzlement or misappropriation). (**Carmelo**, 6-28-2016, P. 10, L.15 – P. 11, L.9) |
| 89.    Only the Tribal Council has the power and authority to spend Tribal funds, including the Investment Funds. (**Carmelo**, 6-28-2016, P. 46, L. 26 – P. 47, L. 3) (**Stein**, 6-30-2016, P. 24, L. 8 – P. 25, L. 5) |
| 90.    Arthur Margolis began as a prosecutor for the State Bar of California on disciplinary matters and ethic matters in 1973.  He investigated hundreds of complaints against attorneys, prosecuted informal disciplinary proceedings, and represented the State Bar in disciplinary proceedings before the State Bar review department which is the internal appellate division of the State Bar Court.  He also represented the State Bar before the California Supreme Court in attorney disciplinary matters.  He answered the ethics line when the attorneys had questions regarding ethics and as a representative of the State Bar he spoke at various bar associations on disciplinary matters and ethical issues.  When he left the State Bar in 1986, he had the title of Senior Trial Counsel.  After leaving in 1986, the State Bar asked Margolis to come back to prosecute two more cases. (**Arthur Margolis ("Margolis")**, July 15, 2016, Page 4, Line 17 — P. 5, L.5; P. 5, L. 16-28) (**Margolis**, 3-3-2017, P. 5, L. 22-28) (**Margolis**, 3-8-2017, P. 54, L. 2-11) |
| 91.    After Margolis left the State Bar in 1986, his practice has been almost entirely, although not entirely, devoted to State Bar issues, ethics, professional responsibility and defending attorneys who are being investigated or prosecuted at the state bar and in consulting with attorneys so that they can avoid ethical issues.  He served as a consultant with the Los Angeles County District Attorney's office on certain ethical issues.   From 1986 to the present, he has had dozens of speaking engagements where he discussed ethical issues with various bar associations and groups including giving a speech at the State Bar convention.  His practice also consists, to an extent, of doing expert witnessing. (**Margolis**, 7-15-2016, P. 6, L. 2-20) |
| 92.    Stein drafted the SMDC agreement in such a way that he would protect himself. (**Margolis**, 7-20-2016, P. 30, L. 21-24; P. 32, L. 9-15; P. 32, L. 21 — P. 33, L. 1; P. 33, L. 24 — P. 34, L. 16; P. 35, L. 22 — P. 36, L. 2) (**Margolis**, 3-3-2017, P. 32, L. 27 — P. 33, L. 2) (**Margolis**, 3-8-2017, P. 20, L. 6-13) |
| 93.    The 2001 SMDC Agreement provides that no attorney-client relationship is created by the contract or ever existed between the Tongva and either Stein or the law firm or Arter & Hadden LLP. (**Velasquez**, 7-6-2016, P. 157, L. 9-17) (**Simental**, 7-7-2016, P. 41, L. 5-20) (**Dunlap**, 7-7-2016, P. 98, L. 9-11; P. 99, L. 3-9; P. 102, L. 25 – P. 103, L. 8) (**Exh. 569** (SMDC Agreement at pp. 5, section |

| | |
|---|---|
| 1 | **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
| 2 | 2.e)) |

94.     The SMDC agreement applies only to the relationship that would have been created by that contract or by Stein's role in SMDC, but it does not apply to any of his independent actions outside of those roles. The agreement itself is limited, because it only deals with what is created by the agreement and by the specific roles that are defined in the agreement, but it does not deal with his independent actions outside of those roles or outside of the contract. Any legal work or legal advice he does outside of that role creates an attorney-client relationship and a fiduciary duty. [Lewis versus state bar, 1973, nine Cal third '70 four at seven 13] [Beery versus state bar, 1987, 43 Cal third 802 at 813]. (**Margolis**, 7-15-2016, P. 53, L. 26 — P. 54, L. 4; P. 57, L. 21-28; P. 58, L. 8 — 59, L. 5) (**Margolis**, 7-20-2016, P. 27, L. 8-16; P. 28, L. 4-14; P. 30, L. 27 — P. 31, L. 15; P. 51, L. 14-21; P. 52, L. 19-24; P. 56, L. 19 – P. 57, L. 18; P. 58, L. 12-28; P. 60, L. 8-12; P. 60, L. 19-28; P. 63, L. 14-18; P. 101, L. 1-6; P. 109, L. 21-24) (**Margolis**, 3-8-2017, P. 10, L. 14-16; P. 15, L. 17-21; P. 16, L. 9-13; P. 56, L. 8-20) (**Margolis**, 3-9-2017, P. 43, L. 1-8) (**Exh. 569** (SMDC Agreement dated March 4, 2001 - Section 2E and Section 3D))

95.     Even though the SMDC Agreement states that all modifications to the agreement have to be in writing, Stein could still create an implied attorney-client relationship agreement outside of the SMDC Agreement. (**Margolis**, 7-20-2016, P. 51, L. 14-21; P. 52, L. 19-24; P. 53, L. 11 – P. 54, L. 16; P. 54, L. 23 – P. 55, L. 3; P. 56, L. 19 – P. 57, L. 18; P. 58, L. 12-28; P. 60, L. 8-12; P. 60, L. 19-28) (**Margolis**, 3-8-2017, P. 10, L. 14-16; P. 15, L. 17-21; P. 16, L. 1-13) (**Exh. 569** (SMDC Agreement dated March 4, 2001))

96.     An attorney-client relationship is formed informally, through an implied agreement even if there is an understanding that an attorney and an individual are not in a previous attorney-client relationship, by conduct and by course of dealing. It is formed if an attorney provides legal services and the person symptoms them, or the speculation of the client, based on how the situation appears to a reasonable person in the client's situation, or when a person reasonably believes that the attorney is representing him based on the attorney's representation or conduct. [Agran versus Shapiro, 127 Cal.App.2d 807 at 809] [People versus Merchants Protective corporation, 1922, it's at 189 Cal 531, 535] [Mallen on malpractice)]. (**Margolis**, 7-15-2016, P. 14, L. 14-26) (**Margolis**, 7-20-2016, P. 19, L. 6-10; P. 23, L. 12-15; P. 24, L. 4-12; P. 24, L. 22 — P. 25, L. 8; P. 36, L. 3-18; P. 37, L. 18 — P. 38, L. 15; P. 38, L. 23-27; P. 40, L. 5 – P. 41, L. 6; P. 60, L. 22-23; P. 67, L. 3-9; P. 72, L. 4-11; P. 72, L. 18 – P. 73, L. 22; P. 74, L. 28 — P. 75, L. 18; P. 76, L. 9-28; P. 77, L. 24 – P. 78, L. 15; P. 79, L. 27 – P. 80, L. 4; P. 80, L. 10-18; P. 80, L. 20-26; P. 80, L. 27 – P. 81, L. 5; P. 82, L. 15 — P. 83, L. 1; P. 83, L. 2-28) (**Margolis**, 3-3-2017, P. 16, L. 19-24; P. 17, L. 6-17; P. 20, L. 13 — P. 21, L. 28; P. 23, L. 16-20; P. 23, L. 24 — P. 24, L. 15) (**Margolis**, 3-8-2017, P. 7, L. 14-28; P. 9, L. 4-6; P. 24, L. 2-4) (**Margolis**, 3-9-2017, P. 2, L. 9-23; P. 4. L. 4-10; P. 4, L. 13 — P. 5, L. 6; P. 5, L. 28 — P. 6, L. 11)

97.     You don't have to call it an attorney-client relationship for an attorney-client relationship to be one. If everyone accounts with all elements of an attorney-client relationship, that is the request for advice, the giving of advice, the acceptance of the advice, if you have that, when you say you aren't my attorney, or you are, whatever, it's still an attorney-client relationship. It's the practice of law that creates an attorney-client relationship. Likewise, you don't have to call a fiduciary relationship, a fiduciary relationship for it to be one. (Benninghoff versus superior court it's 2006

| **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
| --- |
| 136 Cal.App.4th '61.)   A written disclaimer does not by itself prevent the existence of an attorney-client relationship.  A retention agreement is like any other contract creating a legal relationship. The nature of the instrument is not to be determined by what the parties called it, its nature is to be determined by the legal effect. The label placed by the parties on the relationship is not dispositive and subterfuges are not countenanced, the law respects form less than substance. (**Margolis**, 7-20-2016, P. 22, L. 26 – P. 23, L. 2; P. 30, L. 12-15; P. 36, L. 14-18; P. 57, L. 12-15; P. 72, L. 4-8; P. 72, L. 28 – P. 73, L. 6; P. 73, L. 15-22; P. 76, L. 18-28) (**Margolis**, 3-3-2017, P. 23, L. 16-22) (**Margolis**, 3-8-2017, P. 18, L. 16 — P. 19, L. 3) (**Margolis**, 3-9-2017, P. 2, L. 9-23; P. 4, L. 1-13; P. 34, L. 3-25) |
| 98.   One important indicia as to whether an attorney-client relationship has been formed, which is stated in particular in the Responsible Citizens case is that Stein used his law office to hold and control the tribe's books, records, including confidential membership records and financial records. [Responsible Citizens versus Superior Court 1993, 16 Cal. App. 4th 17 17 at 732 to 733]. (**Margolis**, 7-15-2016, P. 25, L. 18 — P. 26, L. 17) |
| 99.   Stein secured and controlled the tribal records at his law offices.  On the night he resigned in September of 2009, the tribal council took what they could carry of the business and financial records.  They could not reach the membership confidential  records in the storage room. (**Candelaria**, 6-21-2016, P. 96, L. 28 – P. 97, L. 24; P. 98, L. 24-27; P. 126, L. 19 – P. 127, L. 5; P. 129, L. 19 – P. 130, L. 2; P. 130, L. 8-14; P. 132, L. 16-20; P. 148, L. 24-28; P. 154, L. 10-24) (**Candelaria**, 6-22-2016, P. 8, L. 20 – P. 9, L. 14; P. 51, L. 9-15; P. 51, L. 23 – P. 52, L. 16; P. 54, L. 15 – P. 55, L. 22; P. 55, L. 26 – P. 56, L. 10; P. 63, L. 12 – P. 64, L. 6; P. 66, L. 12 – P. 67, L. 1) (**Garcia**, 6-22-2016, P. 7, L. 8 – P. 8, L. 12; P. 14, L. 27 – P. 15, L. 4; P. 34, L. 2-8; P. 41, L. 1 – P. 42, L. 23; P. 44, L. 13-23) (**Garcia**, 6-23-2016, P. 6, L. 9-15; P. 8, L. 12 – P. 9, L. 7; P. 9, L. 28 – P. 10, L. 2; P. 29, L. 2 – P. 30, L. 3; P. 30, L. 26 – P. 31, L. 3; P. 31, L. 21-26; P. 32. L. 1-11) (**Sandonne Goad ("Goad"**), June 23, 2016, Page 32, Line 22-28; P. 61, L. 26 – P. 62, L. 5; P. 62, L. 19 — P. 63, L. 5; P. 63, L. 18-27) (**Carmelo**, 6-28-2016, P. 18, L. 28 – P. 19, L. 7; P. 20, L. 25 – P. 21, L. 12; P. 31, L. 14-22; P. 38, L. 15 – P. 39, L. 4; P. 44, L. 13 – P. 45, L. 17) (**Polanco**, 6-28-2016, P. 84, L. 13-25; P. 89, L. 26 – P. 90, L. 3) (**Dunlap**, 6-29-2016, P. 48, L. 23 – P. 49, L. 15; P. 69, L. 13 – P. 70, L. 1; P. 70, L. 14-23) (**Garcia**, 6-30-2016, P. 5, L. 2-16) (**Neminski**, 7-6-2016, P. 65, L. 23-27; P. 66, L. 3-14) (**Perez**, 7-6-2016, P. 112, L. 18 – P. 113, L. 3) (**Carmelo**, 7-11-2016, P. 16, L. 9-20; P. 17, L. 8 – P. 18, L. 25) (**Carmelo**, 7-12-2016, P. 37, L. 19-20; P. 40, L. 2-12; P. 45, L. 5-9; P. 45, L. 24-26) (**McShane**, 7-15-2016, P. 22, L. 6-15; P. 25, L. 28 – P. 26, L. 4) (**Steven Johnson ("Johnson"**), July 19, 2016, Page 75, Lines 5-21) (**Carmelo**, 7-19-2016, P. 125, L. 22-26; P. 141, L. 11 – P. 142, L. 11) (**Lamothe**, 7-21-2016, P. 43, L. 12 – P. 44, L. 12; P. 44, L. 26 – P. 46, L. 7) (**Stein**, 2-8-2017, P. 35, L. 12-17; P. 44, L. 1-15) (**Stein**, 2-17-2017, P. 5, L. 13-26; P. 6, L. 25 – P. 7, L. 2; P. 7, L. 26 – P. 10, L. 4) (**Aronson**, 3-2-2017, P. 56, L. 11-26) (**Aronson**, 3-6-2017, P. 38, L. 2-26) (**Exh. 507** (GT TRIBE Membership List March 2007 Class B and C (after termination of members who left to join New GT Nation))) (**Exh. 508** (2006-2008 Sample "Blue Card" from GT Tribe member requesting records)) (**Exh. 514** (GT TRIBE Election Results Talley Certification 2007 and 2008))) (**Exh. 520** (Member Letter #1 – raised $21 million but never informed the Tribe)) (**Exh. 578** (2007 Talley Certification 2007 Election Candelaria Group)) (**Exh. 784** (April 4, 2007 Writ of Attachment - Terminal St. Address)) (**Exh. 785** (Writ of Attachment and Right to Attach Order against Gabrielino-Tongva Tribe in Amount of $812,500 – Santa Monica address))) |

| | |
|---|---|
| 1 | **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |

100.    Margolis concluded that yes Stein was an attorney for the tribe, that there was an attorney-client relationship, even though there was no written agreement, because Stein performed legal services for the tribe. [Butler versus State Bar case, 1986, 42 Cal third 323 at Page 329)] [Ben 2006 it's 136 Cal.App.4th '61 at Page 3] (**Margolis**, 7-15-2016, P. 14, L. 12-16; P. 14, L. 26 — P. 15, L.1; P. 24, L. 13-17; P. 40, L. 21 — P. 41, L. 1; P. 54, L. 7-21) (**Margolis**, 7-20-2016, P. 19, L. 3-6; P. 19, L. 27 — P. 21, L. 2; P. 21, L. 17 – P. 22, L. 14; P. 22, L. 26 – P. 23, L. 11; P. 24, L. 4-12; P. 24, L. 22 — P. 25, L. 8; P. 30, L. 12-17; P. 31. L. 28 — P. 32, L. 2; P. 38, L. 17-25; P. 40, L. 5 – P. 41, L. 6; P. 42, L. 13 – P. 43, L. 8; P. 44, L. 9 – P. 45, L. 20; P. 51, L. 19-21; P. 60, L. 8-12; P. 60, L. 19-28; P. 81, L. 17 – P. 82, L. 10; P. 89, L. 9-12; P. 107, L. 3-4; P. 113, L. 3-9) (**Margolis**, 3-3-2017, P. 16, L. 19-24; P. 23, L. 16-22; P. 28, L. 10-15; P. 33, L. 4-22; P. 36, L. 27 — P. 37, L. 10; P. 39, L. 26 — P. 40, L. 4; P. 43, L. 13-19) (**Margolis**, 3-8-2017, P. 12, L. 1-7; P. 16, L. 1-13; P. 16, L. 18-19; P. 18, L. 7-9; P. 36, L. 6-13) (**Margolis**, 3-9-2017, P. 7, L. 10-15; P. 8, L. 27 — P. 9, L. 2; P. 43, L. 1-8) (**Exh. 30** (March 25, 2005 letter from Stein to Escutia with a BCC to Polanco)) (**Exh. 32** (An unsigned letter by Stein apparently written for Attorney General Bill Lockyer providing a legal opinion regarding tribal gaming)) (**Exh. 569**, (SMDC Agreement dated March 4, 2001)) (**Exh. 1547** (Resolution 46 approving SMDC Agreement and Modification Agreement dated September 28, 2003.  (Note was called as 1548 in testimony))) (**Exh. 1548** (2003 Modification agreement and ratification of SMDC Agreement dated September 28, 2003.  (Note was called as 1549 in testimony)))

101.    Stein preformed legal work for the Tribe after the SMDC Agreement was executed on March 4, 2001. In fact, one of Mr. Stein's witnesses at trial, Mr. Steven Johnson (testified on July 18, 2016) was asked whether when he "looked at all of the -- all of those backup documents, were you able to determine if Mr. Stein was doing legal work for the tribe?"  He answered: "yes." And when asked if he concluded if he was doing legal work, he again responded yes.  In fact, he elaborated: "I think he was using his general legal knowledge but I think most of it was development work for trying to get a gaming license."  He also said that:  Stein was a "smart guy so he used his well oiled brain to try to do -- better the tribe in many different directions and if some of that involved legal expertise, ...", (**Perez**, 7-6-2016, P. 103, L. 9-13; P. 126, L. 8-14) (**Dunlap**, 7-7-2016, P. 71, L. 8-16; P. 96, L. 4; P. 98, L. 19-26; P. 100, L. 14-16; P. 100, L. 24-25; P. 121, L. 10-12; P. 123, L. 17-21; P. 123, L. 28 — P. 124, L. 2; P. 124, L. 5-6; P. 125, L. 27 — P. 126, L. 20) (**Carmelo**, 7-7-2016, P. 140, L. 28 — P. 141, L.16; P. 142, L. 17-21) (**Barrett**, 7-8-2016, P. 16, L. 1-20) (**Carmelo**, 7-12-2016, P. 91, L. 3-16) (**McShane**, 7-15-2016, P. 10, L. 14 -- P. 11, L. 8; P. 41, L. 21 – P. 42, L. 18; P. 42, L. 26 — P. 43, L. 13; P. 43, L. 21-27; P. 44, L. 7-12) (**Johnson**, 7-19-2016, P. 101, L. 8-13) (**Lamothe**, 7-21-2016, P. 35, L. 4 — P. 36, L. 17) (**Lamothe**, 7-22-2016, P. 2, L. 13 — P. 4, L. 10; P. 11, L. 25 - P. 12, L. 1; P. 25, L. 14 — P. 26, L. 6; P. 27, L. 11 — P. 30, L. 17) (**Lamothe**, 1-24-2017, P. 5, L. 1-11) (**Aronson**, 3-1-2017, P. 34, L. 8-14; P. 34, L. 25 — P. 35, L. 13; P. 41, L. 10 — P. 42, L. 12; P. 42, L. 13-23; P. 43, L. 3 — P. 44, L. 13) (**Barrett**, 3-7-2017, P. 63, L. 25 — P. 64, L. 16) (**Exh. 40** (March 23, 2006 email from Stein to Barrett)) (**Exh. 41** (March 23, 2006 Email (at about 11:03 a.m.) from Stein to Rae Lamothe)) (**Exh. 60** (An unsigned letter, drafted by Stein purporting Termination for Cause letter addressed to Ms. Elizabeth Aronson)) (**Exh. 67** (Sept. 9, 2006 Stein's "Fiduciary Duties Report" to Tribal Council)) (**Exh. 71** (Sept. 12, 2006 letter prepared by Mr. Stein to Elizabeth Aronson re Termination For Cause)) (**Exh. 245** (2006, Sept. 19 email from Stein to McShane Re GTGA – Jim Here are bullet points to reformulate)) (**Exh. 1547** (Resolution 46 - Originally attached to Exh. 569 - SMDC Agreement))

| | **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|---|
| 102. | Stein represented himself as an experienced attorney very skilled in Indian matters, an expert at all issues relating to the tribe and so when the tribe entered into that agreement they reasonably believe that Stein was the tribe's attorney, that they could rely on him and his advice, regardless of his title with the organization. (**Margolis**, 7-15-2016, P. 24, L. 15-25; P. 25, L. 16-18; P. 27, L. 14-20; P. 28, L. 13-18; P. 40, L. 26 — P. 41, L. 11) (**Margolis**, 7-20-2016, P. 42, L. 20-23; P. 42, L. 24-27; P. 44, L. 15-22; P. 45, L. 2-14) (**Margolis**, 3-3-2017, P. 16, L. 19-21; P 33, L. 5-11) (**Margolis**, 3-9-2017, P. 35, L. 24-26) |
| 103. | Stein acted as the main attorney for the tribe, even though he made it clear in the SMDC Agreement that he was not entering into an attorney-client relationship. (**Perez**, 7-6-2016, P. 109, L. 10-14; P. 114, L. 15 – P. 115, L. 1) (**Loya**, 7-6-2016, P. 178, L. 21- P. 179, L. 13) (**Dunlap**, 7-7-2016, P. 85, L. 7-19; P. 94, L. 21-28; P. 98, L. 19-26; P. 100, L. 4-8; P. 100, L. 14-16; P. 100, L. 24-25) (**Carmelo**, 7-7-2016, P. 136, L. 19 — P. 137, L. 13) (**Carmelo**, 7-11-2016, P. 2, L. 14-22; P. 31, L. 22 - P. 32, L. 6; P. 33, L. 11-19) (**Carmelo**, 7-12-2016, P. 17, L. 26 — P. 18, L. 24; P. 62, L. 19-25; P. 64, L. 17 - P. 65, L. 2) (**McShane**, 7-15-2016, P. 3, L. 13 – P. 4, L. 13) (**Aronson**, 3-2-2017, P. 39, L. 10-14) (**Exh. 32** (An unsigned letter by Stein apparently written for Attorney General Bill Lockyer providing a legal opinion regarding tribal gaming)) (**Exh. 55** (Email Dunlap to Tribal Council)) (**Exh. 56** (Email Dunlap to Polanco - August 4th, 2006)) |
| 104. | Advising the tribal council on their standing in the Morales case, advising on the Morales settlement, and negotiating the costs from the Morales case with Libra during the investment transaction are all legal services and representation. (**Margolis**, 7-15-2016, P. 15, L. 1-18; P. 17, L. 25 — P. 18, L. 1; P. 19, L. 8-20) |
| 105. | Stein advised the plaintiffs in the Morales litigation and was the primary strategist in that litigation. He advised the Tribe that three individual leaders of the Tribe (who were acting as Tribal Council) should bring a lawsuit against Morales group and sue in their own name, instead of in the name of the Tribe. (**Perez**, 7-6-2016, P. 106, L. 2-8; P. 107, L. 9-20; P. 107, L. 27 – P. 108, L. 3; P. 108, L. 24 – P. 109, L. 11; P. 110, L. 3-12; P. 120, L. 2-10) (**Dunlap**, 7-7-2016, P. 73, L. 16 – P. 74, L. 20; P. 75, L. 4-16; P. 76, L. 27 – P. 77, L. 18; P. 80, L. 4-10; P. 123, L. 11-16; P. 124, L. 7-24) (**Carmelo**, 7-7-2016, P. 128, L. 25 – P. 129, L. 23; P. 130, L. 21 – P. 131, L. 19) (**Carmelo**, 7-12-2016, P. 62, L. 19-25) (**Lamothe**, 7-22-2016, P. 12, L. 9 — P. 13, L. 13; P. 22, L. 11-23) (**Lamothe**, 1-24-2017, P. 7, L. 10-17) (**Exh. 18** (2002, Aug. 29 Complaint in Morales Litigation (case number BC280605) (called as exhibit 19 later **separated from exh. 19**))) (**Exh. 22** (Substitution of Attorney - Lamothe for Stein)) |
| 106. | Stein insisted on handling the Morales settlement negotiations (even after a judgment was entered against the plaintiffs) even though he was no longer counsel of record in that litigation. (**Dunlap**, 7-7-2016, P. 124, L. 7-24) (**Carmelo**, 7-7-2016, P. 134, L. 27 – P. 135, L. 9) (**Aronson**, 3-1-2017, P. 32, L. 11 – P. 33, L. 18; P. 34, L. 12-19) (**Aronson**, 3-2-2017, P. 42, L. 28 – P. 43, L. 8) (**Aronson**, 3-6-2017, P. 32, L. 22 – P. 33, L. 16) (**Exh. 254** (Aronson Response Letter to Geoffrey Long)) |
| 107. | An email from Stein to Rae Lamothe, dated November 30, 2005, says that he will do the legal work on behalf of the tribe and will represent the tribe's point of view on the Dunlap bankruptcy. |

| | **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|---|
| 1 | |
| 2 | (**Margolis**, 7-15-2016, P. 27, L. 10-14) |
| 3 | 108.    Eventually, the plaintiffs in the Morales litigation lost all of their claims against the Morales Group and became liable for the fees and costs owing to the Morales Group.  The costs were beyond what Dunlap could handle and he was forced to file for personal bankruptcy. (**Dunlap**, 6-29-2016, P. 119, L. 28 – P. 120, L. 13) (**Dunlap**, 7-7-2016, P. 77, L. 23 – P. 78, L. 11) (**Lamothe**, 7-22-2016, P. 16, L. 13-26) (**Lamothe**, 1-24-2017, P. 9, L. 18-22) |
| 4 | |
| 5 | |
| 6 | 109.    Stein gave legal advice when he told the tribal council that certain debts owed to a council member constituted property of a bankruptcy estate. (**Margolis**, 7-15-2016, P. 18, L. 21-26) |
| 7 | |
| 8 | 110.    On July 15, 2006, Stein e-mailed the Tribal Council as well as Elizabeth Aronson about a dispute with Tribal Councilperson Sam Dunlap.  Accusing Dunlap of seeking reimbursement which he was not entitled to and making other accusations against Dunlap. (**Carmelo**, 7-11-2016, P. 22, L. 17-20; P. 23, L. 24 – P. 26, L. 7) (**Exh. 54** (July 15, 2006 email from Mr. Stein to Tribal Council and Ms. Aronson re Confidential re Dunlap proposal)) |
| 9 | |
| 10 | |
| 11 | |
| 12 | 111.    The course of the relationship and the conduct would indicate that Stein intended for the tribe to rely on his legal capabilities, and he intended for the tribe to give him authority to use his legal skills to supervise other attorneys and to override their advice at his sole discretion. (**Margolis**, 7-15-2016, P. 26, L. 18-23) (**Margolis**, 7-20-2016, P. 20, L. 13 — P. 21, L. 2; P. 21, L. 17-22; P. 22, L. 26 — P. 23, L. 15; P. 33, L. 18-23; P. 45, L. 2-6; P. 96, L. 27 — P. 97, L. 2) (**Margolis**, 3-3-2017, P. 16, L. 19-21; P. 33, L. 5-11) (**Margolis**, 3-8-2017, P. 32, L. 9-10) (**Margolis**, 3-9-2017, P. 35, L. 23-27; P. 36, L. 25-28) |
| 13 | |
| 14 | |
| 15 | |
| 16 | 112.    Stein had the authority to hire the tribe's various attorneys and to supervise them, but the arrangement was that he would have control over the final product, he would have the final say as to what was going to be presented, so what came out of the legal work was his. (**Margolis**, 7-15-2016, P. 17, L. 7-9; P. 20, L. 21-25; P. 23, L. 18-23) (**Margolis**, 7-20-2016, P. 20, L. 13 — P. 21, L. 2; P. 21, L. 17 – P. 22, L. 14; P. 22, L. 26 — P. 23, L. 15; P. 96, L. 27 — P. 97, L. 2) (**Margolis**, 3-8-2017, P. 32, L. 9-10) (**Margolis**, 3-9-2017, P. 20, L. 24-25) |
| 17 | |
| 18 | |
| 19 | |
| 20 | 113.    Stein introduced, hired, and fired all lawyers who served as the Tribe's inside and outside counsel, supervised them closely and vetted all legal opinions before they were presented to the Tribal Council. (**Carmelo**, 6-28-2016, P. 13, L. 9-17; P. 14, L. 1- 20; P. 23, L. 23 – P. 24, L. 1) (**Perez**, 7-6-2016, P. 126, L. 11-14) (**Loya**, 7-6-2016, P. 166, L. 18 – Page 167, Line 11; P. 168, L. 14-23; P. 169, L. 3-8; P. 179, L. 8-25; P. 184, L. 28 – P. 185, L. 2; P. 185, L. 24 – P. 186, L. 18) (**Dunlap**, 7-7-2016, P. 61, L. 21 – P. 62, L. 14; P. 63, L. 20 – P. 64, L. 19; P. 126, L. 8-15) (**Barrett**, 7-8-2016, P. 16, L. 1-5; P. 19, L. 6-7; P. 19, L. 24 – P. 20, L. 19; P. 21, L. 7-11; P. 24, L. 9-10; P. 30, L. 14-27; P. 31, L. 2-5; P. 32, L. 8-10; P. 42, L. 26-28; P. 43, L. 23-24; P. 48, L. 24-25; P. 49, L. 2-6; P. 50, L. 1-3; P. 54, L. 4-8; P. 59, L. 10-16; P. 59, L. 19-22) (**Carmelo**, 7-11-2016, P. 11, L. 4-14) (**Carmelo**, 7-12-2016, P. 14, L. 11-20; P. 79, L. 23 – P. 80, L. 13) (**McShane**, 7-15-2016, P. 1, L. 7-25; P. 7, L. 9-21; P. 49, L. 6 – P. 50, L. 13) (**Lamothe**, 7-21-2016, P. 51, L. 9-17) (**Aronson**, 3-1-2017, P. 15, L. 13-25; P. 17, L. 11-14; P. 21, L. 19 – P. 22, L. 5; P. 22, L. 21-28; P. 23, L. 6-12; P. 25, L. 17 – P. 26, L. 2; P. 64, L. 28 – P. 65, L. 2) (**Aronson**, 3-2-2017, P. 45, L. 3-8; P. 45, L. 24-27) (**Aronson**, 3-6-2017, P. 84, L. 9-18) (**Barrett**, 3-7-2017, P. 2, L. 26-27; P. 7, L. 21-24; P. 8, L. 1-6; |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

Exh. C -- Appendix of Evidence In Support of Statement of Decision

| | **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|---|
| | P. 38, L. 6-10) **(Exh. 40** (March 23, 2006 email from Stein to Barrett)) **(Exh. 60** (An unsigned letter, drafted by Stein purporting Termination for Cause letter addressed to Ms. Elizabeth Aronson.)) **(Exh. 71** (Sept. 12, 2006 letter prepared by Mr. Stein to Elizabeth Aronson re Termination For Cause.)) **(Exh. 254** (Aronson Letter to Geoffrey Long)) |
| | 114.    Ms. Lamothe served part-time and did only the legal work that Stein delegated to her. **(Perez**, 7-6-2016, P. 125, L. 27 – P. 126, L. 14; P. 135, L. 17 -- P. 136, L. 17) **(Dunlap**, 7-7-2016, P. 126, L. 6-15) **(Carmelo**, 7-7-2016, P. 141, L. 17-19) **(Carmelo**, 7-12-2016, P. 17, L. 26 – P. 18, L. 24; P. 84, L. 14-27) **(Lamothe**, 7-21-2016, P. 26, L. 7-25; P. 36, L. 4-17) **(Lamothe**, 7-22-2016, P. 2, L. 13 – P. 4, L. 10; P. 25, L. 25 – P. 26, L. 6; P. 27, L. 11 – P. 29, L. 25) **(Lamothe**, 1-24-2017, P. 2, L. 23-28; P. 5, L. 1-26) **(Lamothe**, 1-25-2017, P. 33, L. 15 – P. 34, L. 4) **(Exh. 41** (March 23, 2006 Email (at about 11:03 a.m.) from Stein to Rae Lamothe)) **(Exh. 1547** (Resolution 46 - Originally attached to Exh. 569 - SMDC Agreement)) |
| | 115.    Hiring another attorney from Washington, D.C. to handle the Indian issues did not prevent Stein from also acting as an attorney for the estate. This was legal services. **(Margolis**, 7-15-2016, P. 17, L. 10-20) **(Margolis**, 3-8-2017, P. 18, L. 7-9) |
| | 116.    After hiring Marilyn Barrett, a tax and corporations attorney, to assist in the Libra Securities investment transaction, Stein did some of the legal work himself while directing Barrett on other matters having final say as to what was to be presented. **(Margolis**, 7-15-2016, P. 17, L. 4-10) |
| | 117.    As he did with other lawyers, Stein directed Barrett's work. For example, in one email, dated March 22, 2006, Stein explained to Barrett that he was contemplating hiring a new lawyer "to help with Indian issues", but he was not convinced one was needed because "you are here for all corporate issues and I can handle Indian issues well enough to respond to investor counsel.  In essence, the question is just the same as corporate law: duly organized, validly existing and fully authorized." **(Barrett**, 7-8-2016, P. 8, L. 18 – P. 9, L. 9) **(Exh. 38** (March 22, 2006 email from Stein to Marilyn Barrett, describing specific legal tasks to be performed by either Marilyn or Stein)) |
| | 118.    Stein gave legal advice regarding the competence of outside counsel and general counsel, further advising that general counsel had acted illegally.  This is legal services. **(Margolis**, 7-15-2016, P. 19, L. 1-6) |
| | 119.    Stein preparing a letter of statement in an effort to get rid of or to have the tribe terminate Aronson, is legal services. **(Margolis**, 7-15-2016, P. 19, L. 22 — P. 20, L. 2) |
| | 120.    In an unsigned draft letter from the Tribal Council to Aronson that Stein drafted and urged the Tribal Council to sign, but which they refused to sign, Stein set forth the bases he believed existed to terminate Aronson for cause.  **(Carmelo**, 7-12-2016, P. 79, L. 8 – P. 80, L. 15; P. 89, L. 17-22) **(Stein**, 2-1-2017, P. 49, L. 21 – P. 50, L. 19) **(Aronson**, 3-6-2017, P. 36, L. 5-16) **(Exh. 60** (An unsigned letter, drafted by Stein purporting Termination for Cause letter addressed to Ms. Elizabeth Aronson)) |
| | 121.    In May of 2006, when Stein fired Barrett or caused her to be fired, the state of the negotiations with Libra were down to the attorneys.  These were not negotiations that didn't require |

20

Exh. C -- Appendix of Evidence In Support of Statement of Decision

| **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|
| an attorney. There was no other attorney who was at those negotiations representing the tribe except for Stein. Stein handled the closing of the Libra funding transaction himself. Stein was doing this on behalf of the tribe, giving him ultimate say as to what that contract was going to look like at that time. This was very technical, very legal work. (**Margolis**, 7-15-2016, P. 17, L. 20 — P. 18, L. 11) |
| 122.    After terminating Ms. Barrett, Stein handled the closing of the Libra Funding Agreement, personally, without the benefit of experienced, corporate counsel, other than himself. (**Carmelo**, 7-11-2016, P. 11, L. 19 – P. 13, L. 23) (**Stein**, 7-13-2016, P. 60, L. 1-7; P. 61, L. 5-26; P. 67, L. 11 – P. 68, L. 28) (**Exh. 644** (GT Tribe — Libra Investors Agreement) |
| 123.    There were several significant pieces of the Libra Agreement, which Stein admits were drafted by him, including: the bill that is attached as exhibit <u>B</u>, and which purports to be the Senate Bill that would be introduced and be a prerequisite for future funding. Although it is not marked as a draft, it is clearly a draft bill and Mr. Stein admitted that he drafted it and that it was never introduced. (**Stein**, 7-13-2016, P. 63, L. 7 – P. 65, L. 14; P. 65, L. 22 – P. 67, L. 2; P. 68, L. 23-28; P. 69, L. 6-13) (**Exh. 644** (GT Tribe — Libra Investors Agreement)) |
| 124.    Stein held himself out as the tribe's attorney to the public and the press, to competing organizations and factions of the Gabrielino-Tongva Indians, and to elected officials and other political representatives. (**Margolis**, 7-15-2016, P. 25, L. 8-12) (**Margolis**, 7-20-2016, P. 45, L. 17-20; P. 45, L. 24 — P. 46, L. 23) (**Margolis**, 3-3-2017, P. 39, L. 26 — P. 40, L. 4; P. 40, L. 19-27; P. 43, L. 12-19) (**Exh. 30** (March 25, 2005 letter from Stein to Escutia with a BCC to Polanco)) (**Exh. 32** (An unsigned letter by Stein apparently written for Attorney General Bill Lockyer providing a legal opinion regarding tribal gaming)) |
| 125.    Around March of 2005, Stein blind carbon copied (BCC) Polanco on a letter to State Senator Martha M. Escutia. With that letter, Stein attaches a copy of a 120 page brief which he had written regarding the Tribe's ability to conduct gaming in California even before it achieves federal recognition. Specifically, in that letter, Stein tells Escutia that the brief "argues, successfully, I think, that our state-recognized tribe may conduct gaming on a state Indian reservation without federal recognition." (**Candelaria**, 6-22-2016, P. 46, L. 11-21) (**Loya**, 7-6-2016, P. 165, L. 7-22) (**Polanco**, 7-13-2016, P. 35, L. 12-15) (**Stein**, 3-15-2017, P. 44, L. 22 – P. 45, L. 13) (**Exh. 30** (Excutia Letter)) |
| 126.    Stein drafted a shorter letter (or 3-4 pages) which is apparently addressed to California's then Attorney General Bill Lockyer and makes a similar argument: that a California recognized tribe can engage in gaming operations as long as they get certain approval from the State, even without federal recognition. (**Dunlap**, 7-7-2016, P. 83, L. 22 – P. 84, L. 2; P. 84, L. 20-26; P. 85, L. 7-19) (**Carmelo**, 7-7-2016, P. 135, L. 16-25; P. 136, L. 1-6) (**Carmelo**, 7-12-2016, P. 66, L. 22 – P. 67, L. 22) (**Stein**, 1-31-2017, P. 32, L. 21 – P. 33, L. 10) (**Stein**, 2-1-2017, P. 16, L. 22 – P. 17, L. 2) (**Exh. 32** (An unsigned letter by Stein apparently written for Attorney General Bill Lockyer providing a legal opinion regarding tribal gaming)) |
| 127.    After the SMDC agreement was entered into, Stein never denied being the tribe's attorney. When members of the public and members of the tribe identified Stein as the tribe's attorney, he never corrected them. He told Richard Polanco in 2004 that he was the tribal attorney, that the tribal council would do anything he asked, and that they never failed to follow his advice. In the summer |

21
Exh. C -- Appendix of Evidence In Support of Statement of Decision

| | |
|---|---|
| 1 | **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
| 2 | of 2006, Dunlap sent an email to other members of the tribe and a copy to Stein, complaining about |
| 3 | Stein, referring to him as the tribe's attorney. Stein never denied being the tribe's attorney and no one else contradicted it or denied it. (**Margolis**, 7-15-2016, P. 26, L. 23 — P. 27, L. 10; P. 27, L. 18– |
| 4 | 19) (**Margolis**, 7-20-2016, P. 20, L. 7-13; P. 45, L. 17-20; P. 45, L. 24 — P. 46, L. 23) (**Margolis**, 3-3-2017, P. 39, L. 26 — P. 40, L. 27; P. 43, L. 12-19) (**Exh. 30** (March 25, 2005 letter from Stein to |
| 5 | Escutia with a BCC to Polanco)) (**Exh. 32** (An unsigned letter by Stein apparently written for Attorney General Bill Lockyer providing a legal opinion regarding tribal gaming)) |

<br>

| | |
|---|---|
| 6 | 128.    Stein told Polanco that the Tribal Council had never failed to follow his advice on any issue. |
| 7 | (**Polanco**, 6-28-2016, P. 76, L. 24 – P. 77, L. 1) |

<br>

| | |
|---|---|
| 8 | 129.    Carmelo never heard anybody say that Stein was not the Tribe's lawyer. (**Carmelo**, 7-11- |
| 9 | 2016, P. 31, L. 3 – P. 32, L. 6; P. 32, L. 12 – P. 33, L. 14) (**Exh. 55** (Email Dunlap to Tribal Council)) (**Exh. 56** (Email Dunlap to Polanco - August 4th, 2006)) |

<br>

| | |
|---|---|
| 10 | 130.    You can't get a client to agree in an effective way that the attorney is not going to be liable for |
| 11 | what his duties are as an attorney and as a fiduciary. It would be against public policy for an attorney |
| 12 | to enter into an agreement with a client that the attorney would not be held to the rules of professional conduct or fiduciary standards. That agreement would be against public policy and it |
| 13 | would be unconscionable. (**Margolis**, 7-20-2016, P. 64, L. 7-28; P. 73, L. 12-16; P. 95, L. 20-22) |

<br>

| | |
|---|---|
| 14 | 131.    The 2001 SMDC Agreement provides that no attorney-client relationship or fiduciary duty is |
| 15 | created by the agreement. (**Velasquez**, 7-6-2016, P. 157, L. 9-17) (**Simental**, 7-7-2016, P. 41, L. 5-20) (**Dunlap**, 7-7-2016, P. 98, L. 9-11; P. 99, L. 3-9; P. 102, L. 25 – P. 103, L. 8) (**Exh. 569** (SMDC |
| 16 | Agreement at pp. 5, section 2.e)) |

<br>

| | |
|---|---|
| 17 | 132.    Stein can't absolve himself from the consequences of his legal attorney activities by saying |
| 18 | I'm not acting as an attorney. (**Margolis**, 7-20-2017, P. 37, L. 1-6; P. 37, L. 12-17; P. 57, L. 15-18) |

<br>

| | |
|---|---|
| 19 | |
| 20 | **Stein is Liable for Breach of Fiduciary Duty** |

<br>

| | |
|---|---|
| 21 | 133.    The fiduciary relationship is one in which the fiduciary owes complete loyalty to the |
| 22 | beneficiary and to maintain confidences, to look out after their interests and to support the interests of the fiduciary to the detriment of himself, it's the same fiduciary duties that an attorney would have. |
| 23 | (**Margolis**, 7-15-2016, P. 43, L. 17-23; P. 44, L. 16-25) (**Margolis**, 7-20-2016, P. 84, L. 19-23) (**Margolis**, 3-8-2017, P. 54, L. 28 — P. 55, L. 2; P. 55, L. 11-15; P. 56, L. 11-20) |

<br>

| | |
|---|---|
| 24 | 134.    Whether you are an attorney or a CEO, you owe the same duty of loyalty to the beneficiary, |
| 25 | to the organization or to the members, to your own detriment if that has to be and also it involves |
| 26 | complete candor, full disclosure, no concealment and a situation where the fiduciary must warn the beneficiary against himself just as he would warn the beneficiary against a third party. (**Margolis**, 7- |
| 27 | 15-2016, P. 44, L. 16-25) (**Margolis**, 7-20-2016,P. 59, L. 17-22; P. 64, L. 7-28; P. 84, L. 19-23) (**Margolis**, 3-3-2017, P. 14, L. 21 — P. 15, L. 2; P. 15, L. 5-16) (**Margolis**, 3-8-2017, P. 30, L. 2-10; |
| 28 | P. 31, L. 3-19; P. 45, L. 10-27; P. 56, L. 11-20) (**Margolis**, 3-9-2017, P. 27, L. 1-5; P. 27, L. 14-17; |

| | **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|---|
| | P. 28, L. 1-2; P. 40, L. 15-22) |
| | 135.    Even if you put aside the creation of an attorney-client relationship and the fiduciary duty created by that relationship, Stein still owed a fiduciary duty to the Tribe as the development officer from March 4, 2001 until August 23, 2006 and then as the CEO of the Gabrielino Tribal Gaming Authority established in May of 2006 through September of 2006. **(Margolis**, 7-15-2016, P. 42, L. 28 – P. 43, L. 11; P. 54, L. 6-8) **(Margolis**, 7-20-2016, P. 64, L. 7-14) **(Margolis**, 3-8-2017, P. 7, L. 6-11; P. 56, L. 8-20) |
| | 136.    On September 9, 2006, Stein on behalf of SMDC resigned his position as CEO of the Gabrielino Tribal Gaming Authority, which was the only position with the Tribe he held at the time because he resigned as Tribal Development officer on August 23, 2006. **(Carmelo**, 6-28-2016, P. 17, L. 10-21; P. 19, L. 14 – P. 20, L. 1) **(Stein**, 6-28-2016, P. 46, L. 1-4; P. 46, L. 24-28; P. 63, L. 18-25) **(Dunlap**, 6-29-2016, P. 117, L. 20 – P. 118, L. 6) **(Stein**, 6-30-2016, P. 3, L. 19-26) **(Stein**, 2-2-2017, P. 2, L. 21-27; P. 4, L. 14-20; P. 5, L. 11-12; P. 6, L. 6-20; P. 6, L. 25 – P. 7, L. 19; P. 50, L. 13-23) **(Stein** 2-6-2017, P. 62, L. 22-28) **(Stein**, 2-7-2017, P. 18, L. 12-14; P. 39, L. 23 – P. 40, L. 5; P. 50, L. 19-25) **(Stein**, 2-8-2017, P. 2, L. 24 – P. 3, L. 2) **(Stein**, 2-16-2017, P. 21, L. 16-19; P. 22, L. 3-15; P. 26, L. 14-17) **(Stein**, 2-21-2017, P. 20, L. 1) **(Aronson**, 3-1-2017, P. 24, L. 16-22) **(Aronson**, 3-2-2017, P. 28, L. 13-20; P. 32, L. 15-16; P. 59, L. 6-12; P. 60, L. 1-4; P. 61, L. 28 – P. 63, L. 6; P. 83, L. 27 – P. 84, L. 5) **(Aronson**, 3-6-2017, P. 37, L. 3-9) **(Stein**, 3-16-2017, P. 57, L. 25 – P. 58, L. 1) **(Exh. 64** (Sept. 9, 2006, Stein's letter confirming his resignation)) **(Exh. 71** (Sept. 12, 2006 letter prepared by Mr. Stein to Elizabeth Aronson re Termination For Cause)) **(Exh. 571** (October 3, 2006 - SMDC Termination Letter)) |
| | 137.    An attorney-client relationship, no matter how it is formed, comes with all the obligations under the Rules of Professional Conduct and fiduciary duties. **(Margolis**, 7-15-2016, P. 45, L. 15-28) **(Margolis**, 7-20-2016, P. 25, L. 16-22; P. 59, L. 17-22; P. 64, L. 7-28; P. 84, L. 19-23) **(Margolis**, 3-9-2017, P. 2, L. 10-27) |
| | 138.    There is a third fiduciary relationship that can be formed by special formal relationships like attorney-client or guardian and ward, conservator agent, principal and so on, but it can also be formed informally through trust.  In the course of the relationship one person is entrusted and has earned the trust of the other person, so that that person (beneficiary) believes that they can trust the other person.  A fiduciary relationship would have been established.  [Barbara A versus John G, it's 1983, it's 145 Cal. App. 3d 369] [Beery versus state bar, it's 1987, 43 Cal third 802]. **(Margolis**, 7-15-2016, P. 43, L. 24 — P. 44, L. 15; P. 44, L. 25-28) **(Margolis**, 3-8-2017, P. 57, L. 5-7; P. 59, L. 2-13) |
| | 139.    Tribal Councilmembers trusted Stein.  **(Dunlap**, 7-7-2016, P. 83, L. 11-14; P. 127, L. 18-28) **(Carmelo**, 7-7-2016, P. 140, L. 25-27) **(Carmelo**, 7-11-2016, P. 25, L. 28 — P. 26, L. 15) |
| | 140.    Stein told Polanco that the Tribal Council had never failed to follow his advice on any issue. **(Polanco**, 6-28-2016, P. 76, L. 24 – P. 77, L. 1) |
| | 141.    When Stein made clear to Polanco that the tribe never failed to follow his advice, that he could convince them to do whatever he told them to do, that this is evidence of a trust relationship. |

| **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
| --- |
| Further, the tribe placed ultimate trust in Stein as the tribe's closest and longest serving advisor. The relevance of this is that because there was a fiduciary duty as an attorney, as an officer, and independently or simply having a trust relationship, Stein was held to the standards that attorneys are held to. [Beery versus state bar case, it's 1987, 43 Cal third 802] [Lewis case versus state bar 1973, 9 Cal third 704 at 713, it says when an attorney assumes a administrative fiduciary relationship and violates his duty in a manner that would justify discipline action if the relationship had been that of an attorney and client, he would properly be disciplined for his conduct. The attorney would be held to the rules of professional conduct and any other state bar enacted rules that govern an attorney's ethical conduct]. (**Margolis**, 7-15-2016, P. 44, L. 25 — P. 46, L. 3) (**Margolis**, 7-20-2016, P. 5, L. 5-9; P. 42, L. 20-27; P. 45, L. 2-6; P. 59, L. 17-22; P. 63, L. 14-18; P. 63, L. 22 — P. 64, L. 28; P. 84, L. 19-23) (**Margolis**, 3-3-2017, P. 32, L. 6-13) (**Margolis**, 3-8-2017, P. 7, L. 6-11; P. 54, L. 28 — P. 55, L. 2; P. 55, L. 11-17; P. 56, L. 8-20) |
| 142.    A mere breach of the rules does not necessarily mean that there is a breach of fiduciary duty. However, if there are other matters surrounding it, like concealment or advice which is not unbiased or a conflict which pervades the relationship and the client is not even informed of it, then that would be a breach of fiduciary duty.  There were fiduciary breaches of 3-300 by Stein from the beginning. (**Margolis**, 7-15-2016, P. 20, L. 28 — P. 21, L. 5; P. 23, L. 4-13) (**Margolis**, 7-20-2016, P. 94, L. 9-16; P. 110, L. 7-17; P. 114, L. 16-20; P. 134, L. 28 — P. 135, L. 4) (**Margolis**, 3-8-2017, P. 13, L. 17 — P. 14, L. 11; P. 20, L. 6-13; P. 33, L. 22-25) (**Margolis**, 3-9-2017, P. 20, L. 2-13; P. 20, L. 24 — P. 21, L. 8; P. 22, L. 20-25; P. 26, L. 20-21; P. 32, L. 5 — P. 33, L. 12; P. 33, L. 16-20; P. 33, L. 28 — P. 34, L. 25; P. 35, L. 23-27; P. 37, L. 9-14; P. 39, L. 21 — P. 40, L. 1; P. 40, L. 10-13; P. 40, L. 15-22; P. 40, L. 28 — P. 41, L. 8; P. 50, L. 19 — P. 52, L. 4; P. 52, L. 19-25; P. 53, L. 4-21; P. 53, L. 26 — P. 54, L. 13) |
| 143.    If it is true that when originally presented with the SMDC agreement in 2001, the tribal council members were not allowed to take home the agreement, this would add an element of concealment and overreaching that would add to the issue of moral turpitude, 6106 in the Business and Professions code. (**Margolis**, 7-15-2016, P. 20, L. 18 — P. 21, L. 5; P. 23, L. 4-13) (**Margolis**, 7-20-2016, P. 114, L. 16-20; P. 134, L. 28 — P. 135, L. 4) (**Margolis**, 3-9-2017, P. 37, L. 9-14; P. 53, L. 26 — P. 54, L. 13) |
| 144.    Stein controlled the SMDC Agreement from day one.  The Tribal Councilmembers were not allowed to take a copy home; therefore, they did not have a meaningful opportunity to have a lawyer (or anybody else) review the document.  (**Neminski**, 7-6-2016, P. 60, L. 16-17; P. 70, L. 27 – P. 71, L. 1; P. 87, L. 11-18; P. 97, L. 24 - P. 98, L. 17) (**Velasquez**, 7-6-2016, P. 149, L. 14-23; P. 157, L. 18-25; P. 163, L. 4-12) (**Simental**, 7-7-2016, P. 14, L. 1-3; P. 18, L. 18-22; P. 20, L. 3-7; P. 22, L. 18-25; P. 37, L. 22-27; P. 38, L. 21-25; P. 41, L. 5-20; P. 48, 5-17) (**Exh. 16** (2001, March 8, Letter dated from Stephen Otto, Esq. to Tribal Council and Stein **declining** appointment of General Counsel of Tribe)) |
| 145.    Carmelo didn't receive or see the SMDC Agreement in whole, until this litigation broke out and she became a party to it on November 2, 2006.  (**Carmelo**, 7-7-2016, P. 139, L. 9 – P. 140, L. 24) (**Carmelo**, 7-11-2016, P. 16, L. 12-17) (**Carmelo**, 7-12-2016, P. 3, L. 23 – P. 4, L. 4) |
|  |

| | |
|---|---|
| 1 | **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
| 2 | **Stein & SMDC are Liable for Conversion of the Tribe's Property** |
| 3 | 146.   In its Tentative Decision/Statement of Decision, the Court also found that: "Prior to the split, the Gabrielino-Tongva Tribe's offices were in Jonathan Stein's Law offices in Santa Monica. After the split, the Gabrielino-Tongva tribe changed the location of their office to 761 Terminal St.  Los Angeles CA 90021.  At the time of the split and relocation of their office, Gabrielino-Tongva Tribe councilmembers took the Tribe's check books from the SMDC offices; there was nothing impermissible or wrong with their action.  Other financial documents, membership books and records, and computers belonging to the Gabrielino-Tongva Tribe remained in Jonathan Stein's law offices and were apparently the subject of other litigation." (**Candelaria**, 6-21-2016, P. 29, L. 15-21; P. 34, L. 19-22; P. 39, L. 15 – P. 40, L. 18; P. 83, L. 28 – P. 84, L. 17; P. 96, L. 28 – P. 97, L. 24; P. 98, L. 24-27; P. 126, L. 19 – P. 127, L. 5; P. 129, L. 19 – P. 130, L. 2; P. 130, L. 8-14; P. 132, L. 16-20; P. 148, L. 24-28; P. 154, L. 21-25) (**Candelaria**, 6-22-2016, P. 8, L. 20 – P. 9, L. 14; P. 51, L. 9-15; P. 51, L. 23 – P. 52, L. 16; P. 54, L. 15 – P. 55, L. 22; P. 55, L. 26 – P. 56, L. 19; P. 63, L. 12 – P. 64, L. 6; P. 66, L. 12 – P. 67, L. 1) (**Garcia**, 6-22-2016, P. 7, L. 8 – P. 8, L. 12; P. 8, L. 25 – P. 9, L. 7; P. 13, L. 22 – P. 14, L. 10; P. 14, L. 27 – P. 15, L. 4; P. 34, L. 2-7; P. 41, L. 1 – P. 42, L. 23; P. 44, L. 13-23) (**Garcia**, 6-23-2016, P. 6, L. 9-15; P. 8, L. 12 – P. 9, L. 7; P. 9, L. 28 – P. 10, L. 5; P. 29, L. 2 – P. 30, L. 3; P. 30, L. 26 – P. 31, L. 3; P. 31, L. 21-26; P. 32. L. 1-11) (**Goad**, 6-23-2016, P. 4, L. 26 – P. 5, L. 6; P. 32, L. 22-28; P. 61, L. 26 – P. 62, L. 5; P. 63, L. 21-27) (**Carmelo**, 6-28-2016, P. 18, L. 11 – P. 19, L. 7; P. 20, L. 25 – P. 21, L. 12; P. 24, L. 23-27; P. 26, L. 28 – P. 27, L. 7; P. 31, L. 14-22; P. 38, L. 15 – P. 39, L. 4; P. 44, L. 13 – P. 45, L. 17) (**Polanco**, 6-28-2016, P. 84, L. 13-25; P. 89, L. 26 – P. 90, L. 3) (**Stein**, 6-28-2016, P. 48, L. 5-19) (**Dunlap**, 6-29-2016, P. 48, L. 23 – P. 49, L. 15; P. 69, L. 13 – P. 70, L. 1; P. 70, L. 14-23) (**Garcia**, 6-30-2016, P. 5, L. 2-16) (**Neminski**, 7-6-2016, P. 65, L. 23-27; P. 66, L. 3-14) (**Perez**, 7-6-2016, P. 112, L. 18 – P. 113, L. 3) (**Carmelo**, 7-11-2016, P. 16, L. 9-20; P. 17, L. 8 – P. 18, L. 25) (**Carmelo**, 7-12-2016, P. 37, L. 19-20; P. 40, L. 2-12; P. 45, L. 5-9; P. 45, L. 24-26) (**McShane**, 7-15-2016, P. 22, L. 6-15; P. 25, L. 28 – P. 26, L. 4) (**Johnson**, 7-19-2016, P. 75, L. 5-21) (**Carmelo**, 7-19-2016, P. 125, L. 22-26; P. 141, L. 11 – P. 142, L. 11) (**Lamothe**, 7-21-2016, P. 43, L. 12 – P. 44, L. 12; P. 44, L. 26 – P. 46, L. 7) (**Stein**, 2-1-2017, P. 73, L. 13 – P. 74, L. 18) (**Stein**, 2-8-2017, P. 35, L. 12-17; P. 44, L. 1-15; P. 51, L. 19 – P. 52, L. 1) (**Stein**, 2-17-2017, P. 5, L. 13-26; P. 6, L. 25 – P. 7, L. 2; P. 7, L. 26 – P. 10, L. 4; P. 9, L. 12 – P. 10, L. 4) (**Aronson**, 3-2-2017, P. 56, L. 11-26) (**Aronson**, 3-6-2017, P. 38, L. 2 – P. 39, L. 13) (**Exh. 507** (GT TRIBE Membership List March 2007 Class B and C (after termination of members who left to join New GT Nation))) (**Exh. 508** (2006-2008 Sample "Blue Card" from GT Tribe member requesting records)) (**Exh. 514** (GT TRIBE Election Results Talley Certification 2007 and 2008))) (**Exh. 520** (Member Letter #1 – raised $21 million but never informed the Tribe)) (**Exh. 578** (2007 Talley Certification 2007 Election Candelaria Group)) (**Exh. 784** (April 4, 2007 Writ of Attachment - Terminal St. Address)) (**Exh. 785** (Writ of Attachment and Right to Attach Order against Gabrielino-Tongva Tribe in Amount of $812,500 – Santa Monica address)) |
| | 147.   Similarly, the trial court at the bench trial found that "After his termination Jonathan Stein had no authority to act on behalf of the Gabrielino-Tongva Tribe. Nonetheless, he sent out at least three 'member letters' on Gabrielino-Tongva Tribe stationary to the members of the tribe." (**Candelaria**, 6-21-2016, P. 26, L. 15-19; P. 27, L. 27 – P. 28, L. 3; P. 29, L. 1-21; P. 29, L. 27 – P. 30, L. 3; P. 30, L. 27 – P. 31, L. 5; P. 123, L. 16-27; P. 124, L. 19 – P. 125, L. 8; P. 129, L. 19-27; P. 135, L. 7-11) (**Candelaria**, 6-22-2016, P. 6, L. 20-28; P. 7, L. 11-24; P. 8, L. 2-12; P. 17, L. 7-12; P. |

Exh. C -- Appendix of Evidence In Support of Statement of Decision

| | **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|---|
| | 29, L. 10-16) (**Garcia**, 6-23-2016, P. 15, L. 11-22; P. 16, L. 18 – P. 17, L. 2) (**Goad**, 6-23-2016, P. 4, L. 26-27) (**Stein**, 6-27-2016, P. 67, L. 12-23) (**Carmelo**, 6-28-2016, P. 26, L. 28 – P. 27, L. 19; P. 33, L. 4-13) (**Polanco**, 6-28-2016, P. 89, L. 16-25) (**Stein**, 6-28-2016, P. 1, L. 19 – P. 2, L. 2; P. 35, L. 26 – P. 36, L. 10; P. 48, L. 5-16) (**Polanco**, 6-29-2016, P. 30, L. 23 – P. 31, L. 13) (**Dunlap**, 6-29-2016, P. 100, L. 12-21) (**Stein**, 6-30-2016, P. 4, L. 12-26; P. 27, L. 11-19) (**Exh. 520** (Member Letter #1 – raised $21 million but never informed the Tribe)) (**Exh. 522** (Member Letter #3 – poll results summarized and Nov 18 meeting announced)) (**Exh. 523** (Member Letter #4 – Financial Oversight Committee formed and sends first letter anticipating Nov 18 meeting and then recall election)) |
| | 148.    Stein kept both the tribal hard copies of the membership records and the electronic database. In turn, he gave them to the Candelaria group.  The Candelaria group believed the records were theirs and used them for their group's benefit.  (**Candelaria**, 6-21-2016, P. 39, L. 15 — P. 40, L. 18; P. 82, L. 28 — P. 84, L. 17; P. 96, L. 28 — P. 97, L. 5; P. 97, L. 22 — P. 98, L. 27; P. 126, L. 19 — P. 127, L. 13; P. 127, L. 26 — P. 128, L. 7; P. 129, L. 19 — P. 130, L. 2; P. 130, L. 8-14; P. 132, L. 16-20; P. 154, L. 21-24) (**Candelaria**, 6-22-2016, P. 9, L. 3-14; P. 54. L. 3 — P. 55, L. 10; P. 55, L. 19-25; P. 66, L. 12 — P. 67, L. 1) (**Garcia**, 6-23-2016, P. 7, L. 8-24; P. 8, L. 3-12; P. 13, L. 22-28; P. 14, L. 1-10; P. 34, L. 2-5) (**Garcia**, 6-23-2016, P. 8, L. 22 — P. 9, L. 7; P. 9, L. 28 — P. 10, L. 5; P. 30, L. 26 — P. 31, L. 1; P. 31, L. 21-26; P. 32, L. 1-7) (**Neminski**, 7-6-2016, P. 66, L. 9-14) (**Perez**, 7-6-2016, P. 112, L. 18-27) (**Exh. 507** (GT TRIBE Membership List March 2007 Class B and C (after termination of members who left to join New GT Nation))) (**Exh. 514** (GT TRIBE Election Results Talley Certification 2007 and 2008))) |
| | 149.    Garcia testified that she kept all of the business records of the tribe: "That included everything, contracts, resolutions, we had a copy of the contract and resolution, usually if it had one approving it."  She further testified that they contained one bookcase that went all the way up to the ceiling filled with notebooks; and filing cabinets that were about three or four rows of filing cabinets. And, they were also full of notebooks.  And all of these were not SMDC's records, they were the Tribe's records. (**Garcia**, 6-22-2016, P. 41, L. 6-8; P. 41, L. 13 — P 42, L. 23; P. 44, L. 13-15) |
| | 150.    Garcia testified that she never returned these records to the tribal council, even when they asked her to do so because Mr. Stein wouldn't allow her to return those records to the Tribal Councilmembers and she felt she had no discretion to do anything that was not authorized by Mr. Stein and she felt that returning these documents to the tribal councilmembers would be stealing. (**Garcia**, 6-23-2016, P. 26, L. 7-24) |
| | 151.    Garcia specifically offered an unsolicited legal opinion that giving those documents to the tribal councilmembers "in fact they did take some things so for them to ask me specifically to make copies of database information, that was had not legal." (**Garcia**, 6-23-2016, P. 27, L. 12-14) |
| | 152.    After Stein and the Tribe terminated their relationship, Stein had no right to take the Tribe's letterhead and convert it for his use.  Yet, he did, in order to send letters to the Tribe membership in order to plead his side of the case. These letters – which contained only Stein's side of the story regarding his dispute with the Tribe (and possible also included falsehoods) – had lasting damage in the relationship between the Tribe and its membership. (**Candelaria**, 6-21-2016, P. 27, L. 27 — P. 28, L. 3; P. 29, L. 15-21; P. 30, L. 25 — P. 31, L. 5; P. 124, L. 24 — P. 125, L. 8; P. 125, L. 23 — P. 126, L. 2; P. 126, L. 20-23; P. 129, L. 19 — P. 130, L. 2) (**Candelaria**, 6-22-2016, P. 6, L. 20 — P. |

| | **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|---|
| | 7, L. 24; P. 8, L. 2-12) (**Garcia**, 6-22-2016, P. 8, L. 25 — P. 9, L. 7) (**Garcia**, 6-23-2016, P. 15, L. 11-22; P. 16, L. 18-22) (**Exh. 520** (Member Letter #1 – raised $21 million but never informed the Tribe)) (**Exh. 522** (Member Letter #3 – poll results summarized and Nov 18 meeting announced)) (**Exh. 523** (Member Letter #4 – Financial Oversight Committee formed and sends first letter anticipating Nov 18 meeting and then recall election)) |
| | 153.    Stein registered an unincorporated association using the name the "Gabrielino-Tongva Tribe." (**Stein**, 6-28-2016, P. 58, L. 4-11) (**Garcia**, 7-18-2016, P. 44, L. 22 — P. 45, L. 24) (**Exh. 107** (Dec. 17, 2006 document titled "Registration of Unincorporated Association" using the name the "Gabrielino-Tongva Tribe")) |
| | 154.    Linda Candelaria, a former member of the Plaintiff (Tribe) is listed as the Secretary of this "new" group; Stein's legal assistant Barbara Garcia is listed as the agent for service of process and his law offices are listed as the entity's business address.  (**Stein**, 6-28-2016, P. 54, L. 20-23; P. 55, L. 21-26; P. 55, L. 27 — P. 56, L. 13) (**Exh. 107** (Dec. 17, 2006 document titled "Registration of Unincorporated Association" using the name the "Gabrielino-Tongva Tribe")) |
| | 155.    Stein admitted that he was responsible for causing the "new" tribe to file a statement of unincorporated association. (Stein, 6-28-2016, P. 58, L. 4-11; P. 58, L. 16-18) |
| | 156.    Stein stated that he took initiative of doing "research" on whether the statement of unincorporated association should be filed. (**Stein**, 6-28-2016, P. 58, L. 13-20; P. 59, L. 10-20) |
| | 157.    Stein chose to register the new Tribe with the same name which had been used by the Tribe, while all sides were still deeply involved in this instant litigation. He also admitted that he "brought" that idea to the new tribe (hereinafter referred to as the "Candelaria Faction") but wanted to file such a document in part to "make it clear where the address is  and in part that had become an issue because of the postal inspector trick that Mr. Polanco had played." (**Stein**, 6-28-2016, P. 58, L. 13-26) (**Exh. 107** (Dec. 17, 2006 document titled "Registration of Unincorporated Association" using the name the "Gabrielino-Tongva Tribe")) |
| | |
| | **Stein is Liable For Misappropriation of Trade Secrets** |
| | 158.    With regards to those same documents (membership records, financial documents, it is established that Stein also misappropriated those same documents, which were trade secrets, namely, the confidential membership records. (**Candelaria**, 6-21-2016, P. 39, L. 22 — P. 40, L. 18; P. 83, L. 28 — P. 84, L. 17; P. 96, L. 28 — P. 97, L. 5; P. 126, L. 19 — P. 127, L. 13; P. 127, L. 26 — P. 128, L. 7; P. 129, L. 28 — P. 130, L. 2; P. 132, L. 16-20; P. 154, L. 21-24) (**Candelaria**, 6-22-2016, P. 9, L. 3-14; P. 54. L. 15 — P. 55, L. 10; P. 55, L. 19-25; P. 66, L. 12 — P. 67, L. 1) (**Garcia**, 6-22-2016, P. 7, L. 8-24; P. 8, L. 3-12; P. 13, L. 22 — P. 14, L. 6; P. 34, L. 2-5; P. 41, L. 6-8; P. 41, L. 13 — P 42, L. 23; P. 44, L. 13-15) (**Garcia**, 6-23-2016, P. 8, L. 22 — P. 9, L. 7; P. 9, L. 28 — P. 10, L. 5; P. 30, L. 26 — P. 31, L. 1; P. 31, L. 21-26; P. 32, L. 1-7) (**Exh. 507** (GT TRIBE Membership List March 2007 Class B and C (after termination of members who left to join New GT Nation))) |

| **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|
| 159.   GT Tribe's membership records were highly confidential documents, which individually belonged to the members, as individuals, but the collection of them in aggregate belonged to the Tribe. (**Carmelo**, 6-28-2016, P. 38, L. 21 — P. 39, L. 4) |
| 160.   Stein admits that these membership records, and the membership as a whole was developed as a consequence of the efforts of individual Tribal Councilmembers, and not as a consequence of his own efforts. "With the excellent work of the Tribal Council, we built up tribal membership to over 1900 Gabrielinos." In a letter, where Mr. Stein otherwise brags about every single other effort he has undertaken, he freely gives all credit to the Tribal Council. (**Candelaria**, 6-21-2016, P. 27, L. 27 — P. 28, L. 3; P. 29, L. 15-21; P. 30, L. 25 — P. 31, L. 5; P. 39, L. 10-27; P. 124, L. 24-25) (**Exh. 520** (Member Letter #1 – raised $21 million but never informed the Tribe)) |
| 161.   Carmelo recalled that the tribal council records were the result of efforts by the five main tribal councilmembers (Martin Alcala, Sam Dunlap, Cindi Alvitre, Edgar Perez, and Carmelo) and who were specifically chosen to serve on the tribal council because they were representatives of key family groups of surviving Gabrielinos. And each of these tribal council people, as representatives of their family groups recruited their families to join the Tribe. Ms. Garcia who kept the individual membership records of all of the members (which showed their familiar relationships and native American heritage and relationship to the Tribe) agreed that the original information regarding the members (individual membership files) came from Sam Dunlap. (**Carmelo**, 6-28-2016, P. 2, L. 1-6; P. 2, L. 14-23; P. 3, L. 5-8; P. 3, L. 20-23) (**Garcia**, 6-23-2016, P. 31, L. 16 – P. 32, L. 15) |
| 162.   Stein kept both the tribal hard copies of the membership records and the electronic database. (**Candelaria**, 6-21-2016, P. 39, L. 25 — P. 40, L. 18; P. 96, L. 28 — P. 97, L. 5; P. 126, L. 24 — P. 127, L. 13; P. 129, L. 28 — P. 130, L. 2; P. 130, L. 8-14; P. 132, L. 16-20; P. 154, L. 21-24) (**Candelaria**, 6-22-2016, P. 9, L. 3-14; P. 54. L. 15-16; P. 55, L. 19-25; P. 66, L. 12 — P. 67, L. 1) (**Garcia**, 6-22-2016, P. 7, L. 8-24; P. 8, L. 3-12; P. 13, L. 22 — P. 14, L. 10; P. 34, L. 2-5) (**Garcia**, 6-23-2016, P. 8, L. 22 — P. 9, L. 7; P. 9, L. 28 — P. 10, L. 5; P. 30, L. 26 — P. 31, L. 1; P. 31, L. 21-26; P. 32, L. 1-7) (**Neminski**, 7-6-2016, P. 66, L. 9-14) (**Perez**, 7-6-2016, P. 112, L. 18-27) (**Exh. 507** (GT TRIBE Membership List March 2007 Class B and C (after termination of members who left to join New GT Nation))) (**Exh. 514** (GT TRIBE Election Results Talley Certification 2007 and 2008))) |
| |
| **Breach of Confidence** |
| 163.   Stein, SMDC, Law Offices, Garcia, the Tribe's leadership and GTGA had access to the membership records, which were maintained confidentially. After Stein's relationship with the Tribe ended Stein admitted to using the Tribe's membership records for the benefit of Stein and SMDC, and directly contrary to the rights of the Tribe and GTGA. And Ms. Garcia admitted that she did not returned the records even when the individual Tribal Councilmembers asked her to return those records to them because she believed they belonged to Stein. (**Candelaria**, 6-21-2016, P. 39, L. 25 — P. 40, L. 18; P. 83, L. 28 — P. 84, L. 17; P. 96, L. 28 — P. 97, L. 5; P. 126, L. 24 — P. 127, L. 13; P. 127, L. 26 — P. 128, L. 7; P. 129, L. 28 — P. 130, L. 14; P. 132, L. 16-20; P. 154, L. 21-24) (**Candelaria**, 6-22-2016, P. 9, L. 3-14; P. 54. L. 15 — P. 55, L. 10; P. 55, L. 19-25; P. 66, L. 12 — P. |

28

Exh. C -- Appendix of Evidence In Support of Statement of Decision

| **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|
| 67, L. 1) (**Garcia**, 6-22-2016, P. 7, L. 8-24; P. 8, L. 3-12; P. 13, L. 22 — P. 14, L. 6; P. 34, L. 2-5) (**Garcia**, 6-23-2016, P. 8, L. 22 — P. 9, L. 7; P. 9, L. 28 — P. 10, L. 5; **B. Garcia, 6-23-2016, p. 26, L. 15 – L. 28 B. Garcia, June 23, 2016, p. 27, L. 5 – L. 23** P. 30, L. 26 — P. 31, L. 1; P. 31, L. 21-26; P. 32, L. 1-7) (**Exh. 507** (GT TRIBE Membership List March 2007 Class B and C (after termination of members who left to join New GT Nation))) |

| **Intentional Interference with Economic Relationships** |
|---|
| 164.    It is undisputed that the Libra Agreement between the Tribe and the Libra investors existed during the time in question.  (**Stein**, 6-27-2016, P. 31, L. 8-12; P31, L. 28 — P. 32, L. 4; P. 45, L. 8-12) (**Stein**, 6-28-2016, P. 30, L. 7 — P. 31, L. 6) (**Carmelo**, 6-28-2016, P. 5, L. 1-4; P. 7, L. 4-6; P. 12, L. 26 — P. 13, L. 5) (**Polanco**, 6-28-2016, P. 76, L. 4-8) (**Polanco**, 6-29-2016, P. 7, L. 26-27) (**Exh. 644** (GT Tribe — Libra Investors Agreement)) |
| 165.    Stein admitted that he negotiated the Libra Agreement between the Tribe and Libra Group. Thus, he knew of that relationship. (**Stein**, 7-13-2016, P. 60, L. 1-7; P. 61, L. 5-26; P. 63, L. 7 — P. 64, L. 19; P. 68, L. 14-28) (**Exh. 644** (GT Tribe — Libra Investors Agreement)) |
| 166.    Stein's attorney, Ken Sulzer testified (under a waiver of the attorney-client privilege) that once a dispute with the Tribe started, Stein/SMDC wanted to be paid of any monies owed by the Tribe by Libra from the 18 million funds that Libra had promised to the Tribe.  Stein/SMDC insisted that Stein and SMDC be first in line for payment.  (**Stein**, 6-28-2016, P. 38, L. 9 -23; P. 42, L. 13-27) (**Stein**, 7-13-2016, P. 100, L. 1-10) (**Sulzer**, 7-18-2016, P. 25, L. 2 -11; P. 29, L. 24 – P. 30, L. 1) |
| 167.    Ms. Virginia Carmelo testified that during the negotiations for the Libra Agreement, it had been agreed that Stein/SMDC would not be paid from the Agreement because it would eat up a chunk of the funds.  (**Carmelo**, 6-28-2016, P. 73, L. 2 — P. 74, L. 2) |
| 168.    Moreover, separate and apart from his demand to be paid from the first tranche of the Libra funds, when he did not get to spend the Libra money as he wanted, Stein threatened to send the money back to Libra, and therefore, intentionally disrupt the Libra agreement between the Tribe and Libra.  (**Aronson**, 3-2-2017, P. 55, L. 18 – P. 56, L. 4) (**Exh. 68** (Sept. 10, 2006 Mr. Stein's email explaining that he had frozen the Tribe's accounts)) |
| 169.    Even though Libra wanted to continue its relationship with the Tribe and made the decision to do so, Stein was intent on frustrating that relationship.  (**Stein**, 6-27-2016, P. 60, L. 1-16) (**Stein**, 6-28-2016, P. 34, L. 13-22; P. 38, L. 5-23) (**Carmelo**, 6-28-2016, P. 20, L. 11-12; P. 33, L. 12-20; P. 46, L. 26 — P. 47, L. 7) (**Polanco**, 6-28-2016, P. 81, L. 11 — P. 82, L. 3; P 82, L. 9-25; P. 83, L. 10-18; P. 85, L. 7-27) (**Exh. 647** (Stein Email to Tribal Council "casino project dead in water")) (**Exh. 678** (Email Stein to Tribal Council re willing to be terminated but $2 million payment is due and will cooperate in transition to new casino project leader)) |
| 170.    The future economic prospect was the 18 million dollars that Libra had promised as "subsequent" tranches to the Tribe and that Stein wanted to be used to pay him, or else he would |

| | **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|---|
| | disrupt the relationship. The act that actually disrupted the relationship was Stein's demand that he be paid out of the first tranche and that he be made signatory to the Tribe. (**Stein**, 6-27-2016, P. 61, L. 11— P. 62, L. 6) |
| | 171.  The tribe was supposed to imminently receive a two (2) million dollar tranche from the Libra investors; but they never received that tranche because Stein interfered with that contract. Moreover, it is undisputed between the parties that the Libra Agreement was ultimate worth 21 million dollars in damages. (**Carmelo**, 6-28-2016, P. 33, L. 14-25) (**Stein**, 6-28-2016, P. 34, L. 13-22) (**Loya**, 7-6-2016, P. 166, L. 2-6; P. 170, L. 24 — P. 171, L. 1; P. 177, L. 2-5) (**McShane**, 7-15-2016, P. 39, L. 12-20; P. 40, L. 6-14) (**Exh. 1515** (Sept 18, 2006 McShane email conflict check to "Records" - #4 & 6) (**Stein**, 2-1-2016, P. 45, L. 24, P. 46, L. 7) (**Aronson**, 3-2-2017, P. 75, L. 26 — P. 76, L. 7, P. 76, L. 28 — P. 77, L. 2) (**Aronson**, 3-6-2017, P. 25, L. 12-25) (**Exh. 649** (Sept. 26, 2006 Stein email to Tribal Council re delay, items to do to resolve dispute and continue casino project with or without Stein.)) (**Exh. 1510** (Sept. 18, 2003 McShane emails to various, including JAS and Carmelo re Council Meeting on Gaming Issues)) |
| | |
| | **Negligent Interference with Economic Relationships** |
| | 172.  It is undisputed that the Libra Agreement between the Tribe and the Libra investors existed during the time in question. (**Stein**, 6-27-2016, P. 31, L. 8-12; P31, L. 28 — P. 32, L. 4; P. 45, L. 8-12) (**Stein**, 6-28-2016, P. 30, L. 7 — P. 31, L. 6) (**Carmelo**, 6-28-2016, P. 5, L. 1-4; P. 7, L. 4-6; P. 12, L. 26 — P. 13, L. 5) (**Polanco**, 6-28-2016, P. 76, L. 4-8) (**Polanco**, 6-29-2016, P. 7, L. 26-27) (**Exh. 644** (GT Tribe — Libra Investors Agreement)) |
| | 173.  Stein admitted that he negotiated the Libra Agreement between the Tribe and Libra Group. Thus, he knew of that relationship. (**Stein**, 7-13-2016, P. 60, L. 1-7; P. 61, L. 5-26; P. 63, L. 7 — P. 64, L. 19; P. 68, L. 14-28) (**Exh. 644** (GT Tribe — Libra Investors Agreement) |
| | 174.  Stein's attorney, Ken Sulzer testified (under a waiver of the attorney-client privilege) that once a dispute with the Tribe started, Stein/SMDC wanted to be paid of any monies owed by the Tribe by Libra from the 18 million funds that Libra had promised to the Tribe. Stein/SMDC insisted that Stein and SMDC be first in line for payment. (**Stein**, 6-28-2016, P. 38, L. 9 -23; P. 42, L. 13-27) (**Stein**, 7-13-2016, P. 100, L. 1-10) (**Sulzer**, 7-18-2016, P. 25, L. 2 -11; P. 29, L. 24 – P. 30, L. 1) |
| | 175.  Ms. Virginia Carmelo testified that during the negotiations for the Libra Agreement, it had been agreed that Stein/SMDC would not be paid from the Agreement because it would eat up a chunk of the funds. (**Carmelo**, 6-28-2016, P. 73, L. 2 — P. 74, L. 2) |
| | 176.  Moreover, separate and apart from his demand to be paid from the first tranche of the Libra funds, when he did not get to spend the Libra money as he wanted, Stein threatened to send the money back to Libra, and therefore, intentionally disrupt the Libra agreement between the Tribe and Libra. **Aronson**, 3-2-2017, P. 55, L. 18 – P. 56, L. 4) (**Exh. 68** (Sept. 10, 2006 Mr. Stein's email explaining that he had frozen the Tribe's accounts)) |

| **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|
| 177.    Even though Libra wanted to continue its relationship with the Tribe and made the decision to do so, Stein was intent on frustrating that relationship.  (**Stein**, 6-27-2016, P. 60, L. 1-16) (**Stein**, 6-28-2016, P. 34, L. 13-22; P. 38, L. 5-23) (**Carmelo**, 6-28-2016, P. 20, L. 11-12; P. 33, L. 12-20; P. 46, L. 26 — P. 47, L. 7) (**Polanco**, 6-28-2016, P. 81, L. 11 — P. 82, L. 3; P 82, L. 9-25; P. 83, L. 10-18; P. 85, L. 7-27) (**Exh. 647** (Stein Email to Tribal Council "casino project dead in water")) (**Exh. 678** (Email Stein to Tribal Council re willing to be terminated but $2 million payment is due and will cooperate in transition to new casino project leader)) |
| 178.    The future economic prospect was the 18 million dollars that Libra had promised as "subsequent" tranches to the Tribe and that Stein wanted to be used to pay him, or else he would disrupt the relationship.  The act that actually disrupted the relationship was Stein's demand that he be paid out of the first tranche and that he be made signatory to the Tribe.  (**Stein**, 6-27-2016, P. 61, L. 11— P. 62, L. 6) |
| 179.    The tribe was supposed to imminently receive a two (2) million dollar tranche from the Libra investors; but they never received that tranche because Stein interfered with that contract.  Moreover, it is undisputed between the parties that the Libra Agreement was ultimate worth 21 million dollars in damages.  (**Carmelo**, 6-28-2016, P. 33, L. 14-25) (**Stein**, 6-28-2016, P. 34, L. 13-22) (**Loya**, 7-6-2016, P. 166, L. 2-6; P. 170, L. 24 — P. 171, L. 1; P. 177, L. 2-5) (**McShane**, 7-15-2016, P. 39, L. 12-20; P. 40, L. 6-14) (**Exh. 1515** (Sept 18, 2006 McShane email conflict check to "Records" - #4 & 6) (**Stein**, 2-1-2016, P. 45, L. 24, P. 46, L. 7) (**Aronson**, 3-2-2017, P. 75, L. 26 — P. 76, L. 7, P. 76, L. 28 — P. 77, L. 2) (**Aronson**, 3-6-2017, P. 25, L. 12-25) (**Exh. 649** (Sept. 26, 2006 Stein email to Tribal Council re delay, items to do to resolve dispute and continue casino project with or without Stein.)) (**Exh. 1510** (Sept. 18, 2003 McShane emails to various, including JAS and Carmelo re Council Meeting on Gaming Issues)) |

| |
|---|
| **Breach of Contract** |
| 180.    Stein attempted to usurp the decision-making ability of the Tribal Council in violation of Paragraph C of Page 2 of the Development Agreement which states "…understanding that all ultimate decisions in connection therewith (the accomplishment of the Economic Development Tasks) shall at all times reside solely with the Tribe and their Council" by among other things, attempting to terminate Tribal professionals, force tribal council members to resign and have carte blanch power to spend Tribe investment monies.  (**Perez**, 7-6-2016, P. 139, L. 7-26) (**Loya**, 7-6-2016, P. 184, L. 5 — P. 185, L. 2; P 185, L. 24 — P. 186, L. 22) |
| 181.    Stein violated Paragraph 1(b)(ix) on Page 3 of the Development Agreement by terminating the Tribe's outside counsel without Tribal Council approval and prior to the negotiation of the final terms of the investment agreement with Libra Securities.  (**Barrett**, 7-8-2016, P. 19, L. 6-7; P. 31, L. 2-5) (**Aronson**, 3-1-2017, P. 17, L. 11-14) |
| 182.    Stein terminated or attempted to terminate third party professionals, including but not limited to, the Tribe's Outside Counsel and Tribal General Counsel in violation of Paragraph 2(c)(ii) on Page 5 of the Development Agreement.  (**Loya**, 7-6-2016, P. 184, L. 5 — P. 185, L. 2; P 185, L. 24 — P. |

| **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|
| 186, L. 22) **(Barrett**, 7-8-2016, P. 19, L. 6-7; P. 31, L. 2-5) **(Aronson**, 3-1-2017, P. 17, L. 11-14; P. 22, L. 19 — P. 23, L. 15) |
| 183.    Stein violated Paragraph 3(a) on Page 5 of the Development Agreement (regarding economic development tasks) by refusing to explore federal recognition.  **(Stein**, 6-28-2016, P. 33, L. 13-20; P. 33, L. 23-24) **(Margolis**, 7-15-2016, P. 46, L. 27 — P. 47, L. 21) **(Margolis**, 3-3-2017, P. 45, L. 18-25; P. 46, L. 8-16) |
| 184.    Stein attempted to usurp the Tribal Council's authority in violation of Paragraph 2(f) on Page 6 of the Development Agreement by, among other things, terminating tribal professionals, attempting to force tribal council members to resign, and attempting to gain sole signatory authority of Tribe investment monies; **(Perez**, 7-6-2016, P. 113, L. 9-18) **(Loya**, 7-6-2016, P. 177, L. 2-11; P. 178, L. 7-16) **(McShane**, 7-15-2016, P. 42, L. 26 — P. 43, L. 13; P. 50, L. 18 – P. 51, L. 25) **(Exh. 649** (Sept. 26, 2006 Stein email to Tribal Council)) |
| 185.    Stein attempted to claim reimbursement of unreasonable expenses, including but not limited to, expenses incurred by the Law Office of Jonathan Stein and/or double billing for expenses outlaid in violation Paragraph 4(b) on Page 7 of the Development Agreement; and  **(Aronson**, 3-1-2017, P. 58, L. 1 – P. 59, L. 28) |
| |
| **Breach of Implied Covenant of Good Faith and Fair Dealing** |
| 186. |
| 187. |
| |
| **Violation of Penal Code Sec. 502 (c) Computer Fraud** |
| 188.    The Tribe is also asserting a claim against Stein and SMDC for illegally accessing the Tribe's computer data, after Stein/SMDC's legal right to access that data had expired. Specifically, after the Tribe relationship with Stein and SMDC had unambiguously ended, Stein and SMDC accessed the Tribe's confidential computer data, which included, the Tribe's confidential membership records and business files. **(Candelaria**, 6-21-2016, P. 27, L. 27 — P. 28, L. 3; P. 29, L. 15-21; P. 30, L. 25 — P. 31, L. 5; P. 39, L. 15 — P. 40, L. 12; P. 83, L. 28 — P. 84, L. 17; P. 96, L. 28 — P. 97, L. 2; P. 97, L. 22 — P. 98, L. 27; P. 124, L. 24 — P. 125, L. 8; P. 126, L. 19 — P. 127, L. 13; P. 127, L. 26 — P. 128, L. 3; P. 129, L. 19 — P. 130, L. 2) **(Candelaria**, 6-22-2016, P. 9, L. 3-14; P. 55, L. 9-10; P. 55, L. 19-22; P. 66, L. 12 — P. 67, L. 1) **(Garcia**, 6-22-2016, P. 8, L. 3-12; P. 8, L. 25 — P. 9, L. 7; P. 13, L. 22 — P. 14, L. 6; P. 34, L. 2-5) **(Garcia**, 6-23-2016, P. 9, L. 28 — P. 10, L. 5; P. 16, L. 18-22) **(Exh. 507** (GT TRIBE Membership List March 2007 Class B and C (after termination of members who left to join New GT Nation))) **(Exh. 514** (GT TRIBE Election Results Talley Certification 2007 and 2008))) **(Exh. 520** (Member Letter #1 – raised $21 million but never informed the Tribe)) |

| Material Fact/Evidence With Specific Citations to Testimony or Exhibits |
|---|
| 189.    During the trial, Stein admitted that he took possession of the Tribe's computer along with all the information contained within it and disposed of it at some point.  He does not remember where or how.  (**Candelaria**, 6-21-2016, P. 97, L. 22 — P. 98, L. 27) ( **Lamothe**, 1-25-2017, P. 28, L. 15 — P. 29, L. 10) (**Stein**, 2-1-2017, P. 27, L. 26 — P. 28, L. 6) (**Stein**, 2-8-2017, P. 35, L. 9-20, P. 44, L. 1-15) (**Stein**, 2-15-2017, P. 30, L. 2-9) (**Stein**, 2-16-2017, P. 42, L. 15-19) (**Stein**, 2-17-2017, P. 2, L. 4 — P. 3, L. 1; P. 3, L. 12 — P. 5, L. 27; P. 9, L. 25 — P. 10, L. 4; P. 15, L. 2 — P. 16, L. 26) (**Stein**, 2-21-2017, P. 29, L. 20-25, P. 30, L. 9-12) |

| **Unfair Competition (B&P Code Sec. 17200) For Unlawful Conduct by Stein/SMDC and Because the Purpose of the SMDC Agreement is Illegal** |
|---|
| 190.    Philip Hogan was appointed to the National Indian Gaming Commission ("NIGC") in 1995, by the Secretary of the Interior, where he served as Associate Commissioner until 1999.  (**Philip Hogan ("Hogan")**, July 14, 2016, Page 9, Line 27 — P. 10, L. 2; P. 10, L. 21 — P. 11, L. 1) |
| 191.    Hogan was asked to serve as the associate solicitor for the Bureau of Indian Affairs in the Department of the Interior in 2001.  He served one year before being appointed as the chair of the NIGC by President George W. Bush.  Hogan held this position until 2009.  (**Hogan**, 7-14-2016, P. 11, L. 8 — P. 12, L. 16) |
| 192.    The SMDC agreement would not be subject to the regulations of 2001, when it was written, but it would fall under the regulations of an evolving NIGC at the time the SMDC agreement gets reviewed by the NIGC.  (**Hogan**, 7-14-2016, P. 68, L. 19 — P. 69, L. 6; P. 71, L. 11-19) |
| 193.    The Indian Gaming Regulatory Act and the regulations promulgated by the NIGC pursuant to that act, address the proposition that the tribe must have sole proprietary interest in the gaming to be conducted on those Indian lands.  If somebody other than the tribe has an ownership interest in the game, the profits, then the tribe doesn't have the sole proprietorship interest.  (**Hogan**, 7-14-2016, P. 21, L. 2-21; P. 47, L. 21 — P. 48, L. 1) |
| 194.    The NIGC would view a 10 percent of net win or the gross gaming revenues to a third party (and there is no direct relationship between the quantity of the services or the goods provided in exchange for that 10 percent) as the third party having an ownership interest, thus depriving the tribe of the sole proprietary interest.  This arrangement is unlawful.  (**Hogan**, 7-14-2016, P. 22, L. 21 — P. 23, L. 19; P. 24, L. 3-22; P. 47, L. 21-25; P. 51, L. 9 — P. 52, L. 3) |
| 195.    Net win or gross gaming revenues is all the money that comes in from the gaming floor less the amount of money prizes going out.  Net win or gross gaming revenue less the amount to pay the operation costs of running the casino, establishes the net gaming.  (**Hogan**, 7-14-2016, P. 12, L. 25-27; P. 42, L. 20-26; P. 43, L. 1-4; P. 44, L. 27-28) |
| 196.    Typically, a developer that provides the funding to construct the facility and to assist in the management of the facility would have their compensation based on net gaming revenues, which are dramatically different than net win or the gross gaming revenues.  (**Hogan**, 7-14-2016, P. 42, L. 7- |

| **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|
| 16) |
| 197. There is a limitation of 30 percent of net gaming for management agreements. These agreements require the review and approval of the NIGC. (**Hogan**, 7-14-2016, P. 47, L. 5-10) |
| 198. The SMDC agreement compensation is 10 percent of net win of slot machines. (**Hogan**, 7-14-2016, P. 45, L. 1-3; P. 45, L. 7-14; P. 46, L. 18-22) |
| 199. Slot machines are the highest revenue generator with the lowest overhead, in the casino. (**Hogan**, 7-14-2016, P. 43, L. 13 — P. 44, L. 18) |
| 200. The SMDC agreement would not avoid invalidity with Section 4 J of the SMDC agreement. This provision would have raised an immediate red flag with the NIGC, as it is trying to structure the SMDC agreement so that the restrictions of the NIGC or IGRA don't apply. A good trustee would not stand by and permit an arrangement like that to be entered into by its ward. (**Hogan**, 7-14-2016, P. 49, L. 16 — P. 51, L. 26) |
| 201. The SMDC agreement would be invalidated and unenforceable under the sole proprietary interest, if a determination by the commission or under IGRA was pushed. (**Hogan**, 7-14-2016, P. 27, L. 15-26; P. 29, L. 1-10; P. 29, L. 26 — P. 30, L. 15; P. 37, L. 20 — P. 38, L. 26; P. 47, L. 21 — P. 48, L. 1; P. 51, L. 7 — P. 52, L. 3; P. 55, L. 2-9; P. 57, L. 10-13; P. 61, L. 13-15; P. 68, L. 19-27; P. 70, L. 19 — P. 71, L. 4) |
| 202. Although developer agreements have been voluntarily amended with a tribe's cooperation in other situations, the SMDC agreement is not enforceable as is. An amended agreement is a new agreement that stands on its own. (**Hogan**, 7-14-2016, P. 32, L. 2-8; P. 34, L. 24 — P. 35, L. 8; P. 52, L. 6-9; P. 53, L. 16 — P. 54, L. 6; P. 55, L. 24 — P. 57, L. 15) |
| 203. If the parties renegotiated or amended the SMDC agreement, as soon as the amendments were made, the agreement would be considered by the NIGC to be a new or different agreement. (**Hogan**, 7-14-2016, P. 32, L. 2-8; P. 34, L. 24 — P. 35, L. 8; P. 54, L. 4-6; P. 57, L. 4-15) |
| |
| **Rescission – Cal Bus. & Prof. Code 3-300** |
| 204. Stein had an obligation under 3-300, 3-310 B-1, B-3, and B-4, and 3-310 C-1 and C-2 to provide full disclosure to and to get a waiver from the tribe, when all parties executed the SMDC agreement. Likewise, he had the same obligation with each amendment and modification and resolution to the agreement. Therefore, the contract is not binding or enforceable. (**Margolis**, 7-15-2016, P. 47, L. 22 – P. 50, L. 1) (**Margolis**, 7-20-2016, P. 59, L. 17-22; P. 63, L. 22 — P. 64, L. 28; P. 92, L. 19 — P. 93, L. 1; P. 94, L. 1-5; P. 94, L. 9-16; P. 95, L. 5-11; P. 96, L. 1-26; P. 100, L. 5-7; P. 100, L. 22 – P. 101, L. 1; P. 101, L. 21-26; P. 102, L. 9-18; P. 104, L. 10 — P. 105, L. 6; P. 110, L. 11-17; P. 114, L. 9 — P. 115, L. 3; P. 115, L. 8-12; P. 125, L. 2-10; P. 127, L. 27 — P. 128, L. 16; P. 128, L. 12-16; P. 130, L. 22 — P. 131, L. 24; P. 131, L. 14-24; P. 133, L. 3-21; P. 137, L. 1-11; P. 137, L. 26 — P. 138, L. 1) (**Margolis**, 3-3-2017, P. 13, L. 24 — P. 14, L. 3; P. 14, L. 9 — P. 15, L. |

| | **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|---|
| | 16; P. 28, L. 5 — P. 29, L. 3; P. 29, L. 18-19, P. 32, L. 6-13) **(Margolis**, 3-8-2017, P. 7, L. 6-11; P. 30, L. 15-22; P. 31, L. 3-19; P. 33, L. 15-17; P. 33, L. 22-25; P. 34, L. 20-21; P. 36, L. 6-13; P. 60, L. 20 — P. 61, L. 1) **(Margolis**, 3-9-2017, P. 10, L. 11-12; P. 20, L. 2-13; P. 20, L. 24 — P. 21, L. 8; P. 22, L. 20-25; P. 26, L. 20-21; P. 32, L. 5-10; P. 33, L. 13-20; P. 33, L. 28 — P. 34, L. 25; P. 35, L. 23-27; P. 39, L. 21 — P. 40, L. 1; P. 40, L. 10-13; P. 40, L. 15-22; P. 40, L. 28 — P. 41, L. 8; P. 50, L. 12-16; P. 50, L. 19 — P. 52, L. 4; P. 52, L. 19-25; P. 53, L. 4-21) **(Exh. 1547** (Resolution 46 approving SMDC Agreement and Modification Agreement dated September 28, 2003.  (Note was called as 1548 in testimony))) **(Exh. 1548** (2003 Modification agreement and ratification of SMDC Agreement dated September 28, 2003.  (Note was called as 1549 in testimony))) |
| | 205.    Item 3-300 A of the Rules of Professional Conduct states the transaction or acquisition and its terms are fair and reasonable to the client and are fully disclosed and transferred in writing to the client in a manner that should have been reasonably understood with the client.  Case laws clarifies that fully disclosed refers to the terms of the transaction and the fact of a conflict and a discussion or a disclosure to the client as to pros and cons that are reasonably foreseeable. [Beery versus State Bar]. **(Margolis**, 7-20-2016, P. 111, L. 11 — P. 112, L. 8; P. 113, L. 19-21) **(Margolis**, 3-8-2017, P. 30, L. 15-21; P. 31, L. 3-19) **(Margolis**, 3-9-2017, P. 25, L. 13 — P. 26, L. 14; P. 27, L. 1-5; P. 27, L. 14-17; P. 28, L. 1-2) |
| | 206.    Stein has a problem with Rules of Professional Conduct 3-300, which involves adverse interests.  As a fiduciary he had the duty to tell the tribe the pros and cons and to warn them against himself to the same extent he would have warned them against a third party.  He was under an obligation to disclose everything.   [Beery versus state bar it's 1987, 43 Cal third 802 at 813]. **(Margolis**, 7-15-2016, P. 46, L. 27 — P. 48, L. 4) **(Margolis**, 7-20-2016, P. 63, L. 22 — P. 64, L. 28; P. 94, L. 9-16; P. 95, L. 5-11; P. 96, L. 1-26; P. 100, L. 5-7; P. 100, L. 22 – P. 101, L. 1; P. 101, L. 21-26; P. 102, L. 9-18; P. 104, L. 10-26; P. 110, L. 7-17; P. 114, L. 9 — P. 115, L. 3; P. 115, L. 8-12; P. 125, L. 2-10; P. 127, L. 27 — P. 128, L. 16; P. 128, L. 12-16; P. 137, L. 1-11; P. 137, L. 26 — P. 138, L. 1) **(Margolis**, 3-3-2017, P. 13, L. 24 — P. 14, L. 3; P. 14, L. 9 — P. 15, L. 16; P. 28, L. 5-15; P. 29, L. 18-19; P. 31, L. 12-22; P. 32, L. 6-13) **(Margolis**, 3-8-2017, P. 7, L. 6-11; P. 30, L. 2-10; P. 30, L. 15-22; P. 31, L. 3-19; P. 33, L. 15-17; P. 33, L. 22-25; P. 36, L. 6-13; P. 60, L. 20 — P. 61, L. 1) **(Margolis**, 3-9-2017, P. 20, L. 2-13; P. 20, L. 24 — P. 21, L. 8; P. 22, L. 20-25; P. 26, L. 20-21; P. 27, L. 1-5; P. 27, L. 14-17; P. 28, L. 1-2; P. 32, L. 5-10; P. 33, L. 13-20; P. 33, L. 28 — P. 34, L. 2; P. 35, L. 23-27; P. 39, L. 21 — P. 40, L. 1; P. 40, L. 10-13; P. 40, L. 15-22; P. 40, L. 28 — P. 41, L. 8; P. 50, L. 12-16; P. 50, L. 19 — P. 52, L. 4; P. 52, L. 19-25; P. 53, L. 4-21) **(Exh. 1547** (Resolution 46 approving SMDC Agreement and Modification Agreement dated September 28, 2003.  (Note was called as 1548 in testimony))) **(Exh. 1548** (2003 Modification agreement and ratification of SMDC Agreement dated September 28, 2003.  (Note was called as 1549 in testimony))) |
| | 207.    You don't need an independent attorney to meet the requirements of 3-300, just the advice has to be given that they have the right to go out and get an attorney.  If there is independent counsel, then independent counsel relieves the attorney who is offering the contract of the responsibility of discussing the pros and cons of the client taking the transaction, but it does not relieve the fiduciary duty of full and unbiased disclosure from the attorney of having to alert and describe that in fact there is a conflict there and what that conflict is. [Rose versus State Bar, 1989, 49 Cal third six 46 at 6:30 - - at '66 three]. **(Margolis**, 7-20-2016, P. 110, L. 22 — P. 111, L. 1; P. 111, L. 11 — P. 112, L. 8) **(Margolis**, 3-3-2017, P. 12, L. 8-14; P. 12, L. 21 — P. 13, L. 14; P. 14, L. 21 — P. 15, L. 2; P. 15, |

Exh. C -- Appendix of Evidence In Support of Statement of Decision

| | **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|---|
| | L.5-16; P. 15, L. 17 — P. 16, L. 12) (**Margolis**, 3-8-2017, P. 30, L. 11-21; P. 30, L. 24 — P. 31, L. 19; P. 31, L. 23 — P. 32, L. 2; P. 33, L. 19) (**Margolis**, 3-9-2017, P. 27, L. 1-5; P. 27, L. 14-17; P. 28, L. 1-2) |
| | 208.    The tribe was led to believe they had independent counsel from the beginning. (Margolis, 3-8-2017, P. 32, L. 6-8; P. 32, L. 27 — P. 33, L. 8; P. 33, L. 18-25) (Margolis, 3-9-2017, P. 20, L. 24 — P. 21, L. 2; P. 39, L. 23 — P. 40, L. 1; P. 40, L. 10-13; P. 40, L. 28 — P. 41, L. 8) |
| | 209.    Stein wanted Hugh McMullin to be the attorney for the Morales faction.  Dunlap helped arrange a meeting. McMullin walks away. (**Dunlap**, 7-7-2016, P. 61, L. 14 — P. 63, L. 6) (**Exh. 12** (2000, June 27, Letter to Samuel H. Dunlap from Hugh S. McMullen, Esq. clarifying he **no longer** represents the Tribe)) |
| | 210.    On or about March 4, 2001, Stephen B. Otto, Esq. wrote a letter to the Gabrielino Tribal Council, Chief Velasquez and Stein to disclaim his role in the SMDC transaction because Stein had prepared a resolution appointing Otto as tribal general counsel despite the fact that Otto had earlier explicitly declined to accept that position. (**Neminski**, 7-6-2016, P. 46, L. 1-13; P. 60, L. 23-26; P. 63, L. 16-19; P. 70, L. 27 — P. 71, L. 1; P. 78, L. 5-28; P. 81, L. 21 — P. 82, L. 6; P. 85, L. 2-28; P. 90, L. 27 — P. 91, L. 13) (**Velasquez**, 7-6-2016, P. 150, L. 18 — P. 151, L. 2) (**Simental**, 7-7-2016, P. 18, L. 23 – P. 19, L. 18; P. 22, L. 18 – P. 23, L. 13; P. 46, L. 7 – P. 48, L. 17) (**Dunlap**, 7-7-2016, P. 66, L. 4-15; P. 66, L. 24 — P. 67, L. 17) (**Exh. 16** (2001, March 8, Letter dated from Stephen Otto, Esq. to Tribal Council and Stein declining appointment of General Counsel of Tribe)) (**Exh. 241** (2001, March 1, Letter from Stephen Otto, Esq., to Tribal Council declining to be Counsel for the Tribe)) |
| | 211.    Ed Hamburger was never hired by the Tribe. (**Perez**, 7-6-2016, P. 128, L. 23-26; P. 130, L. 17-21) (**Dunlap**, 7-7-2016, P. 64, L. 22 — P. 65, L. 17; P. 92, L. 19-25) (**Carmelo**, 7-12-2016, P. 70, L. 22 — P. 71, L. 10) (**Stein**, 1-23-2017, P. 50, L. 12-17) (Exh. 1537 (Resolution 15 appointing Rae Lamothe as Tribal General Counsel Unsigned)) (**Exh. 1543** (Resolution 15 appointing Ed Hamburger as Tribal General Counsel Unsigned)) |
| | 212.    Lamothe was not independent counsel.  She had a compensation provision in her retainer agreement that was similar to Stein's.  Stein's compensation agreement was part of what the conflict was about.  It was in her interest to further the same interests and the same approach that Stein was interested in, even if it was not to the tribe's benefit.  An independent attorney would have been someone from the outside, that had no relationship like that or an economic interest in the matter of that kind.  The opportunity for independent counsel was not satisfied for 3-300. (**Margolis**, 7-20-2016, P. 122, L. 20-26) (**Margolis**, 3-3-2017, P. 11, L. 23 — P. 12, L. 1; P. 28, L. 16-19; P. 29, L. 11-13; P. 43, L. 22 — P. 45, L. 5; P. 45, L. 18-25; P. 46, L. 7-22; P. 46, L. 27 — P. 47, L. 21; P. 48, L. 1-21) (**Margolis**, 3-8-2017, P. 32, L. 2-12; P. 32, L. 27 — P. 33, L. 8) (**Margolis**, 3-9-2017, P. 20, L. 9-11; P. 20, L. 24-28) |
| | 213.    Lamothe states that she didn't do a "Monday Morning Quarterback" review of the SMDC Agreement, she only researched what was necessary for the amendments and modifications.  She further states the Tribal Councilmembers did not bring any inaccuracies to her attention. (**Lamothe**, 1-24-2017, P. 22, L. 13-22) (**Lamothe**, 1-25-2017, P. 9, L. 9 — P. 10, L. 5; P. 10, L. 21-24;  P. 14, L. |

| | **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|---|
| | 13 — P. 15, L. 11; P. 15, L. 25 — P. 16, L. 24; P. 45, L. 17-28) **(Exh. 16** (2001, March 8, Letter dated from Stephen Otto, Esq. to Tribal Council and Stein **declining** appointment of General Counsel of Tribe)) **(Exh. 1542** (Resolution 10 approving SMDC Agreement Dated 3-4-2001)) |
| | 214.    You also have to give the client an opportunity to obtain independent counsel. **(Margolis,** 3-8-2017, P. 32, L. 4-5) |
| | 215.    Stein controlled the SMDC Agreement from day one.  The Tribal Councilmembers were not allowed to take a copy home; therefore, they did not have a meaningful opportunity to have a lawyer (or anybody else) review the document.  **(Neminski,** 7-6-2016, P. 60, L. 16-17; P. 70, L. 27 – P. 71, L. 1; P. 87, L. 11-18; P. 97, L. 24 - P. 98, L. 17) **(Velasquez,** 7-6-2016, P. 149, L. 14-23; P. 157, L. 18-25; P. 163, L. 4-12) **(Simental,** 7-7-2016, P. 14, L. 1-3; P. 18, L. 18-22; P. 20, L. 3-7; P. 22, L. 18-25; P. 37, L. 22-27; P. 38, L. 21-25; P. 41, L. 5-20; P. 48, 5-17) **(Exh. 16** (2001, March 8, Letter dated from Stephen Otto, Esq. to Tribal Council and Stein **declining** appointment of General Counsel of Tribe)) |
| | 216.    Carmelo didn't see the SMDC Agreement in whole, until this litigation broke out and she became a party to it.  **(Carmelo,** 7-7-2016, P. 139, L. 9 – P. 140, L. 24) **(Carmelo,** 7-11-2016, P. 16, L. 12-17) **(Carmelo,** 7-12-2016, P. 3, L. 23 – P. 4, L. 4) |
| | 217.    If it is true that when originally presented with the SMDC agreement in 2001, the tribal council members were not allowed to take home the agreement, this would add an element of concealment and overreaching that would add to the issue of moral turpitude, 6106 in the Business and Professions code. **(Margolis,** 7-15-2016, P. 20, L. 18 — P. 21, L. 5; P. 23, L. 4-13) **(Margolis,** 7-20-2016, P. 114, L. 16-20; P. 134, L. 28 — P. 135, L. 4) **(Margolis,** 3-9-2017, P. 37, L. 9-14; P. 53, L. 26 — P. 54, L. 13) |
| | 218.    Stein knew and recommended the attorneys that were hired by him to be the Tribe's general counsel.  **(Dunlap,** 7-7-2016, P. 61, L. 20-26; P. 62, L. 5-14; P. 63, L. 1-6; P. 63, L. 20 — P. 64, L. 11; P. 92, L. 19-25) **(Lamothe,** 1-25-2017, P. 10, L. 10-19) **(Aronson,** 3-1-2017, P. 15, L. 19-25) **(Exh. 12** (2000, June 27, Letter to Samuel H. Dunlap from Hugh S. McMullen, Esq. clarifying he **no longer** represents the Tribe)) |
| | 219.    The tribe had no independent counsel, therefore, the disclosure had to be far broader than it was. **(Margolis,** 7-20-2016, P. 99, L. 3-5; P. 104, L. 19 – P. 105, L. 6; P. 113, L. 13-18; P. 123, L. 11 – P. 124, L. 17; P. 125, L. 2-10; P. 129, L. 2-5; P 137, L. 3-11) **(Margolis,** 3-3-2017, P. 28, L. 10-19) **(Margolis,** 3-8-2017, P. 32, L. 2-12; P. 34, L. 20-21) **(Margolis,** 3-9-2017, P. 20, L. 2 — P. 21, L. 8; P. 26, L. 16-21; P. 39, L. 21 — P. 40, L. 1; P. 40, L. 10-22; P. 40, L. 28 — P. 41, L. 8) **(Exh. 1547** (Resolution 46 approving SMDC Agreement and Modification Agreement dated September 28, 2003.  (Note was called as 1548 in testimony))) **(Exh. 1548** (2003 Modification agreement and ratification of SMDC Agreement dated September 28, 2003.  (Note was called as 1549 in testimony))) |
| | 220.    Violations of 3-300 of the Professional Rules of Conduct is an automatic voiding and setting aside of the contract and quantum meruit can be denied, all fees can be denied depending upon the egregiousness. The Bakhtiari case is an example of a case dealing with a business relationship with a |

| **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|
| client. (**Margolis**, 7-20-2016, P. 130, L. 22-26; P. 132, L. 24-28; P. 133, L. 22 — P. 134, L. 7) (**Margolis**, 3-8-2017, P. 38, L.10 — P. 39, L. 16; P. 45, L. 28 — P. 46, L. 14) |
| |
| **3-310** |
| 221.    Stein had an obligation under 3-300, 3-310 B-1, B-3, and B-4, and 3-310 C-1 and C-2 to provide full disclosure to and to get a waiver from the tribe, when all parties executed the SMDC agreement.  Likewise, he had the same obligation with each amendment and modification and resolution to the agreement. Therefore, the contract is not binding or enforceable. (**Margolis**, 7-15-2016, P. 47, L. 22 – P. 50, L. 1) (**Margolis**, 7-20-2016, P. 59, L. 17-22; P. 63, L. 22 — P. 64, L. 28; P. 92, L. 19 — P. 93, L. 1; P. 94, L. 1-5; P. 94, L. 9-16; P. 95, L. 5-11; P. 96, L. 1-26; P. 100, L. 5-7; P. 100, L. 22 – P. 101, L. 1; P. 101, L. 21-26; P. 102, L. 9-18; P. 104, L. 10 — P. 105, L. 6; P. 110, L. 11-17; P. 114, L. 9 — P. 115, L. 3; P. 115, L. 8-12; P. 125, L. 2-10; P. 127, L. 27 — P. 128, L. 16; P. 128, L. 12-16; P. 130, L. 22 — P. 131, L. 24; P. 131, L. 14-24; P. 133, L. 3-21; P. 137, L. 1-11; P. 137, L. 26 — P. 138, L. 1) (**Margolis**, 3-3-2017, P. 13, L. 24 — P. 14, L. 3; P. 14, L. 9 — P. 15, L. 16; P. 28, L. 5 — P. 29, L. 3; P. 29, L. 18-19, P. 32, L. 6-13) (**Margolis**, 3-8-2017, P. 7, L. 6-11; P. 30, L. 15-22; P. 31, L. 3-19; P. 33, L. 15-17; P. 33, L. 22-25; P. 34, L. 20-21; P. 36, L. 6-13; P. 60, L. 20 — P. 61, L. 1) (**Margolis**, 3-9-2017, P. 10, L. 11-12; P. 20, L. 2-13; P. 20, L. 24 — P. 21, L. 8; P. 22, L. 20-25; P. 26, L. 20-21; P. 32, L. 5-10; P. 33, L. 13-20; P. 33, L. 28 — P. 34, L. 25; P. 35, L. 23-27; P. 39, L. 21 — P. 40, L. 1; P. 40, L. 10-13; P. 40, L. 15-22; P. 40, L. 28 — P. 41, L. 8; P. 50, L. 12-16; P. 50, L. 19 — P. 52, L. 4; P. 52, L. 19-25; P. 53, L. 4-21) (**Exh.** 1547 (Resolution 46 approving SMDC Agreement and Modification Agreement dated September 28, 2003.  (Note was called as 1548 in testimony))) (**Exh.** 1548 (2003 Modification agreement and ratification of SMDC Agreement dated September 28, 2003.  (Note was called as 1549 in testimony))) |
| 222.    Rules of Professional Conduct 3-310 A states that disclosure means informing the client or former client of the relevant circumstances of the actual and reasonably foreseeable adverse consequences to the client or former client. (**Margolis**, 7-15-2016, P. 48, L. 18-21) (**Margolis**, 7-20-2016, P. 112, L. 10-15) (**Margolis**, 3-8-2017, P. 34, L. 2-11) |
| 223.    Stein violated 3-310 B-1 of the Rules of Professional Conduct, which refers to, if an attorney has a legal business, financial, or personal relationship with a party or witness in the same matter, he is required to provide written disclosure. Stein didn't do this. (**Margolis**, 7-15-2016, P. 48, L. 5-21) (**Margolis**, 7-20-2016, P. 63, L. 22 — P. 64, L. 28; P. 104, L. 27 — P. 105, L. 6; P. 110, L. 7-17; P. 112, L. 10-25) (**Margolis**, 3-3-2017, P. 14, L. 9-13; P. 28, L. 5-15; P. 29, L. 19; P. 31, L. 12-22; P. 32, L. 6-13) (**Margolis**, 3-8-2017, P. 7, L. 6-11; P. 30, L. 2-10; P. 34, L. 20-21; P. 36, L. 6-13) (**Margolis**, 3-9-2017, P. 35, L. 23-27; P. 37, L. 9-14; P. 39, L. 21-22; P. 50, L. 12-16) (**Exh.** 1547 (Resolution 46 approving SMDC Agreement and Modification Agreement dated September 28, 2003.  (Note was called as 1548 in testimony))) (**Exh.** 1548 (2003 Modification agreement and ratification of SMDC Agreement dated September 28, 2003.  (Note was called as 1549 in testimony))) |
| 224.    Stein's compensation agreement was part of what the conflict was about. The tribe was to a very great extent very interested in federal recognition, which would have precluded Stein's and |

| **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
| --- |
| Lamothe's getting their share of the profits.  Instead of pursuing federal recognition, Stein pursued state recognition which wouldn't have the same problem for his and Lamothe's profits. (**Margolis**, 7-15-2016, P. 15, L. 27 — P. 16, L. 10) (**Margolis**, 3-3-2017, P. 43, L. 28-7; P. 44, L. 12 — P. 45, L. 5; P. 45, L. 18-25; P. 46, L. 7-16) (**Margolis**, 3-8-2017, P. 21, L. 16-22) |
| 225.    Stein created a conflict because he had an adverse interest with the tribe.  The tribe's main interest was federal recognition and what he didn't tell the tribe was if they got federal recognition he would be economically harmed by that because the federal rules would have kept him from getting the profits that he was anticipating. (**Margolis**, 7-15-2016, P. 46, L. 27 — P. 47, L. 21) (**Margolis**, 3-3-2017, P. 45, L. 18-25; P. 46, L. 8-16) |
| 226.    Indeed, pursuant to the 2001 SMDC Agreement, Stein, through SMDC proposed to serve as the Tribe's developer, assist it in achieving federal recognition and develop a casino in Los Angeles County. (**Carmelo**, 6-28-2016, P. 73, L. 20 – P. 74, L. 2) (**Dunlap**, 6-29-2016, P. 39, L. 23 – P. 40, L. 5) (**Neminski**, 7-6-2016, P. 34, L. 5-8; P. 54, L. 8-18) (**Velasquez**, 7-6-2016, P. 141, L. 23-27; P. 157, L. 9-15) (**Loya**, 7-6-2016, P. 165, L. 7-27) (**Lamothe**, 1-25-2017, P. 31, L. 10-15) (**Exh. 569** (SMDC Agreement at pp. 2-3)) |
| 227.    A prerequisite for an agreement to be reviewed by the NIGC would be the tribe has to be federally recognized. (**Hogan**, 7-14-2016, P. 58, L. 17-20) |
| 228.    The NIGC has no authority over a state recognized tribe or an unincorporated association. (**Hogan**, 7-14-2016, P. 30, L. 24-27; P. 58, L. 21-27) |
| 229.    A tribe has to be federally recognized for the sole proprietary interest restriction to be applied by the NIGC. (**Hogan**, 7-14-2016, P. 30, L. 19 — P. 31, L. 2) |
| 230.    The sole proprietary interest standard would not necessarily have application to a state recognized tribe that has no Indian land, no casino, and no federal recognition. (**Hogan**, 7-14-2016, P. 29, L. 14-19; P. 30, L. 19 — P. 31, L. 2) |
| 231.    The NIGC would determine that the SMDC agreement was invalid for a federally recognized tribe. (**Hogan**, 7-14-2016, P. 29, L. 1-13 |
| 232.    Stein stated the Libra money was for the benefit of the casino project.  The casino project was given a separate name and identity, the Gabrielino Tribal Gaming Authority or "GTGA". (**Stein**, 6-28-2016, P. 33, L. 1-8) |
| 233.    Stein claimed that the Libra investors were not interested in funding federal recognition on behalf of the Tribe.  The reason the Libra investors were interested in state recognition project was that they knew federal recognition would take 30 years. (**Stein**, 6-28-2016, P. 33, L. 13-20) |
| 234.    Indeed, a key argument occurred between Stein and Sam Dunlap when Dunlap requested that Stein hire a Indian Law expert who could help the Tribe achieve federal recognition. (**Stein**, 6-28-2016, P. 33, L. 23-24) |
| 235.    Stein never explained to the Tribal members, at the time, that no such expert could be hired |

| **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|
| with Libra Funds because the investors had not authorized money for that purpose. (**Stein**, 6-28-2016, P. 33, L. 23-24) |
| 236.   Stein violated Rules of Professional Conduct 3-310 B-3. This is when a member of the state bar has a legal business, financial, personal or professional relationship with another person or entity that the attorney knows or reasonably should know would be affected substantially by resolution of the matter. (**Margolis**, 7-15-2016, P. 48, L. 21 — P. 49, L. 14) (**Margolis**, 7-20-2016, P. 63, L. 22 — P. 64, L. 28; P. 104, L. 27 — P. 105, L. 6; P. 110, L. 7-17; P. 112, L. 10-25) (**Margolis**, 3-3-2017, P. 14, L. 9-13; P. 28, L. 5-15; P. 29, L. 19; P. 31, L. 12-22; P. 32, L. 6-13) (**Margolis**, 3-8-2017, P. 7, L. 6-11; P. 30, L. 2-10; P. 34, L. 20-21; P. 36, L. 6-13) (**Margolis**, 3-9-2017, P. 35, L. 23-27; P. 37, L. 9-14; P. 39, L. 21-22; P. 50, L. 12-16) (**Exh. 1547** (Resolution 46 approving SMDC Agreement and Modification Agreement dated September 28, 2003. (Note was called as 1548 in testimony))) (**Exh. 1548** (2003 Modification agreement and ratification of SMDC Agreement dated September 28, 2003. (Note was called as 1549 in testimony))) |
| 237.   Stein violated Rules of Professional Conduct 3-310 B-4. Stein was required to give a written disclosure, the same kind described before, that comes into play when an attorney has a legal, business, financial, or professional interest in the subject matter of the representation, and Stein did have an interest. He should have put that in writing and provided the disclosure that is required. (**Margolis**, 7-15-2016, P. 49, L. 14-21) (**Margolis**, 7-20-2016, P. 63, L. 22 — P. 64, L. 28; P. 104, L. 27 — P. 105, L. 6; P. 110, L. 7-17; P. 112, L. 10-25) (**Margolis**, 3-3-2017, P. 14, L. 9-13; P. 28, L. 5-15; P. 29, L. 19; P. 31, L. 12-22; P. 32, L. 6-13) (**Margolis**, 3-8-2017, P. 7, L. 6-11; P. 30, L. 2-10; P. 34, L. 20-21; P. 36, L. 6-13) (**Margolis**, 3-9-2017, P. 35, L. 23-27; P. 37, L. 9-14; P. 39, L. 21-22; P. 50, L. 12-16) (**Exh. 1547** (Resolution 46 approving SMDC Agreement and Modification Agreement dated September 28, 2003. (Note was called as 1548 in testimony))) (**Exh. 1548** (2003 Modification agreement and ratification of SMDC Agreement dated September 28, 2003. (Note was called as 1549 in testimony))) |
| 238.   Stein violated Rules of Professional Conduct 3-310 C-1 and C-2, because there was concurrent representation, he was representing both SMDC and the tribe. That kind of concurrent representation of potential or actual conflicts requires not just that he provide a written disclosure which he didn't do but also that he obtain the clients written consent. (**Margolis**, 7-15-2016, P. 42, L. 9-20; P. 49, L. 21 — P. 50, L. 1) (**Margolis**, 7-20-2016, P. 63, L. 22 — P. 64, L. 28; P. 104, L. 27 — P. 105, L. 6; P. 110, L. 7-17; P. 112, L. 25 — P. 113, L. 2) (**Margolis**, 3-3-2017, P. 14, L. 9-13; P. 28, L. 5-15; P. 29, L. 19; P. 31, L. 12-22; P. 32, L. 6-13) (**Margolis**, 3-8-2017, P. 7, L. 6-11; P. 30, L. 2-10; P. 34, L. 20-21; P. 36, L. 6-13) (**Margolis**, 3-9-2017, P. 35, L. 23-27; P. 37, L. 9-14; P. 39, L. 21-22; P. 50, L. 12-16) (**Exh. 1547** (Resolution 46 approving SMDC Agreement and Modification Agreement dated September 28, 2003. (Note was called as 1548 in testimony))) (**Exh. 1548** (2003 Modification agreement and ratification of SMDC Agreement dated September 28, 2003. (Note was called as 1549 in testimony))) (**Exh. 1553** (William Mills expert opinions and their explanation)) |
| 239.   Stein created a conflict with the Tribe because he was acting as the attorney for the Tribe and SMDC. He was representing both sides of the deal. (**Margolis**, 7-15-2016, P. 42, L. 9-20; P. 46, L. 13-26; P. 49, L. 21 — P. 50, L. 1) (**Margolis**, 7-20-2016, P. 42, L. 20 — P. 43, L. 1; P. 45, L. 24 — P. 46, L. 23; P. 113, L. 3-9) (**Margolis**, 3-3-2017, P. 13, L. 28 — P. 14, L. 3; P. 28, L. 10-15) |

40

| |
|---|
| **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
| (Margolis, 3-8-2017, P. 12, L. 1-7) (Margolis, 3-9-2017, P. 35, L. 23-27; P. 36, L. 25-28) |
| 240.    Stein had a conflict, because at the time of the SMDC contract, he prepared the tribe's resolution approving it and as it went on, Stein drafted all the resolutions and the amendments on behalf of the tribe.  He was representing both sides of the deal. (Margolis, 7-15-2016, P. 46, L. 11-26) (Margolis, 7-20-2016, P. 96, L. 20-24) (Margolis, 3-3-2017, P. 13, L. 28 — P. 14, L. 3; P. 28, L. 10-26) (Margolis, 3-8-2017, P. 12, L. 1-7) (Margolis, 3-9-2017, P. 35, L. 23-27; P. 36, L. 25-28; P. 37, L. 9-14) (Exh. 1547 (Resolution 46 approving SMDC Agreement and Modification Agreement dated September 28, 2003.  (Note was called as 1548 in testimony))) (Exh. 1548 (2003 Modification agreement and ratification of SMDC Agreement dated September 28, 2003.  (Note was called as 1549 in testimony))) |
| 241.    Violations of 3-310 of the Professional Rules of Conduct, in equity, could set aside the contract but it's not as clear as with 3-300. (Margolis, 7-20-2016, P. 130, L. 22 — P. 131, L. 13; P. 132, L. 18-28; P. 133, L. 22 — P. 134, L. 7) (Margolis, 3-8-2017, P. 41, L. 2-24; P. 43, L. 24 — P. 44, L. 2) |
| 242.    In the Sheppard Mullin case the court said that you can't quote any fee if the conflict is egregious enough.  What's egregious enough?  When there's a conflict, when there's an actual conflict that's pretty much egregious enough, so if there's an actual conduct of Sheppard Mullin, that would be sufficiently egregious to preclude fees in quantum meruit, particularly in a case like this where the conflict pervades the relationship.    [Sheppard Mullin Richter Hampton LLP versus J M manufacturing company Inc., it was decided January 29, 2016, 244 Cal.App.4th 59 zero and it deals exactly with this subject, it deals with rule 3-310.  Now that's a case that was accepted for review by the California Supreme Court but it can be cited under the new appellate rules, not as precedent but for its persuasive effect]. (Margolis, 3-8-2017, P. 41, L. 2-24; P. 43, L. 24 — P. 44, L. 2) |
| 243.    Under the Sheppard Mullin case, you would separate out the part which is fees and that would be precluded, but other damages could be dealt with separately. (Margolis, 3-8-2017, P. 44, L. 8 — P. 45, L. 9) |
| 244.    Being the only attorney in the room, Mr. Stein failed to give full disclosure as provided in 3-300 and 3-310 to the Tribe for the SMDC Agreement. (Neminski, 7-6-2016, P. 46, L. 12-15; P. 97, L. 13 — P. 98, L. 17) (Simental, 7-7-2016, P. 13, L. 14-26; P. 37, L. 14 — P. 38, L. 6; P. 41, L. 5-20) (Stein, 7-13-2016, P. 26, L. 27 — P. 27, L. 6) (Exh. 569 (SMDC Agreement)) |
| |
| |
| **Alter Ego** |
| 245.    St. Monica Development Company ("SMDC") is a California limited liability that is owned 100% by Jonathan Stein.  (Garcia, 6-23-2016, Page 51, Line 24 – Page 52, Line 1) (Stein, 6-27-2016, Page 26, Lines 23-28) (Stein, 2-15-2017, P. 6, L. 24 – P. 7, L. 7) (Barrett, 3-7-2017, Page 4, Lines 9-27) (Stein, 3-14-2017, P. 13, L. 10-19) (Exh. 6 (2000 April 21 Stein to Dunlap, et al |

41
Exh. C -- Appendix of Evidence In Support of Statement of Decision

| | **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|---|
| 1 | |
| 2 | regarding SMDC Development Agreement and stating that Ken Sulzer is viewing it for the first time.)) (**Exh. 252** (Stein Declaration January 28, 2008)) (**Exh. 1508** (Unsigned Conflict of Waiver - Barrett/SMDC)) (**Exh. 1561** (Stein Declaration on Time Slips dated Sept. 8, 2008)) |
| 3 | |
| 4 | 246.    The Law Offices of Jonathan A. Stein, Esq. and the offices of SMDC, shared the same address of 501 Santa Monica Blvd., Suite 500.  Likewise, they also shared Barbara Garcia as an employee. Stein paid her wages. (**Aronson**, 3-6-2017, P. 80, L. 22 — P. 83, L. 8) |
| 5 | |
| 6 | 247.    Garcia worked as Stein's paralegal and SMDC's office manager, and was appointed by Stein to be the Tribal Administrator. Stein paid Garcia's wages. (**Garcia**, 6-22-2016, P. 4, L. 23 — P. 7, L. 1) (**Garcia**, 6-23-2016, P. 18, L. 12-27; ) |
| 7 | |
| 8 | |
| 9 | 248.    Although, there was no resolution appointing Garcia as the Tribal Administrator, the Tribe never complained about Garcia's role. (**Garcia**, 6-23-2016, P. 18, L. 12-22, P. 19, L. 10 -- P. 20, L. 9) (**Garcia**, 7-18-2016, P. 42, L. 10-21) (**Stein**, 2-8-2017, P. 34, L. 21-- P. 35, L. 20) (**Aronson**, 3-6-2017, P. 80-81, L. 22-28 and 1-18, P. 82, L. 8-16) |
| 10 | |
| 11 | |
| 12 | 249.    Stein through being the sole owner of SMDC, paid the Tribe's attorneys. (**Stein**, 1-23-2017, P. 62, L. 14-18) |
| 13 | |
| 14 | 250.    Polanco was engaged to provide the tribe with both consulting and political lobbying.  He received monthly payments from the Law Offices of Jonathan Stein.  This continued until the Libra agreement was signed and the investor funds transferred to the tribe's accounts. (**Polanco**, 6-28-2016, P. 75, L. 17 – P. 76, L. 8) |
| 15 | |
| 16 | 251.    Stein was **not** introduced to the Tribe as a representative or the CEO of SMDC. (**Candelaria**, 6-21-2016, P. 118, 15-20) |
| 17 | |
| 18 | 252.    Some of the Tribal Councilmembers believed that Stein and SMDC were one in the same. (**Neminski**, 7-6-2016, P. 73, L. 17-23) (**Perez**, 7-6-2016, P. 124, L. 13-20; P. 124, L. 25 — P. 126, L. 3) |
| 19 | |
| 20 | 253.    Stein did not discuss SMDC with McShane before the September 19, 2006, meeting. (**McShane**, 7-15-2016, P. 38, L. 7-11; P. 47, L. 4-6; P. 52, L. 2-11; P. 52, L. 22 – P. 53, L. 5) |
| 21 | |
| 22 | 254.    A Los Angeles Sheriff's officer executed a Writ of Attachment to 501 Santa Monica Blvd., Suite 500 location. (**Garcia**, 6-23-2016, P. 8, L. 22 — P. 9, L. 7) (**Exh. 785** (Writ of Attachment and Right to Attach Order against Gabrielino-Tongva Tribe in Amount of $812,500 – Santa Monica address)) |
| 23 | |
| 24 | |
| 25 | |
| 26 | **Fraud** |
| 27 | 255.    Stein claimed that Plaintiff's Tribal Council members "abandoned" the Plaintiff Tribe. (**Candelaria**, 6-21-2016, P. 26, L. 16-19; P. 34, L. 23-26; P. 47, L. 8-27; P. 53, L. 22-27; P. 122, L. 7-20; P. 130, L. 3 — P. 131, L. 2) (**Candelaria**, 6-22-2016, P. 60, L. 9-14; P. 75, L. 9-13; P. 78, L. |
| 28 | |

42
Exh. C -- Appendix of Evidence In Support of Statement of Decision

08/28/2019

| **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
| --- |
| 16-20) **(Garcia**, 6-23-2016, P. 2, L. 5-16) **(Stein**, 6-27-2016, P. 24, L. 1-8; P. 60, L. 17-22; P. 72, L. 2-4) **(Garcia**, 6-30-2016, P. 7, L. 18 — P. 8, L. 14) **(Stein**, 6-30-2016, P. 12, L. 23 — P. 5, L. 3; P. 22, L. 2-6; P. 22, L. 13-24; P. 31, L. 23-28; P. 32, L. 1-13) **(Exh. 520** (Member Letter #1 – raised $21 million but never informed the Tribe)) |
| 256.    Stein admits to cutting off access to cell phones, emails, and the website to the Tribal Councilmembers. **(Stein**, 6-28-2016, P. 51, L.15-28; P. 52, L. 1 -28; P. 53, L. 1 – 28; P. 54, L. 1-7) |
| 257.    Stein registered an unincorporated association using the name the "Gabrielino-Tongva Tribe." **(Stein**, 6-28-2016, P. 58, L. 4-11) **(Garcia**, 7-18-2016, P. 44, L. 22 — P. 45, L. 24) **(Exh. 107** (Dec. 17, 2006 document titled "Registration of Unincorporated Association" using the name the "Gabrielino-Tongva Tribe")) |
| 258.    Stein stated that he took initiative of doing "research" on whether the statement of unincorporated association should be filed. **(Stein**, 6-28-2016, P. 58, L. 13-20; P. 59, L. 10-20) |
| 259.    Stein admitted that he was responsible for causing the "new" tribe to file a statement of unincorporated association. **(Stein**, 6-28-2016, P. 58, L. 4-11; P. 58, L. 16-18) |
| 260.    Stein chose to register the new Tribe with the same name which had been used by the Tribe, while all sides were still deeply involved in this instant litigation.  He also admitted that he "brought" that idea to the new tribe (hereinafter referred to as the "Candelaria Faction") but wanted to file such a document in part to "make it clear where the address is  and in part that had become an issue because of the postal inspector trick that Mr. Polanco had played." **(Stein**, 6-28-2016, P. 58, L. 13-26) **(Exh. 107** (Dec. 17, 2006 document titled "Registration of Unincorporated Association" using the name the "Gabrielino-Tongva Tribe")) |
| 261.    Linda Candelaria, a former member of the Plaintiff (Tribe) is listed as the Secretary of this "new" group; Stein's legal assistant Barbara Garcia is listed as the agent for service of process and his law offices are listed as the entity's business address.  **(Stein**, 6-28-2016, P. 54, L. 20-23; P. 55, L. 21-26; P. 55, L. 27 — P. 56, L. 13) **(Exh. 107** (Dec. 17, 2006 document titled "Registration of Unincorporated Association" using the name the "Gabrielino-Tongva Tribe")) |
| 262.    Stein claimed that the entity which he registered with the Secretary of State in December of 2006 which shared a similar name as Plaintiff was the duly elected tribal entity and that the Plaintiff was a false entity.  **(Candelaria**, 6-21-2016, P. 47, L. 28 — P. 48, L. 5; P. 71, L. 1-22; P. 81, L. 28 — P. 82, L. 10; P. 82, L. 15 — P. 83, L. 7; P. 86, L. 1-16) **(Candelaria**, 6-22-2016, P. 15, L. 10-26; P. 21, L. 15 — P. 22, L. 11; P. 70, L. 13 — P. 71, L. 12) **(Stein**, 6-27-2016, P. 73, L. 5-12) **(Stein**, 6-28-2016, P. 58, L. 12 — P. 59, L. 20) **(Stein**, 6-30-2018, P. 47, L. 23 — P. 48, L. 14) **(Exh. 107** (Dec. 17, 2006 document titled "Registration of Unincorporated Association" using the name the "Gabrielino-Tongva Tribe")) **(Exh. 514** (GT TRIBE Election Results Talley Certification 2007 and 2008))) **(Exh. 541** (GT Tribe Constitution)) |
| 263.    That (imposter) entity which was first registered in December of 2006 continues to exist until this very day.  The imposter entity was created by Stein and exists for the sole reason of attempting to succeeded to all of the legal rights and obligations of Plaintiff (Tribe).  **(Candelaria**, 6-21-2016, P. |

| **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|
| 30, L. 10-16; P. 31, L. 10-16; P. 34, L. 9-13; P. 46, L. 28 — P. 47, L. 7; P. 48, L. 13 — P. 49, L. 4; P. 86, L. 1-16) **(Candelaria,** 6-22-2016, P. 15, L. 10-26; P. 19, L. 14 — P. 20, L. 28; P. 22, L. 12-26) **(Stein,** 6-27-2016, P. 73, L. 5-12) **(Carmelo,** 6-28-2016, P. 48, L. 27 — P. 49, L. 9) **(Stein,** 6-28-2016, P. 58, L. 12 — P. 59, L. 20) **(Stein,** 6-30-2018, P. 47, L. 23 — P. 48, L. 14) **(Exh. 107** (Dec. 17, 2006 document titled "Registration of Unincorporated Association" using the name the "Gabrielino-Tongva Tribe")) **(Exh. 541** (GT Tribe Constitution)) |
| 264.   Outside of the context of this litigation, Stein claimed that imposter entity was the "real party in interest" to the rights and obligations of the real Tribe.  For example, Stein claimed that Plaintiff's individual tribal members who sent "blue cards" to Stein requesting that their personal tribal records be returned to them were actually attempting to sever their relationship with Plaintiff (and not just with Stein). Despite the clearly worded demand of the Blue Cards.  In furtherance of that fraud, Stein purposely misrepresented the intent and the meaning of the "Blue Cards." **(Candelaria,** 6-21-2016, P. 34, L. 28 — P. 35, L. 16; P. 40, L. 19-21; P. 148, L. 14 — P. 151, L. 14) **(Candelaria,** 6-22-2016, P. 10, L. 15 — P. 11, L. 4; P. 11, L. 22 — P. 12, L. 2; P. 12, L. 6-16; P. 12, L. 20 — P. 13, L. 25; P. 14, L. 1-23; P. 17, L. 16-25; P. 68, L. 9 — P. 69, L. 20; P. 69, L. 22 — P. 70, L. 12) **(Garcia,** 6-22-2016, P. 14, L. 13 — P. 15, L. 12; P. 24, L. 11-19; P. 25, L. 10, L. 14) **(Garcia,** 6-23-2016, P. 28, L. 9 — P. 29, L. 1; P. 32, L. 16 — P. 33, L. 19; P. 33, L. 22 — P. 34, L. 24; P. 61, L. 13-28) **(Carmelo,** 6-28-2016, P. 28, L. 3 — P. 29, L. 5; P. 29, L. 24 — P. 30, L. 19; P. 31, L. 14 — P. 32, L. 2) **(Polanco,** 6-28-2016, P. 84, L. 19 — P. 85, L. 6; P. 87, L. 3-4) **(Garcia,** 6-30-2016, P. 1, L. 21 — P. 2,          L.          1)          **(Exh.          508**          (Sample Blue Card" from GT Tribe member requesting records to be transferred to New GT Nation)) **(Exh. 509** (GT Tribe Sample Return of Membership Records Form by Barbara Garcia)) **(Exh. 511** (GT Tribe List of Terminated Members)) |
| 265.   Stein also claimed (and continues to claim) that he and SMDC entered into a settlement agreement with a group that is the "real" Plaintiff. **(Candelaria,** 6-21-2016, P. 72, L. 20 — P. 73, L. 2; P. 73, L. 16 — P. 74, L. 9; P. 74, L. 12-23; P. 79, L. 4 — P. 80, L. 3) **(Candelaria,** 6-22-2016, P. 31, L. 3 — P. 33, L. 13; P. 73, L. 21 — P. 6) **(Jason Meyers ("Meyers"),** June 23, 2016, Page 3, Line 6-22; P. 4, L. 9-11; P. 7, L. 15-27; P. 8, L. 12-13; P. 8, L. 17-19; P. 9, L. 10-22) **(Stein,** 6-28-2016, P. 8, L. 22 — P. 9, L. 14) **(Johnson,** 7-19-2016, P. 78, L. 1-7; P. 78, L. 19 — P. 79, L. 6; P. 79, L. 19-28; P. 98, L. 20 — P. 100, L. 4; P. 100, L. 12 — P. 101, L. 5; P. 103, L. 10-18) **(Exh. 582** (GT Tribe — SMDC —Stein Settlement Agreement and Tribal Council Resolutions of approval)) **(Exh. 583** (March 18, 2007 Candelaria Group Estoppel Agreement)) **(Exh. 584** (GT Tribe — Steve Johnson accounting for Estoppel Agreement)) |
| 266.   Stein also claimed (and continues to claim) that Plaintiff (Tribe) is not the "real party in interest" in this case, but instead, is a rogue group composed of imposters.  **(Stein,** 6-27-2016, P. 73, L. 5-12) **(Stein,** 2-8-2017, P. 38, L. 5-27) |
| 267.   A judge presiding over a bench trial in earlier proceedings in this same action found that all of these Stein contentions were false.  And, yet, Stein continued to make these representations inside and outside of court, as if they were true.  He made these representations in order to defraud and confuse Gabrielinos who were members of Plaintiff and Gabrielinos who are not members of Plaintiff from joining Plaintiff.  **(Candelaria,** 6-21-2016, P. 26, L. 8-20; P. 30, L. 10-16) **(Candelaria,** 6-22-2016, P. 16, L. 26 — P. 17, L. 15; P. 60, L. 9-18) **(Garcia,** 6-30-2016, P. 9, L. 22 |

44
Exh. C -- Appendix of Evidence In Support of Statement of Decision

| | **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|---|
| 1 | |
| 2 | — P. 10, L. 15) **(Exh. 520** (Member Letter #1 – raised $21 million but never informed the Tribe)) |

268.   After resigning, and after this litigation had already been initiated, Stein began efforts to mount a recall election of the Tribal Council. However, that recall was never held. Nonetheless, having failed to orchestrate a coup, Stein simply recruited a group of members and then organized them so that they could start their own competing tribal group. **(Candelaria**, 6-21-2016, P. 25, L. 20 — P. 26, L. 14; P. 32, L. 12-16; P. 81, L. 28 — P. 83, L. 7; P. 83, L. 28 — P. 84, L. 3) **(Candelaria**, 6-22-2016, P. 15, L. 10-22; P. 20, L. 8 — P. 21, L. 14; P. 22, L. 3-26; P. 27, L. 22 — P. 28, L. 19; P. 71, L. 13-27) **(Garcia**, 6-23-2016 P. 34, L. 10-16) **(Stein**, 6-28-2016, P. 2, L. 4 — P. 3, L. 16; P. 4, L. 7-12; P. 42, L. 28 — P. 43, L. 14; P. 57, L. 7-13) **(Stein**, 6-30-2016, P. 11, L. 5-7; P. 21, L. 12-19)

269.   Garcia believed that she had the authority to continue representing the tribe and acting as tribal administrator.  Her authority came from the members, then the Financial Oversight Committee, and finally from the Candelaria council. **(Garcia**, 6-23-2016, P. 38, L. 23 — P. 40, L. 4) **(Garcia**, 9-30-2016, P. 11, L. 18 — P. 12, L. 6)

270.   Stein had no reasonable basis for believing that the representations he made until 2016 were true.  He made them knowingly in order to knowingly deceive and defraud Plaintiff's tribal members, the public, former investors; any potential investors and the court.   Stein made these false representations in order usurp all of Plaintiff's legal rights and obligations. **(Stein**, 6-30-2016, P. 4, L. 12-20) **(Exh. 520** (Member Letter #1 – raised $21 million but never informed the Tribe))

271.   There were several significant pieces of the Libra Agreement, which Stein admits were drafted by him, including: the bill that is attached as exhibit B, and which purports to be the Senate Bill that would be introduced and be a prerequisite for future funding. Although it is not marked as draft, it is clearly a draft bill and Mr. Stein admitted that he drafted it and that it was never introduced. **(Stein**, 7-13-2016, P. 63, L. 7 – P. 65, L. 14; P. 65, L. 22 – P. 67, L. 2; P. 68, L. 23-28; P. 69, L. 6-13) **(Exh. 644,** Exh. B).

272.   According to Stein, there was no provision in the Libra Agreement for federal recognition. He explained: "They were -- this money was to go the state route.  Federal recognition would have taken 30 years easily, we spoke with that specifically with the Libra investors about that possibility and they said don't use our money for that stuff, they might have used other more colorful terms. "They wanted the state recognition project, if it failed they'd lose their money, but they thought it would succeed and they were willing to back it.

"Q.  Did it expressly forbid using this money for federal recognition?

"A.  It expressly forbid using this money for anything other than what was in the budget, ..."

**(Stein**, 6-28-2016, P. 33,  L. 13 – 24)

273.   This was the first time that the Tribal Councilmembers, especially, its Chair, had heard that the Libra Agreement was not intended to fund the Tribe's efforts for federal recognition. **(Carmelo**, 6-28-2016, P. 4, L. 17 — P. 5, L. 4; P. 46, L. 23 — P. 47, L. 3) **(Carmelo**, 7-11-2016, P. 40, L. 24 —

| |
|---|
| **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
| P. 41, L. 5.) |
| 274.    On September 30, 2016, Stein sent yet another email, **Exh. 678 (re** Changing Horses Midstream Email).  In that email, he explained that "$2 million is immediately due SMDC from the Tribe and, hopefully Libra could finance that." (Exhibit 678 September 30, 2016  (Changing Horses Midstream Email) Stein Knew that Libra Would Fund a Second Tranche) |
| 275.    Mr. Sulzer testified similarly.  He explained that SMDC and Stein wanted to ensure that since Libra was considering another $18 million to the Tribe that SMDC would be paid out of that additional funding. (**Sulzer,** July 18, 2016, P. 25 L. 2 -11) |
| 276.    On August 17, 2007, Judge Aragon ruled: "SMDC (1) for leave to file a cross-complaint and (2) to continue the trial date.  Both sides agree (a) that the proposed cross-complaint reiterates the claims made by defendants as plaintiffs in action number SC091644 ("the Santa Monica action"), and (b) that it makes sense that the claims and cross-claims of all parties should be adjudicated in a single action.  Therefore, the motion to allow filing of the proposed cross-complaint is conditioned on defendants' dismissal of the Santa Monica action without prejudice, but only as to the parties who are named as plaintiffs in this action and as cross-defendants in the proposed cross-complaint in this action.  This voluntary dismissal must be filed in the Santa Monica action by Monday, August 20, 2007.  Upon filing of the request for dismissal, the defendants' cross-complaint shall be deemed served and filed in this action." |
| 277.    On August 20, 2007, an Ex parte was granted on behalf of Stein.  Judge Aragon modified his ruling on August 17, 2007 to show that the complaint and cross-complaint in case number: SC091644 will be dismissed without prejudice to the further prosecution of those claims in this case, but those requests for dismissal need not be filed until August 28, 2007 or as soon as the Honorable Joseph S. Biderman rules on the pending motion regarding the right to attach order. |
| 278.    On August 20, 2007, Stein files his cross-complaint, but does not serve it on anyone. |
| 279.    On August 24, 2007, Michael Gonzalez gave a Notice of Ruling. |
| 280.    On August 26, 2007, Stein gave Notice of Rulings. |
| 281.    Stein gave Notice of Entry of Orders by Department "C" on August 28, 2007. |
| 282.    On or about September 28, 2007, Stein filed a cross-complaint for indemnity. |
| 283.    October 24, 2007. Candelaria tried to substitute Jason Meyers for Cardenas and Gonzalez. |
| 284.    Polanco filed an answer to the Sep. 26-28 cross-complaint for indemnity, not the Aug. 20th cross-complaint, on October 24, 2007. |
| 285.    On October 30, 2007, Stein gave Notice of Rulings.  The Candelaria substitution of attorney was not deemed effective.  They had to file a "Section 284 Application" and both sides were ordered to provide appropriate discovery for the Section 284 Application to be exchanged on Nov. 2, 2007. Sam Dunlap was allowed an additional two weeks (beginning Oct. 26) to file a first amended cross- |

46
Exh. C -- Appendix of Evidence In Support of Statement of Decision

| | **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|---|
| 1 | |
| 2 | complaint, but only after the parties meet and confer, and to respond to SMDC's cross-complaint. |
| 3, 4 | 286.    On November 13, 2007, Dunlap and Aronson file General Denials and Affirmative Defenses of Cross-Defendants.  This is in answer to the September 26-28, 2007 indemnity cross-complaint filing. |
| 5, 6 | 287.    On December 5, 2007, Stein filed Notice of Unavailability.  The dates are Dec. 21, 2007 - Jan. 14, 2008. |
| 7, 8, 9 | 288.    December 7, 2007, the Stay was lifted.  Stein shall proceed to file and serve his motion to enforce a purported settlement and shall reserve the earliest available date with the calendar clerk for hearing.  In addition, the real party in interest issue having now been temporarily abandoned, there appears to be no need for the stay previously imposed by the court; it is now lifted as to all parties and as to all discovery, pending and prospective. |
| 10, 11, 12, 13, 14, 15, 16, 17 | 289.  At some point during the summer of 2006, Stein learned that on May 22, 2006, the Legislative Counsel which advises the California state legislature had issued an opinion that stated that the Tribe was not state recognized tribe.  Stein claims he told Libra about the opinion in August.  Yet, Stein otherwise, ignored that opinion, disregarded their authority and published his law review article up until 2007 which still was premised on the idea that the Tribe was state recognized and the State of California could allow them to engage in gaming without federal recognition.  (**Stein**, 7-13-2016, P. 64, L. 20 - P. 65, L. 14; P. 77, L. 6 - P. 79, L. 8; P. 79, L. 10 - P. 81, L. 11; P. 82, L. 23 - P. 84, L. 9) (**Exh. 53** (May 22, 2006 Legislative Counsel Opinion Addressed to Senator E. Vincent.)) |
| 18, 19, 20 | 290. In order to prove his "quantum meruit" claims against the Tribe, Stein introduced a quantum meruit worksheet which was heavily redacted and merely had a total of hours which Stein claimed he worked on behalf of the Tribe.  (**Stein**, 3-13-2017, P. 1, L. 25-28; P. 3, L. 11 - P. 5, L. 1; P. 7, L. 2-13) (**Johnson**, 3-17-2017, P. 9, L. 19 – P. 10, L. 5; P. 13, L. 8-16; P. 16, L. 1-28; P. 21, L. 7-11) |
| 21, 22, 23, 24 | 291. In the Lewis case versus state bar, it says when an attorney assumes a administrative fiduciary relationship and violates his duty in a manner that would justify discipline action if the relationship had been that of an attorney and client, he would properly be disciplined for his conduct.  The attorney would be held to the rules of professional conduct and any other state bar enacted rules that govern an attorney's ethical conduct.  (**Margolis**, 7-15-2016, P. 45, L. 19 — P. 46, L. 3) (**Margolis**, 7-20-2016, P. 59, L. 17-22; P. 63, L. 14-18; P. 64, L. 7-28; P. 84, L. 19-23) (**Margolis**, 3-8-2017, P. 7, L. 6-11; P. 54, L. 28 — P. 55, L. 2; P. 55, L. 10-15; P. 56, L. 8-20) |
| 25, 26, 27, 28 | 292. Stein repeatedly advised the tribe that they could get state recognition and didn't need federal recognition in order to proceed with the casino project.  Stein provided a written statement to Attorney General Lockyer in 2004, and State Senator Escutia in 2005, advocating the same position, under the law offices of Jonathan Stein, on behalf of the tribe.  This was a legal issue, it was legal advice.  (**Margolis**, 7-15-2016, P. 15, L. 27 — P. 16, L. 10) (**Margolis**, 7-20-2016, P. 25, L. 4-8; P. |

| | **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|---|
| | 45, L. 24 — P. 46, L. 23) (**Margolis**, 3-3-2017, P. 39, L. 7 — P. 40, L. 27; P. 43, L. 12-19) (**Margolis**, 3-8-2017, P. 21, L. 19-21) (**Margolis**, 3-9-2017, P. 7, L. 10-15, P. 8, L. 10-20) (**Exh. 30** (Escutia Letter)) (**Exh. 32** (Lockyer Letter)) |
| | 293. Stein drafted all of the tribe's resolutions, including the resolutions approving the SMDC agreement and the supplemental resolutions. On the first resolution Stein had the final say and controlled access to it. When a request was made to have the SMDC agreement and resolutions overnight to have an opportunity to possibly present it to an attorney for review, Stein said no, it had to be done that day. Further, Stein never provided the SMDC agreement with a resolution that related to the agreement. This is legal advice. (**Margolis**, 7-15-2016, P. 20, L. 18 — P. 21, L. 5; P. 23, L. 7-17. P. 46, L. 11-26) (**Margolis**, 7-20-2016, P. 113, L. 3-9; P. 114, L. 16-20; P. 134, L. 28 — P. 135, L. 4) (**Margolis**, 3-9-2017, P. 37, L. 9-14; P. 53, L. 26 — P. 54, L. 13) |
| | 294. Stein drafted an ordinance which established the Gabrielino-Tongva Gaming Authority or the GTGA, which was an instrumentality of the tribe for furthering the interests of the casino project. This is an instance of legal services. (**Margolis**, 7-15-2016, P. 16, L. 12-15) |
| | 295. Stein prepared the contract on behalf of the tribe for hiring the political consulting firm of Mr. Polanco's wife. This was legal services. (**Margolis**, 7-15-2016, P. 18, L. 13-16) |
| | 296. Margolis states the problem with the ethics opinion provided by Mr. Mills is that Mills says that there was no attorney-client relationship, there was no evidence of there being legal services provided to the tribe or attorney-client services provided to the tribe, and that there is no reasonable basis for the tribe to believe that Stein was its attorney. Mills opinion relies on the SMDC agreement, which deals with whether the developer (SMDC) is going to be the attorney or is the attorney or has been the attorney and also, it seems with whether the SMDC agreement creates an attorney-client relationship between the tribe and Stein. (**Margolis**, 7-15-2016, P. 50, L. 17-25; P. 51, L. 18-21; P. 51, L. 26 — P. 52, L. 4; P. 52, L. 24 — P. 53, L. 1) (**Margolis**, 3-8-2017, P. 7, L. 12 — P. 8, L. 10; P. 8, L. 23 — P. 9, L. 6; P. 9, L. 26 — P. 10, L. 22; P. 12, L. 10-28; P. 16, L. 1-18) (**Exh. 1553** (Mills Opinion)) (**Exh. 1554** (Basis For Mills' Opinions)) |
| | 297. Mr. Mills' opinion is based primarily on his assumption that because there was no attorney-client relationship, that there wasn't any fiduciary relationship. Mills also states that there was no fiduciary relationship created by the contract in Stein's role with SMDC. His opinion does not deal with the question of whether a fiduciary relationship was created outside of the SMDC agreement and it also ignores Stein's role as officer of the tribe and it ignores Stein's trust relationship that was created with the tribe. (**Margolis**, 7-15-2016, P. 52, L. 14-24) (**Margolis**, 7-20-2016, P. 56, L. 19 — P. 57, L. 18) (**Margolis**, 3-8-2017, P. 7, L. 12-28; P. 10, L. 14-16; P. 56, L. 8-20; P. 57, L. 1-5; P. 57, L. 27 — P. 58, L. 11; P. 59, L. 2-14) (**Margolis**, 3-9-2017, P. 43, L. 1-8) (**Exh. 1553** (Mills Opinion)) (**Exh. 1554** (Basis For Mills' Opinions)) |
| | 298. Mr. Mills' opinion says that there was no obligation to comply with the Rules of Professional Conduct or other rules regarding attorney conduct, because it ignores that there was an attorney-client relationship, it ignores that there was a fiduciary relationship that is separate from the attorney-client relationship, and it ignores the law holding that attorneys will be held to the Rules of Professional Conduct if there's a fiduciary relationship. (**Margolis**, 7-15-2016, P. 53, L. 1-9) |

| **Material Fact/Evidence With Specific Citations to Testimony or Exhibits** |
|---|
| (**Margolis**, 7-20-2016, P. 64, L. 7-28) (**Margolis**, 3-8-2017, P. 7, L. 6-28; P. 30, L. 1-10; P. 34, L. 13-21; P. 35, L. 8-12; P. 54, L. 28 — P. 55, L. 2; P. 55, L. 4-17; P. 56, L. 8-20) (**Exh. 1553** (Mills Opinion)) (**Exh. 1554** (Basis For Mills' Opinions)) |
| 299. Mr. Mills' opinion states that the continuing amendments and resolutions showed no attorney-client relationship, but that ignores that the amendments and the resolutions confirmed only that there was no attorney-client relationship up to March of 2001. The resolutions confirm what was stated in the first agreement, that there was no attorney-client relationship up to the time of the SMDC agreement. Also, there isn't any language which purports to extend the period of there being no attorney-client relationship to a time after the initial SMDC agreement was completed in 2001. The resolutions were not moving the date of when there was no attorney-client relationship, they were simply confirming what had already been said. (**Margolis**, 7-15-2016, P. 53, L. 9-26; P. 55, L. 11-27, P. 56, L. 23 — P. 57, L. 8; P. 57, L. 14-21) (**Margolis**, 7-20-2016, P. 109, L. 5-21) (**Margolis**, 3-8-2017, P. 12, L. 14-28) (**Margolis**, 3-9-2017, P. 16, L. 28 — P. 17, L. 10; P. 17, L. 25-27; P. 18, L. 5-14; P. 18, L. 27 — P. 19, L. 3) (**Exh. 1553** (Mills Opinion)) (**Exh. 1554** (Basis For Mills' Opinions)) |
| 300. Mills assumes that Stein's role as officer was simply nominal, that he didn't perform any of the duties and it was just a title. However, evidence shows that Stein was extremely and intensely involved in the management of the tribe so it was not just nominal. (**Margolis**, 3-8-2017, P. 60, L. 1-18) |
| 301. In an email on July 15, 2006, Stein wrote to the council to complain about a lot of alleged misconduct on the part of the Tribe. He also informed the council that Sen. Vincent refused to author SB 175, and further that it would not be publicly introduced. Stein had already assured the investors of Sen. Vincent's authoring of SB 175. (**Stein**, 7-13-2016, P. 82, L. 21 – P. 84, L. 9) (**Exh. 54** (July 15, 2006 email from Mr. Stein to Tribal Council and Ms. Aronson re Confidential re Dunlap proposal)) |
| 302. Daniel Crane was the federal lobbyist hired by Stein. (**Carmelo**, 7-12-2016, P. 51, L. 21 - P. 52, L. 3) (**Exh. 599** (Resolution 71 - Approving and Ratifying Consulting Agreement with the Crane Group)) |
| 303. Daniel Crane testified that he had done some federal work for the Tribe but, other than his testimony, which was solicited by Jonathan Stein, during the trial, he wasn't able to point to any tangible work product that he had produced for the Tribe. He also failed to show any other evidence that he had actually done any work on behalf of the Tribe. (**Daniel Crane "Crane"**, July 11, 2016, Page 18, Line 1 - Page 19, Line 9; P. 21, L. 2 - P. 22, L. 2; P. 31, L. 21 - P. 32, L. 4) |
| 304. After transaction costs for the Libra Agreement, the tribe received $1.8 million in funding. The trigger for the Crane Group payments ($2 million) never took place, because the contingency and transactional fees never transferred out of escrow account to the tribe's banking accounts, but transferred to McGuire Woods LLP, Morrison and Foerster LLP, Libra Securities, and Wilmer Cutler Pickering Hale and Door LLP. (**Barrett**, 7-8-2016, P. 30, L. 1 — P. 31, L. 7; P. 34, L. 7-27; P. 58, L. 1-28) (**Stein**, 7-13-2016, P. 70, L. 6 — P. 77, L. 4) (**Carmelo**, 7-19-2016, P. 118, L. 24-27) (**Stein**, 2-7-2017, P. 29, L. 3 – P. 30, L. 7) (**Exh. 644** (Libra Funding Agreement Exhibit E - "Budget" - |

| Material Fact/Evidence With Specific Citations to Testimony or Exhibits |
|---|
| Transaction Costs; and  Exhibit 2 - "Flow Fund Agreement" (i)-(iv) and - "Resolution 96: Approval of Development Funding Agreement ")) |

Dated:  January 22, 2019

ALBRIGHT, YEE & SCHMIT, APC

By: _Delia Ibarra_____

Delia Ibarra, Esq.
Attorneys for PLAINTIFF Gabrielino-Tongva Tribe

Exh. C -- Appendix of Evidence In Support of Statement of Decision

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

650 Sierra Madre Vila Ave., Ste. 304, Pasadena, CA 91107

A true and correct copy of the foregoing document entitled (*specify*): **ADVERSARY COMPLAINT FOR DETERMINATION THAT DEBT IS EXCEPTED FROM, DISCHARGE UNDER 11 U.S.C. § 523 AND DENIAL OF DISCHARGE UNDER 11 U.S.C. § 727** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) June 23, 2023, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

**David B Golubchik on behalf of Debtor Jonathan Alan Stein**  dbg@lnbyg.com, stephanie@lnbyb.com

☒

Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) June 23, 2023, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**Debtor**
Jonathan Alan Stein
2520 Murrell Rd.
Santa Barbara, CA 93109

**Honorable Ronald A. Clifford III**
United States Bankruptcy Court, Central District of California
1415 State St., Suite 233/Crtrm 201
Santa Barbara, CA 93101

☒  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| June 23, 2023 | Mandi Peach | /s/ Mandi Peach |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

## F 9013-3.1.PROOF.SERVICE

1   **1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

2   **William C Beall on behalf of Creditor Linda Hong Sun Stein**: will@beallandburkhardt.com,
carissa@beallandburkhardt.com

3   **Anthony A. Friedman on behalf of Debtor Jonathan Alan Stein**: aaf@lnbyg.com

4   **Karen L Grant on behalf of Creditor Glenn Golden**: kgrant@silcom.com

5   **Sarah Rose Hasselberger on behalf of Interested Party Courtesy NEF**:
shasselberger@marshackhays.com, shasselberger@ecf.courtdrive.com; cbastida@marshackhays.com;
6   kfrederick@ecf.courtdrive.com

7   **D Edward Hays**: ehays@marshackhays.com, ehays@ecf.courtdrive.com; kfrederick@ecf.courtdrive.com;
cmendoza@marshackhays.com; cmendoza@ecf.courtdrive.com

8   **Armen Manasserian on behalf of Creditor Gabrielino-Tongva Tribe**: armen@cym.law,
9   jennifer@cym.law; cameron@cym.law; paul@cym.law

10  **Laila Masud on behalf of Interested Party Courtesy NEF**: lmasud@marshackhays.com,
lmasud@ecf.courtdrive.com; kfrederick@ecf.courtdrive.com

11  **Laila Masud on behalf of Trustee Jerry Namba**: lmasud@marshackhays.com,
lmasud@ecf.courtdrive.com; kfrederick@ecf.courtdrive.com
12
**Jerry Namba (TR)**: jnambaepiq@earthlink.net, jnambalaw@yahoo.com;
13  jn01@trustesolutions.net;paknamba@gmail.com

14  **Arvind Nath Rawal on behalf of Creditor BMW Financial Services NA, LLC, c/o AIS Portfolio
Services, LLC**: arawal@aisinfo.com
15
**Alan G Tippie on behalf of Interested Party Courtesy NEF**: Alan.Tippie@gmlaw.com,
16  atippie@ecf.courtdrive.com; Karen.Files@gmlaw.com, patricia.dillamar@gmlaw.com,
denise.walker@gmlaw.com
17
**United States Trustee (ND)**: ustpregion16.nd.ecf@usdoj.gov
18
**Paul P Young on behalf of Creditor Gabrielino-Tongva Tribe**: paul@cym.law, jaclyn@cym.law
19
**Paul P Young on behalf of Interested Party Courtesy NEF**: paul@cym.law, jaclyn@cym.law
20
**Nikko Salvatore Stevens on behalf of Creditor Gabrielino-Tongva Tribe**: nikko@cym.law,
21  mandi@cym.law

22

23

24

25

26

27

28

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

_June 2012_                                                **F 9013-3.1.PROOF.SERVICE**